No. 24-7879

# In the United States Court of Appeals
# for the Ninth Circuit

NETCHOICE,
*Plaintiff-Appellant,*

*v.*

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF CALIFORNIA,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Civil Action No. 5:24-cv-07885-EJD

**APPELLANT'S OPPOSED
MOTION FOR INJUNCTION PENDING APPEAL
Relief Requested by February 1, 2025**

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
Shannon Grammel
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
   Suite 700
Washington, DC 20001
scott@lkcfirm.com

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-7879
NetChoice
*Plaintiff-Appellant,*
*v.*
Rob Bonta, in his official capacity as Attorney General of California,
*Defendant-Appellee.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Appellant NetChoice has no parent corporation and no publicly held corporation owns 10% or more of its stock. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellant:**
NetChoice

**Counsel for Plaintiff-Appellant:**

| | |
|---|---|
| Scott A. Keller | Bradley A. Benbrook |
| Steven P. Lehotsky | Stephen M. Duvernay |
| Jeremy Evan Maltz | BENBROOK LAW GROUP, PC |
| Shannon Grammel | |
| Joshua P. Morrow | |
| Jared B. Magnuson | |
| LEHOTSKY KELLER COHN LLP | |

**Defendant-Appellee:**
Rob Bonta, in his official capacity as Attorney General of California

**Counsel for Defendant-Appellee:**
Christopher Kissel
Jennifer E. Rosenberg
Shiwon Choe
Lara Haddad
CALIFORNIA ATTORNEY GENERAL'S OFFICE

DISTRICT COURT AMICI

**Amicus in Support of Defendant-Appellee**
Electronic Privacy Information Center

**Counsel for Amicus Electronic Privacy Information Center:**
Alan Jay Butler
ELECTRONIC PRIVACY INFORMATION CENTER

*/s/ Scott A. Keller*
Scott A. Keller
*Counsel of Record for*
*Plaintiff-Appellant*

ii

Table of Contents

Page

Table of Authorities.............................................................................. iv

Introduction........................................................................................1

Background ........................................................................................3

Argument...........................................................................................6

    I.   California Senate Bill 976's restrictions on social media websites' personalized feeds and default settings likely violate the First Amendment. ..................................................7

       A.  SB976's speech regulations violate the First Amendment. ..........7

          1.  SB976's parental-consent requirements for minors to access personalized feeds violate the First Amendment. ..................................................................7

          2.  SB976's default limitations on minors' accounts violate the First Amendment.................................................13

          3.  SB976's speech regulations apply to only a subset of Internet websites based on content and speaker, which independently triggers strict scrutiny for all SB976 speech regulations.................................................14

       B.  SB976's speech regulations fail strict scrutiny and any other form of heightened First Amendment scrutiny. ...............16

       C.  NetChoice has standing to raise as-applied First Amendment claims on behalf of its members. ...........................19

    II.  NetChoice meets all the remaining factors for an injunction pending appeal.......................................................................21

Conclusion.......................................................................................22

Certificate of Conference ....................................................................24

Certificate of Service ..........................................................................25

Certificate of Compliance....................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
594 U.S. 758 (2021) ........................................................................22

*Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle,*
829 F.2d 933 (9th Cir. 1987) .........................................................21

*Am. Beverage Ass'n v. City & Cnty. of S.F.,*
916 F.3d 749 (9th Cir. 2019) .........................................................21

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) ........................................................................16

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
627 F.3d 547 (5th Cir. 2010) .........................................................21

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020) ........................................................................15

*Borrero v. United Healthcare of N.Y., Inc.,*
610 F.3d 1296 (11th Cir. 2010) .....................................................21

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) ...........................................2, 7, 8, 17, 18, 19

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
563 F.3d 847 (9th Cir. 2009), ........................................................22

*Children's Health Def. v. Meta Platforms, Inc.,*
112 F.4th 742 (9th Cir. 2024) .....................................................1, 8

*Cmty. House, Inc. v. City of Boise,*
490 F.3d 1041 (9th Cir. 2007) .......................................................22

iv

*Doe v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ............................................................7

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ...........................................................................7

*FEC v. Cruz*,
    596 U.S. 289 (2022) .........................................................................16

*Feldman v. Ariz. Sec'y of State's Off.*,
    843 F.3d 366 (9th Cir. 2016) .....................................................11, 22

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .........................................................................20

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) .........................................................................20

*Meinecke v. City of Seattle*,
    99 F.4th 514 (9th Cir. 2024) ...................................................2, 7, 12

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) .........................................................................16

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ..............................1, 2, 3, 5, 8, 9, 10, 11, 12, 13

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) .........................................................................16

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ....................................................9, 18

*NetChoice, LLC v. Fitch*,
    2024 WL 3276409 (S.D. Miss. July 1, 2024) ...................................3

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ................................3

v

*NetChoice, LLC v. Reyes*,
   2024 WL 4135626 (D. Utah Sept. 10, 2024) ...................................................3

*NetChoice, LLC v. Yost*,
   716 F.Supp.3d 539 (S.D. Ohio 2024) ...............................................................3

*Nken v. Holder*,
   556 U.S. 418 (2009) ..........................................................................................22

*PruneYard Shopping Ctr. v. Robins*,
   447 U.S. 74 (1980) ............................................................................................10

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ..........................................................................................15

*Reuber v. Food Chem. News, Inc.*,
   925 F.2d 703 (4th Cir. 1991) ...........................................................................12

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020) ............................................................................................21

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) ............................................................................................10

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ..........................................................................................14

*United States v. Playboy Ent. Grp.*,
   529 U.S. 803 (2000) ..........................................................................................18

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) ......................................................................................18, 20

*X Corp. v. Bonta*,
   116 F.4th 888 (9th Cir. 2024) ...........................................................................20

**Statutes**

Cal. Bus. & Prof. Code § 22675.........................................................................5, 15

Cal. Health & Safety Code § 27000.5....................................2, 4, 5, 14, 15, 16, 19

Cal. Health & Safety Code § 27001................................................1, 2, 5, 7, 19, 22

Cal. Health & Safety Code § 27002...................................2, 5, 6, 7, 13, 14, 19, 22

Cal. Health & Safety Code § 27005.........................................................................6

Cal. Health & Safety Code § 27006.........................................................................4

Cal. Senate Bill 976 (2024) § 1 ...........................................................................17

INTRODUCTION

The district court is the first federal court in the country to uphold a law requiring minors to secure parental consent to view protected speech on social media websites. The district court granted NetChoice an injunction pending appeal that expires "February 1, 2025 at 11:59 p.m. PT" to "allow[] the Ninth Circuit time to consider whether to grant its own injunction pending appeal." Ex. G 4. NetChoice therefore requests an injunction pending appeal before the district court's time-limited injunction expires.

The district court flouted Supreme Court and Circuit precedent by holding that "personalized" feeds displayed by social media websites may not be expression protected by the First Amendment. Ex. A 15-22. *Moody v. NetChoice, LLC* held that websites engage in First Amendment protected expression when they present "personalized," "customized," or "individualized" "feeds" of speech created by others. 603 U.S. 707, 734 (2024). And this Court recognized that "deci[sions]" about "which third-party content . . . [to] display, or how the display will be ordered and organized," are "expressive choices." *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024) (quoting *Moody*, 603 U.S. at 740). *Moody* even expressly held that the First Amendment protects the curated feeds of "Facebook" and "YouTube"—belonging to NetChoice members. *Moody*, 603 U.S. at 734-35, 739-40.

California Senate Bill 976's ("Act" or "SB976") parental-consent requirement for minors to access personalized feeds on social media, §§ 27001 and

1

27002(b)(2), and its default requirements on minors' accounts, § 27002(b)(2)-(5), therefore infringe the First Amendment rights of both websites and their users.[1] As the district court observed, these requirements would "fundamentally reorient social media companies' relationship with their users." Ex. G 4. The Act's personalized-feed restrictions violate minors' constitutional "right to speak or be spoken to" without parental consent. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). They likewise violate social media websites' right to disseminate "curated compilation[s]" to their users. *Moody*, 603 U.S. at 728. And the Act's default requirements restrict how websites "display" protected expression. *Id.* at 740. These are eminently "colorable claim[s]," which suffice for a preliminary injunction in First Amendment cases. *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (cleaned up).

If Defendant is allowed to enforce the Act's personalized-feed and default provisions beginning February 1, 2025, regulated NetChoice members face irreparable harm. In addition to First Amendment harms, they must undergo burdensome changes to comply with these requirements. *See* Ex. C ¶¶ 28-32, 35; Ex. D ¶¶ 41, 48-49, 52; Ex. F ¶¶ 13, 19, 23-27.

This Court should therefore enjoin Defendant from enforcing §§ 27001 and 27002(b)(2)-(5) against NetChoice members pending appeal. This will

---

[1] This Motion refers to "internet website[s], online service[s], online application[s], online service[s], [and] mobile application[s]," § 27000.5(b)(1), as "websites." Unless otherwise noted, statutory citations in this Motion refer to the California Health & Safety Code.

maintain the status quo, allowing this Court to consider these constitutional issues with full appellate process. And it will align the law of this Circuit with courts across the country that have unanimously barred enforcement of similar laws. *E.g.*, *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023).

## BACKGROUND

**A.** Based on the Act's definitions, SB976 regulates some websites operated by the following members of NetChoice's trade association: (1) Google (YouTube); (2) Meta (Facebook and Instagram); (3) Nextdoor; (4) Pinterest; and (5) X. Ex. C ¶ 26. These websites disseminate a "staggering amount of content." *Moody*, 603 U.S. at 719. This content reflects different languages and cultures and spans countless topics.

One way these websites "engage[] in expression" is by "display[ing]," "compil[ing,] and curat[ing]" protected "third-party speech" (text, audio, images, and video) in "individualized," "customized," and "personalized" feeds. *Id.* at 734; *see* Ex. C ¶¶ 5-7. "A user does not see everything—even everything from the people she follows—in reverse-chronological order. The platforms will have removed some content entirely [and] ranked or otherwise prioritized what remains." *Moody*, 603 U.S. at 719; *see* Ex. C ¶ 8; Ex. D ¶ 43; Ex. E ¶ 12. Such personalized pages allow users to see the most useful, relevant, age-appropriate, and high-quality content. *E.g.*, Ex. D ¶¶ 21, 43.

**B.** Parents have a variety of methods to oversee their children online. Ex. C ¶ 11. To start, parents control *devices*. *Id.* ¶ 12. Not all devices are Internet-enabled, and devices come with many parental-control options. *Id.* ¶ 14. Parents also control the *networks* minors use. Wireless routers allow parents to manage these networks and set up rules defining which websites minors can use. *Id.* ¶ 13. Parents also control *software*. Web browsers and third-party software offer parental controls. *Id.* ¶¶ 14-15. NetChoice members have developed their own parental controls and other protections. *E.g.*, *id.* ¶¶ 16-22; Ex. E ¶¶ 30-37; Ex. D ¶¶ 12-28; *see* Ex. F ¶ 10.

**C.** Despite these private means available to parents, California has imposed *governmental* restrictions on minors' access to online speech. It enacted SB976 on September 20, 2024, to take effect on January 1, 2025. The Act "may only be enforced in a civil action brought . . . by the Attorney General." § 27006(a).

SB976 regulates what it calls "[a]ddictive internet-based service[s]" providing so-called "addictive feed[s]." § 27000.5(b)(1).[2] The Act defines "[a]ddictive internet-based service" as "an internet website . . . including, but not limited to, a 'social media platform' . . . , that offers users or provides users with an addictive feed as a significant part of the service." *Id.* That includes websites that "connect users in order to allow users to interact socially

---

[2] NetChoice disagrees with SB976's pejorative labeling of these services and feeds as "addictive."

4

with each other within the service." Cal. Bus. & Prof. Code § 22675(f)(1)(A) (defining "social media platform").

Crucially, SB976 defines an "[a]ddictive feed" as "an internet website . . . in which multiple pieces of media generated or shared by users are . . . recommended, selected, or prioritized for display to a user based . . . on information provided by the user." § 27000.5(a). So SB976 applies only to the "personalized" feeds "based on a user's expressed interests and past activities" that the Supreme Court held to be protected in *Moody*, 603 U.S. at 734-35.

SB976's personalized-feed and default restrictions are the operative provisions most relevant to this Motion:

*Parental-consent requirements to view personalized feeds.* "It shall be unlawful for the operator of" a covered website "to provide an addictive feed to" a minor "unless . . . [t]he operator has obtained verifiable parental consent." § 27001(a)(2). Even if websites obtain such parental consent, SB976 requires websites to implement a "default" setting limiting minor users' access to "one hour per day unless modified by the verified parent." § 27002(b)(2).

*Default limitations on minors' accounts.* Covered websites must "provide . . . mechanism[s]" for parents to (1) "[l]imit their child's ability to view the number of likes or other forms of feedback" on a personalized feed; (2) require the default feed provided to the child on the website not "recommend[], select[], or prioritize[]" media "based on information provided by the user, or otherwise associated with the user or the users' device, other

5

than the user's age or status as a minor"; and (3) set "their child's account to private mode," where only users connected to the child "may view or respond to content posted by the child." § 27002(b)(3)-(5). All such mechanisms must be set to "on" by default. *Id.*

**D.** NetChoice moved for a preliminary injunction on November 12, 2024. On December 31, 2024, the district court granted that motion in part and denied it in part. Ex. A 34. The court held that multiple provisions of the Act likely violate the First Amendment. *Id.* (citing §§ 27002(a), 27002(b)(1), 27005). But it concluded that the Act's personalized-feed and default provisions likely do not violate the First Amendment.

NetChoice filed a notice of appeal the same day and moved for an injunction pending appeal in the district court on January 1, 2025.[3] The next day, the district court granted an injunction pending appeal that expires "February 1, 2025 at 11:59 p.m. PT." Ex. G 4. This Court has set a briefing schedule in this appeal, with NetChoice's opening merits brief due January 30, 2025.

## ARGUMENT

This Court should grant an injunction pending appeal because (1) NetChoice is likely to prevail on the merits; (2) covered members face

---

[3] NetChoice intends to argue in the merits briefing that, among other things, SB976's age-assurance requirements are ripe for judicial review and violate the First Amendment. But this motion does not seek relief from their enforcement.

6

irreparable harm; and (3) the balance of equities favors maintaining the status quo. *Doe v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020).

# I. California Senate Bill 976's restrictions on social media websites' personalized feeds and default settings likely violate the First Amendment.

"[T]he moving party" in First Amendment cases has the "initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement." *Meinecke*, 99 F.4th at 521 (citation omitted). The burden then "shifts to the government to justify the restriction on speech." *Id.* (citation omitted).

## A. SB976's speech regulations violate the First Amendment.

### 1. SB976's parental-consent requirements for minors to access personalized feeds violate the First Amendment.

SB976's parental-consent requirements for minors to view personalized feeds at all, § 27001, or for more than one hour per day, § 27002(b)(2), violate the First Amendment.

**a.** Supreme Court precedent holds that "the state" lacks "power to prevent children from hearing or saying anything *without their parents' prior consent.*" *Brown*, 564 U.S. at 795 n.3 (emphasis added). Minors have a First Amendment "right to speak or be spoken to." *Id.* And "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975).

7

For instance, the Supreme Court invalidated California's previous attempt to regulate minors' access to protected speech. *Brown* held unconstitutional a California law prohibiting the sale or rental of "violent video games" to minors while allowing minors to play such games with parental consent. 564 U.S. at 802. Any other result would allow States to require parental consent for "political rall[ies]" or "religious" services. *Id.* at 795 n.3. *Brown* emphatically rejected that view. *Id.* at 802. And governments may not rely on the "unprecedented and mistaken" strategy of "creat[ing] new categories of unprotected speech" specifically for minors. *Id.* at 792, 794.

**b.** Minors' rights to consume protected speech—and websites' rights to disseminate it—extend to the "personalized," "customized," or "individualized" feeds that the Supreme Court just reaffirmed as protected by the First Amendment from governmental interference. *Moody*, 603 U.S. at 734.

Under Supreme Court and Circuit precedent, the First Amendment protects "compiling and curating" protected speech in "personalized" "feeds." *Id.* at 731, 734. "[D]eci[sions]" about "which third-party content . . . [to] display, or how the display will be ordered and organized," are "expressive choices" that "receive First Amendment protection." *Id.* at 740; *see Children's Health*, 112 F.4th at 759 (same). "When the platforms use their Standards and Guidelines to decide . . . *how the display will be ordered and organized*[] they are making expressive choices . . . [that] receive First Amendment protection." *Moody*, 603 U.S. at 740 (emphasis added). In other words, "[w]hen platforms choose to . . . deprioritize content in viewers' feeds . . . they engage in First-

8

Amendment-protected activity." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1113 n.3 (9th Cir. 2024) (cleaned up).

**c.** The district court incorrectly concluded that NetChoice "failed to meet its burden of demonstrating . . . that most or all personalized feeds covered by SB 976 are expressive." Ex. A 15. *Moody* resolved that question. It repeatedly observed that personalized feeds—including specifically the curated feeds of "Facebook" and "YouTube"—are protected. 603 U.S. at 734-35, 739-40. Because SB976 regulates access to the very feeds that *Moody* held to be protected, "the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. At a minimum, the Act is unconstitutional as applied to regulated NetChoice members.

Websites like those covered by SB976 receive First Amendment protection because their "personalized" or "individualized" feeds are "expressive." *Id.* at 734. That includes when they use "algorithms" to implement their editorial policies, even if "most often" websites display speech based on a "user's expressed interests":

> [W]henever a user signs on, Facebook delivers a *personalized* collection of those stories. Similarly for YouTube. . . . And any person opening the website or mobile app receives an *individualized* list of video recommendations. The key to the scheme is prioritization of content, achieved through the use of *algorithms*. Of the billions of posts or videos (plus advertisements) that could wind up on a user's *customized* feed or recommendations list, only the tiniest fraction do. The selection and ranking is *most often based on a user's expressed interests and past activities*. But it may also be based on more general features of the communication or its creator. . . . The platforms write

9

> *algorithms* to implement th[eir community] standards—for example, to prefer content deemed particularly trustworthy.

*Id.* at 734-35 (emphases added). The Supreme Court thus made clear that when websites use "personalized" feeds to "[d]ecid[e] on the third-party speech that will be included in" a feed and "organiz[e] and present[] the included items" in that feed to users in a particular way, that "is expressive activity of [their] own." *Id.* at 731. So governments "restricting use of personalized feeds . . . alter[s] the overall speech environment," which changes the "message" those websites convey to users. *Contra* Ex. A 19.

*Moody* also held that prior editorial-discretion precedents involving newspaper "editors, cable operators, and parade organizers" apply to social media websites. 603 U.S. at 738. The Supreme Court explained that the "wealth of choices about whether—and if so, how—to convey posts" gives a "feed a particular expressive quality." *Id.* The district court's attempt to distinguish those cases (Ex. A 16-18) was rejected by *Moody*. 603 U.S. at 738-40.

Likewise, the district court's reliance (Ex. A 16-17) on *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), and *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), was misplaced. *Moody* recognized that "the key fact in those cases . . . was that the host of the third-party speech was not itself engaged in expression," but the "opposite" was true for services like "Facebook's News Feed and YouTube's homepage." 603 U.S. at 740.

The district court also incorrectly extended *Moody*'s reservation of judgment about the First Amendment implications of hypothetical "feeds whose algorithms respond *solely* to how users act online." Ex. A 18 (emphasis added). To start, *Moody* made clear that the "personalized" feeds using "algorithms" on "Facebook" and "YouTube" are protected expression. 603 U.S. at 734. So the district court erred in refusing to enjoin the challenged provisions—at a bare minimum—to the curated feeds of Facebook and YouTube.

This error infected the Court's refusal to enjoin SB976's personalized-feeds restrictions as to other members too. The district court assumed that the facial challenge was no different from the as-applied challenge. Ex. A 31-32. But the as-applied challenge necessarily implicates NetChoice's record evidence about its members. This evidence shows that covered NetChoice members do *not* display content to users based "solely" on "how users act online." *Moody*, 603 U.S. at 736 n.5. Rather, covered NetChoice members display content in feeds according to their own editorial policies developed by humans, which include efforts to "prioritize minor safety and display only age-appropriate content." Ex. C ¶ 8; *id.* ¶ 23 (detailing content-moderation efforts); *e.g.*, Ex. D ¶¶ 12, 21, 24-30, 34-35; Ex. E ¶ ¶ 38, 41-43, 45-48. Defendant did not refute this evidence, nor could he have: NetChoice members make their policies publicly available. Ex. C ¶ 23. The district court's suggestions that the factual record is insufficient (*e.g.*, Ex. A 18-19 & n.4) was therefore both incorrect *and* seems to improperly require a merits-level factual showing. *See Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 403 (9th Cir.

11

2016) (merits-level showing not necessary for preliminary injunction). *Moody*'s binding holding and the factual record here are plenty to show a "colorable claim." *Meinecke*, 99 F.4th at 521 (citation omitted).

NetChoice members' use of "algorithms" to implement human-created editorial policies is exactly what *Moody* held the First Amendment protects. *Moody*, 603 U.S. at 734-35. And that includes using "algorithms" that implement editorial policies even if the "selection and ranking is most often based on a user's expressed interests and past activities." *Id*. So although the district court correctly recognized that "an algorithm designed to convey a message can be expressive," it erred by not concluding the same is true whether the algorithm was created to "recommend[] interesting posts" or to "maximize engagement," Ex. A 20, or be a "mixed" feed—as the court hypothesized, Ex. A 21.

Regardless, the district court erred in holding that, "[w]hen it comes to feeds that recommend posts based solely on prior user activity, there is no apparent message being conveyed." Ex. A 19. Displaying speech based on user preference is a protected editorial "choice[] about what third-party speech to display and how to display it." *Moody*, 603 U.S. at 716. "[I]t is hardly unusual for publications to print matter that will please their subscribers." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (en banc).

Finally, the court disregarded the First Amendment harms to minor *users* "because SB 976 does not remove any speech from social media platforms."

Ex. A 23. But SB976 restricts minors' access to particular "expressive prod-uct[s]" that "compile" content in particular ways. *Moody*, 603 U.S. at 718. The district court erred by focusing only on the availability of *individual* pieces of content, when that content forms part of a "larger offering" of protected ex-pression. *Id.* at 738. And although minor users are currently the target of the State's regulation, the district court's decision and Defendant's arguments would grant California sweeping power to basically ban all personalized feeds on the world's major social media websites—including those for adults. The First Amendment permits no such thing.

### 2.   SB976's default limitations on minors' accounts violate the First Amendment.

The district court erred in declining to enjoin the default settings dis-cussed above at pp.5-6. The default settings restricting personalized feeds, § 27002(b)(2) and (4), should be enjoined for the reasons explained above. Because the personalized-feed provisions infringe protected speech under *Moody*, these duplicative default settings must be enjoined as well.

Likewise, the default setting limiting a "child's ability to view the num-ber of likes or other forms of feedback," § 27002(b)(3), should be enjoined because it restricts First Amendment expression. The district court "s[aw] little apparent expressive value in displaying a count of the number of total likes and reactions." Ex. A 28. But the number of reactions has clear expres-sive value, communicating how others have responded. The fact that the un-derlying reactions are still available does not make the restriction properly

13

tailored. *Cf.* Ex. A 29. To the contrary, that shows it is underinclusive as to preventing minors from seeing reactions and overinclusive as to blocking all counting of reactions.

The "private mode" default setting, § 27002(b)(5), should be enjoined because it restricts with whom a minor user can speak. This provision "obviously regulates speech because it limits the ability of users to speak with minors." Ex. A 29. And it cannot survive any level of heightened First Amendment scrutiny because it is not properly tailored. It is overinclusive because it applies to all covered websites and minor users, regardless of why they are using a particular service. For example, a high school athlete would be hindered from speaking with recruiters on X.

> ### 3. SB976's speech regulations apply to only a subset of Internet websites based on content and speaker, which independently triggers strict scrutiny for all SB976 speech regulations.

SB976's speech regulations also trigger strict scrutiny because the Act's central coverage definition of "[a]ddictive internet-based service" is content-based and speaker-based. § 27000.5(b).

*Content-based.* SB976's central coverage definitions are facially content-based, rendering all the Act's operative speech regulations content-based and subject to strict scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). It selects covered websites for regulation based on the "subject

14

matter" disseminated and thus their "content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

SB976 does this in two primary ways. The Act *includes* websites based on whether one of their substantial functions "is to connect users in order to allow users to interact socially with each other." Cal. Bus. & Prof. Code § 22675(e)(1)(A). And it *excludes* websites that display "pieces of media generated or shared by [other] users," but not websites that display self-generated content in significant part. § 27000.5(a). It thus singles out websites that have made editorial choices to foster social interaction between users. SB976 even excludes websites that facilitate "commercial transactions" and "consumer reviews of products, sellers, services, events, or places." § 27000.5(b)(2)(A). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.).

The district court erroneously resisted this straightforward conclusion by referencing SB976's "legislative purpose." Ex. A 25. Whether a law is "content based" requires examination of the statutory text "on its face." *Reed*, 576 U.S. at 163 (citation omitted). At any rate, Defendant partially justified the Act's restrictions with reference to the purportedly harmful *content* on covered websites. *See, e.g.*, ECF 18-3 ¶¶ 61.b-e, 91 ("violent, scary, or sexualized images"). So whether through SB976's text or its purpose, the Act is content-based.

*Speaker-based.* The Supreme Court is also "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) (cleaned up). Here, SB976 "covers a curiously narrow subset of speakers." *Id.* at 777; *see Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting law that "target[ed] a small group of newspapers").

SB976 burdens websites that provide personalized feeds of "media generated or shared *by users.*" § 27000.5(a) (emphasis added). But it does not burden websites that provide content generated *by the website*, even if that content is displayed in a personalized feed. Thus, while minors can freely access curated feeds of shows on streaming services, they cannot access personalized feeds of clips from those shows on YouTube without facing governmental restrictions.

## B. SB976's speech regulations fail strict scrutiny and any other form of heightened First Amendment scrutiny.

Under strict scrutiny, Defendant must demonstrate for each provision that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). SB976 cannot satisfy this standard or any form of heightened scrutiny. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). The State must "specifically identify an actual problem in need of solving." *Brown*, 564 U.S. at 799

16

(cleaned up). "[A]mbiguous proof will not suffice." *Id.* at 800. Moreover, the problem identified must need a *governmental* solution, as compared to a *private* one.

**1.** Although the "State possesses legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794 (citation omitted). SB976's legislative findings discuss concerns about the "well-being of children and adolescents" from use of social media. § 1(b). But "[n]early all of the research" cited by Defendant in the district court about social media's purported harms was "based on correlation, not evidence of causation." *Brown*, 564 U.S. at 800 (citation omitted). That is insufficient to infringe First Amendment rights. *Id.* The district court thought otherwise, Ex. A 27, concluding that there are "studies that show correlation as well as [] smaller experimental studies that show causation." Ex. A 27. But if all it took to restrict speech were a handful of mixed studies, then *Brown* would have come out differently. *See* 564 U.S. at 858-69 (invalidating law although dozens of "articles . . . support[ed] the hypothesis that violent video games are harmful").

Furthermore, these arguments ignore the wealth of means parents have to control their minor children's online activity. *See supra* p.4. NetChoice members also engage in content moderation and provide their own website- and app-level tools to parents. *See supra* p.3. Whatever "modest gap in concerned parents' control" those private tools leave open, filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803 & n.9.

**2.** SB976's speech regulations are not the least restrictive means to accomplish the State's asserts. Again, parents already have many options to oversee their children online. *Supra* p.4. Those are precisely the kinds of private tools that the Supreme Court has endorsed over governmental intervention. *See, e.g.*, *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000). California could provide "parents the information needed to engage in active supervision" over children's Internet access. *Id.* It also "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary [tools]" or "(2) educating children and parents." *NetChoice*, 113 F.4th at 1121. Defendant did not argue that existing tools are ineffective. Rather, Defendant argued that they do not offer *precisely* the options the State imposed. ECF 18 at 20. That is not a sufficient basis to restrict speech. *Brown*, 564 U.S. at 803 & n.9.

Regardless, SB976's speech regulations are improperly tailored. To begin, they are vastly overinclusive, targeting websites that disseminate a broad range of protected speech. The Act does not purport to limit itself to websites that are particularly harmful to minors or even particularly likely to be accessed by minors. Ex. F ¶ 9. For the websites it regulates, SB976 restricts users' access to *all* personalized feeds without parental consent, restricting access to core protected speech. And it fails to "take into account juveniles' differing ages and levels of maturity." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 396 (1988).

18

The Act's coverage is also "seriously underinclusive," because it targets only a subset of disfavored websites. *Brown*, 564 U.S. at 805. If the State is attempting to provide parents greater control over their children's online activity, it makes no sense to use ill-defined statutory exceptions, such as "consumer reviews." § 27000.5(b)(2)(A). To the extent the State is attempting to regulate particular personalization features or content it deems harmful to minors, SB976's approach is underinclusive. For example, SB976 restricts minor users from accessing personalized feeds of music on YouTube, but allows free access to virtually identical feeds on Spotify. § 27000.5(b)(1).

The Act's parental-consent requirement to access personalized feeds is also underinclusive. §§ 27001, 27002(b)(2). If covered websites' personalized feeds are genuinely "dangerous," it is not clear why the State would allow minors access to them "so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802.

## C. NetChoice has standing to raise as-applied First Amendment claims on behalf of its members.

The district court correctly concluded that NetChoice has associational standing to raise facial First Amendment claims on behalf of its members. Ex. A 7-8 & n.3. But it erroneously concluded that NetChoice lacks associational standing to raise "as-applied" claims. Ex. A 31-32. That decision rested on the court's conclusion that "it is . . . necessary for NetChoice's individual members to participate in this lawsuit." Ex. A 32.

19

NetChoice has associational standing to obtain relief remedying members' injuries: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Likewise, NetChoice has standing to assert the First Amendment rights of its members' users. *E.g.*, *Am. Booksellers*, 484 U.S. at 392-93.

Those conclusions do not change because NetChoice has also asserted "as-applied" claims. These "claim[s] asserted" do not "require[] the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. The as-applied First Amendment inquiry here is straightforward "from the face of the law," because all aspects of SB976's speech regulations "in every application . . . raise the same First Amendment issues." *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024). In other words, the as-applied challenge here goes to the scope of relief—NetChoice's regulated members. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (claim had "characteristics" of as-applied challenge where it did "not seek to strike the [law] in all its applications, but only to the extent it covers referendum petitions").

Nor does the "relief requested . . . require[] the participation of individual members in the lawsuit" as parties. *Hunt*, 432 U.S. at 343. "[B]ecause [NetChoice] seeks declaratory and prospective relief rather than money damages, its members need not participate directly in the litigation." *Alaska*

*Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 938 (9th Cir. 1987).

The question is whether the claims would require "excessive participation" of members. *Borrero v. United Healthcare of N.Y., Inc.*, 610 F.3d 1296, 1306 (11th Cir. 2010). So courts often permit organizations to raise as-applied claims, even if they would require some participation from members in discovery. *E.g.*, *id.*; *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 553 (5th Cir. 2010).

The district court's analysis of the as-applied claims therefore should have examined the record evidence about NetChoice's regulated members. Instead, the district court erroneously speculated about hypothetical websites and algorithms having nothing to do with these as-applied claims. *See* Ex. A 31-32; *see supra* p.11.

## II. NetChoice meets all the remaining factors for an injunction pending appeal.

SB976 will cause NetChoice members irreparable harm. NetChoice's "colorable First Amendment claim" shows its members "likely will suffer irreparable harm." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019); *accord Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020).

Furthermore, SB976 requires covered websites to shoulder compliance costs "with no guarantee of eventual recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021). Each website must create parental-consent systems

and devise new default settings for certain accounts—at great expense. Ex. C ¶¶ 28-32, 35; Ex. D ¶¶ 41, 48-49, 52. One member has stated that the Act's compliance burdens are in "excess of our available budget." Ex. F ¶ 27; *see id.* ¶¶ 13, 19, 23-26. Sovereign immunity prevents later recovery of those expenses. *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012).

The final two factors—"harm to the opposing party and . . . the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The fact that [Plaintiff] ha[s] raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [Plaintiff's] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (cleaned up).

Finally, an injunction would "preserve[] the status quo prior to the recent legislative action" while this Court considers these important First Amendment questions. *Feldman*, 843 F.3d at 369.

## CONCLUSION

NetChoice respectfully requests that this Court enjoin Defendant from enforcing §§ 27001 and 27002(b)(2)-(5) against NetChoice members pending appeal.

22

DATED: January 3, 2025          Respectfully submitted,

                                */s/ Scott A. Keller*

Joshua P. Morrow                Scott A. Keller
LEHOTSKY KELLER COHN LLP         Steven P. Lehotsky
408 W. 11th Street, 5th Floor    Jeremy Evan Maltz
Austin, TX 78701                 Shannon Grammel
(512) 693-8350                   LEHOTSKY KELLER COHN LLP
                                200 Massachusetts Avenue, NW
Jared B. Magnuson                  Suite 700
LEHOTSKY KELLER COHN LLP          Washington, DC 20001
3280 Peachtree Road NE           scott@lkcfirm.com
Atlanta, GA 30305

            *Counsel for Plaintiff-Appellant*

### CERTIFICATE OF CONFERENCE

On January 2, 2025, Jeremy Evan Maltz, counsel for Plaintiff-Appellant conferred by e-mail with Christopher Kissel, counsel for Defendant-Appellee, who stated that Appellee opposes the relief requested in this motion.

/s/ Scott A. Keller
Scott A. Keller

## CERTIFICATE OF SERVICE

On January 3, 2025, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. It was also served by email to: christopher.kissel@doj.ca.gov. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Federal Rule of Appellate Procedure 25(a)(5); and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) and the limits of Circuit Rule 27–1(d) because it contains 5181 words, excluding the parts of exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Scott A. Keller*
Scott A. Keller