# Exhibit A

to NetChoice's Motion for Injunction Pending Appeal

1

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF CALIFORNIA

5    SAN JOSE DIVISION

6

7    NETCHOICE,                                    Case No.  5:24-cv-07885-EJD

8                 Plaintiff,                       **ORDER GRANTING IN PART AND
                                                   DENYING IN PART MOTION FOR
9          v.                                      PRELIMINARY INJUNCTION**

10   ROB BONTA,
                                                   Re: ECF No. 2
11                Defendant.

12          When Facebook first launched in 2004, the phrase "social media" had not yet made its way

13   into most people's vocabularies.[1]  Much has changed since then.  Today, one would be hard-

14   pressed to find someone who has not heard of social media.  Companies like Facebook (now

15   known as Meta) have grown into multibillion-dollar juggernauts, and social media has rapidly

16   grown to touch on nearly every aspect of modern life.  With social media's growth, it is easier than

17   ever to forge connections with others, whether that is with someone across the street or across the

18   ocean.  News can be shared almost instantly, not only by traditional media outlets but also by

19   individuals seeking to contribute to public conversations.  And officials, government agencies, and

20   advocacy organizations alike now have a direct line to those they serve and those who support

21   them.  But such rapid growth comes with its share of challenges.  It is easy to connect on social

22   media, but in some circumstances, those connections may degrade the quality of our interactions

23   with each other in ways that amplify rather than reduce loneliness.[2]  Just as news travels quickly,

24

25   [1] *Social Media*, Oxford English Dictionary, https://www.oed.com/dictionary/social-media_n
     ("social media" first published in 2012); Press Release, Merriam-Webster Inc., Something to
26   Tweet About: Merriam-Webster's Collegiate Dictionary Updated for 2011 (Aug. 25, 2011),
     https://www.prnewswire.com/news-releases/something-to-tweet-about-128379408.html (noting
27   the addition of "social media" into the Merriam-Webster dictionary).

     [2] U.S. Surgeon General, Our Epidemic of Loneliness and Isolation 20 (2023),
28   https://www.hhs.gov/sites/default/files/surgeon-general-social-connection-advisory.pdf.

     Case No.: 5:24-cv-07885-EJD
     ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
     1

1   so does misinformation.  And much like those working to better the world may leverage social

2   media platforms to reach a wide audience, so can those seeking to do harm.

3        A robust debate has emerged about how to maximize social media's benefits while

4   minimizing its potential harms.  Social media companies have taken some voluntary steps to

5   address possible harms while critics question whether those steps have gone too far or not far

6   enough.  In recent days, policymakers have focused on one particular concern: the potential for

7   social media to harm children's health.  Over the past two years, at least five states, including

8   California, have passed laws seeking to protect children from social media's harmful effects.  *See*

9   *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) (California); *NetChoice, LLC v. Reyes*,

10  --- F. Supp. 3d ----, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *NetChoice, LLC v. Fitch*, ---

11  F. Supp. 3d ----, 2024 WL 3276409 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 716 F.

12  Supp. 3d 539 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug.

13  31, 2023).  At the federal level as well, Congress has discussed legislation to protect kids on social

14  media.  *See* Kids Online Safety Act, S. 1409, 118th Cong. (2023).

15       This case arises from California's most recent efforts to address social media safety for

16  children.  On September 20, 2024, California's governor signed SB 976, also known as the

17  Protecting Our Kids from Social Media Addiction Act, into law.  A month and a half later, on

18  November 12, 2024, Plaintiff NetChoice—an internet trade group with several social media

19  companies among its members—sued Defendant Rob Bonta, in his official capacity as California

20  Attorney General, to block SB 976.  In doing so, NetChoice raised facial First Amendment and

21  vagueness challenges to SB 976, in addition to as-applied challenges on behalf of five of its

22  members.  At the same time, NetChoice moved to enjoin enforcement of SB 976 ahead of its

23  effective date on January 1, 2025.  Since SB 976 was scheduled to take effect so soon after

24  NetChoice filed its motion, the parties agreed to an expedited briefing schedule.  The parties

25  finished briefing NetChoice's motion on December 9, 2024, and the Court held a hearing on the

26  matter eight days later, on December 17, 2024.  Because NetChoice has shown that parts of SB

27  976 are likely to infringe upon the First Amendment, the Court **GRANTS IN PART** and

28  **DENIES IN PART** NetChoice's preliminary injunction motion.

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
2

United States District Court
Northern District of California

# I.      BACKGROUND

When the California Legislature enacted SB 976, it did so for the stated purpose of "ensur[ing] that social media platforms obtain parental consent before exposing children and adolescents to harmful and addictive social media features." SB 976, § 1(g), ECF No. 2-1. According to the Legislature, this was necessary because of mounting evidence that linked minors' use of social media to negative health outcomes such as eating disorders, disrupted sleep patterns, depression, and self-harm, *id.* §§ 1(c)–(e), and because "some social media platforms [had] evolved to include addictive features" that could keep minors on those platforms for increasingly long hours. *Id.* § 1(b).

## A.      Coverage Definition

SB 976 regulates companies that offer certain types of personalized media feeds "as a significant part of the service provided by [those companies'] internet website, online service, online application, or mobile application." Cal. Health & Safety Code § 27000.5(b)(1). Specifically, personalized feeds that recommend user-generated or user-shared content based on "information provided by the user, or otherwise associated with the user or the user's device," trigger SB 976's provisions. *Id.* § 27000.5(a).

However, there are several exceptions to this coverage definition. The first group of exceptions is based on a personalized feed's features. A feed that would otherwise meet the coverage definition is excluded if that feed also acts in one or more of seven ways, such as by recommending content based on information "not persistently associated with the user or user's device," based on privacy or accessibility settings, or based on a user's "express[] and unambiguous[]" request for a specific category of content. *Id.* §§ 27000.5(a)(1)–(7). The seven feed-based exceptions are varied, but they generally serve to exempt feeds from SB 976's provisions if those feeds recommend content based on a user's explicit requests and not based on data collected about that user's previous internet activity. *See id.* The second group of exceptions is based on the nature of a potentially covered company's business. Even if a company offers a feed that falls under SB 976's coverage definition, the bill's provisions do not apply if that company provides services "for which interactions between users are limited to commercial

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
3

United States District Court
Northern District of California

transactions or to consumer reviews" or if that company "operates a feed for the primary purpose of cloud storage." *Id.* § 27000.5(b)(2).

### B.    Regulatory Requirements

At a high level, SB 976 imposes what some call an "age gate." That is, SB 976 requires covered companies to gate off, or restrict, minors from accessing certain features unless those minors receive "verifiable parental consent." *Id.* §§ 27001(a)(2), 27002(a)–(b). From January 1, 2025 to December 31, 2026, covered entities need only gate off features from users actually known to be minors. *Id.* §§ 27001(a)(1)(A), 27002(a)(2). But starting January 1, 2027, covered companies must undertake age assurance efforts to determine whether users are adults or minors; then, they must gate off restricted features from any user whom the company cannot reasonably determine to be an adult. *Id.* §§ 27001(a)(1)(B), 27002(a)(2). To implement this latter age-assurance requirement, SB 976 directs the California Attorney General to promulgate regulations on the issue by January 1, 2027. *Id.* § 27006(b).

SB 976 restricts two features behind an age gate. Minors can only access those features with parental consent. *Id.* §§ 27001(a)(2), 27002(a). First, SB 976 restricts access to personalized feeds that meet its coverage definition and do not satisfy any exception. *Id.* § 27001(a). Second, SB 976 prohibits push notifications (*i.e.*, pop-ups from smart phone applications) from being sent at certain times of the day. *Id.* § 27002(a). Namely, SB 976 bars covered companies from sending notifications at night between 12 a.m. and 6 a.m. (year-round) and also during school hours between 8 a.m. and 3 p.m. (Mondays through Fridays from September through May). *Id.*

In addition to age gating the above two features, SB 976 requires covered companies to develop settings that parents can use to control their children's social media use. Some of those required settings overlap with the age gated features. *Id.* §§ 27002(b)(1)–(2), (4). Two, though, are distinct. The first gives parents the power to "[l]imit their child's ability to view the number of likes or other forms of feedback to pieces of media within an addictive feed," and SB 976 mandates that this setting be turned on by default. *Id.* § 27002(b)(3). The second allows parents to "[s]et their child's account to private mode, in a manner in which only users to whom the child is connected on the [covered company's] service or application may view or respond to content

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
4

United States District Court
Northern District of California

1    posted by the child"; again, this setting must be turned on by default. *Id.* § 27002(b)(5).

2        Finally, SB 976 compels covered companies to make disclosures related to the

3    requirements above. Under this last provision, covered companies must publicly disclose the

4    following information every year: the number of minors who use their service; the number of

5    minor users who received parental consent to access covered feeds; and the number of minor users

6    for whom SB 976's default settings are or are not enabled. *Id.* § 27005.

7    **II.    LEGAL STANDARD**

8        "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

9    *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To secure a preliminary injunction, a

10   plaintiff must establish that it (1) "is likely to succeed on the merits," (2) "is likely to suffer

11   irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its]

12   favor," and (4) "that an injunction is in the public interest." *Id.* at 20.

13       Because NetChoice makes a First Amendment claim, the likelihood of success factor is

14   subject to burden shifting. The plaintiff still bears the initial burden and must demonstrate "a

15   colorable claim that its First Amendment rights have been infringed[] or are threatened with

16   infringement." *Smith v. Helzer*, 95 F.4th 1207, 1214 (9th Cir. 2024) (quoting *Cal. Chamber of*

17   *Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022)). Once the

18   plaintiff makes that initial showing, the burden "shifts to the government to justify the restriction

19   on speech." *Id.* (quoting *Cal. Chamber of Com.*, 29 F.4th at 478). If the government fails to

20   satisfy that burden, the plaintiff prevails on likelihood of success. Put differently, the plaintiff has

21   the initial burden of showing that a challenged law implicates the First Amendment while the

22   government has the subsequent burden of showing that the challenged law satisfies the appropriate

23   level of scrutiny. *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).

24       Further, likelihood of success "is especially important when a plaintiff alleges a

25   constitutional violation and injury" like NetChoice does here. *Baird v. Bonta*, 81 F.4th 1036, 1040

26   (9th Cir. 2023). A finding that the plaintiff is likely to succeed on its First Amendment claim puts

27   a strong (and perhaps insurmountable) thumb on the scale in favor of a preliminary injunction.

28   Likelihood of success on a constitutional claim necessarily implies that the plaintiff would suffer

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
5

1    irreparable harm absent an injunction. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th

2    Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[T]he loss of First Amendment

3    freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Doe*,

4    772 F.3d at 583 (quoting *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)) (same); *see*

5    *also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) ("Thus, it follows inexorably from

6    our conclusion that the government's current policies are likely unconstitutional . . . that Plaintiffs

7    have also carried their burden as to irreparable harm.").  And analysis of the remaining equity and

8    public interest factors, which merge when the government is a defendant, *Drakes Bay Oyster Co.*

9    *v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), begins tilted in favor of a preliminary injunction

10    since it is "always in the public interest to prevent the violation of a party's constitutional rights."

11    *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (quoting *Melendres v.*

12    *Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

13        Meanwhile, courts can deny a preliminary injunction without "'consider[ing] the other

14    [preliminary injunction] factors' if a movant fails to show a likelihood of success on the merits."

15    *Baird*, 81 F.4th at 1040 (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir.

16    2017)); *see also Smith*, 95 F.4th at 1215 (affirming denial of a preliminary injunction after finding

17    no likelihood of success and without discussing any other preliminary injunction factor).

18    **III.    DISCUSSION**

19        **A.    Ripeness of Age Assurance Challenges**

20        The Court begins by addressing the provisions of SB 976 that require covered companies

21    to conduct age assurance (Cal. Health & Safety Code §§ 27001(a)(1)(B), 27002(a)(2)) because

22    Defendant's argument regarding those provisions—that challenges to age assurance are not yet

23    ripe—cuts across this entire case.  The purpose of ripeness doctrine is "to prevent the courts,

24    through avoidance of premature adjudication, from entangling themselves in abstract

25    disagreements." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003) (quoting

26    *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)).  For First Amendment cases, courts give

27    more leeway to plaintiffs faced with ripeness questions. *Twitter, Inc. v. Paxton*, 56 F.4th 1170,

28    1173–74 (9th Cir. 2022) (citation omitted).  But that does not mean ripeness becomes toothless

1   whenever the First Amendment is involved.  *See id.* at 1172 (affirming dismissal of First

2   Amendment challenge as unripe).  In this instance, the Court finds that NetChoice's challenge to

3   age assurance is not yet ripe because covered companies do not need to implement age assurance

4   procedures until January 1, 2027, and the regulations governing age assurance have not yet been

5   issued.

6           Ripeness has both constitutional and prudential dimensions.  *Nat'l Park Hops. Ass'n*, 538

7   U.S. at 807 (citation omitted).  NetChoice, as the party asserting a claim, has the burden of

8   satisfying both dimensions.  *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th

9   Cir. 2009).

10                          **1.      Constitutional Ripeness**

11          Although the parties do not directly address constitutional ripeness, the Court starts there

12  because it has a duty to consider all aspects of ripeness.  *City & Cnty. of S.F. v. Garland*, 42 F.4th

13  1078, 1084 (9th Cir. 2022).  The constitutional component of ripeness is equivalent to the injury-

14  in-fact prong of Article III standing.  *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th

15  Cir. 2021) (citation omitted).  For a pre-enforcement challenge like the one NetChoice brings here,

16  this requires examining "(1) whether the plaintiffs have articulated a concrete plan to violate the

17  law in question, (2) whether the prosecuting authorities have communicated a specific warning or

18  threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the

19  challenged statute."  *Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th

20  Cir. 2007).

21          Looking to the first constitutional ripeness factor, the Court finds little doubt that

22  NetChoice's members[3] have a concrete plan to forego implementing age assurance—most of

23  NetChoice's members do not have the capabilities to conduct age assurance, and they would like

24  to avoid both the costs of establishing such capabilities as well as the potential drop in user growth

25

26  _____

27  [3] NetChoice asserts associational standing, so its standing to sue derives from its members'
    independent standing to sue.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343
    (1977).  Therefore, the Court analyzes injuries to NetChoice's members rather than to NetChoice

28  itself.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    that age assurance might trigger.  Cleland Decl. ¶¶ 29, 32, ECF No. 2-2.  Second, even though the

2    record does not reflect that Defendant has made any specific enforcement threat, for First

3    Amendment cases, the necessary "threat of enforcement may be inherent in the challenged

4    statute." *Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010).  This way, "a plaintiff need

5    not risk prosecution in order to challenge" restrictions on protected speech. *Id.* at 1060.  Finally,

6    the third factor plays little role here because SB 976 is new, so there is no history of enforcement

7    to examine. *Id.*  But, California's participation in other lawsuits seeking to hold NetChoice

8    members accountable for alleged harms to minors suggests that Defendant would be willing to

9    enforce SB 976. *E.g.*, *California v. Meta Platforms, Inc.*, No. 4:23-cv-05448 (N.D. Cal.).

10   Therefore, the Court finds that NetChoice has established constitutional ripeness.

11                  **2.       Prudential Ripeness**

12          However, NetChoice's challenge to age assurance falters at prudential ripeness.  The

13   prudential component of ripeness requires examining (1) "fitness of the issues for judicial

14   decision" and (2) "the hardship to the parties of withholding court consideration." *Ass'n of*

15   *Irritated Residents*, 10 F.4th at 944 (quoting *Abbot Lab'ys*, 387 U.S. at 149).  The fitness

16   component reflects the "interest the judiciary has in delaying consideration of a case"—that is to

17   say, the interest in waiting for further development that renders disputes more concrete and less

18   hypothetical. *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir.

19   2012).  The hardship component "serves as a counterbalance" to the judiciary's interests in

20   awaiting further development. *Id.*  If a plaintiff could suffer great hardship from delaying judicial

21   review, courts should address that plaintiff's claim even if the record and the circumstances do not

22   present a perfectly concrete issue.

23                  **a.       Fitness for Review**

24          The Court finds that the free speech issues surrounding age assurance are not yet fit for

25   judicial review.  Fitness turns on two factors: whether the challenged action is final and whether

26   the issues raised "are primarily legal [and] do not require further factual development." *Wolfson*,

27   616 F.3d at 1060 (quoting *US W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir.

28   1999)).  Here, SB 976 is final, but age assurance raises extensive factual issues that still require

Case No.: 5:24-cv-07885-EJD

ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION

8

1    more development.

2        Efforts to impose age assurance requirements on the internet are not new, and those

3 previous efforts have been met with First Amendment scrutiny as well. The Supreme Court first

4 addressed age assurance almost thirty years ago in *Reno v. ACLU*, 521 U.S. 844 (1997). In that

5 case, the Supreme Court reviewed whether it was constitutional under the First Amendment for

6 Congress to criminalize the transmission of offensive or indecent internet communications to

7 minors through the Communications Decency Act (CDA). As relevant here, the Supreme Court

8 considered whether the presence of an age assurance affirmative defense narrowly tailored the

9 CDA to Congress's purpose. *Id.* at 881–82. The answer was no. *Id.* In reaching that conclusion,

10 the Supreme Court relied on the district court's factual findings that age assurance technology at

11 the time was neither effective nor economically feasible for most websites. *Id.* As such, websites

12 would not be able to take advantage of the age assurance affirmative defense and would

13 necessarily need to limit speech to adults in order to avoid criminal liability under the CDA. *Id.* at

14 882. In other words, the government "failed to prove that the proffered defense would

15 significantly reduce the heavy burden on adult speech." *Id.*

16        The Supreme Court returned to online age assurance in *Ashcroft v. ACLU*, 542 U.S. 656

17 (2004). *Ashcroft* dealt with Congress's second attempt at protecting children from sexually

18 explicit materials on the internet after the Supreme Court struck down its first attempt in *Reno*.

19 This time, Congress passed the Child Online Protection Act (COPA), which narrowed the scope of

20 the content prohibited to children and broadened the age assurance affirmative defense. *Id.* at

21 661–62. Again, the Supreme Court considered whether age assurance helped to narrowly tailor

22 COPA to Congress's purpose. And once again, the Supreme Court answered no. *Id.* at 666–70.

23 Like it did in *Reno*, the Supreme Court reached this answer by carefully parsing the district court's

24 findings of fact. The district court found that, based on the current state of age assurance methods,

25 a less restrictive alternative—filtering technology—would be *more* effective than age assurance.

26 *Id.* at 668. Importantly, the Supreme Court also remanded this case for additional factfinding

27 because the record in front of it "[did] not reflect current technological reality." *Id.* at 671.

28 Further, *Ashcroft* expressly left open the possibility that, upon further factual development, the

United States District Court
Northern District of California

1    district court could conclude that age assurance *was* the least restrictive alternative for meeting

2    Congress's purpose. *Id.* at 673. In doing so, the Supreme Court made clear that the viability of

3    age assurance under the First Amendment is not an abstract question of law but rather requires a

4    deep factual dive into how the implementation of age assurance using current technologies does or

5    does not burden speech.

6           On remand, both the district and circuit courts heeded this message about the factual nature

7    of the First Amendment analysis of age assurance. *ACLU v. Mukasey*, 534 F.3d 181, 195–97 (3d

8    Cir. 2008). The circuit court eventually affirmed a permanent injunction against COPA in part

9    because it agreed with the district court that the presence of the age assurance defense "[did] not

10   aid in narrowly tailoring COPA." *Id.* For a third time, the district court's factual findings were

11   key. Even after updating the record, the district court found that no effective age assurance

12   options existed at the time, that options requiring payment or personal information would deter

13   adult users, and websites themselves would have to bear implementation costs disproportionate to

14   age assurance's usefulness. *Id.*

15          The lesson from this line of cases is that a First Amendment analysis of age assurance

16   requirements entails a careful evaluation of how those requirements burden speech. That type of

17   evaluation is highly factual and depends on the current state of age assurance technology. For

18   example, if certain speech is prohibited to minors but there is no effective age assurance

19   mechanism, websites and other speakers might err on the side of denying the prohibited speech to

20   both adults and children so that they can avoid liability. Or, if there are effective age assurance

21   mechanisms but they are onerous, implementing those mechanisms might discourage adults from

22   accessing speech that they are entitled to since those adults may not wish to go through the hassle

23   of age assurance.

24          Of course, the fact that technology can rapidly change does not render an issue unfit for

25   judicial review. Such rapid change is commonplace, and courts cannot avoid adjudicating

26   technology issues simply because technology progresses quickly. Nor does the need for a robust

27   factual record render an issue unfit for judicial review by itself. Most cases will require the parties

28   to explore relevant factual circumstances. The key is whether the current circumstances are

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
10

United States District Court
Northern District of California

1   sufficiently concrete in ways that allow a court to determine the scope and effects of a challenged

2   regulation. *Alaska Right to Life*, 504 F.3d at 849 (citation omitted). The reason this case is not fit

3   for judicial review is because SB 976's requirements for age assurance are still in flux. SB 976

4   requires covered entities to "reasonably determine[]" whether a user is a minor starting January 1,

5   2027. Cal Health & Safety Code §§ 27001(a)(1)(B), 27002(a)(2). That requirement, however, is

6   merely a "starting point" for determining what covered companies will have to do. *United States*

7   *v. Braren*, 338 F.3d 971, 976 (9th Cir. 2003). SB 976 also requires Defendant to promulgate

8   regulations implementing these age assurance provisions. Cal Health & Safety Code § 27006(b).

9   There are many ways that those regulations can interpret what it means to make "reasonable" age

10  assurance efforts. Perhaps the regulations might require covered entities to verify age through

11  photo identification. Or alternatively, they may permit covered entities to use age estimation

12  tools, such as by using computer vision to analyze facial features. Amicus Br. 11–12, ECF No.

13  31-1 (citing Noah Apthorpe et al., *Online Age Gating: An Interdisciplinary Evaluation* 21–22

14  (Aug. 1, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4937328). The regulations

15  may even allow covered entities to estimate age using tools that run in the background and require

16  no user input. For example, many companies now collect extensive data about users' activity

17  throughout the internet that allow them to develop comprehensive profiles of each user for

18  targeted advertising. *Id.* at 12; *see also, e.g.*, Egelman Decl. ¶¶ 20–21, ECF No. 18-1. The

19  regulations implementing SB 976 could permit covered entities to use such advertising profiles or

20  similar techniques to estimate age without needing a user to affirmatively submit information.

21      These differences matter. As NetChoice itself observes, the burden placed on covered

22  companies to conduct age assurance varies "with the level of certainty with which companies must

23  verify ages." Cleland Decl. ¶ 29. So too will the burdens that age assurance places on adult

24  access to speech. While adults might be reluctant or unable to provide photo identification, age

25  assurance that runs in the background may discourage few if any adults from accessing speech.

26  All this is important when assessing whether SB 976's age assurance requirement is properly

27  tailored to achieve California's goal of protecting children. And none of this can be developed in

28  the factual record until Defendant issues regulations on age assurance. Until then, both the parties

and the Court would only be guessing at which age assurance tools they should focus on when weighing the burdens that those tools may have on speech. In sum, because Defendant still has significant leeway to clarify the scope of SB 976's age assurance provisions, the issue of age assurance is not yet fit for review. *Cf. Pakdel v. City & Cnty. of S.F.*, 594 U.S. 474, 480 (2021) ("[F]ailure to properly pursue administrative procedures [in a takings case] may render a claim unripe if avenues still remain for the government to clarify or change its decision.") (emphasis omitted).

NetChoice resists this conclusion by pointing to *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 794 (2011), a case in which the Supreme Court struck down California's ban on selling violent video games to minors. *Brown* explained that minors have First Amendment rights to receive speech, and those rights are not conditional on parental consent. *Id.* at 795 n.3 (states do not have "the power to prevent children from hearing or saying anything *without their parents' prior consent*") (emphasis in original). But NetChoice goes too far to the extent it argues that this means restricting speech by age is per se unconstitutional. *Brown* did not hold that California's violent video game ban was per se unconstitutional; instead, it applied strict scrutiny. *Id.* at 799–804. More importantly, the Supreme Court has expressly declined to hold that governments are "incapable of enacting any regulation of the Internet designed to prevent minors from gaining access to harmful materials." *Ashcroft*, 542 U.S. at 672. Indeed, the Supreme Court has in the past upheld regulations that restricted speech to minors but not to adults. *See, e.g.*, *Ginsberg v. New York*, 390 U.S. 629 (1968). At most, *Brown* stands for the proposition that courts look at age-based speech restrictions skeptically.

At hearing, NetChoice also suggested that even if there is no per se rule against age-based speech restrictions, further factual development would not be helpful here because the core of age assurance's unconstitutionality stems from fundamental human nature. According to NetChoice, people are less likely to do something if it requires an additional step, and age assurance necessarily entails additional steps and barriers. By putting up additional barriers, age assurance deters adults from accessing speech. To be sure, "fact-intensive inquiries that depend on further factual development may nevertheless be ripe if . . . that development would do little to aid the

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
12

United States District Court
Northern District of California

1    court's decision." *Educ. Credit Mgmt. Corp. v. Coleman* (*In re Coleman*), 560 F.3d 1000, 1009

2    (9th Cir. 2009).  But here, NetChoice's explanation for why further fact development would be

3    unhelpful depends on the assumption that all age assurance tools must require extra steps a user

4    would be unwilling to take.  As just discussed, that is not necessarily the case.  Age assurance

5    processes that run in the background may not appreciably depress adults' access to speech at all.

6    Therefore, the Court finds that NetChoice's challenge to SB 976's age assurance provisions is not

7    fit for judicial review.

**b.    Hardship**

8

9        Nevertheless, lack of fitness may be overcome if withholding review would result in

10   hardship.  *Okleveuha*, 676 F.3d at 838.  Plaintiffs must demonstrate a high level of hardship,

11   though, to surmount a finding that the issues are not yet fit for review.  Hardship "does not mean

12   just anything that makes life harder; it means hardship of a legal kind, or something that imposes a

13   significant practical harm upon the plaintiff." *Colwell*, 558 F.3d at 1128 (quoting *Nat. Res. Def.*

14   *Council v. Abraham*, 388 F.3d 701, 706 (9th Cir. 2004)).  It requires a "significant change in the

15   plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Stormans,*

16   *Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (quoting *Ass'n of Am. Med. Colls. v. United*

17   *States*, 217 F.3d 770, 783 (9th Cir. 2000)).  Hardship must also be urgent enough to "pose an

18   immediate dilemma." *Colwell*, 558 F.3d at 1128 (quoting *Ass'n of Am. Med. Colls.*, 217 F.3d at

19   783).  If hardship is not "direct and immediate," there is little harm to delaying judicial review.

20   *Stormans*, 586 F.3d at 1126 (quoting *MFS Intelenet*, 193 F.3d at 1118).  In sum, hardship must be

21   sufficiently serious and immediate to overcome a lack of fitness for review.

22       NetChoice has not met its burden to show hardship sufficient to overcome a lack of fitness

23   for review.  SB 976's age assurance provisions do not take effect until January 1, 2027, giving

24   NetChoice and its members two years before compliance becomes an issue.  Certainly, covered

25   companies must begin their compliance efforts before SB 976's provisions become effective.  That

26   is the only way to ensure that those companies will have proper age assurance infrastructure in

27   place by the time SB 976 requires it.  However, nothing in the record indicates that those efforts

28   must start *now* as opposed to waiting until after Defendant issues the relevant regulations.

United States District Court
Northern District of California

NetChoice asserts that developing age assurance tools will be "costly [and] time-consuming," Cleland Decl. ¶ 29, but it is not clear how costly and how time-consuming it will be. If developing age assurance tools would take six months, covered companies could wait longer before starting development than if developing such tools would take a year and a half. Moreover, given the increased attention paid to age assurance recently, there well might be vendors offering turnkey age assurance solutions that can be deployed rapidly. *See* Amicus Br. 8. That possibility further mitigates any urgency.

Accordingly, the Court finds that NetChoice's challenge to age assurance is not prudentially ripe. That is not to say that the challenge cannot become ripe at a later time if the effective date for age assurance approaches and Defendant still has not issued regulations. At some point, covered companies *will* have to begin implementing age assurance even if regulations have not yet been published. But NetChoice and its members are not at that point now. It is therefore prudent to wait for further developments.

### B.    Facial First Amendment Challenges

Facial challenges to a law's constitutionality are disfavored. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). For that reason, the Supreme Court "has [] made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). The standard for prevailing on a facial challenge is "less demanding" in the First Amendment context, but it is still "rigorous." *Id.* To succeed, a plaintiff must show that "a substantial number of [a challenged statute's] applications are unconstitutional" relative to "the statute's plainly legitimate sweep." *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). This analysis proceeds in two steps. Courts start by "assess[ing] the state laws' scope" and identifying the activities and actors being regulated. *Id.* at 724. Then, courts must "decide which of the laws' applications violate the First Amendment, and [] measure them against the rest." *Id.* at 725. If the unconstitutional applications substantially outnumber the constitutional ones, the laws are facially unconstitutional.

Below, the Court addresses NetChoice's facial challenge to each provision of SB 976—restrictions on personalized feeds (§ 27001), limitations on the timing of notifications

Case No.: 5:24-cv-07885-EJD

ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION

14

United States District Court
Northern District of California

United States District Court
Northern District of California

1 (§ 27002(a)), requirements to develop certain default settings (§ 27002(b)), and compelled

2 disclosure of statistics related to minors' social media use (§ 27005)—in turn.

3         **1.**        **Personalized Feeds**

4         **a.**        **Covered Companies' Own Expression**

5        NetChoice's main argument against the personalized feed provisions is that those

6 provisions restrict social media platforms' own speech.  From NetChoice's perspective,

7 personalized feeds are inherently expressive, so SB 976's restrictions on those feeds impede free

8 speech.  The Court concludes that NetChoice has not shown a likelihood of success on that issue

9 because it has failed to meet its burden of demonstrating, as *Moody* requires for facial challenges,

10 that most or all personalized feeds covered by SB 976 are expressive and therefore implicate the

11 First Amendment.

12        NetChoice claims that it satisfies this burden because *Moody* held that, as a matter of law,

13 "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and

14 then organizing and presenting the included items—is expressive activity of its own."  *Moody*, 603

15 U.S. at 731.  And that is precisely what personalized feeds do: compile and organize speech from

16 social media users.  On the surface, this argument accords with older cases holding that the

17 exercise of editorial judgment (*i.e.*, deciding what speech to publish and how to organize it) is

18 usually protected by the First Amendment.  For example, in *Miami Herald Publishing Co. v.*

19 *Tornillo*, 418 U.S. 241 (1974), the Supreme Court held that states could not compel newspapers to

20 provide political candidates with a right of reply.  As it explained, doing so "intru[des] into the

21 function of editors."  *Id.* at 258.  So too in *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622

22 (1994).  There, the Supreme Court held that cable operators were engaging in expressive activity

23 when choosing which channels to carry because they were "exercising editorial discretion over

24 which stations or programs to include."  *Id.* at 636 (citation omitted).

25        That argument reads too much into *Moody* and its forebears.  Although it is true that

26 *Moody* uses sweeping language that could be interpreted as saying that all acts of compiling and

27 organizing speech, with nothing more, are protected by the First Amendment, *Moody* also

28 expressly discusses situations where such activity did not receive protection.  For instance, *Moody*

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
15

observed that a mall could not claim a First Amendment right to exclude pamphleteers from its property because the mall was not "engaged in any expressive activity" when trying to exclude the pamphleteers and their speech. *Moody*, 603 U.S. at 730 (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980)). *Moody* also explained that law schools could not claim a First Amendment right to exclude military recruiters from on-campus recruiting because those law schools were "not [] engaged in expression" and were "not speaking when they host [job] interviews." *Id.* at 731 (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 64 (2006)). That is, *Moody* stands only for the proposition that restrictions on a private speaker's ability to compile and organize third-party speech implicate speech rights only if those restrictions impair the speaker's own expression. *Moody*, 603 U.S. at 730–31; *see also id.* at 740 (no First Amendment issues with requiring inclusion of speech when "the host of the third-party speech was not itself engaged in expression"). Justice Alito, joined by Justices Thomas and Gorsuch, further highlighted this point in his *Moody* concurrence. *Id.* at 780–83 (Alito, J., concurring).

This limit on the protections offered to speech compilations makes good sense. The touchstone of First Amendment speech rights is, after all, the protection of *expression*. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("It is true that restrictions on *protected expression* are distinct from restrictions on economic activity or, more generally, on *nonexpressive* conduct.") (emphasis added). Activities that are expressive in one context are not necessarily expressive in all others, and courts should be careful to distinguish between "'speech' and 'nonspeech' elements [that] are combined in the same course of conduct" when analyzing First Amendment issues. *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Consequently, even post-*Moody*, courts must inquire into whether an act of compiling and organizing third-party speech is expressive before they can determine whether that act receives First Amendment protection.

In response to this conclusion, NetChoice urges the Court to find that personalized feeds are always expressive even if not all acts of compiling and organizing third-party speech are expressive. From its perspective, the work that personalized feeds do is closely analogous to the editorial activities that *Moody*, *Tornillo*, *Turner*, and other similar precedents have found to be protected. There is some force to this suggestion. "'[T]he basic principles of freedom of speech

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
16

1   and the press . . . do not vary' when a new and different medium for communication appears."

2   *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).  So

3   "analogies to old media, even if imperfect, can be useful."  *Moody*, 603 U.S. at 733.  Yet, this does

4   not mean that courts should uncritically assume that analogies to old media are always apt and that

5   there is little meaningful difference between old and new.  Quite the opposite.  The Supreme Court

6   has cautioned lower courts against reflexively "import[ing] law developed in very different

7   contexts into a new and changing environment."  *Denver Area Educ. Telecomms. Consortium, Inc.*

8   *v. F.C.C.*, 518 U.S. 727, 740 (1996).  It is not enough that a new function or activity (personalized

9   feeds) "seems roughly analogous to a more familiar example from [] precedent" (editorial

10  discretion).  *Moody*, 603 U.S. at 749 (Jackson, J., concurring).  While the same "settled principles

11  about freedom of expression" apply regardless of the technology at issue, *id.* at 733, "new

12  circumstances requir[e] different *adaptations* of prior principles and precedents."  *Denver Area*

13  *Educ. Telecomms.*, 518 U.S. at 740 (emphasis added).  Indeed, the Supreme Court has a history of

14  developing special rules for addressing free speech concerns in different and newly arising

15  contexts.  *Id.* at 741 (collecting cases).

16          With that caution in mind, the Court finds that old precedents on editorial discretion do not

17  fully resolve the issue at hand regarding the expressiveness of personalized feeds.  For instance,

18  *Tornillo* involved editorial discretion in the traditional sense: human newspaper editors deciding

19  what articles to publish and where to place them in the paper based on the editors' own judgments

20  about newsworthiness and how the proposed articles fit their newspaper's journalistic point of

21  view.  The *Tornillo* decision left this unspoken, but that is likely because, in 1974 when the case

22  was decided, there was no other way to make editorial decisions.  Thus, editorial discretion and

23  human judgments about the value of speech (whether based on the speech's importance, truth,

24  entertainment, or some other criteria) were one and the same.  Personalized feeds on social media

25  platforms are different.  Rather than relying on humans to make individual decisions about what

26  posts to include in a feed, social media companies now rely on algorithms to automatically take

27  those actions.

28          Due to these differences between traditional and social media, the Supreme Court was

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
17

United States District Court
Northern District of California

1   careful not to overextend itself in *Moody*.  The First Amendment questions in *Moody* involved

2   restrictions on content moderation policies that embodied human value judgments about the types

3   of messages to be disfavored.  When the social media platforms in *Moody* removed posts for

4   violating their community standards, it was because people at those platforms found those

5   messages to contain vile or dangerous ideas—such as support for Nazi ideology, glorification of

6   gender violence, or advancement of phony medical treatments.  *Id.* at 735–37.  The content

7   moderation policies at issue were much like the traditional forms of editorial discretion discussed

8   in *Tornillo* and other prior precedents.  This close analogy led the Supreme Court to hold that the

9   First Amendment prevents governments from displacing the social media platforms' content

10  moderation policies with the governments' own view of how different messages should be

11  balanced.  *Id.* at 741.  *Moody* therefore had no occasion to address, and explicitly declined to

12  address, "feeds whose algorithms respond solely to how users act online—giving them the content

13  they appear to want, without any regard to independent content standards."  *Id.* at 736 n.5.

14       The question that *Moody* reserved is precisely the question that the Court must answer

15  here.  NetChoice seeks to avoid the question by claiming that the feeds at issue in this case do not

16  "respond solely to how users act online."  That may be so, but it is not in the record.[4]  And nothing

17  about the definition of covered feeds requires such feeds to do more than "respond solely to how

18  users act online."  Indeed, a feed responding only to user activity would undoubtedly be covered

19  under SB 976 because it recommends content based on "information provided by the user," Cal.

20  Health & Safety Code § 27000.5(a).

21       Of course, the fact that *Moody* reserved judgment on feeds that "respond solely to how

22  users act online" does not mean that such feeds must be non-expressive and unprotected.  If

23

24  _____

    [4] *Moody* discussed feeds on Facebook and YouTube and found them to contain expressive
25  elements.  603 U.S. at 733–40, 744.  It is not clear whether the Court can simply import *Moody*'s
    findings into this case.  But even if the Court could do so, those findings would only address two
26  feeds out of many.  Those findings alone would not be enough for NetChoice to meet its burden
    on a facial challenge of showing that most of SB 976's applications to personalized feeds are
27  unconstitutional.  That exercise would require, at a minimum, NetChoice to show that most feeds
    contain expressive elements.  NetChoice has not provided the kind of wide-ranging record on the
28  entire spectrum of personalized feeds in existence that would be necessary to make that showing.

    Case No.: 5:24-cv-07885-EJD
    ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
    18

1  applying SB 976 to such feeds uniformly implicates expression, then NetChoice might yet satisfy

2  its facial burden.  However, NetChoice made virtually no argument about whether that is so.  For

3  this reason alone, NetChoice has failed to meet its burden.

4       Regardless, the Court doubts that regulating feeds responding solely to user actions would

5  uniformly interfere with expression.  Regulations intrude on a speech compiler's expression when

6  those regulations force the compiler to "alter its own message," *Pac. Gas & Elec. Co. v. Pub.*

7  *Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986), or prevent the compiler from sending its desired

8  message.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 574–

9  75 (1995) (parade organizer had a First Amendment right to express disapproval of a message by

10 excluding it from the parade, and state law could not compel the organizer to forego sending that

11 message of disapproval by requiring the organizer to allow the message in).  In the latter

12 circumstance, the message that a compiler seeks to send need not be particularly articulate, *id.* at

13 574, but to trigger the First Amendment, there must clearly be a message of some sort.  *Id.* ("The

14 message [the parade organizer] disfavored is not difficult to identify.").  For social media

15 platforms, that message might be "the overall speech environment" created through the "messages

16 that [allowed] posts convey *in toto*."  *Moody*, 603 U.S. at 739.

17      When it comes to feeds that recommend posts based solely on prior user activity, there is

18 no apparent message being conveyed.  At the outset, the Court observes that SB 976 restricts only

19 the use of certain personalized information when compiling posts into feeds.  SB 976 does not

20 prevent social media platforms from carrying out content moderation like that discussed in *Moody*.

21 Platforms can continue to remove posts containing disfavored ideas, such as racist ideology, while

22 still complying with SB 976 because content moderation depends on "independent content

23 standards" separate from a user's personal information.  *Id.* at 736 n.5.  As such, it is difficult to

24 say that restricting use of personalized feeds would alter the overall speech environment on any

25 social media platform in any appreciable way.  In addition, it is also challenging to identify how

26 personalization, as opposed to content moderation, might send any message.

27      NetChoice suggested at hearing that personalization of feeds conveys a message that the

28 user receiving personalized recommendations might find a post interesting.  That *can* undoubtedly

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
19

1    be true. Algorithms operate personalized feeds, and humans create algorithms to achieve certain

2    purposes. To do so, humans build rules into those algorithms that they believe will best serve their

3    purposes. In that sense, an algorithm simply acts as a tool to implement a conscious human

4    choice. *Id.* at 745–46 (Barrett, J., concurring). If a human designs an algorithm for the purpose of

5    recommending interesting posts on a personalized feed, the feed probably does reflect a message

6    that users receiving recommended posts are likely to find those posts interesting. This perspective

7    suggests that an algorithm designed to convey a message can be expressive.

8        But what if an algorithm's creator has other purposes in mind? What if someone creates an

9    algorithm to maximize engagement, *i.e.*, the time spent on a social media platform? At that point,

10    it would be hard to say that the algorithm reflects any message from its creator because it would

11    recommend and amplify both favored and disfavored messages alike so long as doing so prompts

12    users to spend longer on social media. Amicus Br. 5 (collecting news articles). To the extent that

13    an algorithm amplifies messages that its creator expressly disagrees with, the idea that the

14    algorithm implements some expressive choice and conveys its creator's message should be met

15    with great skepticism. Moreover, while a person viewing a personalized feed could perceive

16    recommendations as sending a message that she is likely to be interested in those recommended

17    posts, that would reflect the user's interpretation, not the algorithm creator's expression. If a third

18    party's interpretations triggered the First Amendment, essentially everything would become

19    expressive and receive speech protections—a good lawyer would almost certainly be able to

20    assign some plausible meaning to any action. Yet, the Supreme Court has made clear that there is

21    not "limitless variety of conduct can be labeled 'speech' [even when] the person engaging in the

22    conduct intends thereby to express an idea." *O'Brien*, 391 U.S. at 376.

23        The increasing prominence of artificial intelligence (AI) and machine learning only further

24    complicates matters. As Justice Alito observed, "when AI algorithms make a decision, 'even the

25    researchers and programmers creating them don't really understand why the models they have

26    built make the decisions they make.'" *Moody*, 603 U.S. at 795 (Alito, J., concurring) (quoting

27    Tammy Xu, *AI Makes Decisions We Don't Understand—That's a Problem* (Jul. 19, 2021),

28    https://builtin.com/artificial-intelligence/ai-right-explanation); *see also id.* at 746 (Barrett, J.,

Case No.: 5:24-cv-07885-EJD

ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1    concurring).  This is an important observation because it makes it challenging to determine

2    whether AI algorithms convey human expression.  Imagine an AI algorithm that is designed to

3    remove material that promotes self-harm.  To set up that algorithm, programmers need to initially

4    train it with data that humans have labeled ahead of time as either unacceptably promoting self-

5    harm or not.  Federal Judicial Center, *An Introduction to Artificial Intelligence for Federal Judges*

6    15 (2023), https://www.fjc.gov/sites/default/files/materials/47/An_Introduction_to_Artificial_

7    Intelligence_for_Federal_Judges.pdf.  Thus, when that AI algorithm initially begins to operate, it

8    will reflect those human judgments, and courts can plausibly say that it conveys a human's

9    expressive choice.  But as the algorithm continues to learn from other data, especially if the

10    humans are not supervising that learning, that conclusion becomes less sound.  Rather than

11    reflecting human judgments about the messages that should be disfavored, the AI algorithm would

12    seem to reflect more and more of its own "judgment."[5]  Thus, it would become harder to say that

13    the algorithm implements human expressive choices about what type of material is acceptable.

14         Up to this point, the Court has focused on content moderation and feeds that respond solely

15    to user activity as a dichotomy, as if the personalized feeds regulated by SB 976 must be one or

16    the other.  But a personalized feed might recommend posts based on both content moderation

17    policies *and* user activity, or both expressive *and* non-expressive factors.  NetChoice does not

18    address the possibility of "mixed" feeds even though such feeds raise numerous legal and factual

19    questions.  For instance, the relative weight assigned to expressive and non-expressive factors in

20    an algorithm might be relevant to free speech issues.  "[T]he First Amendment does not prevent

21    restrictions directed at . . . conduct from imposing incidental burdens on speech."  *Sorrell*, 564

22    U.S. at 567.  Regulating feeds that use algorithms mostly relying on non-expressive factors may

23    not trigger First Amendment scrutiny at all because doing so only incidentally burdens any

24    expressive component of those algorithms.  Or, if it is very easy to separate an algorithm's

25    expressive content moderation functions from non-expressive user-activity-based functions, a law

26

27    ────────────────
       [5] While the Court uses the word "judgment," it is not at all clear that, in any relevant sense, an AI

28    algorithm can reason through issues like a human can.

       Case No.: 5:24-cv-07885-EJD
       ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
       21

1    prohibiting personalized feeds from relying on user activity information may also only

2    incidentally burden speech.  A covered company could just remove the user activity factors from

3    the recommendation algorithms driving its media feeds.  This latter possibility is especially

4    significant here because SB 976 targets only recommendations based on user information.  It does

5    not prohibit covered entities from incorporating their content moderation guidelines into their

6    recommendation algorithms.

7          In short, much of the First Amendment analysis depends on a close inspection of how

8    regulated feeds actually function.  Because NetChoice has not made a record that can be used to

9    address these important questions, it has not met its burden to show facial unconstitutionality.

10                         **b.    User's Access to Speech**

11          In addition to claiming that SB 976's personalized feed restrictions limit its members' own

12    speech, NetChoice also claims that SB 976 limits social media users' access to speech.  Although

13    NetChoice may raise the rights of its members' users, *Virginia v. Am. Booksellers Ass'n*, 484 U.S.

14    383, 392–93 (1988), it has not shown that those rights are implicated by the personalized feed

15    restrictions here.  As the discussion in the previous section makes clear, personalized feeds are not

16    necessarily a form of social media platforms' speech, so restricting personalized feeds does not

17    restrict access to those platforms' speech.  That said, NetChoice does not focus just on users'

18    access to personalized feeds.  According to NetChoice, restricting personalized feeds also restricts

19    users' ability to access speech from the social media posts that they otherwise would have seen in

20    their feeds.  The theory seems to be that there is so much speech online that most of it is

21    inaccessible as a practical matter; only if someone (like a social media platform) brings a post to a

22    user's attention (say, through a personalized feed) is that post accessible.  That is a curious

23    argument because all posts are still, in fact, available to all users under SB 976.  SB 976 does not

24    require removal of any posts, and users may still access all posts by searching through the social

25    media platforms.  NetChoice has not offered any authority suggesting otherwise, and the Court is

26    skeptical that speech becomes inaccessible simply because someone needs to proactively search

27    for it.  If that were the case, library books would be inaccessible unless a librarian recommends

28    them because libraries hold too many books for a single person to sort through.

Case No.: 5:24-cv-07885-EJD

ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION

22

United States District Court
Northern District of California

* * *

In conclusion, the Court finds that NetChoice has not met its burden to show likelihood of success on its First Amendment claim against SB 976's personalized feed provisions. NetChoice has failed to demonstrate a colorable facial claim based on the expressiveness of personalized feeds because it has not provided a record demonstrating that more personalized feeds than not are actually expressive. And NetChoice has not shown that SB 976 interferes with social media users' right to access speech because SB 976 does not remove any speech from social media platforms. So, the Court **DENIES** NetChoice's motion as to SB 976's personalized feed provisions.

### 2.    Limits on Notifications

#### a.    Level of Scrutiny

Unlike with personalized feeds, there is little question that notifications are expressive. So, the Court begins by determining the level of scrutiny that applies. One of the most fundamental principles of First Amendment law is that governments lack the "power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). As such, content-based laws "are presumptively unconstitutional and may be justified only if" they survive strict scrutiny. *Id.* By contrast, a content-neutral law need only survive intermediate scrutiny. *Porter v. Martinez*, 68 F.4th 429, 439 (9th Cir. 2023) (citing *Turner*, 512 U.S. at 642).

A law is content based in two circumstances. First, it is content based on its face if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 165. However, a law is not content based merely because it requires some "examination of speech or expression" if that examination is "only in service of drawing neutral [] lines." *City of Austin v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 69, 73 (2022). A law is not content based unless it discriminates between different "topic[s], subject matter[s], or viewpoint[s]." *Id.* at 72 (citation omitted). In this sense, it is not quite accurate to say that all content-*based* laws face strict scrutiny. Rather, it is content-*discriminatory* laws that face strict scrutiny. Second, even if a law if not facially content based, it is still treated as content based if it "cannot be justified without reference to the content of the regulated speech, or [was] adopted by

United States District Court
Northern District of California

1    the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S.

2    at 164 (cleaned up) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

3    Here, the prohibition on notifications does not itself differentiate by content on its face.

4    During school hours and at night, notifications of all kinds, about any topic, sending any message,

5    are prohibited from being sent to minors. No particular message or subject receives favorable

6    treatment. However, NetChoice argues that SB 976's coverage definition creates content-based

7    distinctions in two ways: (a) by explicitly including companies that facilitate social interactions

8    and (b) by explicitly excluding companies that facilitate consumer review sharing. Cal. Health &

9    Safety Code §§ 27000.5(b)(1) (incorporating a definition from Cal. Bus. & Prof. Code § 22675),

10   27000.5(b)(2)(A). The Court concludes that neither of those classifications is content based.

11   Social interactions can run the entire gamut of topics and ideas. Users can interact socially

12   about politics, sports, art, or any other subject. And during those interactions, users can express

13   any message or viewpoint they like. On the other side of the coin, speech that is not a social

14   interaction can also be about any topic and reflect any viewpoint. Thus, distinguishing between

15   social interactions and other forms of speech is content neutral since doing so does not

16   discriminate based on subject matter or viewpoint. To see this, one can imagine a travel blog with

17   and without commenting functionality. The latter facilitates social interactions through its

18   comment function while the former does not. But both blogs can contain the exact same blog

19   posts.

20   For similar reasons, distinguishing between websites that are limited to consumer reviews

21   and those that are not does not create a content-based distinction either. This is a harder question,

22   because reviews convey certain information that non-reviews cannot; in particular, reviews

23   involve some level of assessment of a good or service while non-reviews do not contain any type

24   of assessment. As such, the review/non-review distinction is closely analogous to solicitation bans

25   that the Supreme Court has found to be content neutral in the past. *City of Austin*, 596 U.S. at 72.

26   Like reviews convey information that non-reviews cannot, a solicitation conveys information that

27   non-solicitations cannot: a request to obtain something or an attempt to gain business. *Id.* (citation

28   omitted). Yet solicitation bans are still content neutral when they do not "inherently present 'the

United States District Court
Northern District of California

1   potential for becoming a means of suppressing a particular point of view.'" *City of Austin*, 596

2   U.S. at 72 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649

3   (1981)). Such is the case here. A review can discuss any topic and express any viewpoint on

4   those topics just as a non-review can. For example, a book review about Keynesian economics

5   can either praise or criticize the book's arguments, while a non-review can directly praise or

6   criticize Keynesian theories as well. Accordingly, SB 976's notification provisions are content

7   neutral on their faces.

8        The notification provisions are also content neutral when considering the legislative

9   purpose behind SB 976. NetChoice argues otherwise, alleging that SB 976 reflects a legislative

10  purpose to undermine speech about specific topics. In support, NetChoice points to an expert

11  declaration submitted in this case explaining that social media can be harmful to minors because it

12  exposes them to "violent, scary, or sexualized images." Radesky Decl. ¶¶ 61(b)–(e), 91, ECF No.

13  18-2. If the legislature were motivated by a desire to prevent children from being exposed to such

14  images, that would plainly be a content-based motivation. But this declaration was submitted as

15  post hoc evidence in a lawsuit filed after SB 976 passed. Nothing in the record suggests that

16  anyone in the California Legislature knew or was motivated by this connection to violent and

17  sexualized images when the Legislature passed SB 976. In determining whether legislative

18  motive was improper, courts look to stated legislative ends and other evidence that is

19  contemporaneous with a law's enactment. *See McCullen v. Coakley*, 573 U.S. 464, 480 (2014)

20  (referring to a law's stated purpose); *Sorrell*, 564 U.S. at 565 (2011) (analyzing a law's express

21  purpose and legislative findings); *Colacurcio v. City of Kent*, 163 F.3d 545, 552 (9th Cir. 1998)

22  (considering "objective indicators of intent, including the face of the statute, the effect of the

23  statute, comparison to prior law, facts surrounding enactment, the stated purpose, and the record of

24  proceedings" when determining whether the purpose of a law is to suppress speech) (citation and

25  internal quotation marks omitted); *Nat'l Rifle Ass'n of Am. v. City of L.A.*, 441 F. Supp. 3d 915,

26  931 (C.D. Cal. 2019) (relying on the "text of the Ordinance, the Ordinance's legislative history,

27  and the concurrent public statements made by the Ordinance's primary legislative sponsor" to find

28  that the challenged law was intended to suppress speech). An improper reason that *could* have

1    motivated legislation is not relevant unless there is evidence showing that the improper reason

2    *actually* motivated the legislature.

3         As a fallback, NetChoice argues that SB 976 is subject to strict scrutiny because its

4    coverage definition draws speaker-based distinctions.  NetChoice is correct that the law draws

5    speaker-based distinctions, but the fact that a law is speaker-based does not automatically trigger

6    strict scrutiny.  "[P]rovisions [that] distinguish between speakers" are not subject to strict scrutiny

7    if they do not distinguish based "upon the messages [those speakers] carry."  *Turner*, 512 U.S. at

8    645.  Only when "speaker preference reflects a content preference" does strict scrutiny apply.

9    *Reed*, 576 U.S. at 170 (quoting *Turner*, 512 U.S. at 658).  Here, for the reasons above,[6] the

10   distinctions that SB 976 draw do not reflect a content preference.  Accordingly, intermediate

11   scrutiny applies.

                                    b.        **Application of Scrutiny**

13        Defendant has the burden of establishing that SB 976 is likely to survive intermediate

14   scrutiny.  Such scrutiny has three steps.  First, Defendant must demonstrate that SB 976

15   "'further[s] an important or substantial government interest' that [] must be 'unrelated to the

16   suppression of free expression.'"  *Porter*, 68 F.4th at 443 (quoting *O'Brien*, 391 U.S. at 377).

17   Second, burdens on speech must be "no greater than is essential to the furtherance of that interest,"

18   though a regulation "need not be the least restrictive or least intrusive means of serving that

19   interest."  *Id.* (first quoting *O'Brien*, 391 U.S. at 377; and then quoting *Ward*, 491 U.S. at 798)

20   (internal quotations omitted).  Finally, the regulation must "leave open ample alternative channels

21   for communication."  *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293

22   (1984)).  On the record assembled to date, Defendant has failed at the second step to show that SB

23   976's notification provisions are properly tailored.

24        Starting at the first step, the Court finds that Defendant has established an important

25   government interest: the protection of children's health.  *See* SB 976 § 1(b) (noting that social

26

27   ───────────────────────
     [6] NetChoice also posits that SB 976 distinguishes between speakers by distinguishing between
     user- and provider-generated content.  That does not reveal any content preference, though,
28   because either type of content can be about any topic and espouse any view.

     Case No.: 5:24-cv-07885-EJD
     ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
     26

United States District Court
Northern District of California

1    media platforms "pose a significant risk of harm to the mental health and well-being of children

2    and adolescents").  As the Supreme Court recognizes, "the need to protect children from

3    exposure" to harmful material is an "extremely important justification, one that [it] has often

4    found compelling." *Denver Area Educ. Telecomms.*, 518 U.S. at 743 (collecting cases).  That is a

5    good start, but in claiming an interest in protecting children, governments must go beyond the

6    general and abstract to prove that the activities they seek to regulate actually harm children.

7    *Brown*, 564 U.S. at 799.  In *Brown*, the government failed to do so because it provided evidence

8    only of correlation, not causation.  *Id.* at 799–800.  However, *Brown* involved strict scrutiny, not

9    intermediate scrutiny as applies here.  *Id.* at 799.  And in any case, Defendant in this case has

10    provided evidence of both causation and correlation.  His experts have pointed to both large

11    observational studies that show correlation as well as to smaller experimental studies that show

12    causation.  *See* Feder Decl., ECF No. 18-2; Radesky Decl.  All these studies show that social

13    media can cause harms to minors.

14          Even so, Defendant has failed to show that SB 976's notification provisions are properly

15    tailored because the provisions are extremely underinclusive.  Even on intermediate scrutiny,

16    underinclusiveness can be fatal on its own when severe enough.  *See Nat'l Inst. of Family & Life*

17    *Advocs. v. Becerra*, 585 U.S. 755, 773–74 (2018) (finding that a compelled speech provision

18    failed intermediate scrutiny because it was "wildly underinclusive"); *see also Brown*, 564 U.S. at

19    802 (when applying strict scrutiny, a finding that a "regulation is wildly underinclusive . . . is

20    alone enough to defeat it").  The motivation for banning notifications to minors during school

21    hours and at night seems to be a concern that notifications will distract minors from school or

22    interrupt their sleep.  SB 976 § 1(d); *see also, e.g.*, Radesky Decl. ¶¶ 24, 28–29, 33, 37–41.  But if

23    that is the case, why not prohibit all notifications during those hours?  As NetChoice observed at

24    hearing, a sports website such as ESPN can send notifications about, for instance, a minor's

25    favorite team winning a national championship during prohibited hours, but Facebook could not

26    send the same notification.  Both notifications seem equally capable of causing distractions or

27    sleep disruptions, so by allowing notifications from non-covered companies, SB 976 undermines

28    its own goal.  As a result, SB 976 appears to restrict significant amounts of speech for little gain.

United States District Court
Northern District of California

1    There may well be an explanation for why Facebook's notification is more likely to
2    distract students or disrupt sleep than ESPN's notification.  The Court can speculate as to why that
3    may be, but the Court's own speculations are not enough.  It is Defendant's burden to show that
4    SB 976 is likely to survive intermediate scrutiny by providing evidence.  He has not done so.

5                                                  *          *          *

6    As a result, the Court finds that NetChoice is likely to succeed on its First Amendment
7    claim against SB 976's notification provisions.  The remaining preliminary injunction factors also
8    favor granting an injunction, as NetChoice's members would suffer irreparable harm from First
9    Amendment violations, and there is a strong public interest in protecting free speech.  *Klein*, 584
10   F.3d at 1208; *Elsasser*, 32 F.4th at 731.  Therefore, the Court **GRANTS** a preliminary injunction
11   as to SB 976's notification provisions.

12                          **3.          Default Settings**

13   Next, the Court turns to the five default settings that SB 976 requires covered entities to
14   create.  Three of them are effectively duplicative of SB 976's personalized feed and notification
15   provisions.  Cal. Health & Safety Code §§ 27002(b)(1) (notification provisions), (2) and (4)
16   (personalized feed provisions).  The Court's analysis above applies equally to those three settings.
17   Accordingly, the Court **ENJOINS** § 27002(b)(1) but not §§ 27002(b)(2) and (4).

18   The two remaining default settings present different questions.  The Court begins with
19   § 27002(b)(3), which requires covered entities to create a setting that allows parents to "[l]imit
20   their child's ability to view the number of likes or other forms of feedback."  This setting must be
21   turned on by default.  Notably, this setting would only restrict a minor's ability to view the *number*
22   of likes and other forms of feedback, not the minor's ability to view the underlying likes and
23   feedback.  It far from obvious that this setting implicates the First Amendment at all because the
24   underlying speech is still viewable.  Further, the Court sees little apparent expressive value in
25   displaying a count of the number of total likes and reactions.  Even assuming the First Amendment
26   applies, though, this setting would face at most intermediate scrutiny because it applies to all
27   forms of feedback and is therefore content neutral.  It easily survives intermediate scrutiny.  The
28   setting is motivated by an important interest—protecting minors from harms to self-esteem and

United States District Court
Northern District of California

1    mental health that arise when minors fixate on the number of positive reactions they receive.  SB

2    976 § 1(c); *see also, e.g.*, Radesky Decl. ¶¶ 53, 72–73, 88.  The setting is also minimally

3    restrictive because all the underlying speech is still available for viewing.  By removing automatic

4    counters, the setting only makes it harder to fixate on the number of likes received and therefore

5    discourages minors from doing so.  Finally, since the underlying reactions are still viewable,

6    virtually no speech has been blocked.  For these reasons, the Court **DENIES** a preliminary

7    injunction as to § 27002(b)(3).

8        Lastly, § 27002(b)(5) requires covered entities to create a private mode setting that

9    prevents users from viewing or responding to a child's posts unless that user is connected with the

10   child on social media (such as becoming friends with the child on Facebook).  This obviously

11   regulates speech because it limits the ability of users to speak with minors on social media

12   platforms.  But it is content neutral because it does not discriminate based on message.  And it

13   subsequently survives intermediate scrutiny:  It is well-known that adults on the internet can

14   exploit minors through social media, and implementing a private mode would reduce that danger.

15   It is not particularly restrictive because the minor can still speak to any user she wishes to if that

16   user requests to connect and the minor accepts.  And the ability for users to request to connect

17   with minors leaves open adequate channels of communication.  So, the Court also **DENIES** a

18   preliminary injunction as to § 27002(b)(5).

19                **4.    Compelled Disclosures**

20       Finally, the Court addresses SB 976's compelled disclosure requirement.  Cal Health &

21   Safety Code § 27005.  Under this requirement, covered companies must annually disclose "the

22   number of minor users of [their covered platforms], and of that total the number for whom the

23   operator has received verifiable parental consent to provide [a covered] feed, and the number of

24   minor users as to whom the controls set forth in Section 27002 are or are not enabled."  *Id.*

25       Defendant argues that this provision is constitutional under *Zauderer v. Office of*

26   *Disciplinary Counsel*, 471 U.S. 626 (1985), because it compels information that is purely factual

27   and uncontroversial.  *Zauderer*, however, applies to "First Amendment claim[s] involving

28   compelled *commercial speech*."  *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 756

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
29

United States District Court
Northern District of California

1    (9th Cir. 2019) (en banc) (emphasis added).  Commercial speech is "usually defined as speech that

2    does no more than propose a commercial transaction."  *United States v. United Foods, Inc.*, 533

3    U.S. 405, 409 (2001).  Disclosing information about the number of minors using a social media

4    platform does not in any way propose a commercial transaction.

5         That said, the inquiry does not end here as this propose-a-transaction definition is more of

6    a "starting point" for identifying commercial speech than an exclusive definition.  *X Corp. v.*

7    *Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (quoting *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d

8    1107, 1115 (9th Cir. 2021)).  The ultimate determination on whether speech is commercial or non-

9    commercial depends on the unique facts of a case.  In evaluating those facts, courts focus on three

10   *Bolger* factors: (1) whether speech is an advertisement, (2) whether speech refers to a particular

11   product, and (3) whether there is an economic motivation to speak.  *Hunt v. City of L.A.*, 638 F.3d

12   703, 715 (9th Cir. 2011) (citing *Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)).

13   The inquiry into these three factors is holistic—not every one of those factors is required to find

14   that speech is commercial.  *Bolger*, 463 U.S. at 67 n.14.

15        In this instance, the speech required by § 27005 fails at least the first and third *Bolger*

16   factors.  The disclosures about minor users are plainly not advertisements.  And because the

17   compelled disclosures do not report "existing commercial speech, [] a social media company has

18   no economic motivation in their content."  *X Corp.*, 116 F.4th at 901.  Only the second *Bolger*

19   factor arguably supports a finding that the compelled disclosures are commercial speech because

20   the number of minor users is related to the particular service that a social media company

21   provides.  But the compelled information does not seem commercially relevant.  It is not like

22   terms of service that a consumer might be interested in when deciding whether to use a social

23   media platform.  Nor does it give much insight into how covered entities run their social media

24   platforms; rather, the disclosures report how *users* behave on those platforms.  The disclosures

25   also say nothing about the quality of features on those platforms that might be relevant to

26   consumers deciding between different platforms.  Regardless, the fact that the § 27005 disclosure

27   does not accord with the "starting point" definition of commercial speech and does not meet at

28   least two of the *Bolger* factors strongly suggests that it is not commercial speech.  *See id.*

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
30

1   Consequently, *Zauderer* does not apply, and the Court must determine whether

2   intermediate or strict scrutiny applies by assessing § 27005's content neutrality.  The disclosure

3   provision is content based because it requires covered entities to speak on specific topics but not

4   others.  Accordingly, strict scrutiny applies, and the Court finds that § 27005 fails strict scrutiny at

5   least because it is not narrowly tailored.  *See Brown*, 564 U.S. at 799.  Defendant argues that SB

6   976 serves California's interest in protecting minors, but compelling disclosures about the number

7   of minors using a social media platform makes no discernable contribution to that interest.  The

8   Court sees no reason why revealing to the public the number of minors using social media

9   platforms would reduce minors' overall use of social media and associated harms.  Nor does the

10  Court see why disclosing statistics about parental consent would meaningfully encourage parents

11  to withhold consent from social media features that might cause harm.

12  Therefore, NetChoice has shown that it is likely to succeed in its First Amendment claim

13  against the compelled disclosure requirement.  Being compelled to speak in violation of the First

14  Amendment is irreparable harm, and the public interest cuts against compelling unwanted speech.

15  *See Klein*, 584 F.3d at 1208; *Elsasser*, 32 F.4th at 731.  So, the Court **GRANTS** a preliminary

16  injunction as to SB 976's compelled disclosure provision.

17  **C.    As-Applied First Amendment Challenges**

18  Having finished with NetChoice's facial challenges, the Court turns to NetChoice's as-

19  applied challenges.  Since the Court concluded that NetChoice is entitled to preliminary

20  injunctions against SB 976's notification and compelled disclosure provisions based on

21  NetChoice's facial challenges, there is no need to address the as-applied challenges to those

22  provisions.  Any relief that the as-applied challenges could yield would be subsumed within the

23  injunction from the facial challenges.  As for NetChoice's as-applied challenge to the default

24  settings regarding the number of reactions and private mode, the Court sees no meaningful

25  difference between the facial analysis and as-applied analysis.  Accordingly, the Court **DENIES**

26  any as-applied injunction to those two settings as well.

27  That leaves NetChoice's as-applied challenge to SB 976's personalized feed provisions.

28  As the Court explained in detail above, NetChoice's facial challenge fails at this stage because the

United States District Court
Northern District of California

1    expressive qualities of personalized feeds may differ between social media platforms, and

2    NetChoice has not exhaustively surveyed all the personalized feeds covered by SB 976.  *Supra*

3    Section III.B.1.a.  But on an as-applied challenge, NetChoice's task would be less daunting since

4    NetChoice would only need to detail the functioning of personalized feeds for the five members it

5    raises those as-applied challenges on behalf of.  NetChoice lacks associational standing to raise

6    these as-applied challenges, though.

7         To have associational standing, NetChoice must show that "(a) its members would

8    otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane

9    to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires

10   the participation of individual members in the lawsuit."  *Hunt*, 432 U.S. at 343.  There is little

11   question that NetChoice meets the first two requirements.  It is on the third requirement that its as-

12   applied challenges fail.  Challenges to SB 976's personalized feed provisions require deep factual

13   inquiries into how a particular social media feed works.  *Supra* Section III.B.1.a.  In other words,

14   each separate as-applied challenge on behalf of each separate NetChoice member requires its own

15   "ad hoc factual inquiry."  *Ass'n of Christian Schs. Int'l v. Stearns*, 678 F. Supp. 2d 980, 986 (C.D.

16   Cal. 2008) (citation omitted), *aff'd*, 362 F. App'x 640, 644 (9th Cir. 2010) (need for

17   "individualized proof" defeats associational standing).  For the Court to adjudicate these as-

18   applied claims, it is therefore necessary for NetChoice's individual members to participate in this

19   lawsuit, at the very least for the purpose of conducting discovery into how each of those members'

20   feeds work.  So, the Court finds that NetChoice lacks associational standing to raise as-applied

21   challenges to SB 976's personalized feed provisions and **DENIES** a preliminary injunction on that

22   basis.

23         **D.**    **Void for Vagueness Challenge**

24         Finally, NetChoice argues that the Court should enjoin SB 976 in its entirety because it is

25   too vague.  Facial vagueness challenges, however, are difficult to win.  "[P]erfect clarity and

26   precise guidance have never been required even of regulations that restrict expressive activity."

27   *Ward*, 491 U.S. at 794.  And close or difficult cases abound—that such cases can be imagined is

28   not grounds to invalidate a law for vagueness.  *United States v. Williams*, 553 U.S. 285, 305–06

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
32

United States District Court
Northern District of California

1    (2008).

2        Here, NetChoice points to two sources of potential vagueness.  First, it suggests that SB

3    976's definition of covered feeds is vague because it is unclear how the definition's exceptions

4    interact with the base definition of a covered feed.  There is nothing confusing about how the two

5    interact.  As long as any one of the exceptions is met, either "alone or in combination with one

6    another," a feed is not covered even if it otherwise meets the base definition.  Cal. Health & Safety

7    Code § 27000.5(a).  Second, NetChoice claims that it is vague for SB 976 to define covered

8    entities as those that offer covered feeds as a "significant part" of their services.  *Id.*

9    § 27000.5(b)(1).  NetChoice claims that "significant" is open-ended and subjective.  But

10    qualitative words of degree like "significant" are common in our statutes.  They are an

11    unavoidable part of the law.  So, "[a]s a general matter, [courts] do not doubt the constitutionality

12    of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world

13    conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . .

14    some matter of degree.'"  *Johnson v. United States*, 576 U.S. 591, 603–04 (2015) (quoting *Nash v.*

15    *United States*, 229 U.S. 373, 377 (1913)).  For this reason, the Court **DENIES** a preliminary

16    injunction on NetChoice's vagueness argument.

17        **E.    Severability**

18        Because the Court found that some portions of SB 976 are likely unconstitutional while

19    others are not, the Court ends by considering whether the likely unconstitutional provisions can be

20    severed such that the Court can enjoin only those provisions.  As SB 976 is a California law, the

21    Court applies California's rules of severability.  *Sam Francis Found. v. Christies, Inc.*, 784 F.3d

22    1320, 1325 (9th Cir. 2015).  Under California law, the presence of a severability clause creates a

23    presumption that provisions are severable.  *Garcia v. City of L.A.*, 11 F.4th 1113, 1120 (9th Cir.

24    2021) (citing *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 270 (2011)).  Such a

25    clause exists in SB 976.  Cal. Health & Safety Code § 27007.

26        In addition, California law requires courts to evaluate whether "the invalid portion of a

27    statute is 'grammatically, functionally, and volitionally' severable from the valid remainder of the

28    statute.  *NetChoice*, 113 F.4th at 1124 (quoting *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805,

United States District Court
Northern District of California

821 (1989)).  A provision is grammatically severable when it is "distinct and separate" and "can be removed as a whole without affecting the wording of any other provision." *Calfarm*, 48 Cal. 3d at 822.  That is the case here, where each likely unconstitutional provision exists in a separate section or subsection of SB 976.  By contrast, functional severability is met when an invalid provision "is not necessary to the measure's operation and purpose." *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 21 Cal. 4th 585, 613 (1999).  Once more, that is the case here.  The notification and compelled disclosure provisions are not prerequisites for any valid provision's operation.  And part of the reason that the Court enjoined those provisions is that they would not contribute much to SB 976's purpose.  Finally, volitional severability asks "whether the remainder [of a statute] would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute." *Matosantos*, 53 Cal. 4th at 271 (citation and internal quotations omitted).  SB 976's express severability clause and the relative ineffectiveness of the provisions to be severed lead the Court to answer "yes."

Therefore, the Court finds the likely unconstitutional provisions to be severable.

## IV.    CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** NetChoice's motion for a preliminary injunction.  Because the Court decided this motion on a highly abbreviated schedule and the parties had the opportunity to assemble only a thin record in that time, the Court emphasizes that this preliminary injunction order is just that—preliminary. Further factual development could well reveal that provisions enjoined now are constitutional, or that provisions not enjoined now are unconstitutional.  For the time being, though, the Court **ENJOINS** Defendant from enforcing California Health and Safety Code §§ 27002(a), 27002(b)(1), and 27005.  Defendant may enforce the remainder of the law.

**IT IS SO ORDERED.**

Dated: December 31, 2024

EDWARD J. DAVILA
United States District Judge

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART & DEN. IN PART MOT. FOR PRELIMINARY INJUNCTION
34

United States District Court
Northern District of California

# Exhibit B

to NetChoice's Motion for Injunction Pending Appeal

1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

3    NETCHOICE,                                    Case No. _____

4                        Plaintiff,               **EXHIBIT 1 –**
                                                   **TEXT OF SENATE BILL 976 (2024)**
5              v.

6    ROB BONTA, in his official capacity as
     Attorney General of California,
7
                        Defendant.
8

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A – TEXT OF SENATE BILL 976 (2024)**

**Senate Bill No. 976**

**CHAPTER 321**

An act to add Chapter 24 (commencing with Section 27000) to Division 20 of the Health and Safety Code, relating to youth addiction.

[Approved by Governor September 20, 2024. Filed with
Secretary of State September 20, 2024.]

LEGISLATIVE COUNSEL'S DIGEST

SB 976, Skinner. Protecting Our Kids from Social Media Addiction Act.

Existing law, the California Age-Appropriate Design Code Act, requires, beginning July 1, 2024, a business that provides an online service, product, or feature likely to be accessed by children to comply with certain requirements. The act requires the business to complete a data protection impact assessment addressing, among other things, whether the design could harm children and whether and how the online product, service, or feature uses system design features to increase, sustain, or extend use of the online product, service, or feature by children, including the automatic playing of media, rewards for time spent, and notifications. Existing law prohibits the business from using the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child.

Existing law, the Privacy Rights for California Minors in the Digital World, prohibits an operator of an internet website, online service, online application, or mobile application from specified conduct when minors are involved, including the marketing or advertising of alcoholic beverages, firearms, or certain other products or services. Existing law sets forth other related protections for minors, including under the California Consumer Privacy Act of 2018 and the California Privacy Rights Act of 2020.

This bill, the Protecting Our Kids from Social Media Addiction Act, would make it unlawful for the operator of an addictive internet-based service or application, as defined, to provide an addictive feed to a user, unless the operator does not have actual knowledge that the user is a minor; commencing January 1, 2027, has reasonably determined that the user is not a minor; or has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

The bill would define "addictive feed" as an internet website, online service, online application, or mobile application, in which multiple pieces of media generated or shared by users are recommended, selected, or prioritized for display to a user based on information provided by the user, or otherwise associated with the user or the user's device, as specified, unless any of certain conditions are met.

Ch. 321                    — 2 —

The bill would make it unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor or, commencing January 1, 2027, has not reasonably determined that the user is not a minor, unless the operator has obtained verifiable parental consent to send those notifications, as specified. The bill would set forth related provisions for certain access controls determined by the verified parent through a mechanism provided by the operator.

Under the bill, a parent's provision of consent or use of a mechanism, as described above, would not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator regarding any harm to the mental health or well-being of the user.

The bill would require an operator to annually disclose the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the access controls are or are not enabled.

Under the bill, these provisions would only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General. The bill would require the Attorney General to adopt regulations to further the purposes of these provisions, including regulations regarding age assurance and parental consent by January 1, 2027. The bill would authorize the Attorney General to adopt regulations that provide for exceptions to these provisions, but only if those exceptions further the purpose of protecting minors. The bill would require the Attorney General, in promulgating regulations, to solicit public comment regarding the impact that any regulation might have based on certain nondiscrimination characteristics set forth in existing law.

The bill would make these provisions severable.

*The people of the State of California do enact as follows:*

SECTION 1.  The Legislature finds and declares the following:

(a) Social media provides an important tool for communication and information sharing. Approximately 95 percent of 13- to 17-year-olds, inclusive, say that they use at least one social media platform, and more than one-third report using social media almost constantly.

(b) However, some social media platforms have evolved to include addictive features, including the algorithmic delivery of content and other design features, that pose a significant risk of harm to the mental health and well-being of children and adolescents.

(40 of 125), Page 40 of 125   Case: 25-146, 01/03/2025, DktEntry: 4.2, Page 40 of 125
Case 5:24-cv-07885-EJD   Document 2-1   Filed 11/12/24   Page 4 of 8

— 3 —                    Ch. 321

(c)  As the United States Surgeon General has reported, recent evidence has identified "reasons for concern" about social media usage by children and adolescents. This evidence includes a study concluding that the risk of poor mental health outcomes doubles for children and adolescents who use social media at least three hours a day and research finding that social media usage is linked to a variety of negative health outcomes, including low self-esteem and disordered eating, for adolescent girls.

(d)  Heavier usage of social media also leads to less healthy sleep patterns and sleep quality, which can in turn exacerbate both physical and mental health problems.

(e)  Further, social media usage is more strongly associated with negative mental health outcomes, including depressive symptoms and self-harm behaviors, than is consumption of other forms of media such as television or electronic games.

(f)  Both California and the country as a whole are facing an ongoing youth mental health crisis, with rates of adolescent suicides, depressive episodes, and feelings of sadness and hopelessness on the rise in recent years.

(g)  For these reasons, it is essential that California act to ensure that social media platforms obtain parental consent before exposing children and adolescents to harmful and addictive social media features.

SEC. 2.  Chapter 24 (commencing with Section 27000) is added to Division 20 of the Health and Safety Code, to read:

CHAPTER 24.  PROTECTING OUR KIDS FROM SOCIAL MEDIA ADDICTION ACT

27000.  This chapter shall be known, and may be cited, as the Protecting Our Kids from Social Media Addiction Act.

27000.5.  For purposes of this chapter, the following terms have the following meanings:

(a)  "Addictive feed" means an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device, unless any of the following conditions are met, alone or in combination with one another:

(1)  The information is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by others.

(2)  The information consists of search terms that are not persistently associated with the user or user's device.

(3)  The information consists of user-selected privacy or accessibility settings, technical information concerning the user's device, or device communications or signals concerning whether the user is a minor.

(4)  The user expressly and unambiguously requested the specific media or media by the author, creator, or poster of the media, or the blocking, prioritization, or deprioritization of such media, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device, except as otherwise permitted by this chapter and, in the case of audio or video content, is not automatically played.

(5)  The media consists of direct, private communications between users.

(6)  The media recommended, selected, or prioritized for display is exclusively the next media in a preexisting sequence from the same author, creator, poster, or source and, in the case of audio or video content, is not automatically played.

(7)  The recommendation, selection, or prioritization of the media is necessary to comply with this chapter or any regulations promulgated pursuant to this chapter.

(b)  (1)  "Addictive internet-based service or application" means an internet website, online service, online application, or mobile application, including, but not limited to, a "social media platform" as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website, online service, online application, or mobile application.

(2)  "Addictive internet-based service or application" does not apply to either of the following:

(A)  An internet website, online service, online application, or mobile application for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof.

(B)  An internet website, online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage.

(c)  "Media" means text, audio, an image, or a video.

(d)  "Minor" means an individual under 18 years of age who is located in the State of California.

(e)  "Operator" means a person who operates or provides an internet website, an online service, an online application, or a mobile application.

(f)  "Parent" means a parent or guardian, including as defined in regulations promulgated pursuant to this chapter.

(g)  "User" means a person who uses an internet website, online service, online application, or mobile application. "User" does not include the operator or a person acting as an agent of the operator.

27001.  (a)  It shall be unlawful for the operator of an addictive internet-based service or application to provide an addictive feed to a user unless either of the following is met:

(1)  (A)  Except as provided in subparagraph (B), the operator does not have actual knowledge that the user is a minor.

(B)  Commencing January 1, 2027, the operator has reasonably determined that the user is not a minor, including pursuant to regulations promulgated by the Attorney General.

— 5 —                                        Ch. 321

(2) The operator has obtained verifiable parental consent to provide an addictive feed to the user who is a minor.

(b) Information collected for the purpose of determining a user's age or verifying parental consent pursuant to this chapter shall not be used for any purpose other than compliance with this chapter or with another applicable law. The information collected shall be deleted immediately after it is used to determine a user's age or to verify parental consent, except as necessary to comply with state or federal law.

27002.  (a) (1) Except as provided in paragraph (2), it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user if the operator has actual knowledge that the user is a minor unless the operator has obtained verifiable parental consent to send those notifications.

(2) Commencing January 1, 2027, it shall be unlawful for the operator of an addictive internet-based service or application, between the hours of 12 a.m. and 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m., from Monday through Friday from September through May in the user's local time zone, to send notifications to a user whom the operator has not reasonably determined is not a minor, including pursuant to regulations promulgated by the Attorney General, unless the operator has obtained verifiable parental consent to send those notifications.

(b) The operator of an addictive internet-based service or application shall provide a mechanism through which the verified parent of a user who is a minor may do any of the following:

(1) Prevent their child from accessing or receiving notifications from the addictive internet-based service or application between specific hours chosen by the parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited between the hours of 12 a.m. and 6 a.m., in the user's local time zone.

(2) Limit their child's access to any addictive feed from the addictive internet-based service or application to a length of time per day specified by the verified parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited to one hour per day unless modified by the verified parent.

(3) Limit their child's ability to view the number of likes or other forms of feedback to pieces of media within an addictive feed. This setting shall be set by the operator as on by default.

(4) Require that the default feed provided to the child when entering the internet-based service or application be one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor.

(5) Set their child's account to private mode, in a manner in which only users to whom the child is connected on the addictive internet-based service

91

Ch. 321 — 6 —

or application may view or respond to content posted by the child. This setting shall be set by the operator as on by default.

27003.   (a)  This chapter shall not be construed as requiring the operator of an addictive internet-based service or application to give a parent any additional or special access to, or control over, the data or accounts of their child.

(b)  This chapter shall not be construed as preventing any action taken in good faith to restrict access to, or availability of, media.

27004.   (a)  An operator may choose not to provide services to minors. However, the operator of an addictive internet-based service or application shall not withhold, degrade, lower the quality of, or increase the price of, any product, service, or feature, other than as required by this chapter, due to a user or parent availing themselves of the rights provided by this chapter, or due to the protections required by this chapter.

(b)  A parent's provision of consent as described in Section 27001 or 27002, or the use by a parent of a mechanism as described in Section 27002, does not waive, release, otherwise limit, or serve as a defense to, any claim that the parent, or that the user who is a minor or was a minor at the time of using the internet-based service or application, might have against the operator of an addictive internet-based service or application regarding any harm to the mental health or well-being of the user.

(c)  The protections provided by this chapter are in addition to those provided by any other applicable law, including, but not limited to, the California Age-Appropriate Design Code Act (Title 1.81.47 (commencing with Section 1798.99.28) of Part 4 of Division 3 of the Civil Code).

27005.   An operator of an addictive internet-based service or application shall publicly disclose, on an annual basis, the number of minor users of its addictive internet-based service or application, and of that total the number for whom the operator has received verifiable parental consent to provide an addictive feed, and the number of minor users as to whom the controls set forth in Section 27002 are or are not enabled.

27006.   (a)  This chapter may only be enforced in a civil action brought in the name of the people of the State of California by the Attorney General.

(b)  The Attorney General shall adopt regulations to further the purposes of this chapter, including regulations regarding age assurance and parental consent by January 1, 2027. The Attorney General may adopt regulations that provide for exceptions to this chapter, but only if those exceptions further the purpose of protecting minors.

(c)  In promulgating the regulations described in subdivision (b), the Attorney General shall solicit public comment regarding the impact that any regulation might have based on the nondiscrimination characteristics set forth in Section 51 of the Civil Code or in any other applicable law.

27007.   If any provision of this chapter, or application thereof, to any person or circumstance is held invalid, that invalidity shall not affect other provisions or applications of this chapter that can be given effect without

— 7 —                                        **Ch. 321**

the invalid provision or application, and to this end the provisions of this
chapter are declared to be severable.

O

# Exhibit C

to NetChoice's Motion for Injunction Pending Appeal

1

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

3

NETCHOICE,

Case No. _____

4

Plaintiff,

**DECLARATION OF BARTLETT**
**CLELAND IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR**
**PRELIMINARY INJUNCTION**

5

v.

6

ROB BONTA, in his official capacity as
Attorney General of California,

7

8

Defendant.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

I, Bartlett Cleland, declare as follows:

1.    I am the General Counsel and Director of Strategy Initiatives of Plaintiff NetChoice. As such, I draft and deliver legislative testimony, regulatory comments, and position papers in support of NetChoice's objectives, as well as represent NetChoice in public forums, at industry events, and in meetings with government officials and agencies. I work with team members to execute NetChoice's lobbying efforts at the federal and state levels, educating lawmakers and regulators on technology issues in service of NetChoice's mission. I also assist in developing NetChoice's policy agenda, working closely with the CEO, Board of Directors, and members to identify legislative and regulatory priorities. My role at NetChoice and my previous experience—which includes being a known thought leader, writer, and speaker on all issues of innovation, communications, and technology, having spent twenty-six years in the technology and innovation public policy space—has also made me familiar with other websites, applications, and digital services more broadly.[1]

2.    I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

### About NetChoice.

3.    NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas. NetChoice has over two

---

[1] This Declaration will refer to all digital services covered by the Act as "covered websites," unless necessary to distinguish among different kinds of digital services. Similarly, this Declaration will use "members" to refer to NetChoice members with services regulated by the Act, unless otherwise noted.

[2] NetChoice, Home, https://perma.cc/QU4H-5KPQ.

1

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1   decades of experience advocating for online businesses and for the principles of free speech and

2   free enterprise on the Internet.

3       4.    For over two decades, NetChoice has worked to promote online speech and

4   commerce and to increase consumer access and options through the Internet, while minimizing

5   burdens on businesses to help make the Internet more accessible and useful for both businesses

6   and consumers. Our members include a broad array of popular online services, including: Airbnb,

7   Alibaba.com, Amazon.com, AOL, Dreamwidth, eBay, Etsy, Expedia, Fluid Truck, Google,

8   HomeAway, Hotels.com, Lime, Lyft, Meta, Netflix, Nextdoor, Oath, OfferUp, Orbitz, PayPal,

9   Pindrop, Pinterest, PrizePicks, Snap Inc., StubHub, Swimply, Travel Tech, Travelocity, Trivago,

10  Turo, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), and Yahoo!. *See*

11  NetChoice, About Us, https://perma.cc/45JF-PMWK.

**NetChoice members' websites are full of valuable expression and communities that provide people—minors and adults alike—with profound benefits.**

12  
13      5.    NetChoice members' websites publish, disseminate, display, compile, create,

14  curate, and distribute a wide range of valuable and protected expression—including through feeds

15  personalized for each user. They disseminate content (text, audio, graphics, and video) that

16  facilitates their users' ability to practice their religious beliefs, engage in political discourse, seek

17  cross-cultural dialogue, supplement their education, or learn new skills. Users employ the websites

18  to communicate in a wide variety of ways—socially (to connect with friends from school and

19  church, form groups, or find communities of those with likeminded interests), demonstratively (to

20  showcase their creative, artistic, or athletic talents), informatively (to keep up with the news or

21  current events), politically (to participate in public discussion or raise awareness about social

22  causes), educationally (to get help with math problems, learn about financial literacy, or listen to

23  college course lectures), professionally (to network, find job opportunities, and share their

24  resumes), and myriad other ways.

25      6.    NetChoice member websites offer their users the ability to participate in different

26  communities. On Facebook, users can create communities with other like-minded users for many

27  purposes, including by taking part in religious services. On Instagram, users can share vacation

28

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

pictures and short informative videos. On Nextdoor, users can connect with their neighbors, including by sharing local news and requesting to borrow tools. On Pinterest, users can discover ideas for recipes, style, home decor, motivation, and more. On YouTube, users can watch documentaries. And on X, users can engage with their elected representatives and the political, cultural, and social topics of the day.

7.      These covered websites organize combinations of both user-generated (third-party) content and speech they author. Each website makes unique decisions about how to organize, display, moderate, and disseminate content.

8.      **Personalized feeds.** Because it is impossible for users to view all of the content available on the websites, websites must decide how to organize each user's home page. Many member websites provide a "feed," "for you," "following," or "landing" page. This is a central hub that allows a user to see the content, activity, and other expression created and shared by family, friends, selected contributors, connections, and other content creators. Personalization is a hallmark of members' feeds and ensures that people are presented with the most useful and relevant content. Without the ability to curate and present content to people, it would be impossible for websites to prioritize minor safety and display only age-appropriate content to minors—counterproductively making it more likely that minors encounter inappropriate content on members' websites.

9.      **Notifications.** Many covered websites also provide users the option to receive notifications. Notifications allow covered websites to facilitate communication and interaction among users by informing users about new messages, comments, content from connections, and recommendations, among other things. NetChoice member websites that use notifications allow users to control those notifications. *See, e.g.*, Facebook, Choose What You Get Notifications for on Facebook, https://perma.cc/KA7L-AQW4; Instagram, Notification Settings, https://perma.cc/A2WU-DECL; Nextdoor, How to Change Your Mobile Notifications, https://perma.cc/KA5S-J2FJ; Pinterest, Edit Notification Settings, https://perma.cc/FVX9-N282; YouTube Help, Manage YouTube Notifications, https://perma.cc/JT2G-TLWL; X, About Notifications on Mobile Devices, https://perma.cc/N5N7-V7YU. And users can also adjust

3

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

notification settings on their devices. *See, e.g.*, Apple, Use Notifications on Your iPhone or iPad, https://perma.cc/YB2V-PACA; Samsung, Control App Notifications on Your Galaxy Phone or Tablet, https://perma.cc/QK3D-KJMQ; Google, Control Notifications on Your Pixel Phone, https://perma.cc/W5HT-UPSR.

10.    The use of notifications is widespread and not limited to covered websites. Nearly every application left uncovered by the Act also sends notifications to its users. Examples include Apple News, Disney+, ESPN, The New York Times, and The Wall Street Journal. *See* Apple, Turn Notifications and Emails On or Off in Apple News, https://perma.cc/D446-ET89; Disney+, Push Notifications on Disney+, https://perma.cc/V47H-KSBU; ESPN, How Do I Sign Up for Alerts?, https://perma.cc/GA3Z-AZ2A; Libby Help, Managing Notifications, https://perma.cc/9DD2-CPRM; The New York Times Help Center, iOS News App, https://perma.cc/5MG8-8Q46; The Wall Street Journal Help Center, Newsletters & Alerts, https://perma.cc/XL6M-RPYD.

**Parents have many tools to oversee and control their minor children online, and NetChoice members go to great lengths to protect minors.**

11.    With existing and widely available tools, parents and guardians have many choices to oversee and control their minor children's use of the Internet. These tools both overlap and complement each other.

12.    Of course, parents can also control whether their minor children have access to Internet-connected devices in the first place.

13.    **Network-level restrictions.** Many cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access, to block certain apps, sites, and contacts from their children's phones and tablets, and to restrict screen time on devices. *See, e.g.*, Verizon, Verizon Family, https://perma.cc/QMJ7-MG4C; AT&T, AT&T Secure Family, https://perma.cc/CP4K-W4BV; T-Mobile, Family Controls and Privacy, https://perma.cc/9P3X-RQB4;. Similarly, many wireless routers publicize their parental control settings that parents can use to block specific online services, allow only the specific online services that a parent specifies, limit the time that their children spend on the Internet, set individualized content filters, and

4

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1  monitor the online services that their children visit. *See, e.g.*, Molly Price & Ry Crist, *Take a*
2  *Moment to Set Up Parental Controls on Your Router*, CNET (Sept. 24, 2024),
3  https://perma.cc/UW2U-P4FX; Netgear, Netgear Smart Parental Controls, https://perma.cc/F22D-
4  VH27; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1),
5  https://perma.cc/TYM8-RAUD.

6        14.    **Device-level restrictions.** Many Internet-connected devices contain ways parents
7  can restrict their use by minor children. Specifically, many of the manufacturers of the most widely
8  used mobile phones and tablets publicize the ways parents can limit screen time across their
9  devices and provide parents with tools to control what applications their children can use, set age-
10  related restrictions on those applications, filter content, and control privacy settings. *See, e.g.*,
11  Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/8TYS-ZJL4;
12  Google, Family Link, Help Keep Your Family Safer Online, https://perma.cc/7G83-FK48;
13  Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/25SA-MGXP;
14  Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/2RD6-
15  SH5X. Likewise, third-party applications allow parents to monitor their minor children's activity,
16  set limits on screen time, and filter content—as publicized in mainstream publications. *See, e.g.,*
17  Alyson Behr, *The Best Parental Control Apps in 2024, Tested By Our Editors*, CNN underscored
18  (Mar. 11, 2024), https://perma.cc/ACV9-43KB.

19        15.    **Browser-level restrictions.** Internet browsers also allow parents to control what
20  online services their minor children may access. *See, e.g.*, Mozilla, Block and Unblock Websites
21  with Parental Controls on Firefox, https://perma.cc/2BTF-Z6HZ. For example, some browsers
22  offer a "kids mode" or allow parents to see what online services their children are accessing the
23  most. *See* Google, Safety Center, Helping You Set Digital Ground Rules with Family Link,
24  https://perma.cc/R4Y9-UCNS; Microsoft, Learn More About Kids Mode in Microsoft Edge,
25  https://perma.cc/6ZFY-ZSHK. Similarly, third-party software and browser extensions are also
26  widely available to reinforce these tools on browsers. *See, e.g.*, Kim Key, *The Best Parental*
27  *Control Software for 2024*, PCMag (Dec. 15, 2023), https://perma.cc/GEJ4-YPZS. In addition, as
28  the FTC has observed, browsers also provide users with "some control over the information

5

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    websites collect." FTC, How Websites and Apps Collect and Use Your Information,

2    https://perma.cc/9XV5-YHV7.

3        16.    **App-level restrictions.** On top of all these resources, NetChoice members have

4    developed their own tools that allow parents to set further restrictions on their minor children's

5    use of the services. Below are some examples.

6        17.    *Meta (Facebook and Instagram).* Meta has supervision tools that parents and

7    guardians can use to help support their teens. When supervision is set up on Facebook, a parent

8    can see how much time their teen has spent on the Facebook app each day for the last week, and

9    their average daily time spent for the week; set scheduled breaks for their teen; see their teen's

10    Facebook friends; see some of their teen's privacy settings and content preferences; and see the

11    people and Pages their teen has blocked. *See, e.g.*, Meta, Supervision on Facebook,

12    https://perma.cc/6UX2-UG74. Instagram currently offers Supervision features for teens under 18

13    that allow parents and guardians to set time limits; set reminders to close the app; see the average

14    amount of time their teen has spent on Instagram; see which accounts their teen is following and

15    which accounts are following their teen, which accounts their teen is currently blocking, and their

16    teen's account privacy, messaging, and sensitive content settings. *See, e.g.*, Instagram, Help

17    Center, About Supervision on Instagram, https://perma.cc/46M4-LHCB. Instagram recently

18    announced that minors under 18 will automatically be placed into "Instagram Teen Accounts"

19    which default to the strictest privacy settings and have limitations on who can contact minors, the

20    content minors can see, and the time of day minors can receive notifications. Minors under 16 will

21    need a parent's permission to change any of these Instagram Teen Accounts settings to less strict

22    settings. Via Teen Accounts, parents will have added supervision features, including ways to get

23    insights into with whom their minor children are chatting and seeing topics their minor is looking

24    at. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens,

25    Peace of Mind for Parents, https://perma.cc/NM66-8FR3.

26        18.    *Pinterest.* Pinterest provides parents of minors "under 18" the ability to "set[] up a

27    4-digit passcode" that "lock[s] certain settings related to account management, privacy and data,

28

6

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

and social permissions on [a] teen's Pinterest account." Pinterest, Resources for Parents and Caregivers of Teens, https://perma.cc/X6KF-AHV9.

19.    *Google (YouTube).* YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions); and (3) an option to link accounts between a parent and teen. YouTube, My Family, https://perma.cc/8SFQ-LXXZ.

20.    In addition to these tools to aid parents, NetChoice members pursue measures like the following to help promote minors' safety on their services.

21.    *Limiting access by age.* All NetChoice members prohibit minors younger than 13 from accessing their main services. Some members, however, offer separate experiences for users under 13 geared for that specific age group with their own protections. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13 with parental consent. *See* YouTube for Families Help, Import Info for Parents About YouTube Kids, https://perma.cc/5934-HWNQ; YouTube Help, What Is a Supervised Experience on YouTube, https://perma.cc/LZ82-4JH5. These services allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

22.    *Minor-specific policies.* Some NetChoice members have policies or practices specifically for minors' accounts on their main services. YouTube, for instance, publicizes that it "place[s] an age-restriction on" certain content that "may be . . . not appropriate for viewers under 18." YouTube Help, Age-Restricted Content, https://perma.cc/HC2B-VVTN. Pinterest sets accounts for users younger than 16 to private. Pinterest, Resources for Parents and Caregivers of Teens, https://perma.cc/X6KF-AHV9. Meta has the policies described above at ¶ 17.

23.    *Content moderation.* Any minor-specific policies and parental tools exist alongside the websites' generally applicable "content-moderation" policies. NetChoice members limit publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities. Consequently, NetChoice members publish and enforce bespoke content-moderation policies that address the publication of such prohibited content. Based on

7

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1  NetChoice's research, the "rate of violative content removed from platforms and the level at which

2  it is removed prior to being seen by users makes clear companies are successfully prioritizing the

3  safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why

4  13 (2021), https://perma.cc/CHN8-FBXH.

5  **The Act's effect on NetChoice members and the Internet.**

6      24.    I understand that California Senate Bill 976 ("the Act") was signed into law on

7  September 20, 2024, and that the Act takes effect January 1, 2025.

8      25.    The Act regulates "[a]ddictive internet-based service[s] or application[s]." Cal.

9  Health & Safety Code § 27000.5(b). An "[a]ddictive internet-based service or application" is a "an

10  internet website . . . including, but not limited to, a 'social media platform' as defined in Section

11  22675 of the Business and Professions Code, that offers users or provides users with an addictive

12  feed as a significant part of the service provided by that internet website." *Id.* § 27000.5(b)(1). An

13  "[a]ddictive feed" is—with some exceptions—"an internet website . . . or a portion thereof, in

14  which multiple pieces of media generated or shared by users are, either concurrently or

15  sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part,

16  on information provided by the user, or otherwise associated with the user or the user's device."

17  *Id.* § 27000.5(a).

18      26.    According to these definitions, the Act appears to cover at least the following

19  NetChoice members' services: (1) Google, which owns and operates YouTube; (2) Meta, which

20  owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; and (5) X.

21      27.    Many of the Act's requirements and definitions are vague and difficult for

22  NetChoice members (and other websites) to gauge. For example, it is not clear what constitutes an

23  "addictive feed." *Id.* § 27000.5(a). Dreamwidth does not have the same kind of personalized feeds

24  as some of our other members, yet it is not clear whether Dreamwidth's display of content to users

25  is permissible based on what the user has "expressly and unambiguously requested," or

26  impermissible based on "information . . . persistently associated with the user or user's device,

27  and . . . concern[ing] the user's previous interactions with media generated or shared by others."

28  § 27000.5(a)(1), (4).

8

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

28.    **Parental consent and age assurance for personalized feeds and notifications (Cal. Health & Safety Code §§ 27001, 27002, 27006).** The Act requires that covered websites "obtain[] verifiable parental consent" before allowing a minor user to access a personalized feed, allowing a minor user to access a personalized feed for more than one hour per day, or sending a minor user notifications during certain times of the day. *Id.* §§ 27001(a)(2), 27002(a), (b)(2). The Act also requires that covered websites conduct age assurance of all users—including both adults and minors. *Id.* §§ 27001(a)(1), 27002(a), 27006. These requirements will impede minors and adults' access to valuable and protected speech. They will also prove costly and difficult for NetChoice members to implement. Accordingly, each of these requirements burdens access to protected speech. These requirements also pose at least four major hurdles for covered websites.

29.    *First*, most websites do not have compliance mechanisms in place to process parental consent or to conduct age assurance. Designing and maintaining comprehensive systems to comply with the Act will be extremely costly, time-consuming, and resource-intensive. The burdens increase with the level of certainty with which companies must verify ages and process parental consent.

30.    *Second*, as part of implementing mechanisms to comply with the Act, covered websites will be required to obtain sensitive personal identifying information about minors and their parents or guardians. This will significantly amplify the risks of data security breaches, necessitating even more investment in heightened cybersecurity measures. The fact that the Act provides that "[t]he information collected shall be deleted immediately after it is used to determine a user's age or to verify parental consent" does not alleviate these risks. *Id.* § 27001(b). Rather, it confirms that obtaining and storing such personal identifying information is at least temporarily required to verify parental consent and conduct age assurance.

31.    *Third*, verifying a genuine parent-child relationship will require covered websites to identify both the minor and the parent (or guardian), just as conducting age assurance will require covered websites to identify the account holder. It is impossible to do any of this without infringing the privacy rights of both minors and parents (or guardians). And it will create friction impeding users' willingness and ability to use the services. Covered websites also face many

9

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

difficulties in securing parental consent. For example, the law does not account for situations in which a person's status as a parent (or guardian) is opaque or disputed, families are nontraditional (like foster families), families have different surnames or addresses, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated.

32.    *Fourth*, new processes at sign up or sign in inevitably affect account holder growth, as cumbersome registration processes can dissuade people from signing up or continuing to use a service. Any decline in account holder sign-ups or current accounts means that fewer people avail themselves of the valuable speech available on the websites. It likewise will have a ripple effect on companies' advertising revenues, brand partnerships, and overall vitality.

33.    Many NetChoice members' websites cannot function well—if at all—without making decisions about how to present content, groups, and posts on account holders' accounts through personalized feeds. By banning personalization, the Act will also prohibit websites from offering their users choices among these various types of suggestion and organization (as some covered websites currently do).

34.    Furthermore, the Act's restrictions on sending notifications to minor users during certain times of day without parental consent fails to take into account the different schedules of minor users and the time-sensitive nature that the protected speech notifications entail. The requirement fails to account for minors with different school or work schedules. It also may cause minors to lose out on valuable and time-sensitive notifications concerning issues they're following for school, college recruitment, or part-time jobs, to name a few. The content on websites also is not static, so content may appear and disappear during the Act's curfew window, meaning that minors would never get to see it.

35.    **Default limitations on minors' accounts (§ 27002(b)(1), (3)-(5)).** The Act also requires covered websites to establish certain "default" settings for minor users' accounts and provide parents with "mechanisms" to implement or change those settings. *Id.* § 27002(b)(1), (3)-(5). These provisions would require all members to adopt additional capabilities, which would prove particularly difficult for smaller services or websites.

10

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

36.    **Disclosures (§ 27005).** The Act requires covered websites to annually disclose "the number of minor users of its addictive internet-based service or application," the "number [of minor users] for whom the operator has received verifiable parental consent to provide an addictive feed," and "the number of minor users as to whom the [parental] controls set forth in Section 27002 are or are not enabled." *Id.* § 27005. This, too, would require all members to adopt additional capabilities for tracking, recording, and reporting these statistics. And it requires members to adopt implicitly the Act's pejorative "addictive" label.

37.    NetChoice members would be irreparably harmed if they were required to comply with the Act's burdensome requirements. For one thing, the Act's extremely broad and vague proscriptions make perfect compliance impossible for most websites. Any website that even attempts to comply with the Act will incur substantial, unrecoverable costs in reconfiguring their service. All websites face significant uncertainty about their compliance with the Act given the Act's many ambiguities. NetChoice members' users (both minors and adults, current and prospective) will also suffer irreparable harms, as the Act will place burdens on their access to protected and valuable speech.

\*    \*    \*

38.    If the Act takes effect on January 1, 2025, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt—as would its affected member companies and their minor and adult users.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on November 8, 2024, in Washington DC.

_____

Bartlett Cleland

11

**DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

# Exhibit D

to NetChoice's Motion for Injunction Pending Appeal

1

2

3   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA

NETCHOICE,                                Case No. _____

            Plaintiff,                    **DECLARATION OF ALEXANDRA**
                                          **VEITCH IN SUPPORT OF PLAINTIFF**
        v.                                **NETCHOICE'S MOTION FOR**
                                          **PRELIMINARY INJUNCTION**
ROB BONTA, in his official capacity as
Attorney General of California,

            Defendant.

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    I, Alexandra N. Veitch, declare as follows:

2        1.    I am the Director of Public Policy for the Americas at YouTube. As part of my role,

3    I lead a team that monitors and assesses the U.S. legislative and regulatory landscape, including

4    policy proposals and legislation, such as California Senate Bill 976 (2024) ("SB976" or "Act")

5    that would affect YouTube's ability to provide services and content to users in California—and

6    perhaps worldwide. My team also leads external advocacy for YouTube's policies and practices

7    with government leaders and policy stakeholders, advises the company on public policy issues as

8    it relates to online, user-generated content, and represents the company in public policy forums,

9    across a broad region.

10       2.    I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction.

11   I am over the age of 18 and am competent to make the statements herein. I have personal

12   knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and

13   would competently testify to them.

14       3.    YouTube is an online video-sharing service that allows users to view, create,

15   upload, and share videos with others around the world. YouTube strives to be a community that

16   fosters self-expression on an array of topics as diverse as its user base, and to nurture a thriving

17   creative and informational ecosystem. As a result, YouTube has a wealth of highly valuable and

18   enriching user-generated content, providing users with a wide array of news, educational content,

19   and entertainment.

20       4.    People in California use YouTube's services.

21       5.    I understand that Google and YouTube may be subject to the Act, as one or both

22   may meet the definition of an "operator" or what the Act pejoratively calls an "[a]ddictive internet-

23   based service or application." Cal. Health & Safety Code § 27000.5(b)(1).

24              **YouTube's Principled Approach to Minors and Responsibility**

25       6.    On YouTube, "[c]hildren and teenagers today can access a world of possibilities":

26   "Whether it's exploring important topics around the world or looking up a video to help with

27   algebra homework, they've never known a reality without this world at their fingertips." Neal

28

1

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

Mohan, *YouTube's Principled Approach for Children and Teenagers*, YouTube Official Blog (Oct. 16, 2023), https://perma.cc/T5BB-HC9T. We believe that "[f]amilies everywhere deserve the same safe, high-quality experience online, no matter where they live. And all children and teenagers ought to have the same access to the opportunities the internet provides." *Id.*

7.      YouTube has invested, and continues to invest, immense resources in developing and fostering age-appropriate services, features, and policies, making age-appropriate user-generated content accessible for its users. Five principles guide YouTube's approach to minors:

- "The privacy, physical safety, mental health, and wellbeing of children and teenagers require special protections online";

- "Parents and caregivers play an important role in setting the rules for their family's online experiences, particularly for the youngest children";

- "All children and teenagers deserve free access to high-quality and age appropriate content that meets their individual interests and needs";

- "The developmental needs of children differ greatly from those of teenagers and should be reflected in their online experiences"; and

- "With appropriate safeguards, innovative technologies can benefit children and teenagers."

*Id.*

8.      These Youth Principles are just one part of the work we do to foster a vibrant, safer, and open community for users. To successfully support this community, YouTube must constantly balance disseminating a wide range of user-generated content against addressing objectionable and harmful speech. On one hand, the Internet is a force for creativity, learning, and access to information. The world is a better place when we listen, share, and build community through our stories. We strive to empower users to access, create, and share information. We believe that a free flow of ideas fosters opportunity, community, and learning, and enables diverse and authentic voices to break through.

2

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

9.      As a result, YouTube is full of valuable and enriching content for minors. They can encounter educational content, spanning lectures on history from leading universities across the world to step-by-step instructions on how to solve calculus problems. They can watch performances of centuries' old musical compositions and clips of the latest Broadway plays. Indeed, YouTube's open approach ensures that people across the world can interact across language, geography, and culture—breaking down the barriers to information.

10.      But on the other hand, an open Internet poses challenges. Bad actors exploit the Internet, including YouTube, for their own personal gain or for purposes of causing harm, even as we invest in the policies and systems to stop and deter them. Objectionable and harmful content on our website also makes YouTube less open, not more, by creating a space where creators and users may not feel safe to share, learn, and experience. We believe that, in order to have and protect openness, a service should attempt to strike the right balance between fostering freedom of expression and decreasing the likelihood that users will encounter harmful user-generated content on our service.

11.      Consequently, working to keep harmful and illegal content off our services is core to the work of many different teams across Google and YouTube. When it comes to the information and user-generated content on our services, we discharge that responsibility based on clear, transparent policies and processes.

**YouTube's Age-Appropriate Experiences and Policies for Minors**

12.      YouTube has long invested in research, policies, and practices to offer age-appropriate ways for minors to explore, learn, and participate in the online world. Such efforts are designed with consideration of our youngest users' wellbeing. We also provide tools and guidance that offer families flexibility to choose the right experience for them, enabling them to create healthy and positive digital habits at home and in school. We believe that appropriate safeguards can empower young people and help them learn, grow, and prepare for the future. Accordingly, we (1) invest in age-appropriate services and features that align with children's and teens' developmental stages and needs; (2) offer tools that give families flexibility to manage their

3

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1  relationships with technology; (3) implement policies, protections, and programs that aim to

2  increase online safety for children and teens; and (4) provide resources that teach the fundamentals

3  of digital citizenship and media literacy to allow for confident, safer online exploration.

4      13.    We also prioritize making robust resources and guides available for children, teens,

5  and their parents so they can better understand YouTube's services. *See, e.g.*, YouTube Help,

6  Understand Your Choices as a Family, https://perma.cc/7LYQ-RT3S; YouTube Help, What is a

7  Supervised Experience on YouTube?, https://perma.cc/ML4N-F64F ("YouTube Help, What is a

8  Supervised Experience").

9      14.    YouTube offers "Supervised Experiences for Teens." With this experience:

10      [P]arents and teens will be able to link their YouTube accounts in our new Family

11      Center hub. In Family Center, parents can see shared insights into their teens'
channel activity on YouTube including the number of uploads, subscriptions and

12  comments. Parents (and teens) will also receive proactive email notifications at key
events, like when teens upload a video or start a livestream, providing an

13  opportunity to offer advice on responsible creation supported by resources created
with Common Sense Networks, an affiliate of Common Sense Media.

14

15  James Beser, *A Collaborative Approach to Teen Supervision on YouTube*, YouTube Official Blog

16  (Sept. 4, 2024), https://perma.cc/KVE6-HUUZ.

17      15.    Using these features, parents can (1) receive email notifications when a teen

18  uploads a video or starts a livestream, which "provid[es] an opportunity to offer advice on

19  responsible creation supported by resources created with Common Sense Networks, an affiliate of

20  Common Sense Media," *id.*; (2) gain insights into their teen's channel activity (such as "the

21  number of uploads, subscriptions[,] and comments") *id.*; and (3) link accounts between a parent

22  and teen, YouTube, My Family, https://perma.cc/8SFQ-LXXZ.

23      16.    In addition, users known to be under the age of 13 are required to have their parent's

24  consent to their having an account. Further, the parent's account remains linked to their child's

25  account so that they can help manage their child's YouTube experience. When a parent sets up a

26  child's Google Account, the parent is given the option to either allow the child to access only

27  YouTube Kids (a standalone service described in detail below) or set up a "Supervised Experience"

28

4

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

on YouTube. YouTube offers varying content levels and features that are meant to align with kids' developmental stages and give families tools to supervise children's use of the website. YouTube Kids and supervised experiences reach more than 100 million active logged-in and logged-out viewers every month.

17.     *YouTube Kids:* YouTube's standalone service "YouTube Kids" is a filtered version of YouTube built specifically to let children under the age of 13 explore age-appropriate content, with additional tools for parents and caregivers to moderate the content children see. YouTube Kids, A Safer Online Experience for Kids, https://perma.cc/5JGF-HA89 ("YouTube Kids, A Safer Online Experience for Kids"). YouTube Kids features a carefully curated selection of "content that is age-appropriate, adheres to our quality principles, and is diverse enough to meet the varied interests of kids globally." *Id.* YouTube works "with a variety of external specialists in child development, children's media, and digital learning and citizenship" to determine what content should be available on YouTube Kids. *Id.* As a result, kids have access to a broad range of high-quality content. *See* James Beser, *Enabling a High Quality Kids Experience & Helping Kids Creators Thrive on YouTube*, YouTube Official Blog (Dec. 16, 2022), https://perma.cc/AN47-XJTJ ("Beser, *Enabling a High Quality Kids Experience & Helping Kids Creators Thrive on YouTube*"). "The YouTube Kids team has developed a set of quality principles and content policies to help guide which videos are eligible to be a part of the YouTube Kids app. This work is further informed by feedback from parents and through consulting with a variety of external specialists in child development, children's media, and digital learning and citizenship. Our automated filters, which take these efforts into account, then identify family-friendly content for inclusion in the app. The YouTube Kids team also programs content for five categories (e.g. Learning, Shows, Explore, Music, and Gaming) on the homepage of YouTube Kids." YouTube Kids, A Safer Online Experience for Kids,. Parents can further curate the content their children can see. YouTube Kids, Tips and Tools for Your Family, https://perma.cc/ZBE8-ULDL. Videos on YouTube Kids include popular children's videos, educational content, and content from trusted partners. We have invested heavily over the years to make YouTube Kids a safer, family-friendly place for kids to

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

explore their imagination and curiosity. In addition to other tools discussed below, our built-in timer in YouTube Kids lets parents or caregivers, at their discretion, "limit screen time by telling kids when it's time to stop watching." *See* YouTube for Families Help, Limit Screen Time on YouTube Kids, https://perma.cc/L5ZB-2KM8 "The timer will display a friendly alert and stop the app when the session is over" so that parents or caregivers do not have to. *Id.* Similarly, parents can control their minor children's privacy settings. YouTube for Families Help, Manage YouTube Kids Profile Settings, https://perma.cc/79KP-77EK. In short, YouTube Kids provides a simplified version of the service that is attuned to the needs of younger users, providing primarily a service for viewing age-appropriate content, while removing many features that may be less useful for these age groups, such as commenting.

18.    *Supervised Accounts:* YouTube also provides "supervised accounts" that are linked to parents' accounts for children (up to the relevant age of consent) whose parents decide their children are ready to explore some of YouTube's vast universe of user-generated content. In these parent-managed accounts, and at the parent or caregiver's discretion, "parents [can] select a content setting that limits the videos and music [their] children under 13 can find and play." YouTube Help, What is a Supervised Experience. For example, parents can, among other things, (1) "block specific channels"; (2) change their minor child's permissible "content level settings," including "Explore" (generally for viewers 9+), "Explore More" (generally for viewers 13+), and "Most of YouTube" (almost all videos on YouTube except for videos marked only for adults or otherwise not appropriate); and (3) review their child's watch history from their device as well as pause and clear their child's search and watch history in parent tools. YouTube Help, Parental Controls & Settings for Supervised Experiences on YouTube, https://perma.cc/CN6R-GT74 ("YouTube Help, Parental Controls & Settings for Supervised Experiences on YouTube"); *see also* YouTube Help, Choose Content Settings for Pre-teen Supervised Experiences, https://perma.cc/3EB6-5THT. "Supervised accounts also change the features they can use, the default account settings, and the ads they see." YouTube Help, What is a Supervised Experience. For instance, functionalities like creating content and posting content are disabled on the

6

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    Supervised Experience. *Id.* Further, when parents create a Google Account for their child with

2    Family Link and use YouTube's Supervised Experience, parents and caregivers can set screen time

3    limits on their Android device or Chromebook. Google Family Link, FAQ,

4    https://perma.cc/A2HD-RJDS. Parents and caregivers can set their child's Android device or

5    Chromebook to lock after the child has used it for a certain amount of time or when the parents or

6    caregivers think their child needs downtime. Google for Families Help, Manage Your Child's

7    Screen Time, https://perma.cc/UC2Z-7NRB. Parents set up their own accounts to serve as

8    managing accounts. Google for Families Help, Understand YouTube & YouTube Kids Options

9    for Your Child, https://perma.cc/EUQ7-SXQGI.

10         19.    YouTube also offers a suite of digital wellbeing tools that encourage children and

11   teens to be mindful of their screen time.

12         20.    *Autoplay:* YouTube's autoplay feature is turned off by default for all users we know

13   to be under 18 across all of YouTube's services. YouTube Help, Autoplay Videos,

14   https://perma.cc/VP4A-2AJQ Parents or caregivers can choose to disable autoplay on YouTube

15   Kids and YouTube's Supervised Experiences. *See* Parental Controls & Settings for Supervised

16   Experiences on YouTube.

17         21.    *Recommendations on YouTube for Teens:* Our recommendations system plays an

18   important role in how we maintain a responsible and enriching platform for younger users. It helps

19   to connect them to high-quality content—informed by quality principles developed in

20   collaboration with independent child development and digital wellbeing experts—that inspires

21   curiosity, imagination, and creativity. It also minimizes the chances they'll see low-quality content.

22   In short, personalization is one of the main tools we use to safeguard minors' wellbeing.

23   Importantly, as compared to social media platforms that are based on a social graph, YouTube

24   doesn't depend on "friends" or "connections" to be useful. Rather, YouTube is a massive content

25   library where recommendations help surface the most relevant videos for viewers. For example, a

26   young user likely wants to see the highest quality video to prepare for SATs, not necessarily the

27   newest one, the one with the most "likes," or the one "trending" nearest you. We have also worked

28

7

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    to refine our recommendation systems so that teens on YouTube are not overly exposed to user-

2    generated content that, while perhaps acceptable as a single video, could be considered differently

3    if viewed in high quantities. Through consultation with our Youth & Families Advisory Committee

4    and with input from academic research, we "define[d] categories of videos that are innocuous in a

5    single view, but that could be problematic if viewed in repetition for some young viewers" which

6    "include content that": (1) "Compares physical features and idealizes some types over others";

7    (2) "Idealizes specific fitness levels or body weights"; and (3) "Features social aggression (non-

8    contact fights and intimidation)." YouTube, Building Content Recommendations to Meet the

9    Unique Needs of Teens and Tweens at 3, https://perma.cc/XKZ5-6EJV?type=image. We have

10   implemented guardrails for teens to limit repeated recommendations of videos related to these

11   topics.

12        22.    *"Take a Break" Reminders:* These reminders pause a video until a user dismisses

13   or resumes playing the video. This feature is turned on by default for all users we know to be under

14   18 across all of YouTube's services, including on Supervised Experiences. YouTube Help, Take

15   a Break Reminder, https://perma.cc/S5H3-3945.

16        23.    *Bedtime Reminders:* Users can set a specific time to receive a reminder to stop

17   watching YouTube and go to bed. This reminder is turned on by default for all users we know to

18   be under 18 across all of YouTube's services, including on Supervised Experiences. YouTube

19   Help, Set a Bedtime Reminder, https://perma.cc/MDV2-ZAG8.

20                          **Partnerships With Experts**

21        24.    YouTube has ongoing partnerships with independent experts in fields such as child

22   development, emerging media, and digital wellbeing. For example, we have created a set of best

23   practices for kids and family content. *See, e.g.*, YouTube Help, Best Practices for Kids & Family

24   Content https://perma.cc/UAV2-2CVG. These best practices help guide creators to create quality

25   content that "support[s] child development and wellbeing by promoting things like . . . respect[,]

26   healthy habits, learning and curiosity, [and] play and imagination." Beser, *Enabling a High Quality*

27   *Kids Experience & Helping Kids Creators Thrive on YouTube*. They also help determine which

28

8

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

content is recommended in the main YouTube experience and is included in YouTube Kids. Last year, YouTube updated our Community Guidelines to update our approach to eating disorder-related content, including by limiting the visibility of certain content to adults. Dr. Garth Graham, *An Updated Approach to Eating Disorder-Related Content*, YouTube Official Blog (Apr. 18, 2023), https://perma.cc/9PWG-9QPU. This change was informed by independent experts such as the National Eating Disorder Association. *Id.* YouTube's Youth and Family Advisory Committee also advises YouTube on the developmental stages of teens and how content consumed online can affect their wellbeing. James Beser, *Continued Support for Teen Wellbeing and Mental Health on YouTube*, YouTube Official Blog (Nov. 2, 2023), https://perma.cc/U2A2-VVBS.

## YouTube's Minor-Specific Content and Safety Policies

25.     YouTube strives to provide positive online experiences for our users, and that is especially true for children and teens. Over the years, we have developed a robust set of policies and enforcement mechanisms to ensure that YouTube remains a welcoming community for our users. For minors specifically, that might require limiting their access to certain user-generated content—in addition to developing different services that better strive to reflect minors' needs.

26.     YouTube has always maintained a set of Community Guidelines that outline categories of content that are prohibited on YouTube. These Guidelines apply to all types of content on our services, including videos, comments, links, thumbnails, video descriptions, stories, posts, live streams, playlists, external links contained in uploaded content (including clickable URLs or verbal directions to users to visit other sites), and any other user-generated content. Our Community Guidelines are a key part of our broader suite of policies, and we regularly update them to keep pace with emerging challenges. *See* YouTube, Community Guidelines, https://perma.cc/KG7R-D3HU ("YouTube, Community Guidelines"). Our policies for prohibited or restricted content address a variety of issues, including:

27.     *Age-Restricted Content:* We age-restrict user-generated content that might not violate our Community Guidelines but that would otherwise be inappropriate for minors. These include categories of content such as (1) "nudity and sexually suggestive content"; (2) content that

9

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

depicts "adults participating in dangerous activities that minors could easily imitate"; (3) "violent or graphic content"; and (4) "vulgar language." YouTube Help, Age-Restricted Content, https://perma.cc/Y9MG-JTD4. Age-restricted videos are not viewable to users who are known to be under 18 or any signed-out user. *Id.*

28. *Child Safety:* YouTube has a standalone "Child Safety Policy" that prohibits "[s]exually explicit content featuring minors and content that sexually exploits minors." YouTube Help, Child Safety Policy, https://perma.cc/R82U-8PJR. We report content on YouTube that contains child sexual abuse material ("CSAM") to the National Center for Missing and Exploited Children ("NCMEC"). *Id.* This policy also prohibits content: (1) showing a minor participating in "harmful or dangerous acts"; (2) that could encourage minors to participate in dangerous activities; (3) showing any infliction of physical, emotional, or sexual abuse on a child; or (4) concerning "[c]yberbullying and harassment involving minors." *Id.* The Child Safety Policy also prohibits content that targets minors and families, but contains problematic content including, but not limited to, "sexual themes, violence, [and] other [inappropriate]" themes intended to shock young audiences. *Id.* In addition, "content that doesn't violate our policies but features children may have some features disabled at both the channel and content level. These features may include":

- Comments;
- Live chat;
- Live streaming;
- Video recommendations (how and when your video is recommended);
- Community posts; and
- Shorts Video remixing.

*Id.*

### YouTube's General Content Moderation Policies

29. YouTube has robust and extensive content moderation policies and enforcement. *See* YouTube, Community Guidelines.

10

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

30. YouTube has also developed policies around "educational, documentary, scientific, and artistic content" (EDSA), dealing with topics that might otherwise violate our Community Guidelines. Michael Grosack, *A Look at How We Treat Educational, Documentary, Scientific, and Artistic Content on YouTube*, YouTube Official Blog (Sept. 17, 2020), https://perma.cc/VW9D-2CHB. Decisions about whether a piece of content qualifies for an EDSA exception "are nuanced and context is important." *Id.* As an example, YouTube "do[es] not allow content targeting minors with insults or bullying, but [YouTube] may allow content that shows this as part of an educational anti-bullying campaign provided the minors are actors or their identity [is] hidden." *Id.* "EDSA exceptions are a critical way we make sure that important speech stays on YouTube, while protecting the wider YouTube ecosystem from harmful content." *Id.*; *see* YouTube Help, How YouTube Evaluates Educational, Documentary, Scientific and Artistic (EDSA) Content, https://perma.cc/UGZ9-QG8T.

31. YouTube has billions of monthly logged-in users, and over 500 hours of content are uploaded every minute by an extraordinarily diverse community of creators, who span more than 100 countries and 80 languages. *See* YouTube for Press, YouTube Official Blog, https://perma.cc/8553-T3JH. On a daily basis, users watch more than a billion hours of video on YouTube and generate billions of views. *Id.*

32. YouTube has developed robust means of addressing user-generated content that violates our policies. YouTube relies on a mix of human and automated effort to detect violative content and remove it. YouTube's first line of defense is automated systems that are trained with machine learning and/or incorporate hash-matching technology to quickly identify and take action against violative content. YouTube also relies on global teams to review flagged content and remove it, restrict who can view it, or leave the content on the site if it does not violate any policies. YouTube employs expert teams around the world to investigate sophisticated bad actors who are adept at circumventing automated defenses. YouTube, Information Quality & Content Moderation at 12, https://perma.cc/CZ6N-WLBM ("YouTube, Information Quality & Content Moderation"). Content moderation can be human-resource intensive, even for CSAM and known violative

11

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    content. YouTube verifies with human review all CSAM hashes to confirm that they are CSAM

2    before they are reported to NCMEC. And human review becomes even more time-intensive and

3    important for other illegal conduct like "grooming," trafficking, or harassment that requires more

4    context to understand if illegal activity is taking place.

5         33.    While no system of reviewing such a high volume of content is foolproof, YouTube

6    expends great effort and resources in removing objectionable and harmful user-generated content

7    before most users see it. In fact, the vast majority of violative videos are seen by fewer than 10

8    people before they are removed. In the second quarter of 2024, approximately 59.91% of removed

9    videos had no views before they were removed, and approximately 24.34% had between 1-10

10   views. *See* Google, YouTube Community Guidelines Enforcement Report – Removals,

11   https://perma.cc/5S65-TQ4R ("Google, Community Guidelines Enforcement

12   Report – Removals"). Over that same period, YouTube removed 8,497,876 videos. *Id.* YouTube

13   has also created a metric for determining what percentage of views on YouTube comes from

14   content that violates our policies. This metric, known as the Violative View Rate (VVR), helps us

15   measure our responsibility work. *See* Google, YouTube Community Guidelines Enforcement

16   Report – Views, https://perma.cc/8W56-YSHW. YouTube's VVR is calculated by taking a sample

17   of viewed videos to a team for review. The team then determines which videos in the sample

18   violate our policies, and YouTube uses these decisions to estimate a VVR. *Id.* In the second quarter

19   of 2024, YouTube estimated a 0.09-0.11% VVR. *Id.* This means that out of every 10,000 views

20   on YouTube, 9-11 come from violative content. This is down by more than 85% when compared

21   to the final quarter of 2017 (when our teams started tracking this metric), in large part thanks to

22   our investments in robust content moderation, including automated technologies and human

23   review.

24        34.    Our practices also involve taking action against users and channels that continue to

25   upload violative content. A YouTube channel is terminated if it accrues three Community

26   Guidelines strikes in 90 days, has a single case of severe abuse (such as predatory behavior), or is

27   determined to be wholly dedicated to violating our guidelines (as is often the case with spam

28

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

accounts). When a channel is terminated, all of its videos are removed. In the second quarter of 2024, YouTube terminated 3,260,974 total channels. *See* Google, Community Guidelines Enforcement Report – Removals. The majority of channel terminations are a result of accounts being dedicated to spam (80.4%) or adult sexual content (4.8%) in violation of our guidelines. *Id.*

35.     Our efforts are not limited to removing objectionable and harmful user-generated content in the videos uploaded on our site. They also extend to user-generated comments. In the second quarter of 2024, YouTube removed approximately 1,372,493,981 comments. *Id.* Approximately 99.6% percent of comments removed are first detected by YouTube's automatic flagging system, and the majority of actions taken against comments (80.8%) are for spam. *Id.*

36.     Enforcing our policies takes tremendous effort. YouTube's global teams work continually to remove user-generated content from YouTube that violates our policies. We endeavor to give our teams visibility into emerging issues before they reach, or become widespread on, our website. That valuable visibility is driven by our Intelligence Desk, a team within YouTube's Trust & Safety organization. These specialized analysts identify trends and the risks they pose. They also regularly monitor ongoing threats, both tracking their prevalence across media and evaluating how they morph over time. Our teams also work to provide appropriate age restrictions and other appropriate warnings on content.

37.     Given the open nature and scale of YouTube and because bad actors are constantly refining how they attempt to evade detection, detecting violative user-generated content cannot be done with perfect accuracy nor always upon the moment of upload. YouTube, Information Quality & Content Moderation at 12. Nevertheless, YouTube continuously works to combat new challenges and bad actors through a multi-faceted and nuanced approach to exercising its discretion in setting its content moderation policies, working to distinguish among content that is truly objectionable or harmful, borderline content (which is content that comes close to violating, but does not quite violate our Community Guidelines), and content that contributes positively to the YouTube community. To that end, we have a diverse set of means to help us keep our community safe, including: (1) appending warning interstitials for sensitive content; (2) surfacing

13

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1  helpful resources for crisis management; and (3) suspending and/or terminating channels or
2  accounts. YouTube also encourages creators to age-restrict content when appropriate. The
3  YouTube Team, *Using Technology to More Consistently Apply Age Restrictions*, YouTube
4  Official Blog (Sept. 22, 2020), https://perma.cc/8AG3-24AE. We apply age restrictions on content
5  ourselves, when needed. We have other tools to help us provide authoritative information on our
6  service—such as the use of information panels to show basic background information, sourced
7  from independent, third-party partners, that give more context on a topic. For example, in
8  partnership with third-party expert organizations and global experts in the space, we expanded our
9  crisis resource panels to introduce a "pause" page for queries related to suicide, self-harm, and
10 eating-disorder topics that provides users with options with how to proceed before they are able to
11 see search results related to these topics. These include selecting to contact third-party crisis-
12 resource-hotline partners for support or searching for various self-help tools. We further prioritize
13 the recommendations of authoritative content and limit the spread of borderline content to users
14 through recommendations. Because removing content is only one way of managing content,
15 YouTube has developed and invested in this diverse set of tools that are essential in balancing free
16 expression and responsibility on our website. Simply put, these tools provide additional
17 information and options compared to simply removing (or not removing) user-generated content
18 from our website.

19              **YouTube's Compliance Obligations Under the Act**

20        38.    Google and YouTube support regulations designed to protect the wellbeing of
21 minors online while ensuring that users' rights to access speech are not impeded. *See generally*
22 Google, Legislative Framework to Protect Children and Teens Online, https://perma.cc/8D7Y-
23 D7NQ ("Google, Legislative Framework"). But the Act here is not well-suited to protect minors.
24 It fails to take into account differences among online services, fails to take into account the
25 differences among minors at different developmental levels, and ultimately will only impede
26 minors' access to valuable information and speech online. Furthermore, it will discourage and
27 stymie innovation that makes YouTube's services better for all.
28

                                      14
     **DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF
     NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

39.     *Parental-consent requirement for minors to view personalized feeds (Cal. Health & Safety Code §§ 27001, 27002(b)(2)).* I understand the Act provides that "[i]t shall be unlawful for the operator of an addictive internet-based service or application to provide an addictive feed to a user unless . . . [t]he operator has obtained verifiable parental consent to provide an addictive feed to the user who is a minor." Cal. Health & Safety Code § 27001(a)(2). I also understand that the Act provides that the "operator of an addictive internet-based service or application shall provide a mechanism through which the verified parent of a user who is a minor may. . . [l]imit their child's access to any addictive feed from the addictive internet-based service or application to a length of time per day specified by the verified parent. This setting shall be set by the operator as on by default, in a manner in which the child's access is limited to one hour per day *unless modified by the verified parent.*" *Id.* § 27002(b)(2) (emphasis added).

40.     As I understand Section 27001(a)(2), it would prohibit YouTube from displaying personalized feeds to minors *at all* without first securing parental consent.

41.     Section 27001(b)(2) would also require YouTube to secure parental consent before allowing minors to view personalized feeds for more than one hour per day. Although parents have supervision options (described above), YouTube currently does not require minors to secure parental consent to view personalized feeds on YouTube's main service.

42.     Compliance with these provisions will negatively affect users' experiences. Implementing such systems would significantly restrict, if not block entirely, access to information and services online. As we have said, legislatively mandating parental consent "could unnecessarily preclude some teens from accessing the basic benefits of the online world and have unintended effects on vulnerable youth." Google, Legislative Framework at 2. Among other reasons, this is because some teens may have parents who are incapacitated, abusive, not proficient in English, not technologically savvy, or otherwise not available.

43.     Personalizing content is one way YouTube attempts to present useful and age-appropriate content to users. With over 500 hours of content uploaded to YouTube every minute, finding what a user needs would be nearly impossible without some help sorting through all the

15

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1  videos, while avoiding potentially harmful content and spam. Thus, the Act could hinder young

2  people's ability to explore their passions, learn new skills, and seek help when they need it most.

3  LGBTQ teens, in particular, will feel this lack of autonomy. Eight out of ten LGBTQ teens who

4  live on the streets do so because they were kicked out of their family home. Parents or guardians

5  in those cases are not acting in the best interests of their children, and barring these teens from

6  accessing sites absent parental consent will only further the digital divide for those children.

7      44.    *Parental-consent requirement for minors to receive notifications at certain times*

8  *(Cal. Health & Safety Code § 27002(a)).* I understand the Act provides that:

> (1) Except as provided in paragraph (2), it shall be unlawful for the operator of an
> addictive internet-based service or application, between the hours of 12 a.m. and
> 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m.,
> from Monday through Friday from September through May in the user's local time
> zone, to send notifications to a user if the operator has actual knowledge that the
> user is a minor unless the operator has obtained verifiable parental consent to send
> those notifications.
> (2) Commencing January 1, 2027, it shall be unlawful for the operator of an
> addictive internet-based service or application, between the hours of 12 a.m. and
> 6 a.m., in the user's local time zone, and between the hours of 8 a.m. and 3 p.m.,
> from Monday through Friday from September through May in the user's local time
> zone, to send notifications to a user whom the operator has not reasonably
> determined is not a minor, including pursuant to regulations promulgated by the
> Attorney General, unless the operator has obtained verifiable parental consent to
> send those notifications.

18  *Id.* § 27002(a).

19

20      45.    As I understand Section 27002(a), it would prevent minors from receiving

21  notifications during prescribed times unless they first secure parental consent. The YouTube

22  application employs notifications. YouTube Help, Manage YouTube Notifications,

23  https://perma.cc/8D7F-JP63. These notifications "let you know when there are new videos and

24  updates from your favorite channels and other content. We'll send you notifications for channels

25  you're subscribed to and may also send notifications based on your interests." *Id.* Importantly,

26  YouTube does *not* send "notifications if a channel's audience is set as made for kids." *Id.* YouTube

27  settings allow users to alter the notifications they receive, including turning off notifications

28  altogether. *Id.* Users can also change notification settings on their devices. Notifications are one

16

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

of the ways that YouTube facilitates user-generated expression. For example, prohibited notifications could include information about other user-generated content on the service: (1) information about new videos the user might be interested in; (2) updates from creators the users are subscribed to; and (3) recommendations about other content. *Id.* There are legitimate reasons why a teenager would want to be able to receive notifications during early morning hours; for example, perhaps they wake up at 5 a.m. and check the Olympic swimming highlights before going to early morning swim practice. YouTube already makes certain notifications silent at particular times of day.

46. As explained above at ¶ 42, compliance with this provision will negatively affect users' experiences.

47. *Age-assurance requirements (Cal. Health & Safety Code §§ 27001(a)(1)(B), 27002(a)(2), 27006(b)-(c)).* I understand the Act provides that, starting January 1, 2027, "operators" must engage in some form of age assurance to determine which users are minors subject to the Act's restrictions.

48. As I understand this provision, it may require YouTube to verify the ages of all users. Given the lack of clarity regarding what level of certainty would be appropriate and the lack of a meaningful safe harbor with respect to age verification, businesses will be incentivized or even compelled to resort to more intrusive methods of age verification—such as using facial recognition matching against government-issued IDs before any user can create an account—to protect against potential liability.

49. Developing and maintaining systems to verify the ages of teenagers to the level of certainty that could be required by the Act is highly complex, human-resource intensive, and time consuming—resulting in unrecoverable compliance costs. Additionally, as we have publicly stated, age verification also "require[es] more data collection and use." Google, Legislative Framework at 2. Although difficult to estimate with certainty, YouTube will need to dedicate budget, engineering resources, and other staff investment to address this provision.

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

50.     Age assurance also harms Californians, as many YouTube users in California may be unable or unwilling to provide the information or documentation necessary. That will impede users' "access to important information and services." *Id.*

51.     *Default limitations on minors' accounts (Cal. Health & Safety Code § 27002(b)(1), (3)-(5)).* I understand that "operators" must "provide . . . mechanism[s]" for parents to (1) "[p]revent their child from accessing or receiving notifications . . . between specific hours chosen by the parent" (limiting access between 12 a.m. and 6 a.m. by default); (2) "[l]imit their child's ability to view the number of likes or other forms of feedback" on a personalized feed; (3) require the default feed provided to the child on the website not "recommend[], select[], or prioritize[]" media "based on information provided by the user, or otherwise associated with the user or the users' device, other than the user's age or status as a minor"; and (4) set "their child's account to private mode," where only users connected to the child "may view or respond to content posted by the child." Cal. Health & Safety Code § 27002(b)(1), (3)-(5). All of these limitations should be imposed by default. *Id.*

52.     As I understand this provision, it would require YouTube to impose various default limitations on minors accounts beyond what YouTube already provides and allow both parents and minors to alter those defaults. This will require YouTube to invest resources to develop new systems and could degrade minors' experience by limiting the speech they can view.

53.     In sum, if the Act takes effect on January 1, 2025, Google and YouTube will suffer irreparable harm in the form of unrecoverable compliance costs, diminished ability to provide valuable user-generated content, and ongoing regulatory uncertainty about whether its services comply with the Act's broad prohibitions. Moreover, YouTube's users may experience a degraded service that frustrates their ability to engage with the wealth of speech available on YouTube.

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

Case 3:24-cv-07885-ESD   Document 2-3   Filed 11/12/24   Page 20 of 20



\*      \*      \*

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on November 8, 2024, in WASHINGTON, D.C.

Signed by:

*Alexandra N. Veitch*

348A76BAA93C431

ALEXANDRA N. VEITCH

19

**DECLARATION OF ALEXANDRA VEITCH IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

# Exhibit E

to NetChoice's Motion for Injunction Pending Appeal

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NETCHOICE, | Case No. _____ |
| Plaintiff, | **DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of California, | |
| Defendant. | |

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

(81 of 125), Page 81 of 125
Case: 25-146, 01/03/2025, DktEntry: 4.2, Page 81 of 125
Case 5:24-cv-07885-EJD    Document 2-4    Filed 11/12/24    Page 2 of 26

I, Antigone Davis, declare as follows:

1.      I am the Vice President, Global Head of Safety, at Meta Platforms, Inc. ("Meta"), and have been employed in that position since October 2014.  I am over the age of 18 years and maintain an office at 575 7th Street NW, Suite 700, in Washington, DC.  I make this Declaration in support of Plaintiff's Motion for a Preliminary Injunction in the above-captioned matter.  I have personal knowledge of the matters set forth in this Declaration as well as knowledge based on a review of company records kept in the ordinary course of business, and if called as a witness, I could and would testify under oath as follows.

2.      I have dedicated the better part of my adult life to protecting the safety and well-being of young people.  In my role at Meta, I lead the global team responsible for ensuring that Meta remains a leader in online safety, and my work covers safety across all of Meta's platforms and surfaces, including both Facebook and Instagram.  As part of my role, I coordinate the efforts of Meta's Safety Advisory Council,[1] a team of leading safety organizations from around the world who provide Meta with cutting-edge research and advice on best practices, particularly relating to young people and other vulnerable groups.  I also lead our work with our Youth Advisors, our advisory group on suicide prevention, and a global safety network of more than 850 organizations around the world.

3.      I also serve on the board of the Technology Coalition, an organization dedicated to fighting child sexual exploitation.  I previously served on the boards of the National Center for Missing and Exploited Children ("NCMEC"), the National Cybersecurity Alliance, the Family Online Safety Institute, the National Network to End Domestic Violence, the National Center for the Victims of Crime, and the International Advisory Board for WePROTECT, a global alliance working to protect children from sexual exploitation and abuse online.  Before working at Meta, I worked for the Office of the Maryland Attorney General helping to establish the office's first online privacy and safety unit.

---

[1] Meta, *Learn More About the Meta Safety Advisory Council*, https://en-gb.facebook.com/help/222332597793306.

1

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

4. In my role at Meta, I am familiar with Meta's content policies and practices, including Facebook's Terms of Service and Community Standards and Instagram's Terms of Use and Community Guidelines.

## Background

5. Meta (f/k/a Facebook, Inc.) was founded in 2004. Meta's services enable nearly four billion people around the world to share ideas, offer support, and discuss important issues, including politics, public health, and social issues. Users of Meta's services share over a billion stories and reels combined and over 100 billion messages, every day.

6. Meta's mission is to build the future of human connection and the technology that makes it possible.[2]

7. On Facebook, individuals can sign up for an account and establish mutual connections with family and friends, sharing stories, photos, videos, captions, status updates, and links (among other types of content). People can also follow pages managed by businesses, organizations, government agencies, and public figures (such as politicians or celebrities) that share content, as well as join groups or attend events that relate to topics of interest to them.

8. On Instagram, individuals can likewise sign up for an account and establish mutual connections with family and friends, sharing stories, photos, videos, captions, messages, and links (among other types of content). People can also follow and send messages to Instagram accounts managed by businesses, organizations, and public figures (such as politicians or celebrities) that share content.

9. To create, post, and view content on Facebook and Instagram, users make use of certain features on each service. For example, Facebook users might "post" content; use the "Like Button" to react to or acknowledge another user's content, and "comment" to answer a question or express a view on another user's post. Similarly, Instagram users might use "Reels" to create entertaining or educational videos that they can share with their friends or others on Instagram; might share "Stories" that could include photographs or videos from their everyday life that last

---

[2] Meta, *Company Information,* https://about.meta.com/company-info/.

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

for 24 hours; and might similarly react to or "comment" on other users' "Reels" and "Stories."  In other words, Facebook's and Instagram's features allow users to express themselves and to connect with others.[3]

10.    Facebook displays content in Feed, a feature it launched in 2006.  Feed shows a constantly updated and personalized list of content—for example, status updates from friends or elected officials, photos and videos from family gatherings, articles from local or national news outlets, information about upcoming community events or religious services, and much more.

11.    Instagram similarly displays content in Instagram Feed, a feature it launched in 2010.  Instagram Feed shows a constantly updated and curated list of photos and videos—for example, posts from friends, family, businesses, neighborhood groups, news outlets and much more.

12.    People's experience with Facebook and Instagram is personalized based on their activity, because not everyone is interested or disinterested in the same things, and interests may change over time.  To make users' experiences relevant, personalized and unique to them, Facebook and Instagram use artificial intelligence systems to decide what content appears and in what order, informed by a variety of factors including users' own choices, at any given time.[4]  On Facebook and Instagram, Meta suggests certain content in users' Feeds.[5]  These Feeds employ prediction models that use many input signals, such as the user's location, who created a post, how a user previously interacted with posts from the same user or category, and the number of people mentioned in a post's comments, among others, to help select content users are most likely to find interesting and engage with.  The models and their input signals are dynamic and change frequently over time.

---

[3] Meta, *Instagram Features*, https://about.instagram.com/features.

[4] Meta, *How AI Influences What You See on Facebook and Instagram* (June 29, 2023), https://about.fb.com/news/2023/06/how-ai-ranks-content-on-facebook-and-instagram/; Meta, *Our approach to explaining ranking*, https://transparency.meta.com/features/explaining-ranking/.

[5] Meta, *Learn About and Manage Suggested Content in Your Facebook Feed*, https://www.facebook.com/help/485502912850153; Meta, *How Instagram determines which posts appear as suggested posts*, https://help.instagram.com/381638392275939.

3

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

**Teens and Adults Can Use Facebook and Instagram for**

**Social, Informational, Educational, Political, and Other Purposes**

13.     All users—from teens to adults—can use Facebook and Instagram for a variety of purposes, including to: make social connections; showcase creative talents; gather information about the world around them; learn and receive education; and participate in the democratic process.

14.     ***Make Social Connections.***  Users can use Facebook and Instagram to make and foster social connections.  Facebook's features—such as Feed, Stories, Groups and Pages—help people connect with friends, family, and communities of people who share their interests.[6]  For example, a high-school user might make a friend at school and connect with them on Facebook to stay in touch over the summer; engage with one-another's photos and videos during travels apart; and chat with mutual friends in the comments.  Similarly, the Facebook Groups feature facilitates social connections among people who have similar interests—from robotics, SAT prep, and mental health advocacy, to stargazing, sports, baking and parenting—and allows them to learn from and share with each other, and develop a network of like-minded individuals they may never have met otherwise.

15.     Instagram also provides users with opportunities to catch up with friends and explore shared interests.[7]  For instance, users can compose short posts (called Notes), which appear at the top of their followers' or close friends' inboxes.  Users have said the Notes feature provides them with a casual and spontaneous way to express themselves, start conversations, and ask followers for recommendations.  Instagram users can also share photos, videos, and messages with their friends.

16.     ***Showcase Creative Talents.***  Facebook and Instagram also provide outlets for creative expression.  Users can share their artwork, photography, and poetry with their friends through the Feed and Stories features on both Facebook and Instagram.  Further, artists looking to

---

[6] Meta, *About Facebook,* https://about.meta.com/technologies/facebook-app/.

[7] Meta, *Introducing New Ways to Connect on Instagram* (Dec. 13, 2022), https://about.instagram.com/blog/announcements/updates-to-instagram-messenger-and-stories.

4

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

grow their business can create business pages on Facebook and Instagram, allowing them to expand their reach, share their art with wider audiences, and connect with potential customers.[8] An Independent Artist Program allows undistributed musicians to easily distribute their music on Facebook and Instagram, providing aspiring musicians with an opportunity to not only share their creative talents, but also to earn money and gain insights into who is listening to their content.[9]

17.    ***Gather Information About the World.***  Universities, the U.S. armed forces, elected officials, government agencies, advocacy organizations, support groups, charities, scholarship programs, religious institutions, businesses, sports teams, and more have pages or profiles on Facebook and Instagram.  Users, including parents, can access these pages to learn more about the world around them—for example, to identify opportunities with youth organizations in their area—like the Boy and Girl Scouts of America, YMCA, and 4-H, all of which have pages on Facebook and Instagram.  They can access pages to get more information about their favorite sports teams—such as to learn when the next Golden State Warriors game is scheduled or to see highlights from the San Jose State Track team's latest meet.  Users, depending on their age and interests, might seek out Facebook or Instagram pages to learn about events at their local community center; ways to get involved with their local church or place of worship; opportunities to volunteer for causes they care about; hear about available scholarships or study abroad programs; find help with algebra or physics homework; or communicate with elected officials.

18.    Facebook and Instagram also allow both individual users and nonprofits to tap into their networks and fundraise for causes they care about.  Through Facebook and Instagram, users have raised more than $7 billion for important causes, ranging from funding medical research to donating school supplies to children in need.[10]

19.    A wide range of global, national, and local news sources and public services provide up-to-date reporting through their Facebook and Instagram pages.  Following these pages

---

[8] Meta, *Meta Business Suite*, https://www.facebook.com/business/tools/meta-business-suite.

[9] Meta, *Meta Independent Artist Program*, https://www.facebook.com/formedia/independent-artist-program.

[10] Meta, *We Can Do More Together*, https://about.meta.com/giving-together/.

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

equips users with a greater understanding of both the world around them and their local communities. For instance, the Federal Emergency Management Agency (FEMA) has a Facebook page, which provides the latest information about disasters around the nation and has instructions on how affected individuals can apply for disaster aid. On the local level, users can turn to community news organizations' pages on Facebook or Instagram to learn about the latest developments in local politics, or their municipality's pages to keep abreast of public service disruptions, road closures, and public meetings.

20.    ***Natural Disaster Notifications and Alerts.***  Facebook and Instagram enable people to connect and support each other, as well as receive urgent notifications, in life's most critical moments. For example, if Meta believes a Facebook user is located within a disaster zone, the user may receive a notification from Facebook asking if they are safe, so they can quickly reassure friends and family.[11]  Facebook users can also ask if a friend is safe, which will trigger a notification to the friend so they can mark themselves safe. Facebook and Instagram can also connect users in need of resources such as food, supplies, or shelter with those able to give.

21.    ***Local Alerts.***  Local governments, public health agencies, and first responder pages on Facebook can send immediate notifications to Facebook users in designated geographical areas to communicate urgent information about weather emergencies, active shooters, missing persons cases, road closures, public service disruptions, and more.[12]  State election authorities, some local election authorities, and county or municipal government agencies can also use Facebook to send urgent, actionable and broadly relevant notifications to voters about polling locations, voting time frames, rules about voter eligibility, and the like.[13]

22.    ***Educational Opportunities on Facebook and Instagram.***  Facebook and Instagram provide users with access to educational opportunities. Through the Groups feature on Facebook,

---

[11] Facebook, *Crisis Response*, https://www.facebook.com/about/crisisresponse/.

[12] Meta, *Local Alerts Guidelines*, https://www.facebook.com/business/help/347939405788447?id=1549080658590154.

[13] Meta, *Voting Alerts Guidelines*, https://www.facebook.com/business/help/626587208260920?id=1549080658590154.

6

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    users can learn from and work with others to understand the world around them.  For instance,

2    users can learn about subjects ranging from math and phonics to astrophysics and philosophy.  On

3    Instagram, users can view reels with tutorials containing practical advice on everyday tasks, from

4    fixing a sprinkler head to designing PowerPoint presentations.  Aspiring college students can

5    follow Facebook and Instagram pages for colleges and universities around the globe to learn about

6    the application process, different courses of study, and student life.  For some people, such as

7    students who live in regions without postsecondary institutions, or for those who will be the first

8    in their family to attend college, this material might not be easily available to them otherwise.

9          23.    ***Participate in the Democratic Process.***  Many elected officials, candidates, and

10   staff have accounts on Facebook and Instagram that they use to disseminate speech on political

11   issues, as do political and issue-advocacy organizations.  In many instances, users can interact with

12   these accounts by following them, viewing the speech and content they share, and responding with

13   speech and content of their own.  Facebook and Instagram also offer a number of resources to help

14   users keep themselves informed about the democratic process.  For example, Facebook provides a

15   Voting Information Center that offers users information about voting, registration, and becoming

16   a poll worker that is provided in collaboration with state election officials and nonpartisan

17   organizations.[14]  And on Facebook and Instagram, Meta sends users in-app notifications to connect

18   them with details about voter registration and elections that are provided by their state and local

19   election officials.[15]

20         24.    Meta has long recognized the importance of their users having a voice and allowing

21   debate on topics about which people may disagree.  But Meta takes action to block groups that

22   disseminate content that harasses or threatens violence.  For example, Meta has banned more than

23   a thousand militarized social movements and over 270 white supremacist organizations from its

24

25

---

26   [14] Facebook, *Voting Information Center* (Oct. 28, 2024),
     https://www.facebook.com/votinginformationcenter

27   [15] Meta, *Meta Policies and Safeguards for Elections Around the World*,
     https://about.meta.com/actions/preparing-for-elections-with-meta/.

28

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

(88 of 125) Page 88 of 125  Case: 25-146, 01/03/2025, DktEntry: 4.2, Page 88 of 125
DocuSign Envelope ID: 8B035B1B-2233-4B3F-9D92-49A2F0BAFF43
Case 5:24-cv-07885-EJD  Document 2-4  Filed 11/12/24  Page 9 of 26

services.[16]  In the aftermath of Myanmar's military coup in February 2021, Meta banned Myanmar military and military-controlled state and media entities from Facebook and Instagram, but also protected content, including political speech, that allowed "the people of Myanmar to express themselves and to show the world what is transpiring inside their country."[17]  In Q4 2023, Meta also removed dozens of Chinese accounts that, while posing as members of U.S. military families, targeted American audiences with military-themed content and attempted to undermine U.S. support for Taiwan.[18]

## Users' Experiences on Facebook and Instagram Services

25.    A survey and interviews conducted by Harvard University in 2015 and 2016 found that teens viewed social media "predominantly" positively, though they reported both positive and negative impacts on their relationships and self-expression.[19]  In more recent years, a study on the rates of Facebook adoption in 72 countries found that overall, "Facebook adoption positively predicted well-being," an association that held "when comparing countries to each other" and to themselves over time.[20]

26.    Surveys have found that social media can promote connectedness, reduce social isolation, and help users find support.  A recent Gallup survey found that 42% of persons aged 15 or older in the United States said they needed support or help from others in the past 30 days, and nearly one-third of those persons used Meta's services to get that support.[21]  A survey by the Pew

---

[16] Meta, *An Update to How We Address Movements and Organizations Tied to Violence* (Oct. 17, 2022), https://about.fb.com/news/2020/08/addressing-movements-and-organizations-tied-to-violence/.

[17] Meta, *Myanmar Military Banned from Facebook and Instagram with Immediate Effect* (Feb. 24, 2021), https://about.fb.com/news/2021/02/an-update-on-myanmar/.

[18] Meta, *Adversarial Threat Report* (February 2024), at 18–19, https://tinyurl.com/3fyuvbuk.

[19] Meta, *What Our Research Really Says about Teen Well-Being and Instagram* (Sept. 26, 2021), https://about.fb.com/news/2021/09/research-teen-well-being-and-instagram/.

[20] Matt Vuorre & Andrew K, Przybylski, *Estimating the Association Between Facebook Adoption and Well-being in 72 countries*, PsyArXiv (Sept, 16, 2022), https://psyarxiv.com/r794k/.

[21] Meta & Gallup, *The State of Social Connections* (2022), *available at* https://dataforgood.facebook.com/dfg/resources/state-of-social-connections-report.

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

Research center found that the large majority of American teens (80%) agree that social media helps them connect with their friends, while some also pointed to its negative impacts, such as the 40% of teens who reported they sometimes decide not to post things because they worry it might be used to embarrass them.[22] Pew surveys have also found that "[m]ajorities of teens believe social media helps people their age diversify their networks," and that 69% of teens say that social media helps them "interact with people from different backgrounds."[23] A recent study on the use of social media during the COVID-19 pandemic found that social media helped adolescents connect with family and peers, provided them with sources of comedic relief, and enabled participation in "social activism and community efforts consistent with their values" during this period of relative isolation.[24] And a 2024 report from the National Academies of Sciences, Engineering, and Medicine likewise finds that social media platforms offer adolescents a means for social connection.[25]

27.    These benefits can be most profound for the most at-risk and disadvantaged adolescents. The 2024 report from the National Academies of Sciences, Engineering, and Medicine found that social media platforms may offer "the most benefit" to adolescents with "chaotic home lives."[26] Likewise, "teens from lower-income groups . . . tend to put strong value on the relationships they make online." Since driving and car ownership are relatively more

---

[22] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings from Pew Research Center* Surveys, Pew Research Center (Apr. 24, 2023), https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys/.

[23] Emily A. Vogels & Risa Gelles-Watnick, *Teens' Social Media Habits and Experiences*, Pew Research Center 9 (Nov. 28, 2018), https://www.pewresearch.org\\internet\\2018\\11\\28\\teens-social-media-habits-and-experiences [hereinafter Pew Research].

[24] Sarah E. Rimel et al., *Technology Use During the COVID-19 Pandemic and the Ways in Which Technology Can Support Adolescent Well-being: Qualitative Exploratory Study*, JMIR Formative Research (2023), https://formative.jmir.org/2023/1/e41694.

[25] National Academies of Sciences, Engineering, and Medicine, *Social Media and Adolescent Health* (Sandro Galea et al. eds., 2024), at 73, https://www.nationalacademies.org/our-work/assessment-of-the-impact-of-social-media-on-the-health-and-wellbeing-of-adolescents-and-children [hereinafter National Academies].

[26] *Id.*

---

9

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1 expensive today than for previous generations and public transit options are poor in most of the
2 United State, infrequent in-person socialization may be a fact of life for many adolescents from
3 lower-income groups.[27]  Studies have also found that online-only friendships can be a source of
4 social support for youth who may be marginalized in their offline social environments.  A study in
5 the Journal of Clinical Child and Adolescent Psychology found that "youth who are at-risk for
6 suicide, such as those who are LGBTQ . . . or have medical conditions, can gain support from
7 online-only friendships who are going through similar experiences."[28]  A study in the journal of
8 Child Abuse and Neglect found that LGBTQ youth rate their online-only friendships as more
9 supportive than in-person relationships and suggested that online spaces can provide "safe
10 haven[s]" for them.[29]  The same can be true for young people suffering isolating illnesses such as
11 cancer and diabetes, who can use social media to "come together and support each other."[30]

12      28.    For individuals with mental health issues, surveys have found that social media
13 services can be a valuable source of information and support.  A 2018 national survey found that
14 "many young people say social media helps them find connection, support, and inspiration during
15 times of depression, stress, or anxiety"—and among those with symptoms of depression, 30% said
16 that social media is "very" important to them for feeling less alone.[31]  A 2019 literature review
17 found that "there is an association between high levels of psychological distress and engaging in
18 help-seeking online"—and that "many young people were going online to look for a space where

---

21 [27] *Id*. at 78.

22 [28] Maya Massing-Schaffer et al., *Adolescent Peer Experiences and Prospective Suicidal Ideation: The Protective Role of Online-Only Friendships,* J. of Clinical Child and Adolescent Psych 9 (2022), https://pubmed.ncbi.nlm.nih.gov/32324048/.

24 [29] Michelle Ybarra et al., *Online Social Support as a Buffer Against Online and Offline Peer and Sexual Victimization Among U.S. LGBT and Non-LGBT Youth,* 39 Child Abuse & Neglect 123–36 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6483382/.

26 [30] National Academies, *supra*, at 78.

27 [31] Victoria Rideout & Susannah Fox, *Digital Health Practices, Social Media Use, and Mental Well-Being Among Teens and Young Adults in the U.S.*, Articles, Abstracts, and Reports 1093 (2018), https://digitalcommons.psjhealth.org/publications/1093/.

10

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

they could share their feelings without fear of judgment or labelling."[32]  The authors added:  "The nonstigmatizing nature of internet help-seeking makes it an attractive option for marginalized groups" such as "members of the LGBT+ community who may be fearful of disclosing personal concerns to their informal networks."[33]

29.    Studies have also observed that using social media to learn about public affairs and one's community can promote civic engagement.  A study in the Journal of Computer-Mediated Communication concluded that seeking information via social media services like Facebook "is a positive and significant predictor of people's social capital and civic and political participatory behaviors, online and offline."[34]  And a Pew Research survey found that roughly two-thirds of teens say that social media exposes them to different points of view and that majorities of teens believe social media can help them "broaden their viewpoints and get involved with issues they care about."[35]

### Meta's Efforts to Promote Safety and Positivity on Facebook and Instagram

30.    Meta has invested substantial resources to promote a safe experience for teens and empower parents to partner with their teens to ensure they have positive and fulfilling experiences on Facebook and Instagram.  Meta offers numerous tools, features and resources to support teens and their parents,[36] and has around 40,000 people overall working on safety and security.  Since 2016, Meta has invested over $20 billion into safety and security.  This work is core to Meta's mission of designing and building services that bring people together.  Meta wants its services to

---

[32] Claudette Pretorius et al, *Young People's Online Help-Seeking and Mental Health Difficulties: Systematic Narrative Review*, 21 J. of Med. Internet Rsch. 10–11 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6891826/.

[33] *Id.* at 12.

[34] Homero Gil de Zúñiga et al., *Social Media Use for News and Individuals' Social Capital, Civic Engagement and Political Participation,* 17 J. of Comput.-Mediated Commc'n 319 (2012), https://onlinelibrary.wiley.com/doi/full/10.1111/j.1083-6101.2012.01574.x.

[35] Pew Research, *supra,* at 9.

[36] Meta, *Our Tools, Features, and Resources to Help Support Teens and Parents*, https://www.meta.com/help/policies/safety/tools-support-teens-parents/    [hereinafter    Tools, Features, and Resources].

11

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1   be a place for meaningful interactions with friends and family, and cannot achieve that goal if

2   people do not feel safe.

3           31.    **Minimum Age Policy.**  Pursuant to Facebook's Terms of Service and Instagram's

4   Terms of Use, if a child in the United States is under the age of 13, they are not allowed to create

5   an account on Facebook or Instagram and should not be using the services.  When Meta learns an

6   underage user has created a Facebook or Instagram account, Meta removes the account from the

7   service.  In addition to asking for people's date of birth when they create an account and allowing

8   anyone to report a suspected underage account, Meta trains its content reviewers to flag for further

9   investigation reported accounts that appear to be used by people who are underage, and removes

10  those accounts unless the user is able to prove that they meet the minimum age requirements.[37]

11          32.    **Instagram Teen Accounts.**  As of September 2024, Meta began placing teens on

12  Instagram in the United States into Teen Accounts, a new experience for teens with built-in

13  protections that limit who can contact teens and the content they see.[38]  With **default private**

14  **accounts**, teens need to accept new followers, and people who do not follow them cannot see their

15  content or tag, mention, or interact with them.  Teen Account protections also include **messaging**

16  **restrictions**, which permit teens to only be messaged by people they follow or are already

17  connected to; **sensitive content restrictions**, which limit the type of sensitive content (such as

18  content that shows people fighting) teens see in places like Reels; **time limit reminders**, which

19  notify teens to leave the app after 60 minutes each day; and **sleep mode**, which mutes notifications

20  overnight and sends auto-replies to direct messages (from 10 p.m. to 7 a.m.).  Teens under 16 will

21  need a parent's permission to change any of these settings to be less strict.

22          33.    **Parental Supervision.**  On both Facebook and Instagram, Meta empowers parents

23  to work collaboratively with their teens to help them create, explore and connect on Facebook and

24

25  ───────────────

26  [37] Meta, *How Do We Know Someone Is Old Enough to Use Our Apps?* (July 27, 2021),
    https://about.fb.com/news/2021/07/age-verification/.

27  [38] Instagram, *Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind
    for Parents* (Sep. 17, 2024), https://about.instagram.com/blog/announcements/instagram-teen-
28  accounts/ [hereinafter Teen Accounts].

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

Instagram in safe, age-appropriate ways.[39]  Parents and guardians can use supervision tools on Facebook and Instagram to work together to set time limits and schedule breaks; allow parents to see who their teen follows and who follows their teen; enable parents to approve or deny their teens' requests to change default safety and privacy settings to a less strict state; enable parents to view their teen's account privacy settings, sensitive content settings, and messaging settings; and empower teens to notify their parents when they block or report someone.[40]

34.   ***Control Over Experiences in Feed***.  Facebook and Instagram also offer a number of tools for users to customize their experiences in Feed.  By default, the Feed AI systems automatically order posts in the Facebook and Instagram Feeds by predicting what users will find most valuable and relevant.  Facebook and Instagram users have the option to choose to view content from people or groups they follow in reverse chronological order.  Additionally, on Facebook, users can tap the "Show more, Show less" feature on all posts in Feed, Videos, and Reels to see more of the content they want to see, and less of the content they do not want to see; and similarly, on Instagram, users can indicate "Not Interested" on a recommended post.[41]

35.   Facebook and Instagram also offer a host of tools for users to control how they engage with content. For example, users can unfollow accounts; automatically hide content in Feed

---

[39] Meta, *Family Center*, https://familycenter.meta.com/.

[40] Meta*, Giving Teens and Parents More Ways to Manage Their Time on Our Apps* (June 27, 2023), https://about.fb.com/news/2023/06/parental-supervision-and-teen-time-management-on-metas-apps/; Meta, *Introducing Stricter Message Settings for Teens on Instagram and Facebook* (Jan. 25, 2024), https://about.fb.com/news/2024/01/introducing-stricter-message-settings-for-teens-on-instagram-and-facebook/ [hereinafter Stricter Message Settings for Teens]; Meta, *Parental Supervision,* https://help.instagram.com/309877544512275; Meta, *Safety Resources for Parents*, https://www.facebook.com/help/1079477105456277.

[41] Facebook, *New Ways to Customize Your Facebook Feed* (Oct. 5, 2022), https://about.fb.com/news/2022/10/new-ways-to-customize-your-facebook-feed/; Meta, *Facebook Feed AI System*, https://transparency.fb.com/features/explaining-ranking/fb-feed/?referrer=1; Meta, *Instagram Feed AI System*, https://transparency.fb.com/features/explaining-ranking/ig-feed/?referrer=1; Instagram, *How to See More of What You Want on Instagram* (Aug. 30, 2022), https://about.instagram.com/blog/tips-and-tricks/control-your-instagram-feed#:~:text=Use%20the%20E2%80%98Not%20Interested%E2%80%99%20control%20When%20you%20see,suggest%20fewer%20posts%20like%20it%20in%20the%20future.

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1  from selected accounts without unfollowing those accounts; hide comments they do not want to

2  see; hide like counts on all posts in their Feed and all posts they create; and mute push notifications

3  entirely.[42]

4     36.  ***Safety Features for Young Users.***  Meta helps prevent young people from

5  interacting with adults they don't know.  Meta has developed technology that allows it to estimate

6  people's ages to determine, for example, whether someone is younger or older than 18.  Meta

7  restricts people over 19 years old from sending private messages to teens who do not follow

8  them.[43]  Meta has also developed technology to identify and automatically disable accounts if they

9  exhibit a certain number of the 60+ signals Meta monitors for potentially suspicious behavior, such

10  as if a teen blocks or reports an adult, or if someone repeatedly searches for terms that may suggest

11  suspicious behavior.  Meta further limits potentially suspicious adults from finding, following, or

12  interacting with teens and prevents these adults from finding, following, or interacting with one

13  another.[44]  Similarly, Meta does not show suspicious adults to teens (or vice versa) on the Facebook

14  app in People You May Know recommendations, nor does it show such adults to teens (or vice

15  versa) on the Instagram app in Accounts You May Follow recommendations.

16     37.  In an effort to provide age-appropriate experiences for young people on Facebook

17  and Instagram, Meta "age-gates" certain content.  Under Meta's policies on restricted and

18  prohibited goods, branded content involving certain adult goods—such as alcohol, cosmetic

19  procedures, and weight loss services—cannot be provided to minors' accounts.[45]

20

21

---

22  [42] Instagram, *Introducing Mute: A New Feature to Control Posts on Your Feed* (May 22, 2018),
23  https://about.instagram.com/blog/announcements/introducing-mute; Tools, Features, and
   Resources, *supra*.

24  [43] Meta, *Continuing to Make Instagram Safer for the Youngest Members of Our Community*
25  (Mar. 17, 2021), https://about.instagram.com/blog/announcements/continuing-to-make-
   instagram-safer-for-the-youngest-members-of-our-community [hereinafter Continuing to Make
26  Instagram Safer].

   [44] Meta, *Our Work to Fight Online Predators* (Dec. 1, 2023),
27  https://about.fb.com/news/2023/12/combating-online-predators/.

28  [45] Meta, *Branded Content Policies*, https://help.instagram.com/1695974997209192.

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

38.    ***Content Moderation.***  Meta's publicly available Facebook Terms of Service[46] (to which people must agree to create an account on the Facebook service) and Community Standards[47] (which users agree not to violate) describe what content is acceptable on Facebook. Meta's publicly available Instagram Terms of Use[48] (to which users must agree to create an account on the Instagram service) and Instagram Community Guidelines[49] (which users agree not to violate) describe what content is acceptable on Instagram.

39.    The Facebook Terms of Service prohibit users from doing or sharing anything that is "unlawful, misleading, discriminatory or fraudulent" or that "infringes or violates someone else's rights."[50]  The Facebook Community Standards provide details about what content is not allowed on Facebook.  The Community Standards are organized into six categories: (i) violence and criminal behavior, (ii) safety, (iii) objectionable content, (iv) integrity and authenticity, (v) respecting intellectual property, and (vi) content-related requests and decisions.  Within each of those six categories, the Community Standards identify additional subcategories, such as "violent and graphic content," and "bullying and harassment."  Users can see Facebook's policy rationale for prohibiting each category of content and examples.  For example, the Community Standards explain that "bullying and harassment" is not tolerated on Facebook.  Notwithstanding, Facebook recognizes that people sometimes share content that illustrates bullying or harassment to condemn it or raise awareness.  Facebook's policies are designed to allow room for these types of speech.

---

[46] *Facebook Terms of Service*, https://www.facebook.com/terms.php [hereinafter Facebook Terms].

[47] *Facebook Community Standards*, https://transparency.fb.com/policies/community-standards/ [hereinafter Facebook Community Standards].

[48] *Instagram Terms of Use*, https://help.instagram.com/581066165581870 [hereinafter Instagram Terms].

[49] *Instagram Community Guidelines*, https://help.instagram.com/477434105621119 [hereinafter Instagram Community Guidelines].

[50] Facebook Terms, *supra*.

15

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    The Community Standards also include information about when content may be accompanied by

2    a sensitivity warning.[51]

3         40.    Similarly, the Instagram Terms of Use prohibit users from doing or sharing

4    anything that is "unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose" or

5    that would "violate[] someone else's rights," and from "post[ing] someone else's private or

6    confidential information without permission."[52]   The Instagram Community Guidelines provide

7    detail about what content is not allowed on Instagram, including prohibiting "coordination of

8    harm," "nudity," "hate speech," and "bullying and harassment."[53]

9         41.    Meta relies on both automated and human review to enforce its terms and policies

10   at scale.[54]  For many categories of content that violate Meta's policies, such as violent and graphic

11   content and suicide and self-injury content, Meta's artificial intelligence systems find more than

12   90% of the content it removes before anyone reports it.[55]  Meta has also built artificial intelligence

13   technology to identify suicide-related content and rapidly respond with resources.   For other

14   categories of content—such as content that may reflect bullying or harassment—using technology

15   to proactively detect those behaviors can be more challenging than other types of violations.  Meta

16   also relies on people to report that behavior so Meta can identify and remove it.  Meta also works

17   with first responders to conduct wellness checks based on reports it receives via proactive detection

18   efforts.

19        42.    Thousands of people across the company work together to remove millions of

20   pieces of content containing adult nudity, sexual activity, bullying and harassment, child nudity

21   and sexual exploitation of children, and hate speech.

22

23   [51] Facebook Community Standards, *supra* (categories as of June 29, 2023); Meta, *Facebook Community Standards for Bullying and Harassment,*

24   https://transparency.fb.com/policies/community-standards/bullying-harassment/.

25   [52] Instagram Terms, *supra*.

26   [53] Instagram Community Guidelines, *supra*.

27   [54] Meta, *Detecting Violations*, https://transparency.fb.com/enforcement/detecting-violations/.

28   [55] Meta, *Community Standards Enforcement Report* (February 2024), https://transparency.fb.com/data/community-standards-enforcement/.

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

43. Meta recently announced additional measures to protect people from sextortion on Instagram. Meta will hide follower and following lists from potential sextortion scammers, prevent screenshots or screen recordings of ephemeral images or videos sent in private messages, and will blur images that Meta detects as containing nudity when sent or received in direct messages.[56]

44. In Meta's Transparency Center,[57] Meta publicly shares information to help keep people safe and let people hold Meta accountable—including information about Meta's policies (which define what is and isn't allowed on Meta technologies); Meta's transparency reports (which give the community visibility into how Meta enforces its policies); and Meta's enforcement reports (which detail Meta's progress on taking action on content that violates its policies).

45. Meta has a robust system in place to restrict or remove content that may be age-inappropriate or violates its policies. For example, Meta restricts the availability of content discussing self-harm or eating disorders from teens, even if it is posted by friends or people they follow.[58] Meta also restricts the ability of users under 18 to view graphic and violent imagery.[59] For other users, Meta will add warning labels to some graphic or violent imagery so that users are aware of its sensitive nature before they click through. Meta also removes content that goes against the Facebook Community Standards or Instagram Community Guidelines. For example, in Q2 2024, Meta took action on 6.6 million pieces of content on Facebook that violated its suicide and self-injury policies, and over 99% of that content was removed before any user reported it.[60]

---

[56] Meta, *Our New Education Campaign to Help Protect Teens from Sextortion Scams* (Oct. 22, 2024), https://about.instagram.com/blog/announcements/campaign-against-teen-sextortion/ [hereinafter Sextortion Campaign].

[57] Meta, *Transparency Center*, https://transparency.meta.com.

[58] Meta, *New Protections to Give Teens More Age-Appropriate Experiences on Our Apps* (Jan. 9, 2024), https://about.fb.com/news/2024/01/teen-protections-age-appropriate-experiences-on-our-apps/.

[59] Meta, *Violent and Graphic Content*, https://transparency.fb.com/policies/community-standards/violent-graphic-content/.

[60] Meta, *Suicide and Self-Injury*, https://transparency.fb.com/policies/community-standards/suicide-self-injury/.

17

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

46.     When it removes content, Meta will notify the posting user.  When Meta removes a user's content for violating Meta's policies, the user may incur a strike against their account.[61] For most violations, a first strike results in a warning.  If Meta removes additional posts that violate the Facebook Community Standards or Instagram Community Guidelines, the user will incur additional strikes to their account and may lose access to some features for longer periods of time.[62] If a user continues to post content that goes against Meta's policies, despite repeated warnings and restrictions, Meta may disable or remove the user's account.[63]

47.     Meta also has tools that enable users to curate their experience on its services—for example, choosing a list of "Favorite" friends and pages to feature in Feed, blocking content from certain users, and reporting content they consider inappropriate.  Facebook gives users the option to hide a single post or opt to see fewer posts from a specific person, page, or group.[64]  Instagram offers users a "not interested" button they can use to remove a post from their feed immediately, and Instagram will suggest fewer posts like it in the future.[65]  Meta has rolled out other features in response to feedback, such as the ability to turn off a counter displaying how many people have "liked" a post or photo.  Instagram also offers users the option to hide comments and message requests that are inappropriate, disrespectful, or offensive, as well as manually create a custom list of words, phrases, numbers, and emojis they would like to be hidden.[66]

48.     Additionally, Meta's Facebook and Instagram Recommendation Guidelines set forth standards used to determine what third-party content is eligible for Meta to recommend to

---

[61] Meta, *Counting Strikes*, https://transparency.fb.com/enforcement/taking-action/counting-strikes/.

[62] Meta, *Restricting Accounts*, https://transparency.fb.com/enforcement/taking-action/restricting-accounts/.

[63] Meta, *Disabling Accounts*, https://transparency.fb.com/enforcement/taking-action/disabling-accounts/.

[64] Meta, *Control You See in Feed on Facebook*, https://www.facebook.com/help/1913802218945435.

[65] Meta, *How to See More of What You Want on Instagram* (Aug. 30, 2022), https://about.instagram.com/blog/tips-and-tricks/control-your-instagram-feed.

[66] Meta, *Hide Comments or Message Requests You Don't Want to See on Instagram*, https://help.instagram.com/700284123459336.

18

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1  users.[67]  The Recommendation Guidelines are designed to maintain a higher standard than the

2  Community Standards, because recommended content is from accounts the user has not chosen to

3  follow.  Under the Recommendation Guidelines, content may not be eligible for recommendation

4  if, for example, it:  (1) impedes Meta's ability to foster a safe community, including violent content,

5  sexually suggestive content, content that discusses or trivializes self-harm or depression, and

6  content promoting certain regulated products; (2) is sensitive or low-quality content about health

7  or finance; or (3) is false or misleading content that includes claims that have been found to have

8  been false by independent fact-checkers.[68]

9         49.    ***Safety-Related Information, Resources, and Partnerships.***    Meta provides a

10  Safety Center[69] that offers expert-backed safety resources, tools, and information for users of both

11  Facebook and Instagram.  These include resources and information related to suicide prevention,[70]

12  maintaining mental health and well-being,[71] preventing bullying and harassment,[72] as well as

13  resources and information of particular interest to parents,[73] educators,[74] journalists, activists, and

14  public figures.[75]  The Safety Center's Parent Portal, Youth Portal, and Child Safety Hub are

15  focused on fostering conversations around online safety, security, and well-being.  The Safety

16

---

17  [67] Meta, *Recommendation Guidelines* (Aug. 31, 2020),

18  https://about.fb.com/news/2020/08/recommendation-guidelines/; Facebook, *What Are Recommendations on Facebook?*, https://www.facebook.com/help/1257205004624246

19  [hereinafter Facebook Recommendations];  Instagram, *Recommendations on Instagram*, https://help.instagram.com/313829416281232 [hereinafter Instagram Recommendations].

20  [68] Facebook Recommendations, *supra*; Instagram Recommendations, *supra*.

21  [69] Meta, *Safety Center*, https://about.meta.com/actions/safety.

22  [70] Meta, *Suicide Prevention*,
https://about.meta.com/actions/safety/topics/wellbeing/suicideprevention/ [hereinafter Suicide

23  Prevention].

24  [71] Meta, *Mental Health & Well-Being*, https://about.meta.com/actions/safety/topics/wellbeing/.

25  [72] Meta, *Prevent Bullying and Harassment*,
https://about.meta.com/actions/safety/topics/bullying-harassment/.

26  [73] Meta, *Parents*, https://about.meta.com/actions/safety/audiences/childsafety/.

27  [74] *Id.*

28  [75] Meta, *Journalists, Activists, and Public Figures*,
https://about.meta.com/actions/safety/audiences/journalists-activists-public-figures/.

19

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1   Center has a dedicated crisis support resources page to help users quickly obtain expert support to

2   address suicide prevention, eating disorders, domestic violence, and child protection.[76]

3       50.    Meta regularly publishes updates about its efforts to remove harmful content and

4   protect user communities.  For example, Meta has published articles on how it uses artificial

5   intelligence on Facebook to help suicide prevention efforts,[77] on Meta's efforts to protect people

6   on Instagram from abuse by enabling automatic filtering of harmful comments and message

7   requests,[78] on Meta's partnership with the National Center for Missing and Exploited Children

8   (NCMEC) in the development of Take It Down,[79] and on the dozens of tools Meta has developed

9   to support teens and families on its apps—including parental controls, nudges for teens to set time

10  limits on Facebook and Instagram and giving them the ability to set scheduled breaks, nudges to

11  encourage teens to close Instagram after 60 minutes each day, and tools that protect teens against

12  unwanted interactions.[80]

13      51.    Meta collaborates with a number of partners and experts to inform its approach to

14  safety, including the Boys and Girls Club of America, Childhelp, ConnectSafely, the Cyber Civil

15  Rights Initiative, the International Bullying Prevention Association, PACER's National Bullying

16  Prevention Center, the Yale Center for Emotional Intelligence, and the NCMEC.[81]  For example,

---

[76] Meta, *Crisis Support Resources*, https://about.meta.com/actions/safety/crisis-support-resources/.

[77] Meta, *How Facebook AI Helps Suicide Prevention* (Sept. 10, 2018), https://about.fb.com/news/2018/09/inside-feed-suicide-prevention-and-ai/.

[78] Meta, *Updates to How We Protect People on Instagram from Abuse* (Oct. 20, 2022), https://about.fb.com/news/2022/10/protecting-people-on-instagram-from-abuse/.

[79] Antigone Davis, *New Updates to Help Prevent the Spread of Young People's Intimate Images Online*, Meta (Feb. 27, 2023), https://about.fb.com/news/2023/02/helping-prevent-the-spread-of-young-peoples-intimate-images-online/#:~:text=Built%20in%20a%20way%20that,that%20are%20secure%20digital%20fingerprints.

[80] Antigone Davis, *How Meta Is Working to Provide Safe, Age-Appropriate Experiences for Teens*, Meta (Jan. 9, 2023), https://about.fb.com/news/2023/01/providing-safe-experiences-for-teens/; Meta, *Giving Teens and their Parents More Ways to Manage Their Time on Our Apps* (June 27, 2023), https://about.fb.com/news/2023/06/parental-supervision-and-teen-time-management-on-metas-apps/; Teen Accounts, *supra*.

[81] Meta, *Safety Partners,* https://about.meta.com/actions/safety/safety-partners.

20

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

DocuSign Envelope ID: ...

1    Meta worked with ConnectSafely to publish a Parent's Guide[82] with the latest Instagram safety

2    tools and privacy settings and a list of tips and conversation starters to help parents and guardians

3    navigate discussions with their teens about their online presence.  Meta also worked with the

4    Digital Wellness Lab team on a Family Digital Wellness Guide to help families learn about media-

5    related health issues.  Facebook and Instagram are founding members of Take It Down, a service

6    designed to proactively prevent young people's inappropriate intimate images from spreading

7    online.  Meta partnered with the NCMEC in the development of Take It Down.  Moreover,

8    Instagram recently announced a new educational campaign informed by NCMEC and Thorn to

9    help teens spot sextortion scams and help parents support their teens in avoiding these scams.[83]

10   **User Data**

11          52.     While Meta uses data it collects to decide which advertisements and other

12   sponsored or commercial content to show each user, it also (as documented in its Privacy Policy)

13   collects and makes use of user data in part to make Facebook and Instagram functional and to

14   promote safety, security, and integrity on the services.[84]

15          53.     Information Meta collects on these services includes, for example, information that

16   users provide during the sign up process, such as email addresses, phone numbers, language

17   preference, and age; as well as information about users' activities on the services, such as posts,

18   messages, and actions taken in Facebook and Instagram; the user's friends, followers, and other

19   connections; and information from the app, browser, and device on which a user accesses

20   Facebook or Instagram.

21          54.     Meta collects this information to help make Facebook and Instagram functional.

22   For example, Meta's collection and use of this data allows users to create and maintain their own

23   Facebook and Instagram accounts and friends lists; allows users to see new content (as opposed to

24   content they have seen before) when they log in to the services; and enables users to interact and

25

26   [82] Meta, *Helping Your Teen Navigate Instagram Safely,*
     https://about.instagram.com/community/parents.

27   [83] Sextortion Campaign, *supra*.

28   [84] Meta, *Privacy Policy*, https://www.facebook.com/privacy/policy [hereinafter Privacy Policy].

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

(102 of 125), Page 102 of 125

1    communicate with one-another.

2        55.    Meta also collects and makes use of user data to provide safety and security features

3    for all users, including young people.  For example, Meta collects and uses phone numbers and

4    computer and browser information so that users can protect their accounts with two-factor

5    authentication.[85]  Meta also collects and uses user information to verify accounts and activity; to

6    find and address violations of the Facebook Terms of Service and the Instagram Terms of Use; to

7    detect, prevent, and combat harmful or unlawful behavior, such as to review and, in some cases,

8    remove content reported to Meta; and to investigate suspicious activity—for example, Meta might

9    store and use information about a user's typical location during sign-in to detect and prevent

10   suspicious sign-in attempts.[86]  Meta also uses user data and machine learning technology to

11   identify possible suicide or self-injury content, and to help Meta's Community Operations team

12   prioritize and evaluate urgent posts, including contacting emergency services when users might be

13   at risk of harm.[87]

14   **The California Protecting Our Kids from Social Media Addiction Act's Impact on**

15   **Facebook and Instagram**

16       56.    I understand that on or around September 20, 2024, the State of California enacted

17   the Protecting Our Kids from Social Media Addiction Act, Cal. Health and Safety Code §§ 27000

18   to 27007 (the "Act").  I understand that both Facebook and Instagram are covered "service[s] or

19   application[s]" with users in California, as defined by the Act at §27000.5(b).  I understand that

20   many of the Act's relevant provisions will go into effect on January 1, 2025.  I understand that,

21   should the Act go into effect, Facebook and Instagram will be subject to it, as neither service

22   appears to fall within any of the exceptions listed at §27000.5(a)(1)–(7) and §27000.5(b)(2).

23       57.    I understand that the Act's restrictions only apply to certain in-scope services.

24

25   [85] Meta, *Securing Your Instagram Account with Two-Factor Authentication*,
26   https://help.instagram.com/566810106808145; Meta, *How Two-Factor Authentication Works on Facebook*, https://www.facebook.com/help/2FAC/.

27   [86] Privacy Policy, *supra*.

28   [87] Suicide Prevention, *supra*.

22

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

DocuSign Envelope ID: ...

1    Teens move fluidly across online services and Facebook and Instagram are only one part of the

2    online ecosystem.  We can most effectively protect youth if the whole industry works together to

3    achieve this goal.  As a general matter, narrowing the responsibility of youth safety to only certain

4    websites based on arbitrary distinctions can lead to a new marketplace for unmonitored services

5    with no incentive to build new safeguards.

6         58.    I understand that that the Act will restrict certain California account holders from

7    accessing personalized feeds on Facebook and Instagram—*i.e.*, a feed "in which multiple pieces

8    of media generated or shared by users are, either concurrently or sequentially, recommended,

9    selected, or prioritized for display to a user based, in whole or in part, on information provided by

10   the user, or otherwise associated with the user's device," with limited exceptions.  §§ 27000.5–

11   27001.  I understand the Act will additionally prohibit certain California account holders from

12   receiving notifications during certain times of day.  § 27002(a).  I understand that these restrictions

13   will initially apply to users who are known minors that do not have verified parental consent to

14   access personalized feeds or to receive such notifications; and then, on January 1, 2027, the Act's

15   restrictions will apply to all existing or prospective California account holders who do not wish to

16   go through the Act's mandated age assurance processes.  §§ 27001–27002.

17        59.    I understand that many people do not always have access to the forms of

18   identification or other documents or information that may be necessary for a social media service

19   to assure the person's age, §27006(b).  I understand that other people may find age-assurance

20   processes cumbersome, particularly if they are required to undergo them on an app-by-app basis.

21   I understand that lack of identification access disproportionately impacts underserved communities

22   around the world, particularly young women.  I also understand that some people may be

23   uncomfortable sharing identification.

24        60.    I understand that if the Act goes into effect, minors may be severely restricted in

25   what they can see and how they can express themselves on Facebook and Instagram unless a

26   verified parent is willing and able to go through additional processes, which some may find

27   cumbersome on an app-by-app basis, to verify their parental relationship and affirmatively

28   consent.  Absent verifiable parental consent, I understand that the Act will preclude California

23

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

(104 of 125), Page 104 of 125 Case: 25-146, 01/03/2025, DktEntry: 4.2, Page 104 of 125

minors from deciding whether they would like to use Facebook or Instagram to access personalized feeds or to receive notifications (such as "marked safe" alerts following weather emergencies or urgent alerts from local government, public health agency, or first responder Pages during active shooter situations, public health emergencies, missing persons cases, or road closures) during certain times of day.

61.    I understand that the Act's age assurance and verifiable parental consent requirements could deter minors and adults alike from accessing the services.  I understand that if the Act goes into effect, such persons may not be able to use Facebook or Instagram to make social connections; showcase their creative talents; gather information about non-profit organizations, sports teams, and the world around them; engage with religious institutions, out-of-state universities, and educational materials; start or grow their businesses; receive voter registration information; participate in political discourse (including with other users or even directly with political candidates); or engage in any number of other potential uses of these services.

62.    I understand that Act's restrictions on "personalized feeds" will severely limit Meta's ability to personalize Facebook and Instagram users' experiences based on their likes, dislikes, and interests, and will limit Meta's ability to disseminate the kind of third-party content that users have demonstrated an interest in.  As a result, the experience on Facebook and Instagram may no longer be valuable or even recognizable to users of Facebook and Instagram.

63.    In short, if the Act's restrictions go into effect, they will, among other things, burden, if not outright prevent, users' ability to access expression or express themselves on Facebook and Instagram, connect or engage with their family and friends there, and will reduce users' access to information about local businesses, non-profits, educational and religious institutions, sports teams, or events in their community.

24

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1

2                               *        *        *

3

4  I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and

5  correct to the best of my knowledge.

6

7  Dated: _____          By: _____

11/6/2024

Signed by:

Antigone Davis

238F9400FCDB4B3...

8                                    Antigone Davis

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25

**DECLARATION OF ANTIGONE DAVIS IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

# Exhibit F

to NetChoice's Motion for Injunction Pending Appeal

1

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

3    NETCHOICE,

4                              Plaintiff,

5         v.

6    ROB BONTA, in his official capacity as At-
     torney General of California,

7

8                              Defendant.

9

Case No. _____

**DECLARATION OF DENISE PAOLUCCI**
**IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR**
**PRELIMINARY INJUNCTION**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

I, Denise Paolucci, declare as follows:

1.  I am the co-owner of Dreamwidth Studios, LLC, which operates the website dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles for the website, including as the head of the Trust and Safety team, which handles reports of abuse and violations of policy on the site, and head of product development. I am older than 18 and I make this declaration from personal knowledge and a review of Dreamwidth's records kept in the ordinary course of business.

2.  Dreamwidth is an open source social networking, content management, and personal publishing website, in operation since 2009.

3.  Registering an account requires a user to choose a username, provide an email address, and explicitly agree to the provisions of our Terms of Service. Dreamwidth's registered users can: (1) create public profiles; (2) post content to their "Journal" and comment on others' posts; (3) create, join, and post content in "Communities" that function as Journals intended to focus on a specific discussion topic to which multiple users can contribute; (4) send direct messages to users in accordance with the privacy settings those users have chosen; (5) post and comment in shared community forums; and (6) construct, populate, and browse a feed that presents the user with aggregated content posted by other users they have chosen to follow.

4.  Dreamwidth operates according to a set of Guiding Principles and a Diversity Statement that encapsulate our business philosophy. *See* https://www.dreamwidth.org/legal/principles; https://www.dreamwidth.org/legal/diversity.

5.  Dreamwidth provides a number of privacy, security, and content-control features, allowing our users a high degree of control over their own data and their own online experience. Our users can choose who sees their content, restrict access to their content in multiple ways, and control the visibility of everything they post to the site.

6.  ***Business model, data sharing, and data usage.*** Dreamwidth does not accept any form of advertising and does not engage in the sale, trade, or brokering of user data. Our revenue comes entirely from our "freemium" model, where approximately 20% of our users pay a fee to

1

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

access extra services and fund the site for the approximately 80% of our active users who use the site on an unpaid basis. We do not accept payment to promote posts, change the order or priority of content, or target content or posts to a subset of users. In fact, we do not offer any algorithmic sorting or display of user timelines that adjusts the display of content based on a prediction that a particular user will be more or less interested in a particular piece of content, and we do not collect or store the data about user behavior that would allow us to make those predictions. Our Privacy Policy (https://www.dreamwidth.org/legal/privacy) and Guiding Principles promise users that we will collect the minimum amount of personally identifying data about them that is necessary in order to operate the service.

7. Dreamwidth.org has approximately 4 million registered accounts, and has approximately 2 million unique visitors annually. We operate on an extremely limited budget, and are staffed by myself and the company's other co-owner, two part-time employees, and approximately 200 volunteers.

8. Creating an account is necessary to use most of the website's speech-facilitating functionality and to view much of the content, although we do not require visitors to the site to create an account. Primarily, users must create an account to post content and to share their expression with an audience of their choosing. Viewing content is more mixed. For example, searching for individual posts that contain certain phrases or keywords is limited to registered users only. But users have a lot of control over who sees and can interact with their content. In accordance with our principles regarding individual control over account settings and content, individual users can choose to restrict the visibility of their content only to specific users they have affirmatively granted access to the content, on a per-post basis. Users can choose to restrict the visibility of contact information on their profile only to registered users, to specific users they have affirmatively granted access to the contact information, or to no one at all. Users can choose who can comment on their posts, with the options being all site visitors (including those who do not have a site account), registered accounts only, specific users they have affirmatively granted access to comment to their posts, or no one at all. In addition to the public and private post settings, the

2

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1   owner of a Community can also choose to restrict posts only to members of the Community, and
2   can also either allow any registered user to join the Community to see the content posted to it or
3   only allow registered users they have affirmatively granted access to join the Community. Visitors
4   to the site who have not created an account can read public posts made by specific users, access
5   an aggregate feed of the most recent public posts made to the site, look up users who have indicated
6   that they are interested in certain topics or keywords, or ask to be shown a random active account.
7   The default settings for content visibility and access permissions—which apply unless a user over-
8   rides them for a particular post or for their account as a whole—are for posts to be visible to every
9   site visitor, for registered users only to be able to comment in reply to a post, and for profile contact
10  information to be visible only to registered users. The majority of our users use the ability to change
11  post privacy settings in their account on a per-post basis and post a mixture of publicly available
12  and visibility-restricted content. There is no single prevailing configuration for Community ac-
13  counts: our users have found a wide range of settings beneficial, depending on the purpose of the
14  Community. In any use case, whether a Journal or a Community, visitors to the site who haven't
15  registered an account are only able to access a limited subset of the speech available on the site
16  and are only able to contribute to a small subset of discussions happening on the site.

17         9.      Dreamwidth does not deliberately target minors as an audience, and our intended
18  audience is adults looking for a social media service that will respect their privacy. However, in
19  order to ensure compliance with the Children's Online Privacy Protection Act (COPPA), we do
20  collect a date of birth from all users at registration. When a user signs up for a Dreamwidth account,
21  they must enter a username, an email address that can be verified through an automatic email link,
22  a password, and a birthdate. The birthdate field displays a notice that "This information is required
23  by law" and "You must enter your real birthdate." In accordance with COPPA, we have chosen not
24  to create a system that will attempt to verify parental consent for children under the age of 13 to
25  maintain an account on the service. Therefore, we do not accept registration from users whose
26  birthdate provided at registration indicates they are under 13 years old.

27
28
                                          3
**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

10.    Accounts owned by users whose birthdate indicates they are under the age of 18 have further restrictions placed on those accounts for the purposes of user safety, such as the inability to view any post or account that a user or Dreamwidth itself has marked as inappropriate for viewing by minors and restricted visibility in some search results.

11.    Dreamwidth does not collect address or location data of our users at the time of account registration, login, or posting. We utilize a limited form of our network provider's geolocation service to block connections from certain countries that have been the source of elevated levels of network abuse, but we do not associate that geolocation data with specific accounts. And this geolocation and blocking happens before the connection even reaches us. Users are able to voluntarily provide their location information if they choose to do so in order to display it on their profile. Approximately 32,000 Dreamwidth users have chosen to voluntarily identify themselves as residents of California, and at least one of those users have provided birthdates indicating they are under the age of 18 as of the date execution of this declaration. Because we do not store our upstream provider's geolocation data, associate it with individual user accounts, or perform geolocation on our users once their connection reaches our site, this figure does not count users who may be located in California but have not chosen to provide their location information. There is no way for us to identify how many additional users may be located in California but have chosen not to provide their location information.

12.    We are not sure whether Dreamwidth qualifies as an "addictive internet-based service or application," Cal. Health & Safety Code § 27000.5(a)-(b), under California Senate Bill 976 (2023) ("Act"). The statute provides conflicting tests for what may constitute an "addictive feed." *Id.* § 27000.5(b). As stated above, we do not display content in feeds that rely on predictions that a particular user will be more or less interested in a particular piece of content. Thus, we do not think that we provide "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the

4

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1  user's device." *Id.* § 27000.5(a). Instead, at most, we allow a "user" to "expressly and unambigu-

2  ously request[] the specific media or media by the author, creator, or poster of the media, or the

3  blocking, prioritization, or deprioritization of such media." *Id.* § 27000.5(a)(4). That is because we

4  provide a reverse-chronological display of posts from people a user has affirmatively chosen to

5  subscribe to on the reading page at user.dreamwidth.org/read (the "reading page," or our equivalent

6  of the "timeline"). But people can create subset lists of the people they subscribe to ("reading

7  filters"), where those subset lists are arguably "based on other information associated with the user

8  or the user's device," Cal Health & Safety Code § 27000.5(a), in the sense that users have made

9  the list and saved it in their account. Thus, we cannot be sure that the fact "the user expressly and

10 unambiguously requested the specific media or media by the author, creator, or poster of the media,

11 or the . . . prioritization . . . of that media," *id.* § 27000.5(a)(4), is enough to exempt us, because

12 that filtered subset is arguably "persistently associated with the user," *id.* § 27000.5(a). Because

13 we are uncertain as to whether or not the Act applies to our service, in order to avoid potential

14 penalties and fines that we could not afford, we would feel the need to assume that the Act does

15 apply to our service and make the necessary changes should it go into effect.

16       13.    If necessary, we cannot comply with the Act without making significant, sweeping

17 changes to the site that we do not have the resources to make and without collecting additional

18 personally identifying data about each account that we do not currently collect. The changes the

19 Act would require us to make to the software that runs our site would take months, if not years, of

20 work at our current development capacity. The ongoing support burden the Act would impose upon

21 us would also be impossible for us to meet at our current level of staffing, and we do not have the

22 financial capabilities to add more staff.

23       14.    ***Age Verification.*** To the best of my knowledge, there is no technology—much less

24 any technology available to a site with Dreamwidth's limited resources—that can identify users

25 who are under the age of 18. The only method that can determine a user's age to a sufficient degree

26 of confidence is to require every user, no matter what age they claim to be, to upload government-

27

28

5

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1   issued identification, deanonymizing themselves and jeopardizing their privacy. There is no age-

2   verification system that is not also a deanonymization and identity-verification system.

3       15.     Because we do not perform geolocation on our users, we are unable to determine

4   which of our users are located in California. To identify which of our users are located in California

5   and whose age we must establish, we must either (a) begin performing and storing geolocation

6   data lookups on every individual user account to determine which users' connections to the site

7   originate from California, whom we must therefore presume to be residents of California who must

8   undergo deanonymization and identity verification; (b) deanonymize and perform identity verifi-

9   cation on all users, no matter where their connection originates; or (c) utilize our network pro-

10  vider's geolocation service to prevent any connection originating in the state of California from

11  reaching our servers to avoid the potential that the person using that connection is under the age

12  of 18.

13      16.     Because people can move at any time and can travel to states they don't reside in,

14  a single deanonymization and identity verification at the time of account creation would be insuf-

15  ficient to comply with the Act. To protect against the possibility that someone under the age of 18

16  had moved to California after creating an account, or the possibility that someone under the age of

17  18 residing in California was creating an account while on vacation to another state or by using a

18  location-concealing VPN service to enhance their online privacy, we would need to perform reg-

19  ular deanonymization and identity verification checks of all users. This would place a significant

20  burden and chilling effect on the speech of every person who uses Dreamwidth's services, not only

21  people under the age of 18 in California or even only on adult California residents.

22      17.     Dreamwidth's users are extremely privacy-conscious. Our users frequently cite our

23  business practices, our commitment to refrain from selling or sharing their personal data, and our

24  refusal to even gather any data that is not directly necessary to provide our services as the reason

25  they've chosen to use our website. For California to force us to begin collecting account-level

26  geolocation data alone, much less to perform deanonymization and identity verification on every

27  account, would alienate our users, violate the promises we have made to them, and be contrary to

28

6

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    our principles. We do not want to be forced to collect this data, and our users do not want to be

2    forced to provide it to us.

3        18.    Because of our strong commitment to privacy and anonymity, a large percentage of

4    our userbase consists of marginalized people who experience heightened personal security con-

5    cerns online. A nonexhaustive list of these groups include: (a) Russian or Chinese activists pro-

6    testing their government's human rights abuses, who are comfortable using our site because we do

7    not cooperate with their government's mandated censorship and do not require them to provide us

8    personally identifying information that may be discoverable by their government; (b) disabled

9    people who are looking for community or seeking to share information on their conditions, who

10   are comfortable using our site because we do not require them to provide us personally identifying

11   information that may be used against them by doctors, insurance companies, employers, etc., and

12   because we employ significant effort to make sure the site is accessible to multiple conflicting

13   disability access needs; (c) blind people who can use our site easily because of the significant effort

14   we employ to ensure the site is one of the most screenreader-accessible products on the internet

15   and because we minimize the steps it takes to create an account; (d) people of marginalized genders

16   and sexualities, who are comfortable using our site because we don't accept advertising and there-

17   fore are not affected by companies who are more likely to treat LGBTQ content as age-inappro-

18   priate while heterosexual content is treated as acceptable. These groups and many others rely on

19   our promise of privacy and anonymity to feel comfortable engaging in online speech. If Dream-

20   width is forced to impose an age- or identity-verification requirement, it will have a significant

21   chilling effect on these groups' willingness to engage in online speech. Our users frequently cite

22   our commitment to preserving and defending their ability to speak anonymously and our refusal

23   to engage in data brokering practices as a primary reason they use Dreamwidth rather than any

24   other service.

25       19.    ***Compliance burdens.*** Dreamwidth does not have any full-time employees. In ad-

26   dition to myself and my co-owner, both of whom operate Dreamwidth in our spare time, we have

27   two part-time employees. We depend on a pool of approximately 200 volunteers, all of whom

28                                                    7

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    donate their time to make programmatic improvements to the site, provide technical support on a

2    peer-to-peer basis, and protect the community from spam and malicious traffic. We do not have

3    the resources to add more employees: because we are funded only by the users who choose to pay

4    us, not by advertising, our budget is severely constrained and we are unable to absorb additional

5    expenses. We do not have the capacity to build identity-verification, parental-consent, or parental-

6    supervision systems. Likewise, we both do not have the financial resources to engage a third-party

7    service to do it on our behalf and also object to that practice because it inherently involves the

8    transfer of user data to a third party, something that is against our Guiding Principles.

9        20.    From my twenty-two year career in online Trust and Safety, both at Dreamwidth

10    and at prior jobs, I know that confirming a parent-child relationship is significantly complicated,

11    difficult to do accurately, and prone to multiple forms of "social engineering" attempts by unrelated

12    third parties to coerce a site into disclosing protected user information or forcing users out of a

13    community. For instance, because COPPA governs a website's ability to collect data on minors

14    under the age of 13, a relatively common social engineering vector adopted by parties who mali-

15    ciously wish to fool a website into closing a user's account is to write to the website and falsely

16    claim the user is under the age of 13 and does not have parental consent to hold an account, even

17    though the user is over the age of majority. Likewise, a relatively common social engineering

18    vector adopted by parties who maliciously wish to obtain nonpublic information about a user's

19    account is to write to the website and falsely claim to be the user's parent, requesting access to

20    nonpublic data about the account. The provisions of the Act codify these tactics into law, and will

21    provide malicious third parties unrelated to a user the ability to presumptively challenge the age

22    and identity of any user. This not only creates a "heckler's veto" over any speech that proves un-

23    popular or socially disfavored, allowing anyone the ability to force us to deanonymize any user

24    whose speech offends someone and force them to prove that they are an adult, but also will dra-

25    matically increase our support burden necessary to create and administer the system for these age

26    challenges. We do not have the capacity to accept this additional support burden, nor do we have

27

28

8

---

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF**
**NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1   the financial resources necessary to increase staffing to increase that capacity. Because of that, the

2   Act threatens our ability to continue operating.

3       21.    From my twenty-two year career in online Trust and Safety, I know that familial

4   relationships are often far more complicated than conventional wisdom believes, and identifying

5   which person is a minor's parent or guardian with legal decision-making authority is often a com-

6   plex task. For instance, if a minor has two divorced parents who disagree about whether their minor

7   child should be permitted to hold an account on a website, the website must confirm the legal

8   relationship between the parties and the minor involved, and determine which of the people at hand

9   has the legal decision-making authority to provide sufficient parental consent. In a particularly

10  contentious divorce, this can require a website to review divorce decrees, examine legal paper-

11  work, and determine the authenticity and provenance of the documents supplied to them. Because

12  someone who lives in California may have obtained their divorce from any one of the thousands

13  of courts across the United States, or even from another country, before moving to California, this

14  would require us to become experts in authenticating and interpreting court documents from any-

15  where in the world to verify which parent has legal authority to provide parental consent. We do

16  not have the capacity to perform this authentication, nor do we have the financial resources neces-

17  sary to increase staffing to increase that capacity. For this reason, too, the Act threatens our ability

18  to continue operating.

19      22.    There is no national identity database that allows someone to verify a minor's iden-

20  tity, the legal relationship between a parent and a minor, or which parent has the authority to make

21  binding decisions for a minor. There is no way to verify a user's identity beyond requiring the

22  upload of government-issued identifying documents with corroborating photo or video confirma-

23  tion, and many minors do not have photo ID. There is no way for a website to authenticate or verify

24  that the documents uploaded for age- or identity-verification purposes belong to the person who is

25  uploading them, that the person who controls the account is the same person who provided the

26  identifying documents, or that the documents are legitimate and not a forgery. Disputes about the

27  identity of an account holder, their age, or the legal relationship between them and the person

28

9

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    claiming to be their parent are complex, time-consuming, costly to investigate and resolve, and

2    unfortunately common. The Act would only increase their number. We do not have the capacity to

3    accept this additional support burden, nor do we have the financial resources necessary to increase

4    staffing to increase that capacity.

5         23.    We do not track the amount of time users spend on the site, as is seemingly required

6    by California Health & Safety Code § 27002(b)(2). Such tracking is a violation of our Guiding

7    Principles. Even if we were willing to track our users' behavior to the extent of attempting to

8    determine how long they spend viewing the site daily, which we are not, there is no feasible tech-

9    nical method available by which we can accurately track the amount of time users spend viewing

10   our site. Because we don't have a mobile application, we can't track how long someone has the

11   mobile application in the foreground of their phone. Because our site has a considerable amount

12   of long-form content that can take minutes or even hours to read—the maximum length of an entry

13   that can be posted to our site is approximately the length of a commercially published novel—we

14   cannot track whether someone has opened an entry and is actively reading it or whether they have

15   stepped away from their computer (or even turned their computer off). There is no technical means

16   for us to detect whether or not someone is actively present in front of a tab or window that contains

17   an entry on the site without intrusive and privacy-invasive scripting that attempts to capture

18   whether or not the user has pressed the "page down" button or used their scroll bar or scroll wheel

19   in the last few minutes. This sort of scripting is not only intrusive and privacy-invasive, it is indis-

20   criminate as to what it captures and would result in us receiving data about our users that far ex-

21   ceeds the promises we have made to them about what data we will not capture. The available

22   scripting that captures this sort of data is also often detected as malware or spyware by antivirus

23   software and is frequently blocked by browser extensions that protect a user's privacy. Not only

24   would users receiving an alert that every page on our website contained malware or spyware result

25   in reputational harm, but also the fact that such methods can be blocked by browser extensions

26   that protect a user's privacy means the resulting data would still be inaccurate.

27

28
          10

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

24. Similarly, California Health & Safety Code § 27002(b) seemingly requires us to build a system by which one account (the presumed parent) could assume control over another account (their presumed child). We do not have any form of linked account structure or any way to delegate control over one account to another account. Building such a system would require significant engineering work, which we don't have the capacity to perform. In addition to the engineering work it would require, any change that touches logging in to the website, setting or changing privacy or security settings, or setting or changing the visibility of information to another account—as this type of control-delegation system inherently would—requires a thorough and detailed security audit. Our login and account code has been thoroughly hardened and security-tested over the past 25 years, by Dreamwidth Studios, by the company that developed the code before us (LiveJournal), and by dozens of volunteer security experts who have donated their time and effort throughout the years. Any changes must be done carefully, slowly, and with a great deal of peer review to ensure that the underlying logic is sound, the implementation code is bug-free, and there is no way for anyone who visits the website or attempts to log into an account to engage in privilege escalation. That is a type of security issue in which an attacker can utilize browser features, cross-site scripting, session hijacking, malformed HTML requests, or any one of dozens of other attack vectors to obtain a level of control over an account to which they are not entitled. The level of expertise, security knowledge, and familiarity required to perform such a security audit is not common.

25. I am aware of the level of engineering and security difficulty such a system would involve because for fifteen years our users who have multiple accounts with us—for instance, so that they can post their writings on wildly disparate topics to separate accounts so that people who are interested in one aspect of their lives but not another can subscribe only to the material they want to read—have been asking us to implement a way for them to link together multiple accounts and manage or post to one of their sub-accounts while logged into another of their accounts. We have begun mapping out the programming and security changes such a system would require multiple times, and each time concluded that the project would be too complicated for us to handle at

11

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1    our current level of staffing and capacity and that it would carry too much risk to our users and the

2    security of their accounts. Involving a second individual (i.e., the presumed parent) in the system

3    would only complicate the issue even further and require even more significant work.

4         26.    Because of the frequency with which I have witnessed people falsely claim to be a

5    user's parent in order to attempt to gain control over the account, we must also assume that any

6    system by which a second individual could assert control or claim over an account would also add

7    a significant ongoing support burden for handling disputes over whether two accounts should be

8    linked and complaints that two accounts were linked in error. We do not have the capacity to absorb

9    that additional support burden.

10        27.    Because of the uncertainty and vagueness of the Act, the lack of useful definitions

11   for many of its provisions, the impossibility of determining to any degree of certainty which users

12   are residents of California without collecting additional personal data we do not currently collect,

13   the impossibility of determining which users are under the age of 18 without deanonymizing and

14   forcibly identifying every user of our site, and the severe degree of technical difficulty inherent in

15   implementing the provisions of the Act, the Act will force us to err on the side of caution; require

16   us to restrict access to the site beyond the restrictions we wish to place; require us to spend money

17   far in excess of our available budget attempting to comply with the Act's burdensome and expen-

18   sive dictates; require us to force our users to provide us significantly more personally identifying

19   data than we want to collect or they want to have; generally require us to place significant

20   burdens on the speech, conduct, and anonymity of both adults and minors; and jeopardize our

21   ability to continue offering the service at all.

22

23

24

25

26

27

28

12

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF
NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

1                          *              *              *

2       I declare under penalty of perjury that the foregoing is true and correct to the best of my

3   knowledge.

4   Executed this  12th  day of November, 2024, in Baltimore, MD.

5

6

7                                              Denise Paolucci
                                               Co-Owner, Dreamwidth Studios, LLC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                             13
_____
            **DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF**
            **NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

# Exhibit G

to NetChoice's Motion for Injunction Pending Appeal

1
2
3
4                    UNITED STATES DISTRICT COURT
5                    NORTHERN DISTRICT OF CALIFORNIA
6                         SAN JOSE DIVISION
7

8    NETCHOICE,                          Case No.   5:24-cv-07885-EJD

9              Plaintiff,                 **ORDER GRANTING IN PART
                                          MOTION FOR INJUNCTION
10        v.                              PENDING APPEAL**

11   ROB BONTA,                           Re: ECF No. 42

12             Defendant.

13         On December 31, 2024, the Court granted in part and denied in part Plaintiff NetChoice's

14   motion to preliminarily enjoin enforcement of SB 976, also known as the Protecting Our Kids

15   from Social Media Addiction Act.  ECF No. 39.  The law imposed four categories of obligations

16   on social media and other similar companies.  Specifically, it required such companies to (1)

17   restrict minors' access to certain personalized feeds, (2) refrain from sending minors notifications

18   during certain times of the day, (3) develop various settings that parents could use to control their

19   kids' social media use, and (4) make public disclosures regarding the number of minors using

20   those companies' services.  Cal. Health & Safety Code §§ 27001, 27002, 27005.  After receiving

21   expedited briefing and arguments from the parties, the Court declined to enjoin SB 976's

22   personalized feed provisions and two of the settings that SB 976 requires: one limiting minors'

23   ability to view the number of likes and other forms of feedback on their posts, and one creating a

24   "private mode" that restricts third parties from viewing or interacting with minors on social media

25   unless expressly connected with a minor.  ECF No. 39.  The Court enjoined the notification and

26   compelled disclosure provisions.  *Id.*

27         The same day that the Court issued its order, NetChoice filed a notice of appeal.  ECF No.

28   40.  The next day, January 1, 2025, NetChoice moved for an injunction pending appeal under

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Federal Rule of Civil Procedure 62(d).  In its motion, NetChoice asked the Court to issue a ruling

2    by the close of business on January 2, 2025.  Accordingly, the Court directed Defendant to file a

3    response by 11:59 p.m. PT on January 1.  ECF No. 43.  Defendant did so.  ECF No. 44.  Then,

4    early this morning, NetChoice filed its reply.  ECF No. 45.

5        When deciding whether to issue an injunction pending appeal, courts apply a standard

6    "similar to that employed by district courts in deciding whether to grant a preliminary injunction."

7    *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016).  Thus, they "consider

8    whether the moving party has demonstrated that they are likely to succeed on the merits, that they

9    are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

10   equities tips in their favor, and that an injunction is in the public interest."  *S. Bay United*

11   *Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020).[1]

12       Applying the preliminary injunction factors can create some tension when a party seeks to

13   appeal a district court's denial of a preliminary injunction.  In that circumstance, the district court

14

15   _____

16   [1] The Court notes that there may be some inconsistencies in the standards that courts apply when
     deciding whether to issue injunctions pending appeal.  At the Supreme Court level, several
     individual Justices have applied a much higher standard than the one for preliminary injunctions,
17   requiring an applicant seeking an injunction pending appeal to show that "the legal rights at issue
     are indisputably clear."  *Lux v. Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in
18   chambers) (internal quotation marks omitted) (quoting *Turner Broad. Sys., Inc. v. FCC*, 507 U.S.
     1301, 1303 (1993) (Rehnquist, C.J., in chambers)); *see also Hobby Lobby Stores, Inc. v. Sebelius*,
19   568 U.S. 1401, 1403 (2012) (Sotomayor, J., in chambers); *Ohio Citizens for Responsible Energy,*
     *Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers); *Calvary Chapel Dayton Valley*
20   *v. Sisolak*, 140 S. Ct. 2603, 2609 (2020) (Alito, J., dissenting).  According to Justice Scalia, the
     reason for this is because requests for injunctions pending appeal, as opposed to stays pending
21   appeal, "do[] not simply suspend judicial alteration of the status quo but grant[] judicial
     intervention that has been withheld by lower courts."  *Ohio Citizens*, 479 U.S. at 1313.  Thus,
22   injunctions pending appeal "demand[] a significantly higher justification."  *Id.*; *see also* Stephen I.
     Vladeck, *A Court of First View*, 138 Harv. L. Rev. 533, 554 nn.138–39 (2024).
23
     On other occasions, though, the Supreme Court has applied the traditional preliminary injunction
24   factors to determine whether an injunction pending appeal is warranted.  *See, e.g.*, *Tandon v.*
     *Newsom*, 593 U.S. 61, 64 (2021) (per curiam); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592
25   U.S. 14, 16 (2020) (per curiam).  The Ninth Circuit and its district courts also appear to apply the
     traditional injunction factors.  *Feldman*, 843 F.3d at 367; *S. Bay United*, 959 F.3d at 939;
26   *Patagonia Area Res. All. v. U.S. Forest Serv.*, No. 23-cv-00280, 2023 WL 7048848, at *1 (D.
     Ariz. Sept. 13, 2023); *Sanai v. Kruger*, No. 23-cv-01057, 2023 WL 5496802, at *2 (N.D. Cal.
27   Aug. 24, 2023); *Harrosh v. Tahoe Reg'l Plan. Agency*, 640 F. Supp. 3d 962, 984 (E.D. Cal. 2022);
     *United States v. Birdsong*, No. 17-cv-72, 2019 WL 1026277, at *1 (D. Mont. Mar. 4, 2019).
28   Therefore, the Court applies the traditional preliminary injunction factors.

1  would have just concluded that the preliminary injunction factors weighed in favor of denying

2  injunctive relief. Yet the appealing party, in requesting an injunction pending appeal, would be

3  asking the district court to apply the same factors again to reach a different result. From that

4  perspective, moving for an injunction pending appeal would essentially be asking the district court

5  to decide that it was wrong before; put differently, an injunction pending appeal would be no

6  different than reconsideration.

7      But courts evaluate injunctions pending appeal using a standard that is "similar" to the one

8  for preliminary injunctions, not one that is identical. *Feldman*, 843 F.3d at 367. Thus, it does not

9  follow that parties need to meet the high bar for reconsideration to secure an injunction pending

10  appeal. *MediNatura, Inc. v. Food & Drug Admin.*, No. 20-cv-2066, 2021 WL 1025835, at *6

11  (D.D.C. Mar. 16, 2021) ("[T]he standard for granting an injunction pending appeal is, at least at

12  times, more flexible than a rigid application of the traditional four-part standard applicable to

13  granting a preliminary injunction."). Rule 62(d) expressly authorizes district courts to "grant an

14  injunction" while "an appeal is pending from an interlocutory order or final judgment that

15  . . . refuses . . . an injunction." In other words, Rule 62(d) contemplates that there will be

16  situations where district courts can grant injunctions pending appeal even after denying a

17  preliminary injunction. *See Am. Beverage Ass'n v. City & Cnty. of S.F.*, No. 15-cv-03415, 2016

18  WL 9184999, at *2 (N.D. Cal. June 7, 2016). As such, a court may issue an injunction pending

19  appeal even when it "believe[s] its analysis in denying preliminary injunctive relief is correct." *Id.*

20      This can occur when "the trial court is charting a new and unexplored ground" by "rul[ing]

21  on an admittedly difficult legal question[,] and when the equities of the case suggest that the status

22  quo should be maintained." *Protect Our Water v. Flowers*, 377 F. Supp. 2d 882, 884 (E.D. Cal.

23  2004) (citations omitted). That said, the fact that a court previously found that a preliminary

24  injunction was not warranted should carry significant weight, so the circumstances must be of

25  unusual magnitude to justify a district court granting an injunction pending appeal after denying a

26  preliminary injunction. Only when the legal question raised is particularly important and "serious

27  questions going to the merits" have been raised should a district court consider such a course of

28  action. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (approving of

United States District Court
Northern District of California

1  a similar "sliding scale" approach to preliminary injunctions). Even then, the remaining injunction

2  factors must tip sharply in favor of an injunction. *Id.*

3       That is the case here. As the Court detailed in its preliminary injunction order, the First

4  Amendment issues raised by SB 976 are novel, difficult, and important, especially the law's

5  personalized feed provisions. ECF No. 39. If NetChoice is correct that SB 976 in its entirety

6  violates the First Amendment—although the Court does not believe that NetChoice has made such

7  a showing on the current record—then its members and the community will suffer great harm

8  from the law's restriction of speech. Also, as to NetChoice's members specifically, many may

9  need to make significant changes to their feeds. Likewise, if NetChoice is correct in its argument,

10  the public interest would tip sharply in its favor because there is a strong interest in maintaining a

11  free flow of speech. Given that SB 976 can fundamentally reorient social media companies'

12  relationship with their users, there is great value in testing the law through appellate review.

13       For these reasons, the Court finds that an injunction pending appeal is appropriate to allow

14  the opportunity for appellate review of these weighty issues before the law goes into effect.

15  However, Defendant also has a countervailing interest in seeing a duly enacted law (at least, the

16  parts of which this Court has already concluded are likely constitutional) go into effect.

17  Therefore, the Court concludes that an injunction pending appeal is only appropriate to the extent

18  it allows the Ninth Circuit time to consider whether to grant its own injunction pending appeal.

19  Accordingly, the Court **GRANTS IN PART** NetChoice's motion. Defendant is **ENJOINED**

20  from enforcing the entirety of SB 976 for **thirty (30) days** until **February 1, 2025 at 11:59 p.m.**

21  **PT**. At that time, if the Ninth Circuit has not extended this injunction pending appeal or issued its

22  own, this injunction shall dissolve and the more limited injunction issued in the Court's

23  preliminary injunction order (ECF No. 39) shall take effect.

24       **IT IS SO ORDERED.**

25  Dated: January 2, 2025

26

27  EDWARD J. DAVILA
United States District Judge

28

Case No.: 5:24-cv-07885-EJD
ORDER GRANTING IN PART MOT. FOR INJUNCTION PENDING APPEAL
4