No. 25-146

# In the United States Court of Appeals for the Ninth Circuit

———————

NETCHOICE,

*Plaintiff-Appellant*,

*v.*

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellee.*

———————

On Appeal from the United States District Court
for the Northern District of California
Civil Action No. 5:24-cv-07885-EJD

———————

**BRIEF FOR PLAINTIFF-APPELLANT NETCHOICE**

———————

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
Shannon Grammel
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
  Suite 700
Washington, DC 20001
scott@lkcfirm.com
(512) 693-8350

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant NetChoice states that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

*/s/ Scott A. Keller*
Scott A. Keller

i

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ........................................................... i

Table of Authorities .......................................................................... iv

Introduction ........................................................................................ 1

Jurisdictional Statement ..................................................................... 7

Issues Presented .................................................................................. 7

Statutory Authorities .......................................................................... 8

Statement of the Case ......................................................................... 9

        A.  Background ............................................................................ 9

               1.  NetChoice members' websites disseminate and curate vast amounts of speech protected by the First Amendment. .................................................................. 9

               2.  Parents have many tools to oversee how their children use the Internet. ...................................................... 11

        B.  California SB976 (the "Act") is a content- and speaker-based law that restricts access to protected speech. .................. 12

               1.  The actors and activities that the Act regulates include NetChoice members and their websites. ............................... 12

               2.  The Act restricts protected speech on covered websites in multiple ways. ..................................... 15

        C.  Procedural history ......................................................... 17

Summary of the Argument.................................................................. 19

Standard of Review ............................................................................ 24

Argument ........................................................................................... 24

    I.   The Act's "personalized feeds," "default settings," and "age assurance" requirements violate the First Amendment. ........................................................................... 25

A.  The Act's parental-consent requirements for minors to access personalized feeds violate the First Amendment. .......... 25

   1.  The "personalized feeds" requirements restrict protected expression. ............................................... 26

   2.  The "personalized feeds" requirements fail any form of heightened First Amendment scrutiny. ............................ 35

B.  The Act's requirements for websites to enable certain default settings on minors' accounts violate the First Amendment ................................................................. 39

C.  The Act's statutory age-assurance requirements violate the First Amendment, and NetChoice's challenge to this requirement is ripe. ................................................. 44

   1.  The Act's age-assurance requirements violate the First Amendment. ............................................. 44

   2.  NetChoice's challenge to the age-assurance requirements is ripe. ................................................. 47

D.  The Act's central coverage definitions are unconstitutionally content-based and speaker-based. ............... 49

E.  The Act's central coverage definitions are unconstitutionally vague. ................................................. 53

II.  NetChoice has standing to raise as-applied First Amendment claims on behalf of its members. ................................... 55

III.  The other preliminary-injunction factors favor NetChoice. ........... 57

Conclusion ....................................................................... 59

Statement of Related Cases ..................................................... 60

Certificate of Compliance ...................................................... 60

Certificate of Service ......................................................... 61

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008) ................................................................ 46

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) ............................................................................ 58

*Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle,*
    829 F.2d 933 (9th Cir. 1987) .............................................................. 56

*Am. Beverage Ass'n v. City & Cnty. of S.F.,*
    916 F.3d 749 (9th Cir. 2019) .............................................................. 58

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003) ........................................................... 46, 48

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ............................................................................ 35

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ................................................... 1, 4, 22, 45, 46

*Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.,*
    627 F.3d 547 (5th Cir. 2010) .............................................................. 56

*Ass'n of Irritated Residents v. EPA,*
    10 F.4th 937 (9th Cir. 2021) .............................................................. 48

*Barr v. Am. Ass'n of Pol. Consultants,*
    591 U.S. 610 (2020) ............................................................................ 41

*Borrero v. United Healthcare of N.Y., Inc.,*
    610 F.3d 1296 (11th Cir. 2010) ......................................................... 56

iv

*Brown v. Ent. Merchs. Ass'n,*
 564 U.S. 786 (2011) ........................................ 3, 20, 21, 26, 28, 29, 35-38, 43, 52

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
 563 F.3d 847 (9th Cir. 2009) ........................................................... 58

*Cal. Tchrs. Ass'n v. State Bd. of Educ.,*
 271 F.3d 1141 (9th Cir. 2001) ........................................................... 53

*Children's Health Def. v. Meta Platforms, Inc.,*
 112 F.4th 742 (9th Cir. 2024) ............................................................ 2

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
 596 U.S. 61 (2022) ........................................................................ 50

*Cmty. House, Inc. v. City of Boise,*
 490 F.3d 1041 (9th Cir. 2007) ........................................................... 58

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ...................................... 50

*Erznoznik v. City of Jacksonville,*
 422 U.S. 205 (1975) ...................................................................... 28

*FCC v. Fox Television Stations, Inc.,*
 567 U.S. 239 (2012) .................................................................. 53, 55

*FEC v. Cruz,*
 596 U.S. 289 (2022) .................................................................... 2, 39

*Feldman v. Ariz. Sec'y of State's Off.,*
 843 F.3d 366 (9th Cir. 2016) ..................................................... 4, 33, 58

*Hunt v. Wash. State Apple Advert. Comm'n,*
 432 U.S. 333 (1977) .................................................................. 55, 56

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
 515 U.S. 557 (1995) ...................................................................... 27

v

*John Doe No. 1 v. Reed,*
    561 U.S. 186 (2010) ........................................ 56

*Klein v. City of San Clemente,*
    584 F.3d 1196 (9th Cir. 2009) ........................... 57

*Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n,*
    584 U.S. 617 (2018) ........................................ 41

*Meinecke v. City of Seattle,*
    99 F.4th 514 (9th Cir. 2024) .................... 6, 24, 25, 33

*Miami Herald Publishing Co. v. Tornillo,*
    418 U.S. 241 (1974) ........................................ 27

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ........ 2, 3, 9-13, 15, 20, 21, 25-28, 30-32, 34, 35, 39, 40, 45

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
    585 U.S. 755 (2018) ..................................... 43, 52

*NetChoice, LLC v. Bonta,*
    113 F.4th 1101 (9th Cir. 2024) ........................... 37

*NetChoice, LLC v. Fitch,*
    738 F. Supp. 3d 753 (S.D. Miss. 2024) ............. 7, 47, 54

*NetChoice, LLC v. Griffin,*
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ........ 7, 44-46, 48, 54

*NetChoice, LLC v. Reyes,*
    2024 WL 4135626 (D. Utah Sept. 10, 2024) ......... 7, 45, 46

*NetChoice, LLC v. Yost,*
    716 F. Supp. 3d 539 (S.D. Ohio 2024) ..................... 7

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................ 58

vi

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) ............................................... 1-3, 20, 26, 30, 39, 45

*PruneYard Shopping Center v. Robins,*
    447 U.S. 74 (1980) .............................................................. 28

*Reed v. Town of Gilbert,*
    576 U.S. 155 ............................................................. 41, 50, 51

*Reno v. ACLU,*
    521 U.S. 844 (1997) ..................................................... 1, 5, 22, 45, 46

*Reuber v. Food Chem. News, Inc.,*
    925 F.2d 703 (4th Cir. 1991) ................................................ 33

*Riley's Am. Heritage Farms v. Elsasser,*
    32 F.4th 707 (9th Cir. 2022) ................................................ 57

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020) ......................................................... 57

*Rumsfeld v. FAIR,*
    547 U.S. 47 (2006) ......................................................... 28

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) .................................................. 29, 40, 49

*Thunder Studios, Inc. v. Kazal,*
    13 F.4th 736 (9th Cir. 2021) ............................................ 4, 33

*United States v. Playboy Ent. Grp.,*
    529 U.S. 803 (2000) ....................................................... 37

*United States v. Williams,*
    553 U.S. 285 (2008) ....................................................... 53

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) ....................................................... 53

vii

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) ...................................................................... 52, 55

*X Corp. v. Bonta*,
   116 F.4th 888 (9th Cir. 2024) ................................................... 15, 56

**Statutes**

28 U.S.C. § 1292 ............................................................................... 7

28 U.S.C. § 1331 ............................................................................... 7

28 U.S.C. § 1343 ............................................................................... 7

28 U.S.C. § 1651 ............................................................................... 7

28 U.S.C. § 2201 ............................................................................... 7

42 U.S.C. § 1983 ............................................................................... 7

**Other Authorities**

Cal. Bus. & Prof. Code § 22675 ............................................. 13, 14, 50

Cal. Heath & Safety Code § 27000.5 ....................... 1, 5, 6, 13, 15, 27, 31, 50-54

Cal. Heath & Safety Code § 27001 .................. 3, 4, 16, 17, 19, 25, 37, 44, 45, 48

Cal. Health & Safety Code § 27002 ................ 3, 4, 16, 17, 18, 19, 25, 37, 39-44

Cal. Health & Safety Code § 27005 ........................................ 3, 16, 18

Cal. Health & Safety Code § 27006 ................................... 4, 12, 17

Fed. R. Civ. P. 52 ................................................................... 4, 33

## INTRODUCTION

The district court is the first federal court in the country to uphold a law requiring minors to secure parental consent to view protected speech on social media websites.[1] The district court declared that "personalized feeds are not necessarily a form of social media platforms' speech, so *restricting* personalized feeds does not restrict access to those platforms' speech." 1-ER-27 (emphasis added). That outlier holding flouts Supreme Court and Circuit precedent. It also makes zero sense as a matter of first principles. And it could allow the government to ban personalized feeds entirely—*even for adults*—across a wide range of traditional and online media.

The district court declined in substantial part to enjoin California Senate Bill 976 ("Act" or "SB976"). Its holdings contradict First Amendment caselaw protecting users' access to expression and websites' editorial discretion. Supreme Court precedent squarely recognizes that restrictions on "access to social media," and other online services, regulate speech and prevent the "legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017); *see, e.g., Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *Reno v. ACLU*, 521 U.S. 844, 870-71 (1997). This Act targets websites containing "communication of all kinds," including statements from "elected

---

[1] This brief refers to "internet website[s], online service[s], online application[s], [and] mobile application[s]," § 27000.5(b)(1), as "websites." Unless otherwise noted, statutory citations in this brief refer to the California Health & Safety Code.

1

representatives," "debate[s]" about "religion and politics," "vacation pho-tos," "tips on entrepreneurship," and more. *Packingham*, 582 U.S. at 104-05 (citation omitted). Because the Act "restricts" access to that speech, "the Gov-ernment bears the burden of proving the constitutionality of [the Act]." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). But the district court never even *considered* the State's burden for large parts of the Act, because it held that many of the Act's restrictions do not even "implicate[]" the First Amendment. 1-ER-27. That was error.

The Supreme Court also has held that social media websites engage in First Amendment protected expression when they present "personalized," "customized," "curated," or "individualized" "feeds" to their users as part of a "larger offering" of protected expression. *Moody v. NetChoice, LLC*, 603 U.S. 707, 718, 734, 738 (2024). This Court likewise has recognized that "deci[sions]" about "which third-party content . . . [to] display, or how the display will be ordered and organized," are "expressive choices." *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024) (quoting *Moody*, 603 U.S. at 740). *Moody* even expressly held that the First Amendment protects the curated feeds of "Facebook" and "YouTube" (both at issue here). 603 U.S. at 734-35, 739-40. Without question, then, all the Act's speech re-strictions "implicate[]" the First Amendment. *Contra* 1-ER-27.

The district court acknowledged that the Act's sweeping speech re-strictions "can fundamentally reorient social media companies' relationship

with their users." 1-ER-5. The Act imposes three restrictions relevant to this appeal. All three are unconstitutional.

First, the Act requires parental consent before minors can access personalized feeds on covered websites. §§ 27001, 27002(b)(2). The "feeds" the Act restricts include anything where content is "recommended, selected, or prioritized for display to a user based, in whole *or in part*, on information provided by the user." § 27005(a) (emphasis added). For example, covered websites must obtain parental consent before recommending content about physics to a 17-year-old who previously watched videos about Albert Einstein. These sweeping restrictions violate covered websites' right to disseminate "curated compilation[s] of speech" to their users. *Moody*, 603 U.S. at 728. These restrictions also violate minors' "right to speak or be spoken to." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011).

The district court's fixation on "algorithms" caused it to erroneously conclude that personalized feeds do not always reflect human curation and "are not necessarily" expressive. 1-ER-22–27. Supreme Court precedent already holds that restrictions on "access to social media" regulate speech and trigger First Amendment scrutiny. *Packingham*, 582 U.S. at 108. Regardless, the unrebutted record is crystal clear: members' personalized feeds reflect *human* editorial and curational policies. *E.g.*, 3-ER-354 (Davis Decl. ¶ 41); 3-ER-329 (Veitch Decl. ¶ 32). That human curation makes the feeds expressive— even if algorithms help execute some of those editorial decisions. The district court's contrary finding is a "constitutional fact[]" that this Court reviews

3

"*de novo*." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021). The finding was also "clearly erroneous," Fed. R. Civ. P. 52, and seems to improperly require a merits-level factual showing, *see Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 403 (9th Cir. 2016).

Second, the Act requires covered websites to enable restrictive settings on minors' accounts *by default*. § 27002(b)(2)-(5). These mandates restrict covered websites' ability to display personalized feeds to minors. § 27002(b)(2), (4). They also restrict covered websites' ability to show minors some "feedback" metrics that quantify other users' responses to protected speech (such as metrics that quantify "likes"). § 27002(b)(3). And these defaults restrict minors' ability to exchange speech with adults and each other. § 27002(b)(5). These State-dictated defaults unlawfully override websites' editorial choices about how best to organize, curate, and disseminate protected speech.

Third, the Act imposes burdensome age-assurance requirements on *all* users. §§ 27001(a)(1)(B), 27002(a), 27006(b)-(c). These requirements restrict minors' (and burden adults') access to massive amounts of protected expression. The Supreme Court has repeatedly recognized that age-verification requirements are burdensome conditions on accessing speech. *E.g.*, *Ashcroft*, 542 U.S. at 667. That is true even when minors have no right to access the underlying material. *See id.* Yet here, the Act does not even pretend to address speech that is *unprotected* for minors. Instead, it responds to the paternalistic concern that minors will find *protected* speech too engaging or will access it more than the State deems tolerable. That is not a compelling

4

concern. Nor is this restriction well-tailored. So the age-assurance provisions are unconstitutional. *See Reno*, 521 U.S. at 882.

The district court erroneously held that NetChoice's challenge to this provision is not ripe. 1-ER-19. It reasoned that California has not yet issued *regulations* about what precise methods of age assurance can satisfy the Act. *Id.* But those regulations do not affect ripeness here. The First Amendment violation stems from the *statutory* requirement, which places age-assurance as an obstacle between all users and protected speech. This mandate is unconstitutional no matter what specific regulations are promulgated to further it. That legal question is fit for judicial review *now*. NetChoice members also face immediate hardship, because they must begin building complex "age assurance" systems well before these requirements take effect.

The Act's speech restrictions are independently unconstitutional for two additional reasons. First, the Act's bedrock coverage provisions are content-based and speaker-based. They are content-based because they single out websites facilitating social interaction while exempting websites that focus on other kinds of content like "commercial transactions" and "consumer reviews." § 27000.5(b)(2)(A). And the provisions are speaker-based because they regulate only websites where users generate content, while exempting websites where the content comes mainly from the website. Together, these exemptions reflect a preference *for* websites that allow narrow forms of speech and *against* websites that allow open discourse by curating and disseminating third-party speech. Second, the Act's coverage definitions are

5

unconstitutionally vague. For example, the Act never defines what makes a personalized feed a "significant part" of a website under § 27000.5(b)(1).

All agree that NetChoice has standing to raise facial challenges to the Act's speech restrictions. But the district court erred in holding that NetChoice lacks associational standing to raise as-applied challenges. 1-ER-37. For both the facial and as-applied claims, the First Amendment analysis asks the same questions: Whether California can require parental consent for personalized feeds, mandate specific default settings, and require age assurance. It cannot. In other words, the as-applied challenge here goes only to the scope of relief—*i.e.*, whether an injunction should protect all websites or just NetChoice's members. NetChoice has standing to raise that challenge.

Without preliminary injunctive relief, covered NetChoice members face irreparable harm. Beyond the core First Amendment injuries, covered websites also must undertake significantly burdensome technical changes to comply with the Act. Those changes will fundamentally alter the nature of these websites and cannot easily be undone. *See* 3-ER-315–16 (Cleland Decl. ¶¶ 28-32, 35); 3-ER-333–36 (Veitch Decl. ¶¶ 41, 48-49). The Act is so onerous that it threatens at least one NetChoice member's "ability to continue operating." 3-ER-372–73 (Paolucci Decl. ¶ 20); *see* 3-ER-374–76 (*id.* ¶¶ 23-27).

These are eminently "colorable claim[s]" warranting a preliminary injunction in this First Amendment case. *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (cleaned up). The district court itself recognized that these First Amendment issues are "novel, difficult, and important." 1-ER-5. A

preliminary injunction would align this Circuit's law with courts across the country that have overwhelmingly barred enforcement of similar statutes. *E.g.*, *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753 (S.D. Miss. 2024); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023). The balance of interests also favors upholding websites' curatorial rights. And a preliminary injunction would advance the public interest by safeguarding minors' and adults' rights to freely access an enormous range of constitutionally protected expression.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a), and it had authority to grant relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1651 and § 2201(a). That court partially denied NetChoice's preliminary-injunction motion on December 31, 2024. 1-ER-39. NetChoice timely filed a notice of appeal later that day. 4-ER-547. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1. Whether the First Amendment permits California to require social media websites to obtain parental consent before allowing minor users to access personalized feeds of protected speech.

2. Whether the First Amendment permits California to require social media websites to: (a) disable personalized feeds by default on minors' accounts (b) require parental consent before a minor can access a personalized

7

feed for more than one hour per day, (c) enable a default setting that prevents a minor from seeing "feedback" metrics that quantify the number of responses to user-generated content, and (d) enable a default setting that prohibits users who are not "connected" to the minor from viewing or responding to the minor's posts.

3. Whether the First Amendment permits California to require websites to use an age-assurance process for all users, including adults, before allowing those users to access protected speech on social media websites, and whether that challenge is ripe for review.

4. Whether the First Amendment permits California to impose these challenged speech restrictions by using a content-based or speaker-based coverage definition.

5. Whether the First Amendment or Due Process Clause permits California to impose these challenged speech restrictions using an unconstitutionally vague coverage definition.

6. Whether NetChoice has associational standing to raise as-applied First Amendment claims on behalf of its members.

7. Whether the other preliminary-injunction factors favor NetChoice.

## STATUTORY AUTHORITIES

The challenged Act, California Senate Bill 976 (2024), is attached as a statutory addendum.

8

## STATEMENT OF THE CASE

### A. Background

### 1. NetChoice members' websites disseminate and curate vast amounts of speech protected by the First Amendment.

NetChoice is a leading Internet trade association. Based on the Act's coverage definitions, the Act regulates websites operated by at least the following NetChoice members: (1) Google (YouTube); (2) Meta (Facebook and Instagram); (3) Nextdoor; (4) Pinterest; and (5) X. *See* 3-ER-314 (Cleland Decl. ¶ 26). This brief refers to members with services that the Act covers as "members." Although each member is unique, they all allow users to engage with and disseminate protected speech. *E.g.*, 3-ER-321 (Veitch Decl. ¶ 9).

One way these members "engage[] in expression" is by "display[ing]," "compil[ing,] and curat[ing]" protected "third-party speech" (text, audio, images, and video) "created by others." *Moody*, 603 U.S. at 725, 728; *see* 3-ER-308–09 (Cleland Decl. ¶¶ 5-7); 3-ER-341 (Davis Decl. ¶¶ 10-12); 3-ER-325 (Veitch Decl. ¶ 21). Such websites "allow users to upload content . . . to share [it] with others." *Moody*, 603 U.S. at 719. Once a user uploads content, other users "viewing the content can" "react to it, comment on it, or share it themselves." *Id.* It is impossible for any user to find or view even a sliver of the billions of pieces of content on these websites. Thus, to help organize and make this content accessible, websites disseminate speech through feeds or "stream[s] of other users' posts" that are "personalized" to each user. *Id.* at 734.

Many websites display a personalized page for each user, which various websites may call a "feed," "for you," "following," or "landing" page. 3-ER-309, 316 (Cleland Decl. ¶¶ 8, 33); *see Moody*, 603 U.S. at 734. Such personalized pages allow users to see the most useful and relevant content that family, friends, and others create or share. *E.g.*, 3-ER-325 (Veitch Decl. ¶ 21). Without these personalized feeds, users would be lost in the all-but endless flow of material posted online. *E.g.*, 3-ER-325 (*Id.*). By personalizing these feeds, websites can also disseminate age-appropriate content to minors and prioritize their safety. *E.g.*, 3-ER-333 (*id.* ¶ 43). In short, personalized feeds show users more of the relevant content they want to see or would likely be interested in. 3-ER-341 (Davis Decl. ¶ 12). But these feeds exclude content users may not want to see or that may not be appropriate for them. *See id.*

As part of this personalization, NetChoice members limit, to varying degrees, "publication of speech that [they] consider harmful, objectionable, or simply not conducive to their communities." 3-ER-313 (Cleland Decl. ¶ 23). This "content moderation" relies on "human review" of user-generated content. 3-ER-354 (Davis Decl. ¶ 41); 3-ER-329 (Veitch Decl. ¶ 32). It also relies on "automated effort," "automated systems," and "automated defenses"—that is, algorithms implementing human choices about displaying and arranging content. 3-ER-329–31 (Veitch Decl. ¶¶ 32, 34); *see* 3-ER-354 (Davis Decl. ¶ 41).

Just like human review of content, NetChoice members' "bespoke" content-moderation algorithms reflect human judgments about what types of

content are appropriate for a website. 3-ER-313 (Cleland Decl. ¶ 23). These "judgments about what kinds of speech, including what viewpoints, are not worthy of promotion . . . . show up in Facebook's and YouTube's main feeds." *Moody*, 603 U.S. at 736 n.5; *see* 3-ER-323–31 (Veitch Decl. ¶¶ 32, 34); 3-ER-354 (Davis Decl. ¶ 41). The same judgments show up in the personalized feeds of other members' websites. 3-ER-313 (Cleland Decl. ¶ 23). The "algorithms" for "customized feed[s]" of covered websites that "prioritiz[e] . . . content" reflect human judgments too. *Moody*, 603 U.S. at 734.

## 2.  Parents have many tools to oversee how their children use the Internet.

Parents can and do control their children's online experiences. 3-ER-310 (Cleland Decl. ¶ 11). Parents can control what *devices* minors can access— and when. 3-ER-310 (*Id.* ¶ 12). Not all devices are Internet-enabled. *See* 3-ER-310 (*Id.*). And devices themselves come with many built-in parental-control options. 3-ER-311 (*Id.* ¶ 14). Those options include the ability to lock or limit apps and features, restrict settings to limit content, limit access to only approved websites, and set overall or time-of-day usage limits. 3-ER-311 (*Id.*).

Parents also have control over the *networks* that minors use. *See* 3-ER-310 (*Id.* ¶ 13). Wireless routers allow parents to manage which network a minor connects to, if any. 3-ER-310 (*Id.*). They also allow parents to set up rules defining which Internet websites minors can use (and at what times). 3-ER-310 (*Id.*). Many Internet service providers offer similar tools. 3-ER-310 (*Id.*).

11

Parents can also control *software*. 3-ER-311 (*Id.* ¶ 15). Many web browsers offer parental controls. 3-ER-311 (*Id.*). Third-party parental control software is also available for many devices. 3-ER-311 (*Id.* ¶ 14).

Many members have developed their own suite of parental controls and other protections for minors. *E.g.,* 3-ER-312–13 (*id.* ¶¶ 16-22); 3-ER-349–52 (Davis Decl. ¶¶ 30-37); 3-ER-321–28 (Veitch Decl. ¶¶ 12-28); *see* 3-ER-368 (Paolucci Decl. ¶ 10). These controls supplement the resources that members spend crafting and enforcing "content moderation" policies that aim to prevent harmful or objectionable speech from reaching users. *E.g.,* 3-ER-313 (Cleland Decl. ¶ 23); 3-ER-353–58 (Davis Decl. ¶¶ 38-51); 3-ER-328–31 (Veitch Decl. ¶¶ 29-37). These members' efforts have been successful. 3-ER-313 (Cleland Decl. ¶ 23).

## B. California SB976 (the "Act") is a content-based and speaker-based law that restricts access to protected speech.

The Governor of California signed the Act into law on September 20, 2024. The Act grants enforcement authority to the Attorney General of California. § 27006(a).

### 1. The actors and activities that the Act regulates include NetChoice members and their websites.

The Act's speech restrictions apply to only a subset of Internet "actors" and "activities." *Moody*, 603 U.S. at 724. Those restrictions apply to some websites operated by NetChoice members. *See* 3-ER-314 (Cleland Decl. ¶ 26); 3-ER-336 (Veitch Decl. ¶ 52); 3-ER-362 (Davis Decl. ¶ 62).

12

The Act regulates what it labels as "[a]ddictive internet-based service[s] or application[s]" providing "addictive feed[s]." § 27000.5(b)(1).[2] An "[a]ddictive internet-based service or application" is "an internet website . . . including, but not limited to, a 'social media platform' as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service." *Id.* An "[a]ddictive feed" is "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are . . . recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." § 27000.5(a).

Under these definitions, websites trigger the Act's speech restrictions by displaying "feeds" of "personalized" and "curated compilation[s]" of user-generated "third-party speech." *Moody*, 603 U.S. at 728. Such personalized feeds are precisely what the Supreme Court recognized that the First Amendment protects. *Id.* When YouTube selects and orders which videos to recommend to users based on their interests and its own content-moderation policies, it is exercising protected editorial discretion in curating speech. *See id.* And when Instagram personalizes its feed to show users content from

---

[2] NetChoice disagrees with the Act's pejorative label of "[a]ddictive internet-based service" or "[a]ddictive feed" for websites that offer personalized feeds.

13

user accounts that they are likely to find engaging, it is making expressive choices about what content to prioritize and how to present it. *See id.*

Together, these definitions create arbitrary and illogical distinctions. A website could freely show minors extreme or objectionable content, as long as it selects that content based on overall popularity rather than user preference. Or it could display a feed consisting solely of paid promotional content. But if a website displays local events to minor users based on their location, it triggers the Act's parental-consent requirements. Any other attempt to curate content based on minor users' revealed interests does the same. It makes no sense to ignore all methods of content curation except for the methods that attempt to display content users are interested in.

The Act's coverage definitions are also content-based and speaker-based. For example, the Act regulates websites based on whether one of their substantial functions "is to connect users in order to allow users to interact socially with each other within the service or application." Cal. Bus. & Prof. Code § 22675(e)(1)(A). This distinction is content-based because it singles out websites that facilitate social interaction and user-generated dialogue, while exempting websites focused on other forms of content and communication. And it is speaker-based because it regulates websites where users generate and share content with each other, yet exempts websites where identical content comes mainly from the website operator.

Meanwhile, the Act also excludes services for which *Moody* questioned whether a different First Amendment analysis might apply. *See* 603 U.S. at

724-25. It excludes services where interactions between users are limited to "commercial transactions or to consumer reviews." § 27000.5(b)(2)(A). So the Act does not apply to "ride-sharing service[s]," "payment service[s]," and "online marketplace[s]." *Moody*, 603 U.S. at 725. The Act also excludes "direct, private communications." § 27000.5(a)(5). So it does not apply to "direct messaging" and "email." *Moody*, 603 U.S. at 725. Finally, the Act excludes personalized feeds if "any of [seven] conditions are met." § 27000.5(a). These exceptions allow websites to process user information in connection with basic functionality like search, private messaging, and the like. *See id.*

In all, these coverage definitions target "social media" websites, so this Court "need not speculate" about any "hypothetical or imaginary cases." *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (cleaned up).

## 2. The Act restricts protected speech on covered websites in multiple ways.

The Act restricts protected speech appearing on NetChoice members' websites in multiple, overlapping ways. Three are at issue in this appeal: the requirements for websites to (1) obtain parental consent before allowing minors to access personalized feeds, (2) enable certain speech-restrictive settings on minors' accounts by default, and (3) assure themselves of all users' ages before allowing any users to access a personalized feed.[3]

_____

[3] The district court preliminarily enjoined Defendant from enforcing the Act's two other substantive requirements: The Act's requirements related to

15

**Parental consent for personalized feeds. §§ 27001, 27002(b)(2).** The Act provides that "[i]t shall be unlawful for the operator of" a covered website "to provide an addictive feed to" a minor user unless "[t]he operator has obtained verifiable parental consent to provide" that feed to the minor. § 27001(a). Even if covered websites obtain parental consent to provide a personalized feed to minor users, the Act further requires covered websites to implement a "default" setting limiting minor users' access to "one hour per day *unless modified by the verified parent*." § 27002(b)(2) (emphasis added).

**Default limitations on minors' accounts. § 27002(b)(2)-(5).** The Act requires covered websites to enable certain default settings for minor users' accounts and to give parents the ability to adjust those settings. § 27002(b)(2)-(5). Through these default requirements, California dictates to covered websites how they must initially display speech to minors.

As explained, the Act requires covered websites to implement a default setting limiting minor users' access to a personalized feed to "one hour per day unless modified by the verified parent." § 27002(b)(2).

The Act requires three additional default settings. Covered websites must: (1) limit a minor's "ability to view the number of likes or other forms of feedback to pieces of media within" a personalized feed and "provide a mechanism" for a parent to do the same (§ 27002(b)(3)); (2) disable personalized feeds by default (§ 27002(b)(4)); and (3) set a minor's "account to private

_____

the timing of notifications and the compelled disclosure of certain statistics. 1-ER-39 (citing §§ 27002(a), 27002(b)(1), and 27005).

16

mode," where only users connected to the minor "may view or respond to content posted by the[m]" (§ 27002(b)(5)). Even if parents choose to ignore these settings, the State demands that they be "on" by default. § 27002(b)(2)-(5).

**Age assurance for all users. §§ 27001(a)(1)(B), 27002(a), 27006(b)-(c).** The Act also requires covered websites to assure themselves of all users' ages. From January 1, 2025, to December 31, 2026, covered websites must secure parental consent from users that covered websites have "actual knowledge" are minors. §§ 27001(a)(1)(A), 27002(a)(1). But starting January 1, 2027, covered websites must use an enhanced form of "age assurance" for *all* users to determine which are minors. That is, covered websites must treat as minors those users that their age-assurance processes "reasonably determine[]" are minors. §§ 27001(a)(1)(B), 27002(a)(2), 27006(b). The Act directs the Attorney General to promulgate regulations describing how a website may "reasonably determine[] that [a] user is not a minor." 27001(a)(1)(B). The deadline for those regulations is "January 1, 2027," which is when the Act's enhanced age-assurance requirements take effect. *Id.*; *see* § 27006(b).

### C. Procedural history

NetChoice moved for a preliminary injunction on November 12, 2024. 1-ER-7. On December 31, 2024, the district court partially granted and partially denied that motion. 1-ER-39. The district court correctly enjoined the Act's notification and compelled disclosure requirements as violating the

17

First Amendment. *Id.* (citing §§ 27002(a), 27002(b)(1), and 27005). But the district court did not enjoin the Act's other requirements. *See* 1-ER-7.

On the personalized-feed requirements, the court later acknowledged these restrictions "can fundamentally reorient social media companies' relationship with their users." 1-ER-5. But the court found it "difficult to say that restricting use of personalized feeds would alter the overall speech environment on *any* social media platform in *any* appreciable way." 1-ER-24 (emphases added). It rejected the idea that personalized feeds always involve "editorial discretion and human judgments about the value of speech." 1-ER-22. Instead, the court held that "personalized feeds are not necessarily a form of social media platforms' speech, so restricting personalized feeds does not restrict access to those platforms' speech." 1-ER-27.

On the requirements mandating default settings, the district court rejected most, but not all, of NetChoice's challenge to these provisions.[4] The court held that the two requirements in sections 27002(b)(2) and (4) regulate "personalized feeds" and thus are likely constitutional because "personalized feeds are not necessarily . . . speech." 1-ER-27. Next, the court found it "far from obvious" that restrictions on displaying the number of responses to a particular post "implicates the First Amendment at all." 1-ER-33 (citing § 27002(b)(3)). According to the district court, "since the underlying

---

[4] The district court enjoined Defendant from enforcing the Act's notification provisions, including the default requirement for notifications. 1-ER-33 (citing § 27002(b)(1)). All the other defaults, §§ 27002(b)(2)-(5), are at issue here.

18

reactions are still viewable, virtually no speech has been blocked." 1-ER-34. As for the requirement that "private mode" be enabled by default on minors' accounts, the court held that this provision is "content neutral." *Id.* (citing § 27002(b)(5)). And the provision "survives intermediate scrutiny," the court held, because "the minor can still speak to any user she wishes to if that user requests to connect and the minor accepts." *Id.*

Finally, the district court held that NetChoice's challenge to the age-assurance requirements "is not yet ripe because covered companies do not need to implement age assurance procedures until January 1, 2027, and the regulations governing age assurance have not yet been issued." 1-ER-12 (citing §§ 27001(a)(1)(B), 27002(a)).

On January 1, 2025, NetChoice sought an injunction pending appeal from the district court on the personalized-feed and default restrictions. 1-ER-2. The next day, the district court granted a temporary injunction pending appeal (to expire on February 1, 2025). 1-ER-5. NetChoice also sought an injunction pending appeal from this Court. On January 28, 2025, this Court this Court granted that injunction, ordering that "Appellee is enjoined from enforcing California Senate Bill 976 while this appeal is pending." Dkt. 11.1.

## SUMMARY OF THE ARGUMENT

**I.** The Act's requirements restrict users' ability to access protected expression and social media websites' ability to disseminate and curate content via personalized feeds. Those are core expressive activities. *See Packingham,*

19

582 U.S. at 108; *Moody*, 603 U.S. at 734. All the Act's speech restrictions violate the First Amendment under Supreme Court and Circuit precedent.

**A.** The Act's parental-consent requirements for minors to access personalized feeds violate minors' rights to access protected speech without "parental consent" under *Brown*. 564 U.S. at 803. These requirements restrict "access to social media," thus preventing the "legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. And they violate websites' rights to exercise editorial discretion in displaying curated, "personalized" feeds under *Moody*. 603 U.S. at 734. These restrictions trigger strict scrutiny and fail any level of heightened First Amendment scrutiny. They apply to any effort to recommend, select, or prioritize speech for a minor based (even in part) on information associated with that minor. That makes it unlawful for a covered website to recommend a new song based on a minor's previous searches for similar music, or to recommend a Super Bowl preview based on a minor's history of watching NFL highlight reels.

The district court upheld these restrictions by adopting an unprecedented distinction between content curation based on the curators' own preferences versus curation based on the curators' efforts to present content that a user might find most interesting, relevant, or engaging. The First Amendment makes no such distinction. Recommending a friend a book that you like is not more expressive than recommending one you think your friend will like based on what you know about his tastes. Under the district court's contrary reasoning, the government could prohibit a newspaper

20

from recommending articles to readers based on their location or expressed interests. The State could similarly prohibit a museum website from showing different curations of paintings to users who have different tastes in art.

These restrictions are not only overbroad, they are unnecessary. Parents already have numerous tools to control minors' online activities. So there are less restrictive alternatives available instead of these blunderbuss governmental restrictions. California has not shown why existing private solutions are inadequate or why governmental intervention through speech restrictions is required. Nor are the restrictions narrowly tailored. They broadly restrict minors' access to *all* personalized feeds, even if those feeds pose no plausible risk or would be affirmatively beneficial to minors. Yet the Act allows unrestricted access to identical content on non-covered websites.

**B.** The requirements to enable certain settings on minors' accounts by default unconstitutionally dictate how websites must display and curate protected expression. Under *Brown*, the State has no interest in "restrict[ing]" the protected speech "to which children may be exposed." 564 U.S. at 794. These requirements also override core editorial choices about content display and personalization that *Moody* held the First Amendment protects. The "feedback metric" restriction is overinclusive because it blocks minor users from seeing factual information about which posts their community found most helpful. Meanwhile, it is underinclusive because it allows websites to display similar metrics (such as view counts or follower numbers). Similarly, the "private mode" restriction is overinclusive because it restricts all

21

communication with non-connected users no matter their purpose. This prevents even valuable interactions like those between student athletes and college recruiters. Yet the restriction is underinclusive, too, because it ignores communications on non-covered services such as gaming services and chat rooms.

**C.** The age-assurance requirements violate the First Amendment because they burden access to large swaths of speech protected for adults *and* minors. The Supreme Court has repeatedly recognized that age-verification requirements are burdensome conditions on accessing speech. *Ashcroft*, 542 U.S. at 667; *see Reno*, 521 U.S. at 882. Here, these burdens far exceed any legitimate state interest in protecting minors, because *even adults* must undergo age assurance to access protected expression. The Supreme Court has never approved an age-verification (or "age assurance") requirement for speech that is fully protected for adults and minors alike.

NetChoice's challenge to this requirement is also ripe. The Act's statutory age-assurance requirement violates the First Amendment no matter what specific methods of age assurance California may someday approve in rulemaking.

**D.** Each of the Act's speech restrictions also triggers strict scrutiny because the Act's central coverage definitions are content-based and speaker-based. The definitions discriminate based on content by singling out websites facilitating social interaction, while exempting websites focused on commerce and product reviews. Next, the Act regulates only websites that

22

have made the editorial choice to disseminate user-generated content. But it exempts websites that have made the editorial choice to focus on disseminating content that the website's operator generated. That is a speaker-based distinction. None of these definitions are narrowly tailored. They exempt many websites that could harm minors. Yet they simultaneously restrict swaths of protected speech for minors and adults. Less restrictive alternatives to achieve the State's goals exist, such as parental controls and filtering tools.

**E.** Independently, each of the Act's speech restrictions is unlawful because the Act's central definition of "[a]ddictive internet-based service[s]" is unconstitutionally vague. Websites also must guess what the undefined terms "significant part" and "primary purpose" mean. This uncertainty about the Act's scope invites arbitrary and discriminatory enforcement.

**II.** NetChoice undisputedly has standing to raise facial challenges to the Act's speech restrictions. But the district court erred by holding that NetChoice lacked standing to raise as-applied challenges on behalf of its members. No aspect of this case requires substantial participation from any NetChoice member. Instead, the legal questions are common to all covered websites, and a court can resolve them using the same constitutional analysis. Those questions do not turn on the specific circumstances of websites' personalized feeds, default settings, or access to age-assurance technology. Whether through human curation, algorithmic recommendations, or some

23

combination, all of NetChoice's covered members engage in the same fundamental expressive activity that the Act unconstitutionally restricts.

**III.** The remaining preliminary injunction factors strongly favor relief. The loss of First Amendment rights constitutes irreparable harm. So do the massive compliance costs that the Act creates for covered websites. The balance of hardships and the public interest analysis merge in suits against the government. These factors favor protecting speech.

## STANDARD OF REVIEW

This Court "review[s] the denial of a preliminary injunction for abuse of discretion," but it "review[s] de novo the underlying issues of law." *Meinecke*, 99 F.4th at 520 (cleaned up). "In First Amendment cases," the Court must "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* at 521 (cleaned up).

## ARGUMENT

This Court should reverse those parts of the district court's order that denied a preliminary injunction. (1) NetChoice "is likely to succeed on the merits," (2) NetChoice members are "likely to suffer irreparable harm absent the preliminary injunction," (3) "the balance of equities tips" toward NetChoice, and (4) "a preliminary injunction is in the public interest." *Id.* (citation omitted).

24

## I. The Act's "personalized feeds," "default settings," and "age assurance" requirements violate the First Amendment.

To obtain a preliminary injunction in First Amendment cases, the plaintiff has the "'initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement.'" *Id.* at 521 (citation omitted). So a plaintiff must show that "a challenged law implicates the First Amendment." 1-ER-10. Once a plaintiff does that, the burden "'shifts to the government to justify the restriction on speech.'" *Meinecke*, 99 F.4th at 521 (citation omitted). "If the government fails to satisfy that burden, the plaintiff prevails on likelihood of success." 1-ER-10.

### A. The Act's parental-consent requirements for minors to access personalized feeds violate the First Amendment.

The Act requires parental consent for minors to view personalized feeds on social media websites at all, § 27001, and to view those feeds for more than one hour per day, § 27002(b)(2). These restrictions target protected expression, trigger strict scrutiny, and violate the First Amendment. The district court held otherwise, because it concluded that not all personalized feeds are expressive. 1-ER-27. But if that were so, then California and other States could outright *ban* personalized feeds—even for adults. *Packingham*, *Moody*, and this Court's precedents reject that sweeping view of governmental power.

25

### 1. The "personalized feeds" requirements restrict protected expression.

Supreme Court and Circuit precedent recognizes that the First Amendment protects personalized feeds on social media websites. That protection extends to websites that disseminate personalized feeds and to the users who view them. *See Moody*, 603 U.S. at 734. Similarly, *Brown* establishes that the government cannot require minors to obtain parental consent to access protected speech. 564 U.S. at 795 n.3. The district court's contrary holdings flouted this precedent.

**a.** Personalized social media feeds are protected expression.

*Packingham* held that State restrictions on access to "social media" websites "prevent the user from engaging in the legitimate exercise of First Amendment rights." 582 U.S. at 108. That is because "[s]ocial media allows users to gain access to information and communicate with one another about it on any subject that might come to mind." *Id.* at 107. *Packingham* rejected a law barring sex offenders from accessing social media websites. *Id.* at 105. Such restrictions trigger heightened First Amendment scrutiny even if they are content *neutral* (which this Act is not). *Id.*; *see infra* p.49.

*Moody* subsequently addressed the exact type of social-media feeds that this Act covers: "In constructing certain feeds, those platforms make choices about what third-party speech to display and how to display it. They include and exclude, organize and prioritize—and in making millions of those decisions each day, produce their own distinctive compilations of expression." 603 U.S. at 716; *see id.* at 731, 734. These "personalized" feeds "present[] a

26

user with a continually updating stream of other users' posts." *Id.* at 734. The "key" to this personalization "is prioritization of content, achieved through the use of algorithms." *Id. Moody*'s core holding is that those "customized," "individualized" algorithmically sorted "feeds" reflect "expressive choices" that "receive First Amendment protection." *Id.* at 740. These choices are what enable each covered website to curate its overall "larger offering" of expression. *Id.* at 738.

Long before these social-media cases, the Supreme Court had "time and again held that . . . [a] regulation . . . interfere[s] with protected speech" when it targets "how" a third party "present[s]" and "'exercise[s] . . . editorial control'" over others' speech. *Id.* at 738 (citation omitted). For example, *Miami Herald Publishing Co. v. Tornillo* held that a newspaper's selection and arrangement of content is a protected editorial function under the First Amendment. 418 U.S. 241, 258 (1974). And *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston* held that the selection and arrangement of parade participants is protected expressive activity. 515 U.S. 557, 574 (1995). *Moody*'s reasoning flowed directly from these precedents. *E.g.*, 603 U.S. at 728 ("For a paper, and for a platform too.").

The personalized feeds the Act regulates involve the same kind of editorial discretion and expressive curation that the First Amendment has consistently protected. The Act applies where "multiple pieces of media generated or shared by users are . . . recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the

user." § 27000.5(a). This provision directly targets what *Moody* recognized as core First Amendment activity: the selection, prioritization, or recommendation of third-party speech into a curated compilation that is "personalized" or "individualized" to a given person. 603 U.S. at 734-35. This curation is protected no matter whether it is "based on a user's expressed interests and past activities" or on "more general features of the communication or its creator." *Id.*; *see id.* at 731 (feeds "similar" to Facebook's and YouTube's are protected). And *Moody* squarely rejected the argument that "restrictions on the platforms' selection, ordering, and labeling of third-party posts do not interfere with expression." *Id.* at 727. In short, a law directly implicates the First Amendment when it seeks to regulate the "compiling and curating" of content into personalized feeds. *Id.* at 731-32.[5]

**b.** The First Amendment also protects minors' access to protected speech, including personalized feeds. The Supreme Court in *Brown* held that "the state" lacks "power to prevent children from hearing or saying anything without their parents' prior consent." 564 U.S. at 795 n.3. Minors have a First Amendment "right to speak or be spoken to." *Id.* And "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975).

---

[5] The district court thus erred by relying (1-ER-21) on *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), and *Rumsfeld v. FAIR*, 547 U.S. 47 (2006). *Moody* already distinguished those cases. *See* 603 U.S. at 740.

The State, therefore, cannot condition minors' access to constitutionally protected speech on obtaining parental permission. *Brown*, 564 U.S. at 795 n.3. Such restrictions "do not enforce *parental* authority" but rather "impose *governmental* authority, subject only to a parental veto." *Id.* That is why the Supreme Court invalidated California's previous attempt to restrict minors' access to protected speech. *See id.* Specifically, *Brown* held unconstitutional a California law that required parental consent before minors could buy or rent "violent video games" *Id.* at 802. Any other result would allow States to require parental consent for "political rall[ies]" or "religious" services. *Id.* at 795 n.3. *Brown* emphatically rejected that view, *id.* at 802,

California cannot undo these holdings or diminish the constitutional status of protected speech by using a pejorative label, such as "addictive," to describe speech it disfavors. The Supreme Court has rejected the "unprecedented and mistaken" strategy of "creat[ing] new categories of unprotected speech" specifically for minors. *Id.* at 792, 794. California could not impose a parental-consent requirement by labeling video games as "deviant," "morbid," and "lack[ing] serious . . . artistic . . . value" in *Brown. Id.* at 789. And it cannot do so here by labeling personalized feeds as "addictive." Nor can it restrict these feeds by labeling them too engaging. Just because "the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011).

**c.** The district court's contrary holding violated all this binding authority.

First, the court incorrectly concluded that NetChoice "failed to meet its burden of demonstrating . . . that most or all personalized feeds covered by SB 976 are expressive." 1-ER-20. *Packingham* and *Moody* already resolved that question. *Packingham* established that restrictions on "access to social media" trigger First Amendment scrutiny. 582 U.S. at 108. And *Moody* repeatedly observed that personalized feeds—including specifically the curated feeds of "Facebook" and "YouTube"—are protected. 603 U.S. at 734-35, 739-40. Because the Act restricts access to the very feeds that *Packingham* and *Moody* held to be protected, "the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. At a minimum, the Act is unconstitutional as applied to covered NetChoice members. The district court ignored the voluminous evidence about NetChoice members, 1-ER-23, only because it erroneously failed to consider NetChoice's as-applied challenge, *infra* p.55.

Second, the district court incorrectly fixated on "algorithms." 1-ER-23. *Moody* held that websites' "personalized" feeds are "expressive," including when they use "algorithms" to implement that curation and enforce their "[c]ommunity [g]uidelines." *Moody*, 603 U.S. at 734-35. *Moody* even emphasized that the "key" to these feeds' entire operation is "prioritization of content, achieved through the use of algorithms." *Id.* at 734. That holds true if those algorithms "most often" rely on a "user's expressed interests and past

30

activities" to help websites determine the "selection and ranking" of content. *Id.* at 734-35. All this personalization is "expressive activity of its own." *Id.* at 731. Thus, the Act's application to many algorithmically curated personalized feeds only underscores its burdens on core First Amendment activity.

Third, the district court incorrectly extended *Moody*'s reservation of judgment about the First Amendment's application to hypothetical "feeds whose algorithms respond *solely* to how users act online." 1-ER-23 (emphasis added) (quoting 603 U.S. at 736 n.5). The *Moody* footnote that the district court relied on is a *non sequitur* here: This Act applies to personalized feeds that are "based, in whole *or in part*, on information provided by the user." § 27000.5(a) (emphasis added). And *Moody* made clear that the "personalized" feeds on "Facebook" and "YouTube" use "algorithms" and are protected expression, because they implement "[c]ommunity [g]uidelines." 603 U.S. at 734-35. That is, these feeds *do not* respond "solely" to how users act. So the district court erred in refusing to enjoin the challenged provisions to the curated feeds of Facebook and YouTube—at an absolute minimum.

This error infected the Court's refusal to enjoin the Act's personalized-feeds restrictions as to other members too. The unrebutted evidence shows that covered NetChoice members do not display content to users based "*solely*" on "how users act online." *Moody*, 603 U.S. at 736 n.5 (emphasis added). Instead, covered NetChoice members disseminate content in feeds according to their own editorial policies that *humans* developed. *E.g.*, 3-ER-321, 325, 326–31 (Veitch Decl. ¶¶ 12, 21, 24-30, 34-35). Those policies

31

"prioritize minor safety and display only age-appropriate content." 3-ER-309 (Cleland Decl. ¶ 8); *see* 3-ER-353–57 (Davis Decl. ¶¶ 38, 41-43, 45-48).

NetChoice members' use of "algorithms" to implement human-created editorial policies is exactly what *Moody* held the First Amendment protects. 603 U.S. at 734-35. *Moody* expressly distinguished between (1) algorithms reflecting a website's "independent content standards" while simultaneously providing "selection and ranking . . . most often based on a user's expressed interests and past activities," versus (2) algorithms that "respond solely to how users act online." *Id.* at 734-35, 736 n.5. The former are entitled to First Amendment protection, but *Moody* had no occasion to opine on the latter. *Id.* The district court thus made a serious error in suggesting that "mixed feeds" (the first category) do not necessarily have First Amendment protection. 1-ER-26. *Moody* already rejected this basis for the district court's order: Social media websites using "algorithms" that *both* implement "[c]ommunity [g]uideline[]" editorial policies *and* "often" display speech based on user's interests and past activities are fully protected. *Id.* at 734-36.

Defendant did not—and could not—refute the evidence that NetChoice's members implement community guidelines. NetChoice members make their policies publicly available. 3-ER-313 (Cleland Decl. ¶ 23). Even so, the district court suggested that the factual record is insufficient to establish that NetChoice members' personalized feeds are expressive. *E.g.*, 1-ER-23 & n.4. Whether those feeds are protected expression is a "constitutional fact[]," so this Court reviews the district court's finding "*de novo*."

*Thunder Studios*, 13 F.4th at 742. The district court's finding on this point was also "clearly erroneous," Fed. R. Civ. P. 52, and seems to improperly require a merits-level factual showing, *see Feldman*, 843 F.3d at 403. The record is unambiguous: NetChoice members curate personalized feeds using editorial and content-moderation policies that humans developed, so these personalized feeds do not respond solely to user activity. 3-ER-309–10 (Cleland Decl. ¶ 8); 3-ER-321, 325, 326–31 (Veitch Decl. ¶¶ 12, 21, 24-30, 34-35); 3-ER-353–57 (Davis Decl. ¶¶ 38, 41-43, 45-48). That record evidence—and *Moody*'s binding holding—are plenty to show a "colorable claim" that NetChoice members' personalized feeds are expressive. *Meinecke*, 99 F.4th at 521 (citation omitted).

Fourth, the district court incorrectly held that "[w]hen it comes to feeds that recommend posts based solely on prior user activity, there is no apparent message being conveyed." 1-ER-24. That misunderstands the nature of the curatorial judgments that the First Amendment protects. "[I]t is hardly unusual for publications to print matter that will please their subscribers." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (en banc). And the district court's suggestion that websites lose any First Amendment rights when they do so makes no constitutional sense.

Indeed, some curators may choose to select and arrange speech by what they think a given user should like, while some do so based on information or predictions about what a user will like. Some curation is based on general assessments of the selected speech. Some is based on assessments of the

33

intended audience. But whatever the specific strategy, each of these are protected editorial "choices about what . . . speech to display and how to display it." *Moody*, 603 U.S. at 716. They all send the message that the curator believes this is the best mix of content for a given reader. Either way, the curator aims at the same thing: "compiling the third-party speech it wants in the way it wants" and offering a curated feed "that most reflects its own views and priorities." *Id.* at 718. The First Amendment fully protects websites that curate speech based on its length, publication date, or alphabetical order. For the same reasons, it protects websites that curate based on their users' actual interests. The district court erred in suggesting otherwise.

Finally, the court incorrectly disregarded the First Amendment harms to minor *users* on the theory that "SB 976 does not remove any speech from social media platforms." 1-ER-28. The Act restricts minors' access to particular "expressive product[s]" that "compile" content in particular ways. *Moody*, 603 U.S. at 718. So it restricts minors from accessing personalized feeds that curate local events, compile videos that match minors' interests, or recommend songs based on minors' listening history. It also restricts minors' access to personalized feeds that *exclude* content minors have indicated they dislike. The district court thus erred by focusing on the availability of *individual* pieces of content. 1-ER-28. Users will not always know what specific content they are looking for. Personalized feeds can help. The district court's myopic focus on individual pieces of content also erred by ignoring the "larger offering" of protected expression that the Act restricts minors

34

from accessing. *Moody*, 603 U.S. at 738. That reasoning could grant California power to ban *all* personalized feeds on all major social media websites—even for adults. The First Amendment permits no such thing.

In any event, the Act restricts minors' access to collections of undisputedly protected speech. Regardless of websites' editorial-discretion rights, minors have the constitutional right to access personalized feeds.

### 2.   The "personalized feeds" requirements fail any form of heightened First Amendment scrutiny.

The Act's personalized-feed requirements are subject to strict scrutiny for all the reasons just discussed. *E.g.*, *Brown*, 564 U.S. at 795; *see Moody*, 603 U.S. at 740. So Defendant must demonstrate that the requirements are "[1] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Defendant also must show that the problem demands a governmental solution (rather than a private or family solution), and that the governmental solution has the least possible restrictive effect on speech. *See Brown*, 564 U.S. at 799.

The parental-consent requirements for personalized feeds cannot satisfy strict scrutiny or any form of heightened scrutiny. Although California "possesses legitimate power to protect children from harm," that "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794. The Act's legislative findings discuss concerns about social media's impact on the "well-being of children and adolescents." Cal.

35

SB 976 § 1 (2024), https://perma.cc/QPS3-EDEN. But "[n]early all of the research" Defendant cited in the district court about social media's purported harms was "based on correlation, not evidence of causation." *Brown*, 564 U.S. at 800 (citation omitted). Such "ambiguous proof will not suffice" to justify a law that infringes First Amendment rights. *Id.*

The district court thought otherwise, concluding that there are "studies that show correlation as well as [] smaller experimental studies that show causation." 1-ER-32. But those studies do not purport to show that *personalized feeds* specifically cause harms. *See id.* (citing 2-ER-166 (Feder Decl.); 2-ER-215 (Radesky Decl.)). And the district court overstated what those studies actually show. *See id.* Regardless, if all it took to restrict protected speech were a handful of small experimental studies, then *Brown* would have come out differently. *See id.* at 805 (concluding a California law failed strict scrutiny); *id.* at 858 (Breyer, J., dissenting) (appendix) (citing dozens of "articles . . . supporting the hypothesis that violent video games are harmful").

Defendant's claimed interests also ignore the many tools parents have to control their children's online activity. *See supra* p.11. NetChoice members also engage in content moderation and provide their own website- and app-level tools to parents. *See supra* p.12. Whatever "modest gap in concerned parents' control" those private tools leave open, filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803 & n.9. So even before considering the tailoring analysis, Defendant has failed to "specifically identify

36

an actual problem in need of solving" by the government. *Id.* at 799 (cleaned up).

Nor are the parental-consent requirements for personalized feeds the least restrictive means that can accomplish the State's goals. Existing parental tools are precisely the kinds of private options that the Supreme Court has endorsed over governmental intervention. *See, e.g., United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000). If California is concerned those tools do not work, it could provide "parents the information needed to engage in active supervision" over children's Internet access. *Id.* Thus, the State "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary [tools]" or by "(2) educating children and parents." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024). Defendant did not argue that existing tools are ineffective. Rather, Defendant argued that they do not offer *precisely* the State-imposed options. 2-ER-110. That is not a sufficient basis to restrict speech. *Brown*, 564 U.S. at 803 & n.9.

The Act's parental-consent requirements to access personalized feeds are also underinclusive. §§ 27001, 27002(b)(2). If covered websites' personalized feeds are genuinely "dangerous," it is not clear why the State would allow minors access to them "so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802. The requirements are also underinclusive because they apply only to certain websites while leaving minors free to access personalized content on exempted websites. Although YouTube must obtain parental

consent before showing a minor personalized video recommendations, streaming services like Hulu can freely provide those same minors with algorithmically curated video feeds. And while Pinterest would be forced to require parental permission to show personalized content about products, e-commerce sites can freely show minors personalized feeds of recommended products.

These arbitrary distinctions mean that minors can access the very types of personalized content the Act targets, but only by using different websites. They also mean that, under the Act, a feed consisting of extreme or objectionable content would be unregulated so long a website curated it for minors *in general* and not for a *specific minor*. The Act even ignores feeds where a third party pays to have the content arranged in a particular way. But the moment a website adds even one piece of content that it believes a user might be interested in based on what that user has previously communicated about themselves or their preferences, parental consent is required. "That is not how one addresses a serious social problem." *Id.*

Meanwhile, these requirements are also overinclusive, because they restrict access to *all* personalized feeds regardless of their content or potential for harm. The Act sweeps in feeds that show educational content, current events, hobby discussions, local community information, and other valuable speech that poses no plausible risk to minors' wellbeing. A teenager would need parental consent to see personalized feeds of math tutorials on YouTube, community events on Nextdoor, or news about their local sports

38

team on Facebook. The Act makes no attempt to distinguish between beneficial or (purportedly) harmful *uses* of personalization.

The Act's requirements for personalized feeds violate minors' constitutional right to access protected speech without parental consent. They also interfere with covered websites' editorial and curatorial discretion. The State has not shown that existing parental controls are inadequate or that State intervention is necessary. Even so, the Act restricts protected speech while leaving the alleged harms unaddressed elsewhere. It discriminates between similar content on similar websites. And it imposes blanket restrictions where more targeted approaches are available. The restrictions on personalized feeds thus violate strict scrutiny in nearly every way.

### B. The Act's requirements for websites to enable certain default settings on minors' accounts violate the First Amendment.

The Act's requirements for certain speech-restrictive settings to be "on" by default implicate the First Amendment, because they restrict "access to social media," *Packingham*, 582 U.S. at 108, and "alter a [website]'s own editorial choices about the mix of speech it wants to convey," *Moody*, 603 U.S. at 734; *see* § 27002(b)(2)-(5). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC*, 596 U.S. at 305 (citation omitted). Defendant cannot meet that burden for any of the Act's mandatory defaults.

**1.** *Personalized-feed defaults.* The district court erred by declining to enjoin the two personalized-feed default settings discussed above (at p.16). The

39

parties and the district court agree that the default settings that restrict personalized feeds track the arguments for personalized feeds in general (*supra* p.25). *See* 2-ER-50; Dkt. 8.1 at 12 (Def's Opp. to Mot. for Inj. Pending Appeal). Because the personalized-feed provisions infringe protected speech under *Moody*, these duplicative default settings are unconstitutional.

**2.** *"Feedback metrics" default.* The Act requires covered websites to enable a "default" setting that restricts a minor's "ability to view the number of likes or other forms of feedback." § 27002(b)(3). This restriction impedes speech about speech. *Contra* 1-ER-33 (finding "little apparent expressive value in displaying a count of the number of total likes and reactions."). Quantifying the amount of feedback users provide on a particular post has expressive value because it communicates *information* about how others have responded to the speech. The First Amendment protects the "creation and dissemination of information." *Sorrell*, 564 U.S. at 570. So the State could not prohibit a student group from sharing information about how many students signed a petition. For the same reason, the State cannot prohibit covered websites from sharing feedback metrics. The First Amendment protects both quantifications, because "feedback metrics" and "signature counts" are equally informative. *Id.*

*Moody* even recognized that some of the expression on social media websites involves "[t]hose viewing the content [who] can then react to it." 603 U.S. at 719. By quantifying those responses, feedback metrics communicate meaningful context about how content resonates with others. The State can

no more evade the First Amendment when it restricts the publication of truthful information than if it were to bar theaters from disclosing the number of tickets sold or a newspaper from publishing a list of bestsellers.

This restriction is subject to strict scrutiny because it is content-based. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163. It distinguishes between the metrics for "feedback" and "likes," § 27002(b)(3), versus other metrics that websites can display. Covered websites can use numerical metrics to show how many followers or subscribers a user has, how many times a video has been viewed, how many times a post has been shared, or how many posts a user has made. But they cannot use numerical metrics that quantify feedback to specific posts. *See id.* A given metric is thus regulated (or not) depending on the "subject matter" it quantifies. *Reed*, 576 U.S. at 163. If the subject matter is "likes," the metric is restricted. But if the subject matter is "shares" or "views," the metric is not restricted. "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 619 (2020) (controlling plurality op.). The district court therefore erred by holding that this restriction "would face at most intermediate scrutiny." 1-ER-33.

This "feedback metric" restriction fails strict scrutiny. The State's apparent interest is to protect minors from viewing truthful feedback metrics that may cause negative feelings. But it "is not . . . the role of the State or its officials to prescribe what shall be offensive." *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018). In any event, this restriction is improperly tailored. It is underinclusive because it applies only to certain feedback

41

metrics but excludes others. *See* § 27002(b)(3). There is no logical reason to restrict only some feedback metrics (such as "likes") while allowing similar metrics (such as metrics quantifying "views" or "shares"). The restriction is overinclusive, too, because it prohibits displaying metrics across all contexts, regardless of their purpose or potential benefit. The restriction applies equally to feedback metrics that help surface important safety information, validate accurate information during emergencies, highlight educational content, or identify trusted local resources. § 27002(b)(3). That means a student looking for study materials on a covered website cannot see a metric of how many classmates found a tutorial helpful. Likewise, a teenager that uses a covered website to sell her art cannot see metrics about which artistic creations her followers prefer.

The district court erred by minimizing these concerns on the grounds that "all the underlying speech is still available." 1-ER-34. The fact that the underlying, unquantified "feedback" and "likes" are still available merely shows that this restriction is underinclusive as to preventing minors from seeing feedback. The Act would not prohibit a minor who counted such feedback herself from directly communicating that number in her own post. In all, this poor tailoring means that the Act's restrictions for feedback metrics fail all forms of First Amendment scrutiny.

**3.** *"Private mode" default.* The Act's last mandatory "default" setting limits minors' accounts to "private mode." § 27002(b)(5). This requirement "obviously regulates speech because it limits the ability of users to speak with

42

minors." 1-ER-34. Minors must confront this requirement when they are fundraising for a field trip, gathering survey responses for a school project, or simply seeking to discuss matters of public concern. The "private mode" default thus limits minors' own "constitutional right to speak or be spoken to," which in turn triggers strict scrutiny. *Brown*, 564 U.S. at 795 n.3.

This restriction also triggers strict scrutiny because it is speaker-based. It discriminates between speech from users who are "connected" to a minor and speech from all other users. § 27002(b)(5). The Supreme Court is "deeply skeptical of" such laws "that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) (cleaned up) ("*NIFLA*"). Here, the same message is restricted (or not) based solely on the speaker's connection status with the minor. *Id.* Such speaker-based discrimination demands strict scrutiny.

The "private mode" requirement fails strict scrutiny, intermediate scrutiny, or any form of First Amendment scrutiny. It is not clear what governmental interest the requirement even serves, because minors are free to disable the default. § 27002(b)(5). The requirement is also not appropriately tailored. It is overinclusive because it applies to all covered websites and minor users, regardless of why they are using a particular service. A high school athlete would be hindered from speaking with college recruiters on X. So would a religious adherent "who wish[ed] to proselytize young people." *Brown*, 564 U.S. at 795 n.3. And so would two unconnected minors who wished to speak to each other. *See* § 27002(b)(5). Yet the restriction is also

43

underinclusive, because it limits communication only on covered websites while leaving minors free to communicate with unconnected users on other types of services. A minor's posts on Instagram would appear only to "connected" users by default. *Id.* But the same minor could freely post identical content to "'gaming sites or video chat applications that' . . . are common places where adult predators engage [with] minors." *Griffin*, 2023 WL 5660155, at *19 (quoting evidence the State submitted).

### C. The Act's statutory age-assurance requirements violate the First Amendment, and NetChoice's challenge to this requirement is ripe.

The Act's age-assurance requirements violate the First Amendment by requiring all users—including adults—to provide personal "information" to access protected speech. § 27001(b). And contrary to the district court's conclusion, 1-ER-19, NetChoice's challenge to these requirements is ripe. The constitutional defect lies in mandating age assurance, regardless of what specific methods California may eventually require through rulemaking.

### 1. The Act's age-assurance requirements violate the First Amendment.

The Act requires covered websites to conduct "age assurance" before disseminating protected speech. § 27001. This restriction means websites must "collect[]" personal "information" or documentation to continue offering their services. § 27001(b). As a result, all users—minors *and adults* alike— will face "significant burdens on . . . access to constitutionally protected speech." *Griffin*, 2023 WL 5660155, at *17. These burdens will "discourage

44

users from accessing" vast amounts of protected speech on "the regulated sites." *Id.* (cleaned up); *see Reno*, 521 U.S. at 856; 3-ER-361 (Davis Decl. ¶ 59); 3-ER-369–71 (Paolucci Decl. ¶¶ 14-18); 3-ER-336 (Veitch Decl. ¶ 50).

The Supreme Court has held that requiring people to provide personal information or documentation—such as "identif[ication]" or "credit card information"—significantly burdens access to protected speech. *Ashcroft*, 542 U.S. at 667; *see Reno*, 521 U.S. at 882. Yet under the Act, covered websites' "distinctive expressive offering[s]" are unavailable absent age assurance. *Moody*, 603 U.S. at 738; *see* § 27001(a)(1)(B). This restriction on "access to social media," *Packingham*, 582 U.S. at 108, is much broader than the age-verification law the Supreme Court held unconstitutional in *Ashcroft*, 542 U.S. at 659. That law regulated "sexually explicit materials." *Id.* But this Act's age-assurance provision restricts access to speech that is protected for both adults *and* minors. The restrictions thus trigger strict scrutiny. *See id.* at 666; *Reno*, 521 U.S. at 878-79.

The age-assurance restrictions also fail strict scrutiny. For one thing, the restrictions effectuate the Act's other age-based restrictions. *E.g.*, 27001(a), 27002(b)(2)-(5). Because those other provisions are unconstitutional, age assurance serves no state interest. *See, e.g., Griffin*, 2023 WL 5660155, at *21.

Moreover, the age-assurance requirements are unconstitutionally over-inclusive as to any minor-specific state interest. Even *adults* must undergo age assurance to access protected speech on covered websites. *See Reyes*, 2024 WL 4135626, at *16 n.169 (age-assurance requirement "appears

45

overinclusive" as it "broadly burdens adult users'" access to protected speech); *Fitch*, 738 F. Supp. 3d at 774-76 (similar). Impeding adults' access to protected speech in an effort to regulate minors' access to speech makes the Act insufficiently tailored. *See Ashcroft*, 542 U.S. at 666-67 (noting that voluntary "[b]locking and filtering software is an alternative that is less restrictive than [age-verification]"); *Reno*, 521 U.S. at 882.

None of the available methods for accomplishing age assurance can overcome these tailoring issues. That is why recent cases have rejected similar age-assurance requirements for social-media websites. *Reyes* concluded that a similar law's "age assurance provision, which applie[d] to all users, [would] broadly burden[] adult users' ability to 'access a broad range of protected speech on a broad range of covered websites.'" 2024 WL 4135626, at *16 n.169 (quoting *Fitch*, 738 F. Supp. 3d at 744). Likewise, *Griffin* concluded that "[i]t is likely that many adults" and minors "who otherwise would be interested in becoming account holders" on covered websites "will be deterred—and their speech chilled—as a result of the age-verification requirements." 2023 WL 5660155, at *17. Those who are willing to comply with these requirements even risk "forgo[ing] the anonymity otherwise available on the internet" as the price of admission. *Id.* (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008). *Fitch* cited the same principles in enjoining Mississippi's similar age-verification requirement. 738 F. Supp. 3d at 764. The district court should have done the same here.

46

Instead, the district court departed from this consensus by citing a hypothetical process "that run[s] in the background" of a user's web browser. 1-ER-16. But the State has not committed to requiring only a "background-only" process. Nor is it clear that such a process could comply with the Act. Regardless, such background verification still requires websites to collect and process a user's personal information. So this process still raises constitutional concerns about anonymity and access to protected speech. Background verification also creates additional privacy risks since it involves *continuously* monitoring a user's behavior. And it could still deter many users who are unwilling to submit to ongoing surveillance of their online activities simply so that they can access protected speech on covered websites. *See, e.g.*, 3-ER-370 (Paolucci Decl. ¶ 17) ("Our users frequently cite . . . our refusal to even gather any data that is not directly necessary . . . as the reason they've chosen to use our website.").

No matter whether it relies on document verification, facial analysis, behavioral monitoring, or other means, age-verification (or "age assurance") unconstitutionally burdens access to protected speech.

## 2. NetChoice's challenge to the age-assurance requirements is ripe.

The district court erroneously failed to consider NetChoice's challenge to the age-assurance requirements for lack of "prudential ripeness." 1-ER-13. The court correctly noted that "NetChoice has established constitutional ripeness," even though California has not yet promulgated regulations

47

about age assurance. *Id.* But the lack of regulations does not make the challenge prudentially unripe. Requiring websites to conduct age assurance violates the First Amendment no matter what specific age-assurance methods California may later approve through regulations. Any such methods would fail strict scrutiny no matter how they are implemented. *Supra* p.45.

NetChoice satisfies the first prong of the prudential ripeness analysis, which asks whether "[t]he issue here is fit for review." *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021). No matter whether websites must verify age through photo IDs, facial analysis, or some other as-yet untold means, the age-assurance requirement inescapably burdens access to and chills protected speech. §27001(b). Invariably, these kinds of "schemes . . . 'are not only an additional hassle,'" but they also risk forcing "'website visitors forgo the anonymity otherwise available on the internet.'" *Griffin*, 2023 WL 5660155, at *17 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d at 99). The challenge thus presents "a purely legal question." *Ass'n of Irritated Residents*, 10 F.4th at 944. Courts can evaluate this question based on the statutory age-assurance mandate itself, without waiting for California to specify particular compliance mechanisms.

NetChoice also satisfies the second prong of prudential ripeness, which asks whether "delaying review would cause hardship" to NetChoice's members. *Id.* NetChoice members must begin developing age-assurance systems well before the 2027 effective date to ensure timely compliance with the Act. *E.g.*, 3-ER-315–16 (Cleland Decl. ¶¶ 28-32, 35). These systems require

48

significant technical development, testing, and deployment that cannot be accomplished overnight. *E.g.*, 3-ER-372 (Paolucci Decl. ¶ 20); *see* 3-ER-369–76 (*id.* ¶¶ 13, 19, 23-26). Because of these costs, the district court found that many NetChoice members "do not have the capabilities to conduct age assurance" in any event. 1-ER-12. That alone shows a substantial hardship.

The Act itself creates a present hardship by forcing NetChoice members to choose between two equally bad options. Covered websites can begin investing in age-assurance capabilities now despite regulatory uncertainty. Or they can risk being unable to comply when the requirement takes effect. Delaying could result in members shutting down, *e.g.*, 3-ER-372 (Paolucci Decl. ¶ 20), or facing enforcement actions. But acting now requires committing vast resources to work that may prove wasted if California's regulations require different technical approaches. *E.g.*, 3-ER-335 (Veitch Decl. ¶ 49).

In short, NetChoice members cannot simply bide their time for the regulations before beginning compliance work. *Contra* 1-ER-19. Forcing members to operate under a cloud of uncertainty until January 1, 2027, has no benefit when the underlying legal issue will be the same then as it is today.

### D. The Act's central coverage definitions are unconstitutionally content-based and speaker-based.

**1.** In addition to the reasons just discussed, all the Act's speech restrictions trigger strict scrutiny because the Act's coverage definitions are content-based and speaker-based. *See Sorrell*, 564 U.S. at 563-64 (content-based exceptions render entire statute content-based).

*Content-based.* The Act's central coverage definitions are facially content-based. The Act selects covered websites for regulation based on the "subject matter" that they disseminate, and thus based on their "content." *Reed*, 576 U.S. at 163.

The Act *includes* websites based on whether one of their substantial functions "is to connect users in order to allow users to interact socially with each other." Cal. Bus. & Prof. Code § 22675(e)(1)(A). This distinction is content-based because it regulates websites based on whether a substantial function is to allow social interaction between users rather than some other substantial function focusing on other forms of content (such as non-user generated content). The Act also excludes websites that facilitate "commercial transactions" and display user-generated "consumer reviews of products, sellers, services, events, or places." § 27000.5(b)(2)(A). Thus, "[w]hen a site chooses not to primarily offer [consumer reviews] but instead focus on social engagement, it changes from an uncovered to covered platform." *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *12 (W.D. Tex. Aug. 30, 2024). But the only thing that has "changed" is "the *content*" on the website. *Id.* (emphasis added).

The district court erred by relying on *City of Austin v. Reagan Nat'l Advert. of Austin, LLC* to justify the Act's coverage definitions. 1-ER-29 (citing 596 U.S. 61 (2022)). The Act's "review/non-review" distinction is not "closely analogous to solicitation bans that the Supreme Court has found to be content neutral." 1-ER-29. Unlike solicitation bans that apply equally to all

50

requests for money regardless of subject matter, the Act discriminates between otherwise-identical personalized feeds based solely on their content. This is akin to a solicitation ban that restricts solicitations for "reviews" but allows solicitation for "non-reviews." Such a content-based inquiry is precisely what triggers strict scrutiny under *Reed*. 576 U.S. at 168. That holds true even the Act does not "discriminat[e] among viewpoints," *id.*, that can appear in a review versus a non-review, 1-ER-30.

The district court also erred by referencing the Act's "legislative purpose." 1-ER-30. For one thing, determining whether a law is "content based" requires examination of the statutory text "on its face." *Reed*, 576 U.S. at 163 (citation omitted). Regardless, Defendant has attempted to justify the Act's speech restrictions by referencing the purportedly harmful *content* on covered websites. *See, e.g.*, 2-ER-237–39, 248 (Radesky Decl. ¶¶61.b-f, 91) (citing "extreme content" such as "violent, scary, or sexualized images"). So, whether through the Act's text *or* its purpose, the Act is content-based.

*Speaker-based.* The Act's coverage definition is also speaker-based, because it distinguishes between speech "shared *by users*" and speech generated or shared *by the website*. § 27000.5(a) (emphasis added). Minors can freely access personalized feeds of TV shows on streaming services like Hulu, because all that content is either "generated or shared" by the website—not users. *Id.* But minors cannot access personalized feeds of clips from those same shows on YouTube without facing governmental restrictions.

This distinction is speaker based because it turns on who is speaking—even if the underlying content is exactly the same. *NIFLA*, 585 U.S. at 777.

**2.** The Act's content- and speaker-based coverage definitions cannot satisfy any form of heightened First Amendment scrutiny. To begin, the Act's coverage definitions are vastly overinclusive. They target websites that disseminate a broad range of protected speech. The Act does not purport to limit itself to websites that are particularly harmful to minors or even particularly likely to be accessed by minors. *See* 3-ER-367 (Paolucci Decl. ¶ 9). The Act also fails to "take into account juveniles' differing ages and levels of maturity." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 396 (1988).

The Act's coverage is also "seriously underinclusive," because it targets only a subset of disfavored websites. *Brown*, 564 U.S. at 805. If the State is attempting to provide parents greater control over their children's online activity, it makes no sense to use ill-defined statutory exceptions, such as "commercial transactions" and "consumer reviews." § 27000.5(b)(2)(A). To the extent the State is attempting to restrict particular personalization features that it deems harmful to minors, the Act's approach is underinclusive. The Act restricts minor users from accessing personalized feeds of music on YouTube, but allows access to virtually identical feeds on Spotify. § 27000.5(b)(1). This lack of tailoring means that the Act fails strict scrutiny.

52

### E. The Act's central coverage definitions are unconstitutionally vague.

The Act's central coverage definition for "[a]ddictive internet-based ser-vice[s]" is unconstitutionally vague. § 27000.5(b). The Constitution requires "fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Laws cannot be "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). A vague law implicating First Amendment freedoms is facially unconstitutional if it "reaches a sub-stantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982). This First Amendment vagueness standard is "more stringent" than other vagueness standards. *Id.* at 499; *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 n.7 (9th Cir. 2001) (similar).

The Act's pejorative use of "addictive feed" is vague. Websites such as NetChoice member Dreamwidth lack guidance about what feeds constitute "addictive feed[s]" requiring age verification and parental consent. § 27000.5(b); *see* 3-ER-314 (Cleland Decl. ¶ 27); 3-ER-368 (Paolucci Decl. ¶ 12). For example, the Act creates potentially conflicting tests. Some websites show each user a reverse-chronological feed of content from friends that the user has chosen to follow. These feeds might not fall within the Act's cover-age. That is because, by choosing to follow a friend, the "user expressly and unambiguously requested . . . media by the author, creator, or poster of the media." § 27000.5(a)(4). Yet the list of friends itself is "information associated

53

with the user." *Id.* From that perspective, these feeds are included in the Act's coverage. *See id.* Websites have no way to know which test governs. *E.g.*, 3-ER-368 (Paolucci Decl. ¶ 12).

The Act also does not define the vague terms "significant part" and "primary purpose." § 27000.5(b). So websites have no way to know whether a personalized feed is "a significant part" of their service. § 27000.5(b)(1). Similarly, websites could have trouble discerning what it means to "operate[] *a feed* for the primary purpose of cloud storage," § 27000.5(b)(2)(B) (emphasis added). These vague terms leave websites "to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements." *Griffin*, 2023 WL 5660155, at *13. This "ambiguity renders a law unconstitutional." *Id.*; *see, e.g.*, *Fitch*, 738 F. Supp. 3d at 778 (holding that the terms "primarily" and "incidental to" in central coverage definition were "overly indefinite," and therefore unconstitutionally vague).

The district court wrongly rejected NetChoice's vagueness challenge. 1-ER-38. Even if subjective terms like "significant" are common in statutes, *see id.*, the Act's vagueness runs much deeper. The Act's basic coverage definitions and its numerous exceptions create genuine confusion about which services are covered. *E.g.*, 3-ER-368 (Paolucci Decl. ¶ 12). A website cannot reliably determine whether it is covered merely by offering personalized content, or whether it falls into one of the Act's carve-outs. That confusion invites arbitrary and discriminatory enforcement. The vagueness doctrine prohibits such standardless delegation of enforcement discretion.

54

This uncertainty is particularly problematic given the First Amendment interests at stake. The Supreme Court has consistently held that laws regulating speech must provide clear notice of what is prohibited to avoid chilling protected expression. *E.g.*, *Fox*, 567 U.S. at 253. The Act combines ambiguous coverage provisions with potentially severe penalties. That combination could drive many covered websites to err on the side of over-compliance, chilling and restricting speech the State did not intend to restrict.

## II. NetChoice has standing to raise as-applied First Amendment claims on behalf of its members.

The district court correctly concluded that NetChoice has associational standing to raise facial First Amendment claims on behalf of its members. 1-ER-12 & n.3. But the district court erroneously held that NetChoice lacks associational standing to raise "as-applied" claims. 1-ER-37. This decision rested on the court's incorrect, one-sentence conclusion that "it is . . . necessary for NetChoice's individual members to participate in this lawsuit." *Id.*

NetChoice has associational standing to obtain relief remedying members' injuries because: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Likewise, NetChoice has standing to assert the First Amendment rights of its members' users. *E.g.*, *Am. Booksellers*, 484 U.S. at 392-93.

55

Those conclusions do not change because NetChoice has also asserted "as-applied" claims. The as-applied First Amendment inquiries here are straightforward "from the face of the law," because all aspects of the Act's speech regulations "in every application . . . raise the same First Amendment issues." *X Corp.*, 116 F.4th at 899. In other words, the as-applied challenge here goes only to the scope of relief—whether an injunction will protect all covered websites or instead only NetChoice's members' services. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (claim had "characteristics" of as-applied challenge where it did "not seek to strike the [law] in all its applications, but only to the extent it covers referendum petitions").

Nor does the "relief requested  require[] the participation of individual members in the lawsuit" as parties. *Hunt*, 432 U.S. at 343. On the contrary, "because [NetChoice] seeks declaratory and prospective relief rather than money damages, its members need not participate directly in the litigation." *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 938 (9th Cir. 1987). The pertinent question is whether the claims would require "excessive participation" of members. *Borrero v. United Healthcare of N.Y., Inc.*, 610 F.3d 1296, 1306 (11th Cir. 2010). Courts often permit associations to raise as-applied claims, even if they would require some discovery from members. *E.g.*, *id.*; *Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 553 (5th Cir. 2010).

The district court's analysis of the as-applied claims therefore should have examined the record evidence about the Act's application to

56

NetChoice's members (and about the harms they are facing). That evidence established that the Act covers NetChoice's members. *See supra* p.9. And those members need injunctive relief to protect them from irreparable harm. *See infra* p.57. Instead of analyzing this evidence, the district court erroneously speculated about *hypothetical* websites and algorithms having nothing to do with these as-applied claims. *See* 1-ER-23–24; *supra* p.30.

## III. The other preliminary-injunction factors favor NetChoice.

NetChoice is likely to succeed on the merits of its First Amendment challenges to the Act's speech restrictions. *Supra* Parts I-II. This showing "puts a strong (and perhaps insurmountable) thumb on the scale in favor of a preliminary injunction." 1-ER-10. Likewise, the analysis of the other factors "begins tilted in favor of a preliminary injunction since it is 'always in the public interest to prevent the violation of a party's constitutional rights.'" 1-ER-11 (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022)). Regardless, all the remaining factors already favor NetChoice.

NetChoice members face irreparable harm. "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). And a "[l]ikelihood of success on a constitutional claim necessarily implies that the plaintiff would suffer irreparable harm absent an injunction." 1-ER-10–11 (citing *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009)). In other words, NetChoice's "colorable First Amendment claim" shows that its members "likely will suffer

57

irreparable harm." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019).

Furthermore, NetChoice members face additional irreparable harm because the Act requires covered websites to shoulder compliance costs "with no guarantee of eventual recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021). Each website must create parental-consent systems and devise default settings—at great expense. 3-ER-315–16 (Cleland Decl. ¶¶ 28-32, 35); *see* 3-ER-333–36 (Veitch Decl. ¶¶ 41, 48-49, 52); 1-ER-5. Age-assurance systems are costly, too. *E.g.*, 3-ER-372 (Paolucci Decl. ¶ 20). For one member, these compliance costs are in "excess of [the] available budget." 3-ER-376 (*id.* ¶ 27); *see* 3-ER-369, 373 (*id.* ¶¶ 13, 21). Sovereign immunity prevents later recovery of these expenses. *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012).

The final two factors—"harm to the opposing party and . . . the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The fact that [a Plaintiff] ha[s] raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [the Plaintiff's] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (cleaned up). A preliminary injunction would also "preserve[] the status quo prior to the recent legislative action." *Feldman*, 843 F.3d at 369. As the district court itself correctly held, these issues are "novel, difficult, and important." 1-ER-5. In other words, "if NetChoice

is correct in its argument, the public interest would tip sharply in its favor because there is a strong interest in maintaining a free flow of speech." *Id.* The Act's speech restrictions should therefore be preliminarily enjoined.

## Conclusion

This Court should reverse those parts of the district court's order denying a preliminary injunction.

DATED: January 30, 2025

Respectfully submitted,

*/s/ Scott A. Keller*

Joshua P. Morrow
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701

Jared B. Magnuson
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
Shannon Grammel
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW
  Suite 700
Washington, DC 20001
scott@lkcfirm.com
(512) 693-8350

*Counsel for Plaintiff-Appellant*

### STATEMENT OF RELATED CASES

NetChoice is not aware of any related cases currently pending in this Court. *See* Ninth Circuit R. 28.2-6.

*/s/ Scott A. Keller*
Scott A. Keller

### CERTIFICATE OF COMPLIANCE

This brief complies with the word length limits permitted by Ninth Circuit Rule 32-1, as it contains 13,992 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the type size and typeface requirements under Federal Rules of Appellate Procedure 32(a)(5) and (6), because it has been prepared in a proportionately spaced typeface using 14-point Palatino Linotype.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF SERVICE

I hereby certify that I caused this document to be electronically filed on this 30th day of January, 2025, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system. All registered case participants will be served via the Appellate Electronic Filing system.

*/s/ Scott A. Keller*
Scott A. Keller

61