CASE NO. 25-146

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NETCHOICE,

*Plaintiff-Appellant*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellee.*

———————————

*On Appeal from the United States District Court
for the Northern District of California, 5:24-cv-07885-EJD
(Honorable Edward J. Davila)*

———————————

**BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLANT**

———————————

Thomas A. Berry
  *Counsel of Record*
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, DC 20001
(443) 254-6330
tberry@cato.org

February 6, 2025

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation, and none issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the *amicus*'s participation.

## TABLE OF CONTENTS

**Page(s)**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................................... i

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF *AMICUS CURIAE* ........................................................1

INTRODUCTION AND  SUMMARY OF THE ARGUMENT ...........................1

ARGUMENT......................................................................................3

    I. *MOODY* CLARIFIED THE LIMITED SCOPE OF *PRUNEYARD* AND *FAIR*.........................................................................................3

CONCLUSION ...................................................................................8

CERTIFICATE OF COMPLIANCE.........................................................9

CERTIFICATE OF SERVICE.................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Moody v. NetChoice*, 603 U.S. 707 (2024) ...................................................2, 3, 6, 7

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) ...............................2, 4, 5

*Robins v. Pruneyard Shopping Ctr.*, 592 P.2d 341 (Cal. 1979) ............................ 4

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) .................................................................. 2

*Wooley v. Maynard*, 430 U.S. 705 (1977) ............................................................ 5

**Other Authorities**

David B. Gaebler, *First Amendment Protection Against Government Compelled Expression and Association*, 23 B.C. L. REV. 995 (1982) ................ 5

Shane Curtin, *Free Speech in Silicon Valley:* Pruneyard Shopping Center v. Robbins, SJPL BLOG (Aug. 9, 2019) .................................................................. 4

iii

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs. This case interests Cato because *Moody v. NetChoice* established critical protections for online speakers, and it is vital that lower courts properly interpret *Moody*.

## INTRODUCTION AND
## SUMMARY OF THE ARGUMENT

The district court below held that a law regulating social media feeds does not necessarily restrict the speech of social media companies. It did so on the reasoning that "restrictions on a private speaker's ability to compile and organize third-party speech implicate speech rights only if those restrictions impair the speaker's own expression." 1-ER-21. In so holding, the district court vastly underestimated the scope of what entails a "speaker's own expression."

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in whole or in part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission. Pursuant to Ninth Circuit Local Rule 29-2(a), all parties have been notified and have consented to the filing of this brief.

1

The district court's opinion is shot through with the presumption that compiled speech only counts as expression if the compiler is aiming to send a particular *kind* of message. For example, the district court suggested that a parade organizer only has a First Amendment right to exclude a float from a parade if it does so "to express disapproval of a message[.]" 1-ER-24. On the basis of that premise, the district court doubted "that regulating [social media] feeds responding solely to user actions would uniformly interfere with expression." 1-ER-24.

The district court's premise was wrong, and everything that followed in the district court's analysis was skewed as a result. The Supreme Court has clarified that compilers are speaking (and thus have a First Amendment right to control their compilations) whenever they aim to produce a speech product. *Moody v. NetChoice*, 603 U.S. 707, 730 (2024). Whether they aim to produce a speech product simply comes down to the purpose of the forum at issue. If a compiler produces a product with "the expressive quality of a parade, a newsletter, or the editorial page of a newspaper," then the compiler has a First Amendment right to make its own decisions. *Id.* at 731 (quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 64 (2006)). A website that people visit to read and browse obviously fits the bill. The question really is that simple.

The district court was confused mainly because of the Supreme Court's precedent in *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980). That

decision held that a private shopping mall did not have a First Amendment right to exclude pamphleteers. But as the Supreme Court has now clarified, that decision rested on the premise that the mall was not in the business of presenting speech to its patrons; it was only in the business of presenting shopping options. "The mall owner did not claim that he (or the mall) was engaged in any expressive activity." *Moody*, 603 U.S. at 730. If the mall owner had argued that he wanted attendees not just to shop but also to see and hear certain speakers (like attendees of a parade), then the mall owner would have had the right to exclude any speakers he did not want. After *Moody*, *PruneYard* stands only for the proposition that First Amendment plaintiffs must acknowledge that they are engaged in compiling speech for readers and listeners to consume. The social media companies at issue in this case easily satisfy that test, and the law at issue works a First Amendment injury.

## ARGUMENT

### I. *MOODY* CLARIFIED THE LIMITED SCOPE OF *PRUNEYARD* AND *FAIR*.

One Saturday afternoon in 1975, two high school students set up a table in the outdoor courtyard of the PruneYard, a privately owned shopping center. The students distributed pamphlets and asked passersby to sign petitions opposing a then-recent U.N. resolution. *See* Shane Curtin, *Free Speech in Silicon Valley:* Pruneyard

3

Shopping Center v. Robbins, SJPL BLOG (Aug. 9, 2019).[2] A PruneYard security guard asked the students to leave because their pamphleting violated PruneYard's rules. The students left, but they later sued PruneYard in California state court alleging a violation of their right to freedom of speech. While they lost in the lower state courts, the students won at the California Supreme Court, which held that the California Constitution protects "speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Robins v. Pruneyard Shopping Ctr.*, 592 P.2d 341, 347 (Cal. 1979).

PruneYard then appealed to the Supreme Court. Of course, the Supreme Court could not overrule the California Supreme Court's interpretation of the California Constitution. Instead, the question was whether the right of access found within California's Constitution violated PruneYard's rights as protected by the First Amendment to the *federal* Constitution. PruneYard argued "that a private property owner has a First Amendment right not to be forced by the State to use his property as a forum for the speech of others." *PruneYard*, 447 U.S. at 85. Specifically, PruneYard argued that this right had been established by the Supreme Court's decision in *Wooley v. Maynard* three years earlier, which had held that the state of

---

[2] Available at https://tinyurl.com/mrynf8wv.

4

New Hampshire could not force drivers to display the motto "Live Free or Die" on their license plates. 430 U.S. 705, 717 (1977).

The Supreme Court ruled against PruneYard, finding that California had not violated PruneYard's First Amendment rights. How it could have done so consistent with *Wooley* has puzzled scholars ever since. Some of the language in *PruneYard* suggested that the mall had no First Amendment right to reject the pamphleteers because there was no risk of the false appearance that the mall was endorsing the pamphleteers' speech. *See, e.g.*, *PruneYard*, 447 U.S. at 87 ("The views expressed by members of the public in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the owner.").

But as one scholar explained, this didn't truly distinguish *Wooley*, because there was no real risk of the false appearance of endorsement in that case either. "[H]ad plaintiff complied with the license plate requirement, it would seem highly unlikely that anyone would have regarded plaintiff's compliance as an expression of plaintiff's views concerning the state motto. . . . [E]veryone else was also required to display similar license plates on their automobiles. Consequently they probably would have paid little or no attention to plaintiff's doing the same." David B. Gaebler, *First Amendment Protection Against Government Compelled Expression and Association*, 23 B.C. L. Rev. 995, 1011–12 (1982).

The Supreme Court has now clarified that indeed, the false appearance of endorsement (or lack thereof) cannot be the determinative factor in a First Amendment challenge. "To be sure, the Court noted in *PruneYard* and *FAIR*, when denying [First Amendment] protection, that there was little prospect of misattribution. . . . But the key fact in those cases . . . was that the host of the third-party speech was not itself engaged in expression." *Moody*, 603 U.S. at 740 (citations omitted).

The district court below took a far-too-narrow view of what it means to be "engaged in expression," and in doing so effectively rejected *Moody*'s narrowing clarification of *PruneYard*. The district court believed "it would be hard to say that [an] algorithm [to maximize engagement] reflects any message from its creator because it would recommend and amplify both favored and disfavored messages alike so long as doing so prompts users to spend longer on social media . . . . To the extent that an algorithm amplifies messages that its creator expressly disagrees with, the idea that the algorithm implements some expressive choice and conveys its creator's message should be met with great skepticism." 1-ER-25 (citation omitted).

The district court apparently thought that a speech compiler is only "engaged in expression" when it selects speech it *agrees* with. That cannot be right; indeed, it is even more extreme than the now-rejected principle that a speech compiler only engages in speech when it selects speech that observers will *think* it agrees with. As

the Supreme Court has now made clear, "major social-media platforms do not lose their First Amendment protection just because no one will wrongly attribute to them the views in an individual post." *Moody*, 603 U.S. at 739. Being "engaged in expression" does not mean simply accepting posts a compiler agrees with and rejecting posts a compiler disagrees with.

Put simply, "expressive activity" "include[es] compiling and curating others' speech[.]" *Id.* at 731. If a mall is only concerned with selling wares and not with controlling what its patrons see and hear, it is not compiling and curating others' speech. *PruneYard* stands for no more than that. If a mall decided to turn its space into not just a venue for shopping but also for speeches, demonstrations, and art exhibitions, it would win a First Amendment challenge to a compulsion to host any speaker it did not wish to. The PruneYard Shopping Center lost its case only because it disclaimed any interest in treating its space as such a venue.

Some cases about malls or multi-purpose venues might raise hard cases, but this is an easy case. Social media sites care about what their users read and view on their websites. They wish to control what their users read and view on their websites. This Court need not delve into *how or why* the websites control what their users read and view. It is enough to trigger First Amendment protection that social media sites do so. To the extent that the district court departed from this reasoning, it should be reversed.

7

## CONCLUSION

For the foregoing reasons, as well as those presented by Plaintiff-Appellant, this Court should reverse the district court's ruling in part.

Respectfully submitted,

Dated: February 6, 2025

/s/ Thomas A. Berry
Thomas A. Berry
  *Counsel of Record*
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, DC 20001
(443) 254-6330
tberry@cato.org

8

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of 9th Cir. R. 29(a)(2) because it contains 1,693 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Times New Roman, 14-point font.

<u>/s/ Thomas A. Berry</u>

February 6, 2025

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.


<u>/s/ Thomas A. Berry</u>

February 6, 2025