No. 25-146

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NETCHOICE, LLC,

PLAINTIFF-APPELLANT,

v.

ROB BONTA, in his official capacity as Attorney General of California,

DEFENDANT-APPELLEE.

On Appeal from the United States District Court
for the Northern District of California, San Jose
Civil Action No. 5:24-cv-07885-EJD
Hon. Edward J. Davila

## BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER
FOUNDATION, FREEDOM TO READ FOUNDATION,
AND LIBRARY FUTURES IN SUPPORT
OF PLAINTIFF-APPELLANT AND REVERSAL

Aaron Mackey
Emma Leeds Armstrong
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: amackey@eff.org
Telephone: (415) 436-9333
Fax: (415) 436-9993
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici

state that they do not have a parent corporation and that no publicly held

corporation owns 10% or more of their stock.

Dated: February 6, 2025                    By:  /s/ *Aaron Mackey*
                                                Aaron Mackey

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES................................................................................iv

STATEMENT OF INTEREST OF AMICI ...................................................1

INTRODUCTION .....................................................................................2

ARGUMENT ............................................................................................4

I.    SB 976 IMPOSES SPEECH BURDENS ON USERS WHO RELY ON
      DIGITAL FORUMS TO ENGAGE IN A DIVERSE ARRAY OF
      EXPRESSION..................................................................................4

      A.    Minors and adults use social media services to disseminate their own
            speech and to access the speech of others on a wide array of topics....4

      B.    Minors have the same First Amendment rights as adults to access the
            protected expression found on social media. ......................................10

II.   SB 976 BURDENS MINORS AND ADULTS' FIRST AMENDMENT
      RIGHTS. .......................................................................................12

      A.    The law burdens minors' expression by making it much more difficult
            to speak to other users and to access those users' speech...................12

      B.    SB 976 also burdens the First Amendment rights of adults and minors
            by requiring age verification that burdens expression, anonymity, and
            privacy............................................................................................18

            1.    Age-verification requirements will either chill or entirely
                  block access to lawful speech. ..................................................19

            2.    Online age-verification schemes impermissibly burden the
                  right to be anonymous online. ..................................................21

            3.    Online age verification puts internet users' sensitive personal
                  data at risk..............................................................................22

III.    BECAUSE SB 976 IMPOSES CONTENT-BASED BURDENS, IT IS
        SUBJECT TO, AND FAILS, STRICT SCRUTINY. ...................................26

CONCLUSION ........................................................................................28

CERTIFICATE OF COMPLIANCE .....................................................29

CERTIFICATE OF SERVICE................................................................30

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Gonzales*,
  478 F. Supp. 2d 775 (E.D. Pa. 2007) ............................................................22, 23

*ACLU v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008)..................................................................................23

*Am. Booksellers Found. v. Dean*,
  342 F.3d 96 (2d Cir. 2003)...................................................................................19

*American Amusement Machine Ass'n. v. Kendrick*,
  244 F.3d 572 (7th Cir. 2001) ...............................................................................12

*Animal Legal Defense Fund v. Wasden*,
  878 F.3d 1184 (9th Cir. 2018) .............................................................................13

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)...............................................................................................19

*Bantam Books v. Sullivan*,
  372 U.S. 58 (1963).................................................................................................17

*Bd. of Educ. v. Pico*,
  457 U.S. 853 (1982)..........................................................................................5, 17

*Brown v. Entertainment Merchs. Ass'n*,
  564 U.S. 786 (2011) ...................................................................................... *passim*

*Carey v. Population Servs. Int'l*,
  431 U.S. 678 (1977)...............................................................................................10

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*,
  447 U.S. 557 (1980)...............................................................................................27

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975)...............................................................................................11

*In re Anonymous Online Speakers*,
  661 F.3d 1168 (9th Cir. 2011) .............................................................................22

*Lamont v. Postmaster Gen. of U. S.*,
  381 U.S. 301 (1965)...............................................................................................5

*Mahanoy Area Sch. Dist. v. B.L. by & through Levy*,
  594 U.S. 180 (2021)...............................................................................................11

*Martin v. City of Struthers*,
  319 U.S. 141 (1943).............................................................5

*McCullen v. Coakley*,
  573 U.S. 464 (2014)...........................................................27

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995)...........................................................22

*NetChoice v. Moody*,
  603 U.S. 707 (2024)...........................................................13

*Packingham v. North Carolina*,
  582 U.S. 98 (2017).........................................................5, 6

*Project Veritas v. Schmidt*,
  125 F.4th 929 (9th Cir. 2025) ............................................13

*PSINet, Inc. v. Chapman*,
  167 F. Supp. 2d 878 (W.D. Va. 2001) ...............................23

*PSINet, Inc. v. Chapman*,
  362 F.3d 227 (4th Cir. 2004) ...............................19, 22, 23

*Red Lion Broad. Co. v. FCC*,
  395 U.S. 367 (1969)............................................................5

*Reno v. ACLU*,
  521 U.S. 844 (1997)................................................ *passim*

*Snyder v. Phelps*,
  562 U.S. 443 (2011)..........................................................10

*Stanley v. Georgia*,
  394 U.S. 557 (1969)............................................................5

*State v. Weidner*,
  235 Wis. 2d 306 (2000) ....................................................22

*U.S. v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000)......................................15, 18, 26, 27

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943)..........................................................11

**Statutes**

18 U.S.C. §§ 2721 *et seq.* ...................................................23

Cal. Health & Safety Code § 27001 .........................12, 18, 24

Cal. Health & Safety Code § 27006 ........................................................19

California SB 976 ............................................................................ *passim*

**Constitutional Provisions**

U.S. Const. amend. I................................................................... *passim*

**Other Authorities**

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed*,'
  BBC (Nov. 28, 2020) ...............................................................9

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive
  Into the Technology of Corporate Surveillance*, EFF (Dec. 2, 2019)..................24

Brooke Auxier, *Social Media Continue to Be Important Political Outlets for
  Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020) ............................................8

Carrie Back, *How Indigenous Creators Are Using TikTok to Share
  Their Cultures*, Travel & Leisure (Oct. 21, 2022) ................................................8

Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*,
  Pew Rsch. Ctr. (Sept. 17, 2024)...............................................................6

Claire Cain Miller, *For One Group of Teenagers, Social Media Seems
  a Clear Net Benefit*, N.Y. Times (May 24, 2023) ...................................9

Common Sense & Hopelab, *A Double-Edged Sword: How Diverse Communities
  of Young People Think About the Multifaceted Relationship Between Social
  Media and Mental Health* 17 (2024) ......................................................6

Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* 12 (May 2015)...........20

Daphne Keller, *Amplification and Its Discontents*, The Knight First Amendment
  Institute at Columbia University (June 8, 2021)...................................14

*Digital Advertising in the United States – Statistics & Facts*, Statista
  (June 18, 2024).................................................................................24

Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times
  (Jul. 25, 2021) .................................................................................7

Ella O'Keeffe, *Very demure: explaining the new phrase that has taken
  the internet by storm*, Vogue (Aug. 15, 2024) .....................................9

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings
  From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023).................7

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of
  Being Sick*, Teen Vogue (Sept. 22, 2022) .............................................8

J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr., (Mar. 1, 2022) ..................9

Jackie Snow, *Why Age Verification Is So Difficult for Websites*, Wall St. J. (Feb. 27, 2022) ........................................................................................21

Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minors*, EFF (Mar. 15, 2024) .........................................7

Jessica Moyer, *Readers' Advisory: The Most Important Class for New Librarians*, American Library Association (last visited Jan. 23, 2025)..................................16

Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. Md. Ctr. for Democracy & Civic Engagement (Jan. 2024) ................19, 20

Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016) ......................................8

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021) ...............................................................................8

Laura Wong, *How to get on the TikTok FYP (For You Page): 20 expert hacks*, Hootsuite (Jan. 10, 2025) ..................................................................10

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013) .........................................................................................21

Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, Univ. Md. Ctr. for Democracy & Civic Engagement (Mar. 2023) ....................................................20

*Number of Internet and Social Media Users Worldwide as of October 2024*, Statista (Nov. 5, 2024) ............................................................................6

Paige Collings, *Debunking the Myth of "Anonymous" Data*, EFF (Nov. 10, 2023) .......................................................................................24

Phil Morehart, *Inked RA: Librarians recommend books based on patron tattoos*, American Libraries Magazine (March 1, 2018) .................................................16

*Position Paper: Online Age Verification and Children's Rights*, European Digital Rights (Oct. 4, 2023)...............................................................................21

Press Release, Identity Theft Res. Ctr., *ITRC 2023 Annual Data Breach Report Reveals Record Number of Compromises; 72 Percent Increase Over Previous High* (Jan. 25, 2024)...............................................................................25

Press Release, Identity Theft Res. Ctr., *ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts* (Aug. 23, 2023) ...................................................................................25

Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers*, Carnegie Mellon CyLab (2011) ...........................................................25

Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023) .......................................7

Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, Health Expectations (Feb. 2017) ..............................................................................22

Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024)................................21

*The Robloxian Christians*, Exponential.....................................................8

Tracy Kitten, *Child Identity Fraud: A Web of Deception and Loss* 5, Javelin (Nov. 2, 2021) ..............................................................................26

Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44 (2018) ..........................9

U.S. Census Bureau, CB24-62, *Quarterly Residential Vacancies and Homeownership, First Quarter 2024* (Apr. 30, 2024).........................20

Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens* 41, Common Sense (2021) .........................................7

## STATEMENT OF INTEREST OF AMICI[1]

The Electronic Frontier Foundation (EFF) is a non-profit civil liberties organization with more than 30,000 active donors that has worked since 1990 to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for them both in courts and legislatures across the country. EFF has challenged laws that burden all internet users' rights by requiring online services to verify their users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F. Supp. 824, 825 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno*, 31 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act).

The Freedom to Read Foundation (FTRF) is a nonprofit organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, including a broad array of authors and viewpoints; establish legal precedent for the freedom to read of all persons; and protect the public against efforts to suppress or censor speech.

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amici certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

Amicus Library Futures, a project of NYU's Engelberg Center on Innovation Law & Policy, is the vanguard nonprofit organization uncovering and confronting the fundamental policy issues that threaten libraries in the digital age. Library Futures believes librarians, policymakers, and community leaders must take an assertive approach to digital rights so they can protect, advocate for, and advance a fair digital future for libraries and the communities they serve. Government bans, attacks, and restrictions on the freedom to read and learn in both physical and digital libraries fundamentally implicate its mandate to advocate for and promote strong digital rights.

## INTRODUCTION

California SB 976 imposes extraordinary burdens on minors and adults' ability to express themselves and to access speech on the most popular digital forums of our time. Social media services provide diverse forums for internet users to create art, connect with loved ones, form political opinions, find community, and much more. Social media has become an essential locus of expression for everyone—both adults and minors—precisely because services are able to sort and organize the billions of pieces of expression posted daily by their users. These sites accomplish this task by organizing and displaying only a tiny fraction of that immense volume of content to their users, making choices about what expression each user will see each time they log on. Many sites tailor the user-generated

2

content each person sees based on their preferences or activities on the service. And users of those services correspondingly tailor their content to ensure that it is picked up by these systems and more broadly seen by other users.

SB 976 disrupts minors' ability to use personalized feeds to disseminate their speech and to receive the speech of others. The statute requires services that offer personalized feeds to impose an age gate and prohibits minors from using those feeds unless their parents consent. California has thus burdened minors' ability to use the online services' expressive activities, which would otherwise enable the minors' to reach new audiences with their own expression, to find new communities, and to access protected expression online. Because SB 976 imposes these burdens on minors' ability to speak and to access users' lawful speech based on the content appearing on social media services, the statute is subject to strict scrutiny. *See Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 799 (2011). The statute cannot survive the exacting scrutiny required by the First Amendment.

The district court was wrong to ignore the speech burdens SB 976 imposes on all social media users. SB 976 burdens the First Amendment rights of minor social media users by blocking their use of primary systems created to distribute their own speech and to hear others' speech via those systems.

The statute also burdens all internet users' First Amendment rights because the age-verification scheme it requires will block some adults and minors from

3

accessing lawful speech in the first place, make it impossible for them to speak anonymously on these services, and increase their risk of privacy invasions. Courts have repeatedly held that placing such burdens on internet users' rights to access lawful speech implicates the First Amendment.

The district court's opinion thus turned traditional First Amendment principles on their head. The First Amendment requires California to justify SB 976's content-based speech burdens under strict scrutiny. The district court, however, faulted internet users for failing to show that they had an affirmative right to receive speech through personalized recommendation systems. Yet the First Amendment guarantees people with the right to express themselves and to receive information free of government prohibitions or burdens.

This Court should reverse to correct the district court's errors and to affirm that states cannot perform an end-run around the First Amendment rights of both minors and adults by regulating the systems that disseminate users' speech.

## ARGUMENT

I. **SB 976 IMPOSES SPEECH BURDENS ON USERS WHO RELY ON DIGITAL FORUMS TO ENGAGE IN A DIVERSE ARRAY OF EXPRESSION.**

A. **Minors and adults use social media services to disseminate their own speech and to access the speech of others on a wide array of topics.**

The internet plays a dominant role in the exercise of First Amendment rights

today, and social media services are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Internet users of all ages rely on social media "to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)).

The social nature of the medium furthers the First Amendment's expressive goals by allowing users to speak and to hear from others simultaneously. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. This is in part why the First Amendment protects the right to access others' speech, as the "right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality).[2]

---

[2] Supreme Court precedent before and after *Pico* has consistently affirmed that the First Amendment protects the right to receive information and ideas. *See, e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (right to receive literature); *Lamont v. Postmaster Gen. of U. S.*, 381 U.S. 301, 307-308 (1965) (right to receive mail); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("This right to receive information and ideas . . . is fundamental to our free society."); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) (emphasizing "right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and

The internet—and social media in particular—has flourished into an important hub of diverse expressive activity. An estimated 5.22 billion people use social media for everything from political expression, engaging with elected representatives, learning new dances, and finding community.[3]

For instance, 80 percent of Black young people, 69 percent of Latino young people, and 65 percent of white young people rely on social media to stay informed.[4] And 54 percent of American adults sometimes get their news from social media.[5]

Nearly half of American social media users say they have been politically active on social media, whether by participating in a political group, encouraging others to act on a certain issue, looking up information about rallies or protests, or

---

experiences"); *Packingham*, 582 U.S. 98, 107-108 (holding that social media prohibition violated the First Amendment right of internet users to "gain access to information and communicate with one another").

[3] *Number of Internet and Social Media Users Worldwide as of October 2024*, Statista (Nov. 5, 2024), https://www.statista.com/statistics/617136/digital-population-worldwide/.

[4] Common Sense & Hopelab, *A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* 17 (2024), https://www.commonsensemedia.org/sites/default/files/research/report/2024-double-edged-sword-hopelab-report_final-release-for-web-v2.pdf.

[5] Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sept. 17, 2024), https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

posting pictures or using hashtags to show support for a cause.[6]

The internet is also a prime forum for artistic creation. In one study, 71 percent of teens reported that social media makes them feel "like they have a place where they can show their creative side."[7] Young people routinely create and share their art and music on social media.[8] Minors and young adults also report that the internet helps them learn about art and music history, and affords them opportunities to distribute their own creative works.[9]

Social media is also a vital source of religious and spiritual community and information for young people.[10] One young person created an online church, "The Robloxian Christians," as a place for kids on the Roblox gaming platform to pray

---

[6] Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://www.pewresearch.org/internet/2023/06/29/americans-views-of-and-experiences-with-activism-on-social-media/.

[7] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys/.

[8] Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens* 41, Common Sense (2021), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

[9] Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minors*, EFF (Mar. 15, 2024), https://www.eff.org/deeplinks/2024/03/thousands-young-people-told-us-why-kids-online-safety-act-will-be-harmful-minors#art.

[10] *See* Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (Jul. 25, 2021), https://www.nytimes.com/2021/07/25/us/facebook-church.html.

for one another and to talk about their faith.[11] Since 2011, it has expanded into a

"youth-led virtual church ministry serving upwards of 40,000 young people from

over 85 countries."[12]

Social media enables individuals whose voices would otherwise not be heard

to make vital and even lifesaving connections with one another, and to share their

unique perspectives more widely.[13] For example, people with disabilities have used

social media to build community, reduce isolation and stigma, and educate

others.[14] Survivors of abuse, especially women and children who have survived

domestic violence, rely on the accessibility and anonymity of online communities

---

[11] Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016), https://faithandleadership.com/teens-online-church-draws-young-people-around-the-world.

[12] *The Robloxian Christians*, Exponential, https://exponential.org/the-robloxian-christians.

[13] *See, e.g.*, Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://www.pewresearch.org/short-reads/2020/12/11/social-media-continue-to-be-important-political-outlets-for-black-americans; Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022), https://www.travelandleisure.com/culture-design/how-indigenous-creators-use-tiktok-to-share-their-cultures.

[14] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://www.teenvogue.com/story/chronic-illness-influencers-on-tiktok-are-showing-the-reality-of-being-sick; Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://www.theverge.com/22583848/disabled-teen-cripple-punk-media-representation.

to seek advice and resources to help them cope.[15] And many young LGBTQ+ people who face discrimination and judgment offline turn to social media for community, exploration, and support.[16]

Finally, many social media users desiring to find audiences for their speech, including for much of the content described above, have a reciprocal relationship with the platforms' recommendation systems. Users often tailor their speech, or they tag their speech in various ways, to increase the likelihood that it will be picked up by the service's recommendation system and seen by other users.[17] Savvy users have intricate knowledge of how they can use these recommendation systems, and online guides provide insights for users to better distribute their

---

[15] Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44, 44–45 (2018), https://www.crimejusticejournal.com/article/view/893; *see also, e.g.*, J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr., (Mar. 1, 2022), https://www.nsvrc.org/blogs/online-communities-survivors-websites-and-resources-offering-support-and-help1.

[16] *See* Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://www.nytimes.com/2023/05/24/upshot/social-media-lgbtq-benefits.html; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed*,' BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954.

[17] *See, e.g.*, Ella O'Keeffe, *Very demure: explaining the new phrase that has taken the internet by storm*, Vogue (Aug. 15, 2024), https://www.vogue.com.au/culture/demure-tiktok/news-story/f8417f82b723c82cf114f1cde43c2033.

9

speech.[18]

> **B.** **Minors have the same First Amendment rights as adults to access the protected expression found on social media.**

Minors and adults alike enjoy the First Amendment right to access and engage in protected speech on social media. The speech occurring on social media is overwhelmingly, if not wholly, protected speech as to both minors and adults. As the foregoing examples demonstrate, there is an abundance of socially valuable speech on social media and the internet more broadly. But online speech and access to it is protected even if its social value is not obvious.

Even speech which may be considered offensive to some nonetheless remains constitutionally protected as to minors just as it is to adults. This is because protected "speech cannot be restricted simply because it is upsetting or arouses contempt." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *see Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977); *Reno*, 521 U.S. at 874–75. And First Amendment principles apply to new forms of communication regardless of their esthetic and moral value. *See Brown*, 564 U.S. at 790.

The Supreme Court has been explicit that, save for specific content and contexts not relevant to SB 976, bedrock First Amendment principles apply to minors "[e]ven where the protection of children is the object." *Id*. at 804–05

---

[18] Laura Wong, *How to get on the TikTok FYP (For You Page): 20 expert hacks*, Hootsuite (Jan. 10, 2025), http://blog.hootsuite.com/tiktok-for-you-page/.

10

(invalidating regulation of violent video games for minors); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975) (invalidating restriction on drive-in movies designed to protect children from nudity); *Reno*, 521 U.S. at 874 (invalidating statute prohibiting indecent communications available to minors online). And they apply not only to what children can hear, but also to what they can say. *See Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 594 U.S. 180, 187 (2021). Although parents can restrict their children's access to lawful speech, and distributors can decide that they will not provide certain speech to minors without parental consent, the First Amendment prevents the government from establishing such restrictive defaults. *See Brown*, 564 U.S. at 803–04.

The fact that speakers are young provides no basis for California to diminish their First Amendment rights. Instead, minors' age augurs in favor of "scrupulous protection of [their] Constitutional freedoms . . . , if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Even when children are involved, "we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization." *Id.* at 641. This serves important democratic ends: "To shield children right up to the age of 18 from exposure to violent descriptions and images would not only be quixotic, but

11

deforming; it would leave them unequipped to cope with the world as we know it."

*American Amusement Machine Ass'n. v. Kendrick*, 244 F.3d 572, 577 (7th Cir.

2001).

## II. SB 976 BURDENS MINORS AND ADULTS' FIRST AMENDMENT RIGHTS.

### A. The law burdens minors' expression by making it much more difficult to speak to other users and to access those users' speech.

SB 976 burdens social media users' ability to effectively speak to other users

and to access the speech of those from whom they wish to hear. The statute

prohibits social media companies from providing to minors what it deems

"addictive feeds" without first obtaining their parent's permission. Cal. Health &

Safety Code § 27001. The statute defines addictive feeds as the process by which

"multiple pieces of media generated or shared by users are, either concurrently or

sequentially, recommended, selected, or prioritized for display to a user based, in

whole or in part, on information provided by the user, or otherwise associated with

the user or the user's device." § 2700.5(a). The personalized feeds targeted by SB

976 are inherently expressive, because they (1) reflect the choices made by

platforms to organize content on their services, (2) incorporate and respond to the

expression users create to distribute users' speech, and (3) provide users with the

means to access speech in a digestible and organized way.

The Supreme Court recognized that social media services' assembly of user-

generated content into a centralized feed is the linchpin to distributing and accessing user-generated speech on these services. "The key to the scheme is prioritization of content, achieved through the use of algorithms." *NetChoice v. Moody*, 603 U.S. 707, 734 (2024). "Of the billions of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list, only the tiniest fraction do." *Id*. Thus, personalized recommendation systems both shape and disseminate the speech that occurs on social media. As this Court recently instructed, the "speech-creation process," can itself be expressive when it involves, for example, "decisions about content, composition, lighting, volume, and angles, among others" or when a speaker intends to disseminate a message on matters of public concern. *Project Veritas v. Schmidt*, 125 F.4th 929, 945 (9th Cir. 2025) (en banc) (quoting *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018)). By that measure, the creation of the personalized feed is expressive. SB 976 thus targets expressive activity by these services.

Users' ability to have their speech seen by others and to correspondingly access the speech of those they desire to hear from is directly advanced by the social media services' organization and curation of that ocean of expressive activity. As Section I above illustrates, the feeds social media services use to disseminate and then curate users' expression has enabled those users to create,

13

organize, build community, explore religion, and much more. These systems "help users discover new content, goods, artists, activities, and ideas."[19] The benefits of these systems flow to speakers and listeners—as said above, many users explicitly create content they hope will be picked up by the recommendation systems and distributed to other users. Recommendation systems thus provide a mechanism by which any social media user can "become a town crier with a voice that resonates farther than it could from any soapbox." *Reno*, 521 U.S. at 870.

SB 976 prohibits minors from using the central organization and curation system that social media users rely upon to effectively speak and access speech on these sites. California's law burdens minors' First Amendment rights by denying them the ability to differentiate their speech from that of the billions of other social media users, much less to easily find speech by others.

The district court disagreed, holding that SB 976 did not implicate the First Amendment rights of social media services or their users. ER-027. The court reasoned further that minor users enjoyed no First Amendment right to easily and quickly access others' speech. *Id*. Both assertions were incorrect.

Laws that restrict or burden communications between speakers and willing listeners implicate the First Amendment rights of both. *U.S. v. Playboy*

---

[19] Daphne Keller, *Amplification and Its Discontents*, The Knight First Amendment Institute at Columbia University (June 8, 2021) https://knightcolumbia.org/content/amplification-and-its-discontents.

*Entertainment Group, Inc.*, 529 U.S. 803, 812 (2000). In *Playboy*, a federal law did not prohibit speech, but instead made it more difficult to access adult-oriented content on cable networks by requiring providers to scramble those channels' signals or to air the programming at specific times in the late evenings. *Id.* at 806-08. SB 976 similarly makes it more technically and practically difficult for speakers to find their audiences and for listeners to hear from speakers.

The district court sought to avoid SB 976's intrusion on users' First Amendment rights by divorcing the technical means of social media service's content delivery systems from the users' speech itself, on the theory that such speech remains available for minor users should they actively seek it out. ER-027. But *Playboy* demonstrates the error of that reasoning. Although the federal law at issue did not remove any speech or limit willing viewers' ability to take steps to access the content, the Supreme Court faulted the law's technical requirements because they were aimed at burdening the delivery and reception of that speech. *Playboy*, 529 U.S. at 812. The same is true of SB 976.

The argument that SB 976 does not implicate the expressive rights of social media users is belied by how analogous laws would burden First Amendment rights in non-digital contexts. Librarians make personalized recommendations to individual readers about what books they might enjoy, known as Readers'

15

Advisory.[20] The recommendations can be based on the patron's past reading habits, their tastes in particular genres, and other personal information, such as what tattoos they have.[21] A Readers' Advisory is thus similar in function to the social media services' personalized content recommendation systems regulated by SB 976: both seek to connect people with content that they might enjoy.

If California enacted a law that prohibited librarians from providing personalized recommendations to minors absent their parents' consent, the First Amendment burdens imposed on minor patrons would be readily apparent. Librarians make recommendations to their minor patrons based on their knowledge of both (1) the contents of their library, developed in response to their community's needs, and (2) their patrons' reading interests. A law barring librarians from recommending materials to minors would burden those patrons' First Amendment rights in at least two respects. First, it would prevent minor patrons from receiving the librarians' recommendations about books and other materials they might enjoy. Second, the law would place a legal obstacle between minor patrons and their ability to find protected speech that they desire to read. SB

---

[20] Jessica Moyer, *Readers' Advisory: The Most Important Class for New Librarians*, American Library Association (last visited Jan. 23, 2025) https://www.ala.org/nmrt/news/footnotes/november2006ab/readersadvisorymostim p06.

[21] Phil Morehart, *Inked RA: Librarians recommend books based on patron tattoos*, American Libraries Magazine (March 1, 2018), https://americanlibrariesmagazine.org/2018/03/01/inked-readers-advisory/.

976 creates the same speech burdens for minors using social media.

It is no answer to the burdens imposed on patrons' First Amendment rights to assert, as the district court did here, that nothing would prevent minor library patrons from scouring through the library's stacks or querying the library's catalog to find books on their own. ER-027.

That minor library patrons do not have an affirmative right to enjoy easier methods of finding books via a librarian's recommendation is beside the point. The First Amendment restricts the government's ability to indirectly limit the distribution of lawful speech. *See Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963) (holding that informal censorship that limits the distribution of speech by third parties is just as offensive to the First Amendment as direct speech restrictions). The First Amendment also protects minor patrons' rights to receive the recommendation from librarians and access the materials recommended to them. *See Pico*, 457 U.S. at 867 (prohibiting a school board from removing books from a school library based on disagreement with the ideas expressed in the books) (plurality).

Library patrons' rights to receive recommendations regarding books they might like serves both constitutional and practical ends. A library patron may never search for, much less find, a particular book if they do not know its title or author, much less its existence. The same is true on social media, though exponentially

17

more difficult given the vast amount of content created each day.

Finally, the assertion that minor library patrons or social media users must demonstrate an affirmative legal right to obtain such recommendations gets the First Amendment analysis backwards. It is the government that must justify its burdens on people's free exercise of their First Amendment rights. *Playboy*, 529 U.S. at 816. California must justify its intrusion into minors' First Amendment rights via SB 976, rather than minors demonstrating that they have a right to receive speech as they have previously.

**B.    SB 976 also burdens the First Amendment rights of adults and minors by requiring age verification that burdens expression, anonymity, and privacy.**

SB 976 also implicates the First Amendment rights of all social media users—minors and adults alike—because it requires the services to impose age-verification gates on their services. By 2027, SB 976 prohibits offering a personalized newsfeed to anyone they have reasonably determined is a minor unless the service obtains verifiable parental consent. Health and Safety Code § 27001(a)(1)(B). This provision requires social media services to verify which of their users are adults or minors in the first instance and then block minor users' access to personalized feeds absent their parents' permission. The law will thus result in an age-verification gate that all social media users must pass through. Imposing age-verification mandates before accessing protected speech implicates

the First Amendment rights of all internet users in several respects. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004).

> **1.    Age-verification requirements will either chill or entirely block access to lawful speech.**

The method of age-verification required by SB 976 is left to future rulemaking by the California Attorney General. Health & Safety Code § 27006(b). Should future regulations require verification via government-issued identification or similar means, it will "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of identification, *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004), and it will discourage even those users who have the requisite identification from accessing social media. *Reno*, 521 U.S. at 856; *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (invalidating age-verification requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites").

About 15 million adult U.S. citizens do not have a driver's license, while about 2.6 million do not have any form of government-issued photo ID.[22]

---

[22] Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2, Univ. Md. Ctr. for Democracy & Civic Engagement (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf.

Estimates show over 34.5 million adult citizens have neither a driver's license nor a state ID card with their current name or address.[23]

Non-ID-based methods that have been suggested or implemented elsewhere also exclude many internet users. Age verification based on public or private transactional data will exclude many adults. For example, a service relying on mortgage documents would exclude the nearly 35 percent of Americans who do not own a home.[24] Should credit data be used, 26 million Americans—including over 80 percent of 18- and 19-year-olds—are "credit invisible," meaning they do not have a credit record for age-verifying vendors to check.[25]

Should social media services be permitted to use data brokers and commercial services to verify their users' ages, similar problems would arise.

---

[23] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* 3, 5, Univ. Md. Ctr. for Democracy & Civic Engagement (Mar. 2023), https://www.voteriders.org/wp-content/uploads/2023/04/CDCE_VoteRiders_ANES2020Report_Spring2023.pdf ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

[24] *See* U.S. Census Bureau, CB24-62, *Quarterly Residential Vacancies and Homeownership, First Quarter 2024* 5 (Apr. 30, 2024), https://www.census.gov/housing/hvs/files/currenthvspress.pdf.

[25] Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* 12 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

These entities purchase and collect massive amounts of private data.[26] But the data often contains inaccurate or outdated information, resulting in errors that could mistakenly block adults from accessing social media.[27]

### 2. Online age-verification schemes impermissibly burden the right to be anonymous online.

Regardless of the method used, the age verification required by SB 976 would still impermissibly deter users from accessing lawful content by undermining anonymity on social media. *See Am. Booksellers Found.*, 342 F.3d at 99 (age-verification schemes "require that website visitors forgo the anonymity otherwise available on the internet"). A reported 86 percent of internet users have taken steps online to minimize their digital footprints, and 55 percent have done so to "avoid observation by specific people, organizations, or the government."[28]

Anonymity is a respected, historic tradition that is "an aspect of the freedom of speech protected by the First Amendment"—no matter whether its use is

---

[26] *See Position Paper: Online Age Verification and Children's Rights* 16-17, European Digital Rights (Oct. 4, 2023), https://edri.org/wp-content/uploads/2023/10/Online-age-verification-and-childrens-rights-EDRi-position-paper.pdf; Jackie Snow, *Why Age Verification Is So Difficult for Websites*, Wall St. J. (Feb. 27, 2022), https://www.wsj.com/articles/why-age-verification-is-difficult-for-websites-11645829728.

[27] Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024), https://therecord.media/junk-inferences-data-brokers.

[28] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://www.pewresearch.org/internet/2013/09/05/anonymity-privacy-and-security-online/.

"motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

Not surprisingly, without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236; *see also Reno*, 521 U.S. at 856. The absence of anonymity will chill users' ability to engage in dissent, discuss "sensitive, personal, controversial, or stigmatized content," or seek help from online support communities.[29] *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also State v. Weidner*, 235 Wis. 2d 306, 320 (2000) (age verification "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity").

### 3. Online age verification puts internet users' sensitive personal data at risk.

Even when users are comfortable with foregoing their anonymity, legitimate

---

[29] *See, e.g.*, Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, Health Expectations (Feb. 2017), https://pubmed.ncbi.nlm.nih.gov/26725547/.

privacy and security concerns may dissuade them from accessing social media. "Requiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and . . . afraid of fraud and identity theft[.]" *Gonzales*, 478 F. Supp. 2d at 806; *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), aff'd, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access their [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide.").

The personal data that platforms may be required to collect to verify users' ages is extremely sensitive and often immutable.[30] Whereas usernames, passwords, and even credit card information can easily be changed in the event of identity theft or data breach, users' biometric information and any personal information contained in a government-issued ID (such as date of birth, name, and home address) are much more permanent.

Although California enacted SB 976 out of legitimate concern for children's wellbeing, the law's online age-verification regime will make children and adults less safe given the realities of the online advertising industry and data insecurity.

---

[30] *See, e.g.*, Driver Privacy Protection Act, 18 U.S.C. §§ 2721 *et seq.*

All online data, including the sensitive personal data platforms would need to collect from all users to verify age under SB 976, is transmitted through a host of intermediaries. This means that when a user shares identifying information with a website to verify their age, that data can be transmitted beyond the site, including to age-verification vendors and a series of additional parties.[31] Moreover, almost all websites and services host a network of dozens of private, third-party trackers managed by data brokers, advertisers, and other companies that are constantly collecting data about a user's browsing activity.[32] Because personal information collected online sells for astonishing profits,[33] online actors are incentivized to collect as much data as possible.[34]

SB 976 prohibits the social media service from using personal information collected to verify users' ages for any other purpose and requires the services to delete that information. Health & Safety Code § 27001(b). This provision, however, does not limit the many third parties described above from collecting,

---

[31] *See* Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, EFF (Dec. 2, 2019), https://www.eff.org/wp/behind-the-one-way-mirror.

[32] *Id.*

[33] *See Digital Advertising in the United States – Statistics & Facts*, Statista (June 18, 2024), https://www.statista.com/topics/1176/online-advertising/#topicOverview (the U.S. digital advertising market boasted "a revenue of over 270 billion dollars in 2023").

[34] *See* Paige Collings, *Debunking the Myth of "Anonymous" Data*, EFF (Nov. 10, 2023), https://www.eff.org/deeplinks/2023/11/debunking-myth-anonymous-data.

24

selling, or otherwise disclosing the data should they obtain it. And once those entities collect users' personal information, they are likely to disclose it more broadly.

At minimum, the data will present a potential target for data thieves. Today, data breaches are an endemic and ever-increasing part of life. A record 3,205 data breaches occurred in 2023, up 78 percent from the year prior, and far exceeding the previous record of 1,860 breaches in 2021.[35] Over 350 million people—more than the entire population of the United States—have been affected by these breaches, and 69 percent of general consumers have been victims of an identity crime more than once.[36]

Children are attractive targets for identity theft due to their "uniquely valuable" unused Social Security numbers.[37] A 2021 study found that one in 50

---

[35] Press Release, Identity Theft Res. Ctr., *ITRC 2023 Annual Data Breach Report Reveals Record Number of Compromises; 72 Percent Increase Over Previous High* (Jan. 25, 2024), https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high.

[36] *Id.*; *see also* Press Release, Identity Theft Res. Ctr., *ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts* (Aug. 23, 2023), https://www.idtheftcenter.org/post/2023-consumer-impact-report-record-high-number-itrc-victims-suicidal-thoughts/.

[37] Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* 3, Carnegie Mellon CyLab (2011), https://www.akleg.gov/basis/get_documents.asp?session=29&docid=40175 ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

25

U.S. children were victims of identity fraud, and one in 45 children had personal information exposed in a data breach.[38]

## III. BECAUSE SB 976 IMPOSES CONTENT-BASED BURDENS, IT IS SUBJECT TO, AND FAILS, STRICT SCRUTINY.

The foregoing demonstrates that SB 976's ban on minors' use of personalized social media feeds burdens the First Amendment rights of both minors and adults to speak and access content on social media. The district court committed legal error in holding otherwise, and its refusal to acknowledge the speech implications of the law created a backdoor to the First Amendment's protections, enabling states to suppress speech so long as they target how people speak and access others' speech. This Court should shut that door by confirming that SB 976 is subjected to strict scrutiny under the First Amendment. SB 976 cannot survive strict scrutiny.

SB 976 is subject to strict scrutiny because it imposes content-based burdens on social media users' ability to speak and access speech. SB 976 burdens all content appearing on the social media services regulated by the statute, the vast majority of which is lawful speech. "It is of no moment that the statute does not impose a complete prohibition" on access to social media by minors. *Playboy*, 529

---

[38] Tracy Kitten, *Child Identity Fraud: A Web of Deception and Loss* 5, Javelin (Nov. 2, 2021), https://www.javelinstrategy.com/research/child-identity-fraud-web-deception-and-loss.

26

U.S. at 812. "The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Id*.

Satisfying strict scrutiny requires California to identify a compelling interest and to show that the restriction is narrowly tailored to advance that interest. *Brown*, 564 U.S. at 799. Narrow tailoring under strict scrutiny requires that the law directly advance the government interest, that it can be neither overinclusive nor underinclusive, and that it is the least speech-restrictive means to advance the interest. *Playboy*, 529 at 813. SB 976 cannot satisfy strict scrutiny for all the reasons Plaintiff-Appellant NetChoice describes. Appellant Opening Brief 35-39.

SB 976 cannot be viewed as content-neutral law, for all the reasons above. Even if this Court were to apply intermediate scrutiny, the law would fail it. To satisfy intermediate scrutiny, a speech restraint must "directly advance" and be "narrowly drawn" to a "substantial interest." *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 564–65 (1980). Under narrow tailoring in intermediate scrutiny, the speech restriction "must not burden substantially more speech than is necessary to further the government's legitimate interests," though it "need not be the least restrictive or least intrusive means of serving the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (internal quotations omitted).

27

SB 976 burdens substantially more speech than is necessary because it frustrates minors' ability to use social media in the same way that everyone relies upon to speak and access others' speech. Additionally, the statute is "wildly underinclusive when judged against its asserted justification." *Brown*, 564 U.S. at 802. SB 976 still permits all minors to join social media, even as the state's interest is grounded in its view that social media use leads to "negative mental health outcomes." SB 976, § 1(e). Such vast under inclusiveness "is alone enough to defeat" the law. *Brown*, 564 U.S. at 802.

## CONCLUSION

For the reasons stated above, this Court should reverse the district court and enjoin California from enforcing SB 976.

Dated: February 6, 2025                    By:  /s/ *Aaron Mackey*
                                               Aaron Mackey

                                               Emma Leeds Armstrong
                                               ELECTRONIC FRONTIER
                                               FOUNDATION
                                               815 Eddy Street
                                               San Francisco, CA 94109
                                               Telephone:  (415) 436-9333
                                               Fax:  (415) 436-9993
                                               amackey@eff.org

                                               *Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1.      This Brief of Amici Curiae Electronic Frontier Foundation, Freedom to Read Foundation, and Library Futures in Support of Plaintiff-Appellant and Reversal complies with the type-volume limitation of Fed. R. App. P. 32(a)(5) because this brief contains 6,404 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated:  February 6, 2025                      By:  /s/ *Aaron Mackey*
                                                     Aaron Mackey

                                                     *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on February 6, 2025.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

Dated:  February 6, 2025            By:  /s/ *Aaron Mackey*
                                        Aaron Mackey

                                    *Counsel for Amici Curiae*