No. 25-146

# In The United States Court of Appeals for the Ninth Circuit

NETCHOICE, LLC,

*Plaintiff-Appellant,*

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern District of California
Civil Action No. 5:24-cv-07885-EJD (Hon. Edward J. Davila)

## BRIEF OF CHAMBER OF PROGRESS, LGBT TECH, AND THE WOODHULL FREEDOM FOUNDATION AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

Kerry Maeve Sheehan
Legal Advocacy Counsel
CHAMBER OF PROGRESS
1390 Chain Bridge Road #A108
McLean, VA 22101

Carlos Gutierrez
Deputy Director & General Counsel
LGBT TECH
123 W. Frederick Street #214
Staunton, VA 24401

*Counsel for LGBT Tech*

Mark W. Brennan
J. Ryan Thompson
Erin Mizraki
Thomas B. Veitch
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-6409
mark.brennan@hoganlovells.com

*Counsel for Chamber of Progress*

Lawrence Walters
WALTERS LAW GROUP
195 W. Pine Avenue
Longwood, FL 32750

*Counsel for Woodhull Freedom Foundation*

February 6, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record states that, as nonprofit entities organized under § 501(c)(6) of the Internal Revenue Code, amici curiae Chamber of Progress, LGBT Tech, and the Woodhull Freedom Foundation have issued no stock. Consequently, no parent corporation nor any publicly held corporation could or does own 10% or more of their stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF AUTHORITIES ........................................................... iii

STATEMENT PURSUANT TO FED. R. APP. P. 29(A)(4)(E) ............................. viii

AMICI'S IDENTITIES, INTERESTS, AND AUTHORITY TO FILE
    THIS BRIEF ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................... 3

ARGUMENT ..................................................................... 6

I.    Social media platforms use algorithms to curate content,
    enabling young people to find community and engage with
    information of interest amid the deluge of online content ...................... 6

II.   By impeding access to online speech, SB 976 violates the First
    Amendment rights of young people and adult users while
    disproportionately harming vulnerable communities ...................... 12

    A.    SB 976's parental consent provisions violate the First
        Amendment and endanger vulnerable youth ...................... 12

    B.    The law's age-gating measures unconstitutionally force a
        choice between privacy and speech ...................... 17

III.  SB 976 violates basic First Amendment principles of editorial
    discretion ...................... 21

    A.    SB 976 would impede platforms' curatorial freedom,
        inhibiting the Internet's vibrancy and harming
        marginalized youth ...................... 21

    B.    The district court erred in its assessment of the expressive
        nature of personalized feeds ...................... 26

CONCLUSION ...................... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*ACLU v. Mukasey*,
   534 F.3d 181 (3d Cir. 2008) ..................................................17

*Am. Booksellers Found. v. Dean*,
   342 F.3d 96 (2d Cir. 2003) ....................................................17

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982)...............................................................12

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011)...............................................................12

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995)...............................................23, 26, 27

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024)...............................................3, 6, 8, 22

*NetChoice, LLC v. Griffin*,
   No. 5:23-CV-05105, 2023 WL 5660155
   (W.D. Ark. Aug. 31, 2023) ....................................................17

*NetChoice, LLC v. Reyes*,
   No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626
   (D. Utah Sept. 10, 2024) .........................................................8

*Packingham v. North Carolina*,
   582 U.S. 98 (2017)....................................................................3, 6

*Reno v. ACLU*,
   521 U.S. 844 (1997).....................................................................3

*Stanley v. Georgia*,
   394 U.S. 557 (1969)...................................................................12

**STATUTES**

Cal. Health & Safety Code § 27001 ..........................................4

Cal. Health & Safety Code § 27002 ..........................................4

iii

## TABLE OF AUTHORITIES–Continued

Page(s)

Cal. Health & Safety Code § 27005(a) ...................................................21

**OTHER AUTHORITIES:**

*2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People*, TREVOR PROJECT (last visited Feb. 4, 2025) ...........................................14

*A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health,* COMMON SENSE (May 21, 2024) ...........................................9

Aaron Drapkin, *Data Breaches That Have Happened in 2022, 2023, 2024, and 2025 So Far*, TECH.CO (Jan. 29, 2025) ................................19

*Adult LGBTQ+ Role Models in the Lives of LGBTQ+ Young People*, TREVOR PROJECT (May 15, 2024) ........................................................24

Aida E. Manduley et al., *The role of social media in sex education: Dispatches from queer, trans, and racialized communities*, 28 FEMINISM & PSYCH. 309 (2018) .......................................................14

Alexa Hiebert & Kathy Kortes-Miller, *Finding home in online community: exploring TikTok as a support for gender and sexual minority youth throughout COVID-19*, 20 J. LGBT YOUTH 800 (2021) ............................................................ 6

Alvin Thomas et al., *Taking the good with the bad?: Social Media and Online Racial Discrimination Influences on Psychological and Academic Functioning in Black and Hispanic Youth*, 52(2) J. YOUTH & ADOLESCENCE 245 (2023) .......................................5

Anti-Defamation League, *Online Hate and Harassment Survey (2022)*.................21

Asaka Park, *I'm a Disabled Teenager and Social Media is My Lifeline*, N.Y. TIMES (June 5, 2019) ...................................................25

Ashley Austin, et al., *It's My Safe Space: The Life-Saving Role of the Internet in the Lives of Transgender and Gender Diverse Youth*, 21 INT'L J. TRANSGENDER HEALTH 33 (2020) ......................................4

Drew Harwell, *The 'feral 25-year-olds' making Kamala Harris go viral on TikTok*, WASH. POST (Sept. 13, 2024) ....................................6

iv

## TABLE OF AUTHORITIES–Continued

Page(s)

Ellen Sirull, *Do You Know How to Protect Your Child from Identity Theft?*, EXPERIAN (Jan. 8, 2018) ............................................................20

Eric Goldman, *The Plan to Blow Up the Internet, Ostensibly to Protect Kids Online*, CAPITOL WKLY. (Aug. 18, 2022).....................................20

Gay, Lesbian & Straight Education Network, *Out Online: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth on the Internet* (2013) ............................................................................14

Gideon Uchechukwu Nwafor & Frank Obidike Nnaemeka, *Influence of TikTok as an Edutainment Platform on Female Students' Awareness and Use of Contraceptives*, J. ADVANCED RSCH. & MULTIDISCIPLINARY STUD. (Dec. 28, 2023) ..................................................6

Human Rights Campaign Foundation, *2023 LGBTQ+ Youth Report* (Aug. 2023) ..........................................................................................4

J. Maya Hernandez & Linda Charmaraman, *Research on teen social media use has a racial bias problem*, FAST COMPANY (Feb. 22, 2023) ................................................................................5

Jay Aslam et al., *Challenges in Information Retrieval and Language Modeling* (James Allan & Bruce Croft eds., 2002) ...........................................10

Jody L. Herman et al., *The Potential Impact of Voter Identification Laws on Transgender Voters in the 2024 General Election*, UCLA WILLIAMS INST. (Sept. 2024) ...........................................................16

Kiara Alfonseca & Kat Filardi, *Indigenous TikTokers use social media to honor their cultures*, ABC News (Oct. 12, 2021) .........................................25

Laura Ceci, *Hours of video uploaded to YouTube every minute as of February 2022*, YOUTUBE (Apr. 11, 2024) .........................................10

*LGBTQ+ Young People are More Likely to Experience Homelessness*, COVENANT HOUSE (last visited Feb. 4, 2025)......................................14

Monica Anderson et al., *Connection, Creativity and Drama: Teen Life on Social Media in 2022*, PEW RSCH. CTR. (Nov. 16, 2022)................................7

**TABLE OF AUTHORITIES–Continued**

Page(s)

Monika R. Henzinger et al., *Challenges in Web Search Engines*,
36 Special Int. Grp. on Info. Retrieval F. 11 (2002) .........................................10

Noelle M. Hurd et al., *Negative Adult Influences and the Protective
Effects of Role Models: A Study with Urban Adolescents*,
38 J. Youth & Adolescence 777 (2009)..............................................................24

*r/whales*, Reddit.com, https://www.reddit.com/r/whales/?rdt=34734
(last visited Jan. 29, 2025) ...................................................................................9

*Re: SB 976 – "Protecting our Kids from Social Media Addiction Act"*,
Chamber Progress (June 26, 2024)......................................................................11

Ryan McGrady, *What We Discovered on 'Deep YouTube'*,
THE ATLANTIC (Jan. 26, 2024)............................................................................10

Saida Mamedova & Emily Pawlowski, *A Description of U.S. Adults
Who Are Not Digitally Literate*, U.S. Dep't of Educ. (May 2018)....................15

Sara Reardon, *Social media helps Native Americans preserve cultural
traditions during pandemic*, CNN (Feb. 9, 2021) .............................................25

Sarah Forland, et al., *Age Verification: The Complicated Effort to
Protect Youth Online*, NEW AMERICA (Apr. 23, 2024)......................................18

Shae Gardner, *A Safer Digital Future: Recognizing NTIA's Efforts &
LGBTQ+ Youth Considerations*, LGBT TECH (Aug. 6, 2024)............................7

Shoshana Weissmann, et al., *25 percent of kids will face identity theft
before turning 18. Age-verification laws will make this worse*,
R. STREET. INST. (July 25, 2024)..........................................................................19

Shoshana Weissmann, *If platforms are required to have your
government IDs and face scans, hackers and enemy governments
can access them too*, R STREET INST. (May 22, 2023).......................................18

Shoshana Weissmann, *Social Media Was Useful For Me, As An Ill,
Nerdy Teenager*, TECHDIRT (June 28, 2023) .....................................................25

Shoshana Weissmann, *The technology to verify your age without
violating your privacy does not exist*, R STREET INST.
(May 16, 2023)....................................................................................................18

**TABLE OF AUTHORITIES–Continued**

Page(s)

Steve Weisman, *The Unknown Danger Of Child Identity Theft*,
 Forbes (Sept. 20, 2024) ....................................................................20

Tate LeBlanc & Aerika Loyd, *Freedom dreaming to STEM: A
 conceptual model for Black youth's racial and STEM identity
 development through social media*, 13 Frontiers Psych. 1 (2022) ..................5

**STATEMENT PURSUANT TO FED. R. APP. P. 29(A)(4)(E)[1]**

No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

---

[1] All parties have consented to amici filing this amicus brief. See Fed. R. App. P. 29(a); Circuit Advisory Committee Note to Rule 29-3.

## AMICI'S IDENTITIES, INTERESTS, AND AUTHORITY
## TO FILE THIS BRIEF

Amici are nonprofit organizations committed to promoting a society in which all people benefit from technology and interconnectivity and all people enjoy the speech opportunities available through a safe, open, and equitable Internet.

**Chamber of Progress** is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users. In keeping with that mission, Chamber of Progress believes that allowing a diverse range of websites and philosophies to flourish will benefit everyone—consumers, store owners, and application developers. Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or veto over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.[2]

---

[2] Chamber of Progress's partners include a16z, Airbnb, Amazon, Apple, Aurora,Chime, Circle, CLEAR, Coinbase, DailyPay, DoorDash, Earnin, Filecoin Foundation, Google, Grayscale, Grubhub, Instacart, Intuit, Kraken, Lyft, Meta (EU), Midjourney, Paradigm, Pindrop, Ripple, StubHub, Suno, Turo, Uber, Upstart, Vivid Seats, Waymo, and Zoox.

**LGBT Tech** is a nonprofit organization dedicated to promoting technology adoption and advocacy within the LGBTQ+ community. LGBT Tech encourages the continued early adoption and use of cutting-edge, new and emerging technologies by providing information, education, and strategic outreach. As an organization that advocates for policies that benefit the LGBTQ+ community, we are writing to express our support of Appellee NetChoice.

**The Woodhull Freedom Foundation ("Woodhull")** is a nonprofit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. Woodhull's name was inspired by the Nineteenth Century suffragette and women's rights leader, Victoria Woodhull. The organization works to improve the wellbeing, rights, and autonomy of every individual through advocacy, education, and action. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. The Foundation's advocacy has included a wide range of human rights issues, including reproductive justice, anti-discrimination legislation, comprehensive nonjudgmental sexuality education, and the right to define one's own family.

Amici support free expression on the Internet and back public policies that will build a fairer, more inclusive country in which the tech industry operates responsibly and fairly, and in which all people benefit from technological leaps. Amici therefore submit this brief in support of NetChoice.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Internet is like a "vast library" bursting with content "as diverse as human thought."[3] It is also a democratizing force for speech that gives any person access to the "modern public square."[4] And it is a home for community, facilitating an "exchange of information or opinion on a particular topic"[5] and enabling people of all ages to find and build connections with others who share common interests, life stages, or struggles.

By walling off access to personalized feeds, SB 976 would make using today's Internet more challenging and unrewarding for people of all ages—and it would particularly harm marginalized youth. Algorithmic feeds are indispensable to a safe and navigable Internet because they enable platforms to organize the constant flood of digital content, helping users find content of interest even if they do not know that a specific piece of content exists. For example, YouTube "sees more than 500 hours of video uploaded every minute," ranging from math tutoring to sushi restaurant guides, from tips about preparing for an earthquake to discussions of President Trump's immigration policies.[6] Without algorithmic recommendations, attempting

---

[3] *Reno v. ACLU,* 521 U.S. 844, 853, 870 (1997).

[4] *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

[5] *Reno*, 521 U.S. at 851.

[6] *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).

to navigate this vast realm would be extremely taxing at best and entirely futile at worst. These feeds are what make meaningful Internet exploration both possible and enjoyable for users.

In particular, SB 976 would hamper the ability to be exposed to and effectively access online information by imposing restrictive parental consent and age-gating requirements.[7] The law's parental consent requirements prevent children from fully accessing the benefits of social media in the absence of a resourced, willing, and digitally literate parent, and the age-gating provisions condition social media access on the collection and storage of sensitive personal data. This regime poses acute risks to the freedom and safety of young people—particularly those who are low-income, racially marginalized, or LGBTQ+—who tend to rely on the Internet for resources, information, community, and support that is otherwise absent in their day-to-day life. For example, studies show that access to online spaces and communities helps reduce feelings of loneliness and isolation among LGBTQ+ youth and teens of color.[8]

---

[7] *See* Cal. Health & Safety Code §§ 27001; 27002 (West 2025).

[8] Ashley Austin, et al., *It's My Safe Space: The Life-Saving Role of the Internet in the Lives of Transgender and Gender Diverse Youth*, 21 INT'L J. TRANSGENDER HEALTH 33 (2020); *see also* Human Rights Campaign Foundation, *2023 LGBTQ+ Youth Report* (Aug. 2023), https://bit.ly/3UCHIYO ("Over 8 in 10 . . . LGBTQ+ youth have ever used the Internet to seek out LGBTQ+ specific sexual health and behavior information, and well over 9 in 10 . . . have used the Internet to seek out

4

Worse still, SB 976 would undermine the creative expression that is a hallmark of algorithmic feeds, flattening the Internet experience into a monoculture that pushes out niche voices and interests. In organizing, prioritizing, and ranking content, platforms develop their own distinct brand of curation. By dictating when and how platforms deploy algorithmic feeds, SB 976 infringes on their First Amendment right to express themselves freely. The result would be a deadened Internet in which platforms are unable to offer users a diverse array of content.

In sum, while purporting to protect youth, SB 976 creates new risks to young people's safety, privacy, and wellbeing. To prevent these harms, protect fundamental speech rights, and promote a vibrant Internet, this Court should reverse and remand with instructions for the district court to enjoin SB 976 in full.

---

information about LGBTQ+ identities, and their own identity as an LGBTQ+ person . . . ."); Alvin Thomas et al., *Taking the good with the bad?: Social Media and Online Racial Discrimination Influences on Psychological and Academic Functioning in Black and Hispanic Youth*, 52(2) J. YOUTH & ADOLESCENCE 245, 245-57 (2023); Tate LeBlanc & Aerika Loyd, *Freedom dreaming to STEM: A conceptual model for Black youth's racial and STEM identity development through social media*, 13 FRONTIERS PSYCH. 1 (2022). Studies also support the finding that social media has been helpful in supporting academic success and finding acceptance. *See* J. Maya Hernandez & Linda Charmaraman, *Research on teen social media use has a racial bias problem*, FAST COMPANY (Feb. 22, 2023), https://www.fastcompany.com/90853552/research-on-teen-social-media-use-has-aracial-bias-problem.

## ARGUMENT

I.   **Social media platforms use algorithms to curate content, enabling young people to find community and engage with information of interest amid the deluge of online content.**

Social media platforms are at the core of the Internet's digital ecosystem and provide tremendous value to young people. These platforms form the basis of "how we relate to family and friends, as well as to businesses, civic organizations, and governments"[9] and "provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."[10] Personalized algorithms are a key part of making this possible.

Platforms have excelled at supporting community for adolescent users and facilitating discussion of important topics, including LGBTQ+ health, elections, police brutality, reproductive healthcare, and geopolitical affairs.[11] According to a

---

[9] *Moody*, 603 U.S. at 716.

[10] *Packingham*, 582 U.S. at 107.

[11] *See, e.g.*, Alexa Hiebert & Kathy Kortes-Miller, *Finding home in online community: exploring TikTok as a support for gender and sexual minority youth throughout COVID-19*, 20 J. LGBT YOUTH 800 (2021); Drew Harwell, *The 'feral 25-year-olds' making Kamala Harris go viral on TikTok*, WASH. POST (Sept. 13, 2024), https://www.washingtonpost.com/technology/2024/09/13/harris-tiktok-social-media-team/; Gideon Uchechukwu Nwafor & Frank Obidike Nnaemeka, *Influence of TikTok as an Edutainment Platform on Female Students' Awareness and Use of Contraceptive*s, J. ADVANCED RSCH. & MULTIDISCIPLINARY STUD. (Dec. 28, 2023), https://abjournals.org/jarms/papers/volume-3/issue-3/influence-of-tiktok-as-an-edutainment-platform-on-female-students-awareness-and-use-of-contraceptives/.

recent survey by Pew Research Center, a majority of teens said that social media helped them feel more connected to friends, share creative content, get support in tough times, and find accepting communities.[12] Other research shows that 64% of LGBTQ+ adults joined social media before turning 18, with the majority doing so while specifically seeking connection, belonging, and identity discovery.[13] Notably, three-fourths of LGBQ individuals and an overwhelming 90% of transgender individuals report that online platforms were instrumental in their understanding and acceptance of their identities.[14] While observing risks associated with social media, a 2023 U.S. Surgeon General Advisory also noted the many benefits of social media for minors, such as furnishing a "positive community and connection with others who share identities, abilities, and interest," "access to important information," and

---

[12] Monica Anderson et al., C*onnection, Creativity and Drama: Teen Life on Social Media in 2022*, Pew Rsch. Ctr. (Nov. 16, 2022), https://pewrsr.ch/3whSY2z ("Eight-in-ten teens say that what they see on social media makes them feel more connected to what's going on in their friends' lives[;] . . . 71% say it makes them feel like they have a place where they can show their creative side[;] . . . 67% say these platforms make them feel as if they have people who can support them through tough times[;] . . . a majority [] say the same for feeling more accepted. These positive sentiments are expressed by teens across demographic groups").

[13] Shae Gardner, *A Safer Digital Future: Recognizing NTIA's Efforts & LGBTQ+ Youth Considerations*, LGBT Tech (Aug. 6, 2024), https://www.lgbttech.org/post/a-safer-digital-future-recognizing-ntia-s-efforts-lgbtq-youth-considerations.

[14] *Id.*

"a space for self-expression."[15] The report also observed that social media can encourage "help-seeking behaviors" and provide "a gateway to initiating mental health care.'"[16]

Part of what makes these platforms so useful to users is content curation made possible by algorithms. Recommendation algorithms use digital instructions that recognize a user's patterns and apply those instructions to prioritize the information a user is likely to find most pertinent. As the Supreme Court has observed, "platforms cull and organize uploaded posts in a variety of ways" in order to manage the "deluge" of online content.[17] Thus, "a user does not see everything—even everything from the people she follows—in reverse-chronological order."[18] Instead, "platforms will have removed some content entirely; ranked or otherwise prioritized what remains; and sometimes added warnings or labels."[19]

Algorithms therefore enable platforms to provide a vibrant space for users to pursue their passions, discover new ideas, and connect with others. For example, the

---

[15] *NetChoice, LLC v. Reyes*, No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626, at *12 (D. Utah Sept. 10, 2024) (quoting United States Surgeon General Advisory, *Social Media and Youth Mental Health* (2023)).

[16] *Id.*

[17] *Moody*, 603 U.S. at 719.

[18] *Id.*

[19] *Id.*

Internet platform Reddit allows young people to make the most of the Internet by cultivating interests and hobbies online and connecting with people who share those interests. A teenager interested in marine biology might visit the "subreddit" page dedicated to whales, where more than fifty thousand whale enthusiasts share news, videos, and conservation resources about their "warm-blooded cousins in the sea."[20] From there, the teen might be recommended similar communities on the platform, including those for cephalopods, elephant seals, jellyfish, orcas, sea cows, sharks, and marine biology. She might also encounter new ideas about related issues, such as ecosystem preservation and climate change. On YouTube, a young person might look up recipes for Christmas cookies and be led to discover recipes for other baked goods, foods, and holiday traditions from other faiths and around the world. Another young person might look up a famous singer's music videos and be led to discover up-and-coming artists or artists from past decades on the cusp of a revival with a new generation. Research shows that LGBTQ+ youth are significantly more likely to curate their digital feeds to align with their interests, with 78% of LGBTQ+ youth reporting that they have done so, compared to 65% of non-LGBTQ+ youth.[21]

---

[20] *r/whales*, Reddit.com, https://www.reddit.com/r/whales/?rdt=34734 (last visited Jan. 29, 2025).

[21] *A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health*, COMMON SENSE (May 21, 2024),

The district court seemed to misunderstand personalized feeds, suggesting that speech does not "become[] inaccessible simply because someone needs to proactively search for it," adding that "if that were the case, library books would be inaccessible unless a librarian recommends them because libraries hold too many books for a single person to sort through."[22] However, for the Internet, we are talking about a vastly different scale of content. YouTube hosts roughly 14 billion videos and is supplemented by an additional 720,000 hours of new video each day.[23] Libraries do not hold tens of billions of books, nor do they add millions of books each day. Information retrieval on the Internet poses an ongoing challenge,[24] and without algorithmic curation, this content is much more difficult to search for than the district court suggests. Without this curation, an Internet user could search for

---

https://www.commonsensemedia.org/sites/default/files/research/report/2024-double-edged-sword-hopelab-report_final-release-for-web-v2.pdf.

[22] 39-ER-22.

[23] *See* Laura Ceci, Hours of video uploaded to YouTube every minute as of February 2022, YouTube (Apr. 11, 2024), https://www.statista.com/statistics/259477/hours-of-video-uploaded-to-youtube-every-minute/. Ryan McGrady, *What We Discovered on 'Deep YouTube'*, The Atlantic (Jan. 26, 2024), https://www.theatlantic.com/technology/archive/2024/01/how-many-videos-youtube-research/677250/.

[24] *See, e.g.*, Monika R. Henzinger et al., *Challenges in Web Search Engines*, 36 Special Int. Grp. on Info. Retrieval F. 11 (2002); Jay Aslam et al., *Challenges in Information Retrieval and Language Modeling* (James Allan & Bruce Croft eds., 2002), https://sigir.org/files/forum/S2003/ir-challenges2.pdf.

hours or days and still fail to find what she is looking for. Algorithmic feeds provide an essential function for users seeking online information.

Moreover, personalized curation not only caters to users with different views, preferences, and identities, but it also keeps people of all ages safe by, for example, helping to shut down coordinated harassment campaigns, halting spam bots, ensuring young people are presented with age-appropriate content, and preventing the dissemination of harmful content such as hate speech.[25] Personalized feeds are also essential for platforms to protect users from toxic content, like posts that promote self-harm, eating disorders, and suicide.[26] Feeds accomplish these goals by helping to keep this harmful content at bay, boosting instead content that suits users' age and interests over a deluge of unwanted garbage.[27]

---

[25] *See e.g.*, Declaration of Antigone Davis in Support of Plaintiffs' Motion for a Preliminary Injunction in *NetChoice, LLC v. Reyes* No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626c (D. Utah Sept. 10, 2024) (filed Dec. 20, 2023).

[26] *Re: SB 976 – "Protecting our Kids from Social Media Addiction Act"*, Chamber Progress (June 26, 2024), https://progresschamber.org/wp-content/uploads/2024/06/CA-SB-976-Skinner-Oppose-Coalition-Letter.pdf.

[27] As discussed in Section III, although the district court focused exclusively on feeds based solely on user activity, platforms commonly use algorithmic feeds that rely on several factors, including user activity, content moderation policies, and community guidelines, among others.

**II.    By impeding access to online speech, SB 976 violates the First Amendment rights of young people and adult users while disproportionately harming vulnerable communities.**

Citizens of all ages have a "right to receive information and ideas" free from government intervention.[28] SB 976's parental consent and age-gating provisions unconstitutionally burden this right, raising safety risks for vulnerable young people. In particular, the parental consent requirement would for all practical purposes wall off access to critical resources for marginalized youth. And the age-gating requirement forces an unconstitutional choice between privacy and speech, requiring all users to sacrifice sensitive personal information to access online spaces.

**A.    SB 976's parental consent provisions violate the First Amendment and endanger vulnerable youth.**

States cannot provide parents an "on/off switch" for their children's First Amendment rights or make an end run around the constitution by permitting minors to exercise their First Amendment rights only at the discretion of their parent. The state does not have "the power to prevent children from hearing or saying anything without their parents' prior consent."[29] Otherwise, it could "be made criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of

---

[28] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion) (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)).

[29] *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011).

children, or laws in favor of greater rights for minors," or "to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent."[30] The First Amendment does not tolerate these kinds of restrictions: "Such laws do not enforce parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto."[31]

SB 976 undertakes precisely this unconstitutional project—up until a person turns age 18. SB 976 would set a default window of one hour per day during which young people can access a platform that uses personal curation. If a young person's parent refuses to change these default settings, the young person is out of luck, and their rights are infringed. Without this consent, young people would only have access to a deadened social media landscape, devoid of the curation that gives social media its vibrancy.

By conditioning proper social media access on parental consent and failing to consider different social and economic circumstances, SB 976 jeopardizes the safety and privacy of vulnerable youth. For example, for LGBTQ+ youth in unsupportive families or communities, online spaces may be the only places in which they can safely be themselves, connect with accepting communities, and obtain sexual health education information that may otherwise be unavailable in their offline

---

[30] *Id.*

[31] *Id.*

communities.[32] In a 2024 national survey conducted by the Trevor Project, only 40% of LBGTQ+ youth reported living in affirming households, while 68% found online spaces supportive.[33] Obtaining parental consent to access those online spaces could force these youth to come out to unsupportive parents or guardians, jeopardize their safety at home and offline, and risk losing access to online resources that are crucial to their wellbeing. If a young person has non-affirming parents, the consequences are likely serious. Depression and suicidality skyrocket following family rejection. LGBTQ+ youth are 120% more likely to face homelessness than their non-LGBTQ+ counterparts, and rejection plays a massive role. Some LGBTQ+ youth could be forced into conversion therapy, which is still legal in a majority of states.[34]

Additionally, some young people may be shut out from engaging in online discourse simply because their parents do not possess the ability, resources, or

---

[32] Gay, Lesbian & Straight Education Network, *Out Online: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth on the Internet* 28 (2013), https://www.glsen.org/sites/default/files/2020-01/Out_Online_Full_Report_2013.pdf; *see also* Aida E. Manduley et al., *The role of social media in sex education: Dispatches from queer, trans, and racialized communities*, 28 FEMINISM & PSYCH. 309 (2018).

[33] *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People*, TREVOR PROJECT (last visited Feb. 4, 2025), https://www.thetrevorproject.org/survey-2024/#intro.

[34] *See LGBTQ+ Young People are More Likely to Experience Homelessness*, COVENANT HOUSE (last visited Feb. 4, 2025), https://www.covenanthouse.org/homeless-issues/lgbtq-youth.

willingness to comply with SB 976's parental verification requirements. SB 976 would penalize children of parents who—for lack of time, requisite identification documents, digital literacy, or access to technology—are unwilling or unable to verify their parental status or provide the consent necessary to permit their children to diverge from the strict default settings imposed by the law.[35]

The result would worsen the digital divide along racial and class-based lines. A 2018 report by the U.S. Department of Education found that 16% of working-age adults are not digitally literate, meaning these individuals lack a basic understanding of foundational computer skills, such as how to operate a mouse and keyboard or to navigate files, folders, and other digital information.[36] The report found the highest rates of digital illiteracy among adults who are Black, Hispanic, foreign-born, or who lack a high school degree.[37] Moreover, children who may have access to digital devices at school may lack the same technology at home, leaving them unable to obtain verified parental consent as required by SB 976.

---

[35] Indeed, given that online tools are critical for organizing in the 21st century and SB 976 makes them functionally useless, California's extreme approach raises related concerns about young people's rights to assemble or petition for redress.

[36] Saida Mamedova & Emily Pawlowski, *A Description of U.S. Adults Who Are Not Digitally Literate*, U.S. Dep't of Educ. (May 2018), at 3, https://nces.ed.gov/pubs2018/2018161.pdf.

[37] *Id.*

15

SB 976 further perpetuates the digital divide by making paternalistic assumptions about when people under 18 should be encouraged to view content online. Specifically, the law prohibits the operator of a covered service or application from sending notifications to users under 18 between 12:00 am and 6:00 am, and between 8:00 am and 3:00 pm Monday through Friday from September to May in the user's local time zone unless through parental consent. This provision fails to recognize that marginalized youth often experience unique circumstances that may not conform to the typical school year. For example, they may have jobs, familial obligations, or alternative schooling arrangements that require them to be offline when other youth are online. A teen who might have to take care of younger siblings in the afternoon and evening may wish to decompress online at nighttime. Requiring these individuals to obtain parental consent to depart from the law's default settings exacerbates existing inequalities.

Moreover, as a practical matter, adults from marginalized backgrounds may find it difficult to verify their age and avoid the need for parental consent. For example, many LGBTQ+ individuals face challenges with official documentation and identification, in particular transgender individuals whose government-issued IDs largely do not align with their lived identities.[38] Forty-three percent of

---

[38] *See* Jody L. Herman et al., *The Potential Impact of Voter Identification Laws on Transgender Voters in the 2024 General Election*, UCLA Williams Inst. (Sept.

transgender adults do not have documentation that aligns with their identity, and a worsening political landscape for trans Americans will make this alignment even harder to attain.[39]

### B. The law's age-gating measures unconstitutionally force a choice between privacy and speech.

As courts have long made clear, a law that forces users into a double bind of choosing between access to speech and preserving their privacy is untenable under the First Amendment.[40] This is exactly what SB 976 does.

The district court erred in finding that these issues are not ripe. Despite some technical advances, age assurance technologies continue to present serious privacy risks. In surveying potential methods to enforce SB 976's age assurance requirements, the district court offered concerning and intrusive suggestions, including the use of photo identification, facial analysis technology, background data collection, processing, and profiling. And regardless of the precise age assurance

---

2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Voter-ID-Sep-2024.pdf.

[39] *Id.*

[40] *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003); *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (finding age-verification requirements force users to "relinquish their anonymity to access protected speech"); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *1 (W.D. Ark. Aug. 31, 2023) (enjoining social media age-verification law on constitutional grounds).

mechanism California requires, SB 976 would require mass collection of personal data for individuals to access online content, which comes with enormous safety and security risks. A report from the New America Foundation found that, as of April 2024, strict age verification, which involves confirming a user's age without requiring additional personal identifiable information, "is not technically feasible in a manner that respects users' rights, privacy, and security."[41] To date, no technology can verify age while ensuring privacy and security, let alone at the scale SB 976 would require of large social media platforms.

More than 80 percent of U.S. companies have been hacked successfully with the aim to steal, change, or make public important data.[42] In 2024, data breaches compromised millions of users' personal information, including in some instances

---

[41] Sarah Forland, et al., *Age Verification: The Complicated Effort to Protect Youth Online*, NEW AMERICA (Apr. 23, 2024), https://www.newamerica.org/oti/reports/age-verification-the-complicated-effort-to-protect-youth-online/challenges-with-age-verification (emphasis added); *see also* Shoshana Weissmann, *The technology to verify your age without violating your privacy does not exist*, R STREET INST. (May 16, 2023), https://www.rstreet.org/commentary/the-technology-to-verify-your-age-without-violating-your-privacy-does-not-exist (explaining that existing age-verification methods "either lack[] accuracy or deeply invade[] privacy" and noting that France's data protection agency has concluded as such).

[42] Shoshana Weissmann, *If platforms are required to have your government IDs and face scans, hackers and enemy governments can access them too*, R STREET INST. (May 22, 2023), https://www.rstreet.org/commentary/if-platforms-are-required-to-have-your-government-ids-and-face-scans-hackers-and-enemy-governments-can-access-them-too/.

18

names, Social Security numbers, dates of birth, credit card information, email addresses, phone numbers, and financial, medical, and health insurance information.[43] A third-party ID and age-verification company serving several online platforms was recently found to have left sensitive personal data, including images of users' driver's licenses, insecure for more than a year, giving hackers the potential opportunity to access that data.[44]

These concerns are even more pressing when children are involved because their personal information is an especially attractive target for fraudsters. SB 976 requires companies to reasonably determine that a user is not a minor, which will often compel companies to gather information from minors to ensure compliance. Institutions that collect children's personal data, like foster care systems and schools, are highly susceptible to fraud, identity theft, and ransomware.[45] Hacking attacks

---

[43] Aaron Drapkin, *Data Breaches That Have Happened in 2022, 2023, 2024, and 2025 So Far*, Tech.co (Jan. 29, 2025), https://tech.co/news/data-breaches-updated-list.

[44] *Id.*

[45] Shoshana Weissmann, et al., *25 percent of kids will face identity theft before turning 18. Age-verification laws will make this worse*, R. Street. Inst. (July 25, 2024), https://www.rstreet.org/commentary/25-percent-of-kids-will-face-identitytheft-before-turning-18-age-verification-laws-will-make-this-worse.

directed at K-12 schools, for example, have skyrocketed within the last year.[46] This recent trend aligns with a 2018 finding by credit reporting company Experian that one-quarter of all children will become victims of identity fraud or theft before turning 18.[47] By requiring social media platforms to amass children's personal information, SB 976 would vastly magnify these risks.

 The privacy risks of age verification are also especially dangerous for individuals and groups that need to keep their identities private to ensure their offline safety.[48] For example, women who have experienced stalking, sexual harassment, assault, or domestic abuse may wish to use online services anonymously for fear of reprisals at work or at home. In a 2022 survey, 54% of LGBTQ+ respondents reported experiencing severe online harassment, defined as "physical threats, sustained harassment, stalking, sexual harassment, doxxing (having personal information exposed, often for the purpose of further harassment), and swatting (a rare but dangerous tactic in which a harasser anonymously calls in a false report with

---

[46] Steve Weisman, *The Unknown Danger Of Child Identity Theft*, Forbes (Sept. 20, 2024), https://www.forbes.com/sites/steveweisman/2024/09/13/the-unknown-danger-of-child-identity-theft/.

[47] Ellen Sirull, *Do You Know How to Protect Your Child from Identity Theft?*, Experian (Jan. 8, 2018), https://www.experian.com/blogs/ask-experian/know-protect-child-identity-theft.

[48] Eric Goldman, *The Plan to Blow Up the Internet, Ostensibly to Protect Kids Online*, Capitol Wkly. (Aug. 18, 2022), https://bit.ly/3Uv76Q2.

the goal of sending an emergency response team to a target's dwelling)."[49] As social media platforms attempt to verify users' age and identity in compliance with SB 976, these users could be forced to relinquish their anonymity by submitting personal information or biometrics, which could seriously risk their safety and survival.

### III.    SB 976 violates basic First Amendment principles of editorial discretion.

Platforms, like traditional publishers, have a right to editorial discretion. This includes the use of personalized feeds, which involve the same types of decisions traditional publishers make about how to organize and prioritize content. In turn, as a result of this constitutionally protected editorial discretion, personalized feeds help to ensure that marginalized groups have access to relevant content.

### A.    SB 976 would impede platforms' curatorial freedom, inhibiting the Internet's vibrancy and harming marginalized youth.

SB 976 targets feeds that "recommend[], select[], or prioritize[]" pieces of media based "in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device."[50] Notwithstanding the language of SB 976, one is unlikely to find any feed based exclusively on information about users. Rather, the majority of feeds incorporate a host of factors, including a

---

[49] *See* Anti-Defamation League, *Online Hate and Harassment Survey*, (2022), https://www.adl.org/sites/default/files/pdfs/2022-09/Online-Hate-and-Harassment-Survey-2022.pdf.

[50] Cal. Health & Safety Code § 27005(a).

company's terms of service, community standards, and other internal policies and frameworks. Thus, SB 976 certainly applies to feeds that incorporate content moderation policies, which is protected expression under the Supreme Court's decision in *Moody*.[51]

As the Supreme Court declared this past term, the curatorial freedom long afforded to traditional publishers does not waiver if the curated speech product "has gone from the physical to the virtual world."[52] Echoing the discussions in Sections I and II of this brief, this curation is essential for users, particularly for marginalized youth. Without curated content, young people from marginalized backgrounds will find it harder to discover and connect with others who share these backgrounds. This may lead to the ugly and incorrect impression that these young people are alone and that their identities are not reflected online.

Curatorial freedom is the bedrock of a robust, accessible online ecosystem and appropriately protected by the First Amendment. Just like traditional publishers, platforms engage in "expressive activity" when "compiling and curating others' speech,"[53] including when this curation is based on user activity. Like the edited speech compilations produced by newspapers, social media platforms make careful

---

[51] *See Moody*, 603 U.S. at 744.

[52] *Id.* at 717.

[53] *Id.* at 731.

choices about how to include, exclude, organize, prioritize, rank, and recommend media. "[I]n making millions of those decisions each day, [they] produce their own distinctive compilations of expression."[54] The government cannot force companies to alter these compilations simply on account of its roving "interest in improving . . . the marketplace of ideas."[55] Instead, these curations "fall squarely within the core of First Amendment security."[56]

A platform's "distinctive compilation of expression" may vary based on the platform's priorities, content moderation policy, core values, the views of its leadership, or the expectations that users have about the kind of content welcome on the platform. As discussed above, most social media feeds rely on a mix of factors that incorporate both the company's internal policies and data about the platform's users. Even the aspects of feeds that are exclusively based on information about users differ according to the platform's priorities and choices about what content a user should be presented with. For example, these considerations might address what content the user likes, their age demographic, or their post history.

---

[54] *Id.* at 716.

[55] *Id.* at 732.

[56] *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995).

By imposing default restrictions on curatorial decisions, SB 976 would wrest editorial discretion from platforms, placing it in the hands of the state. The result would be a flattened digital landscape in which beneficial creative expression is dulled at the expense of strict compliance with government-mandated default settings. SB 976 would force social media companies to present all content in reverse chronological order, which would ultimately erode the vibrancy and variety of the digital marketplace. And by forcing companies to comply with rigid default or parental settings, the law would degrade the quality of information offered, leaving platforms hamstrung in their efforts to present relevant, edifying information to users.

These harms are likely to impact marginalized youth the most. As an illustrative example, youth from marginalized groups are less likely to have access to adult role models or resources to foster their interests.[57] Imagine a young woman from a smaller town with an interest in engineering who comes from a family without any college degrees and who has never met a female engineer. Through social media, she may discover posts from women sharing their experiences in

---

[57] *See* Noelle M. Hurd et al., *Negative Adult Influences and the Protective Effects of Role Models: A Study with Urban Adolescents*, 38 J. Youth & Adolescence 777 (2009); *Adult LGBTQ+ Role Models in the Lives of LGBTQ+ Young People*, TREVOR PROJECT (May 15, 2024), https://www.thetrevorproject.org/research-briefs/adult-lgbtq-role-models-in-the-lives-of-lgbtq-young-people/.

STEM fields or their formative experiences at a summer engineering camp. This kind of exposure has the power to spark passions, change lives for the better, and diversify a whole profession. Relatedly, it will likely also become harder for marginalized individuals to come across content relevant to them because the majority of content is more likely to reflect majority groups and groups with social power.

As other examples, Indigenous youth honor and share their cultures on social media and advocate for their communities,[58] and youth with disabilities can use social media to access information, advocate for accessibility and disability inclusion, build relationships and communities, and launch their careers.[59] These

---

[58] Kiara Alfonseca & Kat Filardi, *Indigenous TikTokers use social media to honor their cultures*, ABC News (Oct. 12, 2021), https://abcnews.go.com/US/indigenoustiktokers-social-media-honor-cultures/story?id=80303748; Sara Reardon, *Social media helps Native Americans preserve cultural traditions during pandemic*, CNN (Feb. 9, 2021), https://www.cnn.com/2021/02/08/health/coronavirus-native-americans-internet-khn-wellness-partner/index.html.

[59] *See* Shoshana Weissmann, *Social Media Was Useful For Me, As An Ill, Nerdy Teenager*, TECHDIRT (June 28, 2023), https://www.techdirt.com/2023/06/28/socialmedia-was-useful-for-me-as-an-ill-nerdy-teenager; Asaka Park, *I'm a Disabled Teenager and Social Media is My Lifeline*, N.Y. TIMES (June 5, 2019), https://www.nytimes.com/2019/06/05/learning/im-a-disabled-teenager-and-socialmedia-is-my-lifeline.html.

activities may be more difficult if content is provided at scale only to cater to the majority of users.

**B.    The district court erred in its assessment of the expressive nature of personalized feeds.**

The district court erred in concluding that algorithmically curated feeds are not expressive because they convey "no apparent message."[60] Personalized feeds are necessarily expressive because they are carefully designed and refined by humans to convey the message that users are likely to like, dislike, or perhaps find certain content engaging. The district court relies on a fiction by attempting to isolate personalized feeds without content moderation. The majority of today's feeds contain some amount of content curation based both on platforms' internal policies and on information about users.[61]

Moreover, speakers do "not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech."[62] In contravention of this established principle, the district court relied on *Hurley* to distinguish between a personalized feed that recommends posts that users are likely to find interesting and

---

[60] 39-ER-19 ("When it comes to feeds that recommend posts based solely on prior user activity, there is no apparent message being conveyed.").

[61] *Supra* pp. 16-20.

[62] *Hurley*, 515 U.S. at 569-70.

one designed to maximize engagement, reasoning that the former conveys a message and could be expressive, whereas the latter is unlikely to be expressive because "it would recommend and amplify both favored and disfavored messages alike."[63] The court stated that, "[t]o the extent that an algorithm amplifies messages that its creator expressly disagrees with, the idea that the algorithm implements some expressive choice and conveys its creator's message should be met with great skepticism."[64]

But *Hurley* disavows this view, holding that the First Amendment does not require there to be a "particularized message."[65] In other words, using the district court's example, a feed's inclusion of content its creator disagrees with would not alter the message that the user is likely to find the content engaging. The district court incorrectly borrowed from *Hurley* in referring to this as "disfavored content," but it is not. It is content that the speaker favors because it is engaging. *Hurley* affirmed a speaker's right to refrain from expressing a "disfavored" message that it does not agree with, but nothing in *Hurley* suggested that the converse is true: that a speaker's *inclusion* of content it disagrees with forfeits expression.

---

[63] 39-ER-19-20; *Hurley*, 515 U.S. at 574-75.

[64] 39-ER-20.

[65] *Hurley*, 515 U.S. at 569-70.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand with instructions for the district court to enjoin SB 976 in full.

Respectfully submitted,

Kerry Maeve Sheehan
Legal Advocacy Counsel
CHAMBER OF PROGRESS
1390 Chain Bridge Road #A108
McLean, VA 22101

Carlos Gutierrez
Deputy Director & General Counsel
LGBT TECH
123 W. Frederick Street #214
Staunton, VA 24401

*Counsel for LGBT Tech*

/s/ Mark W. Brennan
Mark W. Brennan
J. Ryan Thompson
Erin Mizraki
Thomas B. Veitch
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-6409
mark.brennan@hoganlovells.com

*Counsel for Chamber of Progress*

Lawrence Walters
WALTERS LAW GROUP
195 W. Pine Avenue
Longwood, FL 32750

*Counsel for Woodhull Freedom Foundation*

February 6, 2025

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,059 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ Mark W. Brennan

February 6, 2025                    Mark W. Brennan

## CERTIFICATE OF SERVICE

I certify that on February 6, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Mark W. Brennan
Mark W. Brennan