No. 25-146

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

NETCHOICE, LLC

*Plaintiff*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF CALIFORNIA,

*Defendant*.

————————————

## On Appeal from the United States District Court
## for the Northern District of California
No. 5:24-cv-07885-EJD
The Honorable Edward J. Davila

————————————

## ANSWERING BRIEF

————————————

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
LARA HADDAD
  *Supervising Deputy Attorney*
  *General*

JENNIFER E. ROSENBERG
SHIWON CHOE
CHRISTOPHER J. KISSEL
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6388
Christopher.Kissel@doj.ca.gov
  *Attorneys for Defendant*

February 27, 2025

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................... 1

Statement of Jurisdiction................................................................ 5

Issues Presented ............................................................................. 5

Statement of the Case..................................................................... 6

    I.    Addictive Features of Online Platforms Harm Children and
Teens.................................................................................. 6

    II.    The Protecting Our Kids From Social Media Addiction Act.... 9

    III.    Procedural History.................................................................. 13

Standard of Review......................................................................... 16

Summary of Argument ................................................................... 16

Argument......................................................................................... 19

    I.    NetChoice's Challenge to SB976's Age-Assurance
Requirement Is Unripe ........................................................ 19

        A.    SB976's age-assurance requirement is not yet fit for
review........................................................................... 19

        B.    NetChoice will not suffer hardship if age-assurance
questions are delayed until they are ripe....................... 23

    II.    NetChoice Has Failed to Meet Its Burden of Showing That
SB976 Is Likely Unconstitutional on Its Face ........................ 24

        A.    Facial free speech challenges are "hard to win." .......... 25

        B.    NetChoice has not yet developed a record sufficient
to establish that SB976 facially burdens protected
speech........................................................................... 29

        C.    Instead of submitting evidence to satisfy its burden,
NetChoice misconstrues SB976 and the governing
caselaw. ........................................................................ 35

    III.    SB976 Is Subject, at Most, to Intermediate Scrutiny............. 38

i

# TABLE OF CONTENTS
## (continued)

Page

IV.   SB976's Addictive-Feed and Default-Setting Provisions
      Survive Any Level of First Amendment Scrutiny ................. 42

      A.   SB976 furthers a significant and compelling
           government interest...................................................... 43

      B.   SB976 is narrowly tailored to the protection of
           children's mental and physical health and well-
           being. ............................................................................. 47

      C.   SB976's default-setting provisions are narrowly
           tailored to their own compelling interest. ..................... 51

V.    SB976 Is Not Unconstitutionally Vague Because It Creates
      Requirements a Reasonable Person Would Understand ......... 54

VI.   NetChoice Lacks Associational Standing to Raise As-
      Applied Claims Because Participation From Its Members
      Is Required ............................................................................. 57

VII.  NetChoice Fails to Establish That the Remaining
      Injunction Factors Warrant Extraordinary Relief .................. 59

Conclusion ...................................................................................... 60

ii

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*
    829 F.2d 933 (9th Cir. 1987) ........................................................ 58

*Am. Beverage Ass'n v. City & Cnty. of S.F.*
    916 F.3d 749 (9th Cir. 2019) .................................................... 16

*American Booksellers Foundation v. Dean*
    342 F.3d 96 (2d Cir. 2003) ......................................................... 22

*Arce v. Douglas*
    793 F.3d 968 (9th Cir. 2015) ..................................................... 54

*Ariz. Att'ys for Crim. Justice v. Mayes*
    127 F.4th 105 (9th Cir. 2025) ............................................... 27, 30

*Ashcroft v. ACLU*
    542 U.S. 656 (2004) ............................................................. 20, 21

*Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*
    627 F.3d 547 (5th Cir. 2010) ..................................................... 58

*Ass'n of Christian Schs. Int'l v. Stearns*
    678 F. Supp. 2d 980 (C.D. Cal. 2008) ...................................... 57

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*
    457 U.S. 853 (1982) ................................................................... 30

*Borrero v. United Healthcare of N.Y.*
    610 F.3d 1296 (11th Cir. 2010) ................................................. 58

*Brown v. Entertainment Merchants Association*
    564 U.S. 786 (2011) ...................................................... 45, 46, 50

*Cal. Tchrs. Ass'n v. State Bd. of Educ.*
    271 F.3d 1141 (9th Cir. 2001) ............................................. 55, 56

iii

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*
    596 U.S. 61 (2022) ...................................................38, 39, 40, 41

*Computer & Commc'ns Indus. Ass'n v. Paxton*
    No. 1:24-CV-849-RP, 2024 WL 4051786 (W.D. Tex. Aug.
    30, 2024) ..................................................................................37

*DISH Network Corp. v. FCC*
    653 F.3d 771 (9th Cir. 2011) ...................................................59

*Freedom Holdings, Inc. v. Spitzer*
    408 F.3d 112 (2d Cir. 2005) .....................................................59

*Goldie's Bookstore, Inc. v. Super. Ct.*
    739 F.2d 466 (9th Cir. 1984) ...................................................59

*Hill v. Colorado*
    530 U.S. 703 (2000) ................................................................54

*HomeAway.com, Inc. v. City of Santa Monica*
    918 F.3d 676 (9th Cir. 2019) ...................................................25

*Hoxworth v. Blinder, Robinson & Co.*
    903 F.2d 186 (3d Cir. 1990) .....................................................59

*Hunt v. Wash. State Apple Adver. Comm'n*
    432 U.S. 333 (1977) ................................................................57

*In re Nat'l Sec. Letter*
    33 F.4th 1058 (9th Cir. 2022) ..................................................43

*J.D.B. v. North Carolina*
    564 U.S. 261 (2011) ................................................................44

*Johnson v. United States*
    576 U.S. 591 (2015) ................................................................56

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Klein v. City of San Clemente*
    584 F.3d 1196 (9th Cir. 2009) ................................... 16

*LA All. for Hum. Rts. v. Cnty. of L.A.*
    14 F.4th 947 (9th Cir. 2021) ...................................... 57

*Lewis v. Andes*
    95 F.4th 1166 (9th Cir. 2024) .................................... 47

*Maryland v. King*
    567 U.S. 1301 (2012) ................................................ 60

*Mazurek v. Armstrong*
    520 U.S. 968 (1997) .................................................. 16

*McCullen v. Coakley*
    573 U.S. 464 (2014) .................................................. 40

*Moody v. NetChoice, LLC*
    603 U.S. 707 (2024) ............................................*passim*

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs*
    460 F. Supp. 3d 1030 (D. Mont. 2020) ..................... 59

*Nat'l Inst. of Family & Life Advocates v. Becerra*
    585 U.S. 755 (2018) ............................................ 42, 53

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*
    538 U.S. 803 (2003) .................................................. 19

*NetChoice, LLC v. Bonta*
    113 F.4th 1101 (9th Cir. 2024) .................................. 30

*NetChoice, LLC v. Fitch*
    738 F. Supp. 3d 753 (S.D. Miss. 2024) ................. 22, 37

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*NetChoice, LLC v. Griffin*
No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31,
2023) ...............................................................................22, 38

*NetChoice, LLC v. Reyes*
No. CV 23-00911-RJS (CMR), 2024 WL 4135626 (D. Utah
Sept. 10, 2024) ..............................................................22, 37

*NetChoice, LLC v. Yost*
716 F. Supp. 3d 539 (S.D. Ohio 2024) ......................................37

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
676 F.3d 829 (9th Cir. 2012) ..............................................19, 23

*Packingham v. North Carolina*
582 U.S. 98 (2017)......................................................35, 36, 37

*Pimentel v. Dreyfus*
670 F.3d 1096 (9th Cir. 2011) ...................................................16

*Project Veritas v. Schmidt*
125 F.4th 929 (9th Cir. 2025) .............................................*passim*

*Reno v. ACLU*
521 U.S. 844 (1997).........................................................*passim*

*Sable Commc'ns of Cal., Inc. v. FCC*
492 U.S. 115 (1989)..........................................................43, 60

*Smith v. Helzer*
95 F.4th 1207 (9th Cir. 2024) .....................................................24

*Sorrell v. IMS Health Inc.*
564 U.S. 552 (2011)..........................................................51, 53

*Thomas v. Anchorage Equal Rts. Comm'n*
220 F.3d 1134 (9th Cir. 2000) ..................................................20

vi

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Turner Broad. Sys., Inc. v. FCC*
512 U.S. 622 (1994).......................................................39, 42, 52

*United States v. Hansen*
599 U.S. 762 (2023)........................................................26, 27, 31

*United States v. Playboy Ent. Grp., Inc.*
529 U.S. 803 (2000)...............................................................48

*United States v. Salerno*
481 U.S. 739 (1987)............................................................25, 26

*United States v. Swisher*
811 F.3d 299 (9th Cir. 2016) ....................................................25

*United States v. Williams*
553 U.S. 285 (2008)..............................................................31

*Valle del Sol Inc. v. Whiting*
732 F.3d 1006 (9th Cir. 2013) ...................................................57

*Virginia v. Hicks*
539 U.S. 113 (2003)..............................................................26

*Ward v. Rock Against Racism*
491 U.S. 781 (1989)..............................................................42

*Warth v. Seldin*
422 U.S. 490 (1975)..............................................................57

*Wash. State Grange v. Wash. State Republican Party*
552 U.S. 442 (2008)........................................................25, 26, 35

*Williams-Yulee v. Fla. Bar*
575 U.S. 433 (2015).......................................................43, 44, 49, 50

*Winter v. NRDC*
555 U.S. 7 (2008)................................................................16

vii

## TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

California Health & Safety Code
    § 27000.5.........................................................................*passim*
    § 27001.........................................................................*passim*
    § 27002.........................................................................*passim*
    § 27003.........................................................................12
    § 27006.................................................................12, 20, 24
    § 27007.........................................................................54

**CONSTITUTIONAL PROVISIONS**

First Amendment.........................................................................*passim*

**OTHER AUTHORITIES**

Mackenzie Austin, Max Levy, *Speech Certainty: Algorithmic
    Speech and the Limits of the First Amendment*, 77 STAN. L.
    REV. 1 (2025).........................................................................7, 34

## INTRODUCTION

The California Legislature passed the Protecting Our Kids From Social Media Addiction Act (Senate Bill No. 976, or SB976) with the goal of protecting the mental and physical health of children. SB976 was inspired by a body of research showing that the features internet companies employ to keep people maximally engaged on platforms, websites, services, and applications[1] are fueling an epidemic of compulsive and excessive internet use among children and teens. That epidemic is causing real harm. Children and teens who spend excessive time online experience negative self-image, poor sleep, and anxiety and depression, among other health and behavioral issues. At the same time, children and teens report feeling addicted to their screens—they want to turn their attention to other things but are unable to do so. Peer-reviewed research confirms that certain features employed by internet platforms have habit-forming effects. There is good news, however: These same reliable studies have found that temporarily limiting users' access to habit-forming features on platforms improves users' well-being and self-image, leads to better sleep, and decreases depression and anxiety.

The Legislature carefully crafted SB976 to reflect this body of scientific research. SB976 limits the ability of internet companies to give minors automatic

---

[1] This brief generally refers to platforms, websites, services, and applications on the internet as "platforms."

1

access to digital features designed to trigger compulsive use. For example, SB976 specifically targets addictive feeds—endless scrolls of material that platforms show users based on algorithms that monitor the user's online activity and personal information. SB976 also limits other engagement features designed to grab users' attention or tweak the reward centers of their brains, such as "like" counts on posts. But the Legislature was also cautious. It drafted SB976 to preserve the ability of children and adults to access internet platforms and any online content of their choice. And the law likewise preserves the ability of companies to exercise control over what they allow on their platforms and to promote, demote, or otherwise moderate material they consider harmful.

Despite this careful drafting history, appellant NetChoice, LLC demands that the entirety of SB976 be enjoined on First Amendment grounds. In a thorough, well-reasoned order, the district court rebuffed that demand. The court exercised its discretion to grant preliminary injunctive relief as to a few of NetChoice's claims and appropriately denied it as to others. The court's rationale for denying NetChoice's request for a sweeping injunction was correct: To properly evaluate NetChoice's First Amendment claims, NetChoice needed to produce an evidentiary record that would allow the court to determine how SB976 would impact platforms across the internet, including, but not limited to, NetChoice's members—each of whom operates a different platform that uses different methods

2

for creating users' feeds. As the district court correctly concluded, NetChoice failed to compile that kind of record, meaning NetChoice could not show—at least at this preliminary stage—that it was likely to succeed on the merits of its claims.

NetChoice does not seriously contest the district court's assessment of the evidentiary record. It instead tries to avoid any evidentiary burden, arguing that the Supreme Court has already held that any restrictions on minors' access to "personalized feeds" and similar features are either per se unconstitutional or automatically subject to the most demanding constitutional scrutiny.

The Supreme Court has never held that restrictions on the kinds of feeds at issue in this litigation are subject to First Amendment scrutiny. Indeed, the Court explicitly declined to address the difficult question of whether "feeds whose algorithms respond solely to how users act online" warrant constitutional protection. *Moody v. NetChoice, LLC*, 603 U.S. 707, 736 n.5 (2024). Those are the features that SB976 regulates. Moreover, when the Supreme Court has addressed facial First Amendment claims against laws that regulate internet platforms, it has emphasized that the constitutional inquiry is fact-intensive. *See id.* at 725. Courts must evaluate how the challenged law burdens the speech of every regulated platform. *Id.* NetChoice has made no effort—not before the district court and not on appeal—to facilitate that kind of "rigorous," fact-intensive inquiry. *Id.* at 723. Like the court below, this Court should conclude that NetChoice has not shown

3

that it is entitled to a preliminary injunction on the First Amendment claims at issue in this interlocutory appeal. The parties should litigate the merits of those claims in the context of a more robust factual record before the district court.

That outcome is doubly appropriate in this case, because—even if NetChoice *had* submitted a sufficient record—SB976 survives constitutional review. SB976 is a content-neutral law that regulates certain harmful *features* of internet platforms, such as addictive feeds. It does not target topics, ideas, or messages. As a content-neutral law, SB976 is subject to at most intermediate scrutiny. Yet even assuming that *strict* scrutiny applies, SB976 is constitutional. It pursues an interest that the Supreme Court has long found to be compelling: the protection of the physical and mental health and well-being of children and teens. And its provisions are precisely drawn to serve that compelling interest. It restricts only the particular internet features that have been shown to harm minors and it preserves access to the internet and all the content that lives there.

This Court should therefore affirm the district court's partial denial of NetChoice's demand for preliminary injunctive relief and allow the parties to proceed with developing an evidentiary record capable of permitting the court below to resolve NetChoice's First Amendment claims.

4

## STATEMENT OF JURISDICTION

The Attorney General agrees with NetChoice's statement of jurisdiction except that he disputes that NetChoice has standing to assert as-applied claims.

## ISSUES PRESENTED

1. Was the district court correct in concluding that NetChoice's challenge to SB976's age-assurance requirement is unripe, given that the requirements are subject to further definition and will not go into effect for almost two years?

2. Did the district court abuse its discretion when it concluded that NetChoice was unlikely to establish that SB976's unconstitutional applications substantially outweigh its constitutional applications, without additional evidence concerning the conduct SB976 reaches?

3. Does the First Amendment prohibit a State from requiring internet companies to obtain parental consent before they provide minors with automatic access to harmful features on the companies' internet platforms, when that requirement does not target topics, ideas, or messages?

4. Is SB976 unconstitutionally vague?

5. Does NetChoice lack associational standing to bring as-applied claims against SB976 on behalf of certain members because such claims require factual inquiries specific to each of those members?

## STATEMENT OF THE CASE

### I. ADDICTIVE FEATURES OF ONLINE PLATFORMS HARM CHILDREN AND TEENS

Almost half of American adolescents report being online "almost constantly"—a rate that has roughly doubled since 2015. 2-ER-170 (Feder Decl. ¶ 18); 2-ER-227 (Radesky Decl. ¶ 36). An estimated 19 percent of teens are on the internet so much that it interferes with their schoolwork, relationships, physical health, and/or ability to get a good night's sleep. 2-ER-225-26 (*id.* ¶ 33). Children and teens themselves have given voice to this growing problem. Many report feeling like they spend more time online than they wish they did; others report feeling "compelled" to return to platforms instead of doing things they intended to do. 2-ER-234 (*id.* ¶ 54). Indeed, over a third of girls aged 11-15 in a nationally representative sample classified their use of social media as an addiction. 2-ER-226 (*id.* ¶ 34).

At the same time, internet companies, which are incentivized to increase user "engagement" as a means of boosting advertising revenue, continue to develop features designed to extend the time users spend on the companies' platforms. 2-ER-122 (Egelman Decl. ¶ 17). Those features are often powered by data collected from users. 2-ER-122 (*id.* ¶ 18).

For example, companies track user behavior via "persistent identifiers"— information about individual users that allow the companies to consistently

6

monitor users' activity and infer their routines, preferences, demographics, and relationships. 2-ER-127 (*id.* ¶ 23). Companies then employ complex algorithms that maximize engagement by recommending material to users based on that information. 2-ER-133-34 (*id.* ¶ 34). Those artificial-intelligence-based algorithms can yield unpredictable results. 2-ER-133 (*id.* ¶ 33). Algorithms such as those employed by Google write their own rules for calculating the probability that users will like what they see.[2] Indeed, the algorithms are so complex that even the engineers who program them do not understand how they work.[3]

Other features are similarly designed to keep users coming back to the platform and engaging with it for longer period. 2-ER-135 (*id.* ¶ 37). For instance, companies employ reward-like interactions such as "likes," hearts, friend numbers, scores, and streaks. *Id.*; 2-ER-243-44 (Radesky Decl. ¶ 72).

Research suggests that those features are effective—particularly on children. 2-ER-237-39, 2-ER-240-41 (Radesky Decl. ¶¶ 61, 64, 67). Children and teens are already more susceptible to psychological manipulation than adults. 2-ER-140 (Egelman Decl. ¶ 49). Their executive functions are less developed, they have less

---

[2] Mackenzie Austin, Max Levy, *Speech Certainty: Algorithmic Speech and the Limits of the First Amendment*, 77 STAN. L. REV. 1, 39-67 (2025).

[3] *See, e.g.*, *id.* at 61 ("As a result of this inherent opacity in machine learning models, a vibrant field of research has emerged to try to understand how machine learning algorithms work.").

impulse control, and they are less able to think critically about digital media. 2-ER-232, 2-ER-233-34 (Radesky Decl. ¶¶ 50, 54). Their heightened sensitivity to immediate gratification from rewards or high-pleasure experiences leads them more easily to unhealthy habit formation. 2-ER-233 (*id.* ¶ 52).

Even when children and teens recognize that they are being manipulated, they struggle to turn away. Some report that too-many engagement-promoting features are frustrating and negatively affect their sense of autonomy. 2-ER-235 (*id.* ¶ 56). Nearly three-quarters of teens believe companies are manipulating them to spend more time on the companies' platforms. 2-ER-233-34 (*id.* ¶ 54). And indeed, these engagement features *are* habit-forming. One randomized experiment led researchers to estimate that close to a third of the time users spend on social media is the result of habit or lack of self-control rather than a genuine desire to engage. 2-ER-184-85 (Feder Decl. ¶ 45).

The features used by internet companies to drive engagement can cause minors real harm. Compulsive, addiction-like use of social media is highly disruptive to child well-being and family functioning. 2-ER-226 (Radesky Decl. ¶ 35). The more time children and teens spend online, the more they experience poor sleep, sedentary behaviors, and other health and behavioral issues. 2-ER-234 (*id.* ¶ 55). For example, one study demonstrates that, as a general matter, teens who spend more time on social media experience progressively worse mental health

outcomes, including anxiety and depression. 2-ER-171-72, 2-ER-175, 2-ER-180 (Feder Decl. ¶¶ 20, 30, 36).

This is not an unsolvable problem. Numerous studies have shown that there are ways to mitigate these harms. For example, one study involving children indicated that rates of depression and negative self-image could be improved by reducing social media use, or screen time overall. 2-ER-180-87 (*id.* ¶¶ 37-49). Randomized experiments have indicated that replacing addictive feeds on certain platforms with alternatives such as reverse-chronological feeds—feeds that organize material based on when it was posted, rather than an algorithm's determination of what the user should see—caused users to spend dramatically less time on those platforms. 2-ER-194 (*id.* ¶ 59).

## II.    THE PROTECTING OUR KIDS FROM SOCIAL MEDIA ADDICTION ACT

Motivated to address the harms caused to children by addictive online engagement features, the Legislature passed SB976. The Legislature found that "the algorithmic delivery of content and other design features . . . pose a significant risk of harm to the mental health and well-being of children and adolescents." SB976 § 1. It noted that "the risk of poor mental health outcomes doubles for children and adolescents who use social media at least three hours a day." *Id.* It also noted that heavy social media use "leads to less healthy sleep patterns and sleep quality, which can in turn exacerbate both physical and mental health

problems." *Id.* And it noted a U.S. Surgeon General's report concluding that children and adolescents who use social media at least three hours a day have double the risk of poor mental health outcomes. *Id.* The Legislature emphasized, however, that "[s]ocial media provides an important tool for communication and information sharing," SB976 § 1(a). Given these findings, the Legislature narrowly tailored SB976 to address the harms caused by excessive time online while preserving minors' access to content and platforms across the internet and avoiding intrusion on companies' speech rights.

Three provisions of SB976 are most relevant to this appeal. First, SB976 limits any "internet website, online service, online application, or mobile application," with exceptions, from providing an "addictive feed" to a minor unless a parent or guardian consents. Cal. Health & Safety Code §§ 27000.5(b), 27001(a)(1).[4] An "addictive feed" consists of media shared by other users in which that media is shown to a user based on the user's unique information and online activity. § 27000.5(a). To fit that definition, the material in the feed must be recommended "based, in whole or in part, on information provided by the user" (*e.g.*, the user's location, age, and gender) or on information "otherwise associated with the user or the user's device" (*e.g.*, the user's activity, including their "likes,"

---

[4] All statutory citations are to the California Health and Safety Code, unless otherwise noted.

shares, and comments). *Id.* The definition expressly excludes feeds consisting of media provided in response to a user's search, § 27000.5(a)(2), and feeds of media from authors, creators, or posters whose content the user has expressly requested, § 27000.5(a)(4).

Second, SB976 creates a suite of "default settings" on platforms that feature addictive feeds as a significant part of their services. They include, as relevant here, one provision that limits platforms from providing addictive feeds to minors without parent or guardian consent, § 27001(a), and another that allows parents or guardians to limit the time per day that a minor may access an addictive feed (set to one hour by default), § 27002(b)(2). Other default-setting provisions include a limit, for platforms that significantly feature addictive feeds, on the display of the number of "likes" and other feedback that posts receive, § 27002(b)(3), and a default privacy mode that limits strangers from viewing or interacting with a minor's posts, § 27002(b)(5). All of the default settings must be "on" by default, but they can be turned off by parents or guardians. §§ 27002(b)(3), (5).

Third, to facilitate SB976's other requirements, the statute contains provisions that require companies to reasonably determine whether the users of their platforms are minors. §§ 27001(a)(1)(B), 27002(a)(2). However, that age-assurance requirement does not go into effect until January 1, 2027. *Id.* Moreover, the requirement is subject to further definition, because SB976 requires the

11

Attorney General to promulgate age-assurance regulations, which he has not yet done. *See* § 27006(b). Until January 1, 2027, a company violates SB976 by engaging in conduct the law prohibits only if it has "actual knowledge that [a] user is a minor." §§ 27001(a)(1)(A), 27002(a)(1).

SB976 is also clear about what it does *not* do. It expressly does not limit the content any users, including minors, can search for, access, and view. *See* §§ 27000.5(a)(1), (2), (4). Thus, while SB976 would prevent a child from seeing content as part of an *addictive feed*, that child could access that same content by, for example, actively searching for it or "following" the user who posted it. Additionally, SB976 expressly does not limit direct, private communication between users, including minors. § 27000.5(a)(5). Similarly, SB976 expressly does not diminish privacy protections for minors. It contains a provision that prohibits platforms from retaining information furnished in the age-assurance process. § 27001(b). Another provision clarifies that SB976 does not require companies to give parents any additional or special access or control over their children's accounts. § 27003(a). Nor does SB976 interfere with companies' ability to moderate content or block material that companies consider harmful or objectionable. For example, nothing in SB976 prevents platforms from removing content (including "violent and graphic content," "suicide and self-injury content," "coordination of harm," "nudity," "hate speech," or "bullying and harassment,"

3-ER-354 (Davis Decl. ¶¶ 40-41)).

## III. PROCEDURAL HISTORY

NetChoice is an industry trade association organized to advocate for the legal and business interests of its member companies. 3-ER-307-08 (Cleland Decl. ¶¶ 3-4). Among its members are the companies that own platforms such as Facebook, YouTube, and X. 3-ER-308 (*id.* ¶ 4). On November 12, 2024, NetChoice filed this case, alleging that some of its members were likely to be regulated under SB976's requirements, and claiming, among other things, that SB976 facially violates the First Amendment. 3-ER-378-411 (Complaint).

Along with its complaint, NetChoice filed a motion for a preliminary injunction, seeking to stop SB976 from going into effect on January 1, 2025. 3-ER-274-305 (Motion). NetChoice supported its motion with four declarations. One submitted by NetChoice's general counsel describes the platforms of NetChoice's members and the effect that NetChoice expects SB976 to have. 3-ER-306-17. Crucially, however, the declaration provides no details about how the regulated features of NetChoice's members' platforms—including their feeds—actually work, or how SB976 would impact those features. The remaining three declarations were prepared by executives from three of NetChoice's members: YouTube (owned by Google), 3-ER-318-37; Meta (which owns Facebook and Instagram), 3-ER-338-63; and Dreamwidth, 3-ER-364-77. Those declarations

13

generally describe those platforms and their policies but provide few (if any) pertinent details as to how their purportedly regulated features work or how SB976 would impact them.

The district court denied NetChoice's preliminary-injunction motion in relevant part.[5] 1-ER-006-39. The district court first concluded that NetChoice's challenge to SB976's age-assurance provisions was prudentially unripe. 1-ER-013. It emphasized that age assurance is "not an abstract question of law" but "highly factual[,] and depends on the current state of age assurance technology." 1-ER-015. Here, the court explained, NetChoice's age-assurance challenge "raises extensive factual issues that still require more development." 1-ER-013-14.

For similar reasons, the court determined that NetChoice had not shown a likelihood of success on its claims that SB976's addictive-feed and default-setting provisions facially violate the First Amendment. 1-ER-020-28, 1-ER-033-34. Specifically, the court concluded that "much of the First Amendment analysis depends on a close inspection of how regulated feeds actually function," but that NetChoice had "not made a record" that would allow for that inquiry. 1-ER-027.

---

[5] The district court granted portions of NetChoice's motion, finding preliminarily for NetChoice as to its challenge to SB976's restriction on certain notifications and SB976's requirement that companies make certain disclosures, 1-ER-028-36. The Attorney General does not here challenge those preliminary determinations, which are not the subject of this appeal.

Because NetChoice had not compiled "a record demonstrating that more personalized feeds than not are actually expressive," it "failed to demonstrate a colorable facial claim." 1-ER-028; *see also* 1-ER-033-34 (denying preliminary relief as to default-setting provisions).

Finally, the court preliminarily rejected NetChoice's remaining claims. It declined to find that SB976 was void for vagueness. 1-ER-037-38. And it concluded that NetChoice had not established associational standing to assert any as-applied claims against SB976 on behalf of its members, because "each separate as-applied challenge on behalf of each separate NetChoice member requires its own 'ad hoc factual inquiry.'" 1-ER-036-37. The court was careful to note that it had "decided [NetChoice's] motion on a highly abbreviated schedule[,] and the parties had the opportunity to assemble only a thin record in that time." 1-ER-039. The court "emphasize[d] that this preliminary injunction order is just that—preliminary." 1-ER-039.

NetChoice appealed. 4-ER-547-48. It also moved in the district court for an injunction pending appeal, which the court granted in part—though the court adhered to its previous conclusion that NetChoice had not made a showing, on the current record, that the addictive-feed and default-setting provisions are unconstitutional. 1-ER-005. NetChoice then moved this Court for an injunction pending appeal, which this Court granted. The entirety of SB976 is therefore

15

enjoined pending the outcome of this appeal.

## STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction for abuse of discretion. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2011). Legal questions are reviewed de novo, but the district court's factual findings are entitled to deference unless they are clearly erroneous. *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). The party seeking the injunction must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. The movant bears the burden of proving each element, *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009), and must do so by a "clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

## SUMMARY OF ARGUMENT

The district court correctly concluded that NetChoice is unlikely to succeed on the merits of the claims it presents here. As a threshold matter, NetChoice's challenge to SB976's age-assurance requirement is unripe because the requirement does not go into effect until 2027, and the Attorney General has not yet

promulgated the required regulations. The district court therefore appropriately elected to await further factual developments rather than rule prematurely.

Nor did the district court abuse its discretion in determining that NetChoice was unlikely to succeed on its facial First Amendment claims against SB976's addictive-feed and default-setting provisions. NetChoice seeks to render those provisions unenforceable not just against NetChoice's members, but against any entity that could be regulated by SB976. But facial constitutional claims are disfavored, they require a rigorous factual inquiry, and—as the district court found—NetChoice has not even attempted to meet that burden at this early stage. NetChoice hopes to avoid augmenting its deficient record in the district court by arguing that all content feeds—even those controlled by artificial intelligence rather than judgments made by human beings—are per se protected speech. Contrary to NetChoice's characterization of the caselaw, however, the Supreme Court has expressly declined to reach whether the First Amendment applies to processes defined more by machine learning than human judgment. Instead, the Supreme Court has emphasized that such questions require fact-intensive analysis. There is accordingly no reason for this Court to resolve those questions as a matter of law, at a preliminary stage, in an interlocutory posture, and on record that the district court recognized was much too thin.

Even assuming that SB976's addictive-feed and default-setting provisions were subject to First Amendment scrutiny, this Court should apply the less stringent intermediate-scrutiny standard that governs content-neutral laws. SB976 is content-neutral because it regulates only the way platforms present digital features to minors; it does not restrict the topics, ideas, or messages that platforms express or proliferate. Even assuming SB976 were subject to strict scrutiny, its provisions withstand review because SB976 pursues an interest that the Supreme Court has recognized as compelling—the mental and physical health and well-being of children—it narrowly focuses on features that harm children, and it preserves minors' access to speech online.

This Court should also affirm the remaining bases for the district court's order. SB976 is not unconstitutionally vague. A reasonable person can easily perceive the conduct that it regulates. And NetChoice's as-applied First Amendment claims fail for want of associational standing. As the district court recognized, the resolution of those claims will require the participation of each of NetChoice's members—all of whom operate different platforms with different feeds that function differently. Because the First Amendment implications of SB976—if any—will therefore vary from member to member, NetChoice cannot assert as-applied claims on behalf of its membership. The district court's order denying a preliminary injunction as to those claims should be affirmed.

18

# ARGUMENT

## I. NETCHOICE'S CHALLENGE TO SB976'S AGE-ASSURANCE REQUIREMENT IS UNRIPE

As a preliminary matter, the district court correctly concluded that NetChoice's challenge to SB976's age-assurance provisions is prudentially unripe. 1-ER-013-19. Under the prudential-ripeness doctrine, the Court must "first consider the fitness of the issues for judicial review, followed by the hardship to the parties of withholding court consideration." *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 837 (9th Cir. 2012). Courts "regularly decline[] on prudential grounds to review challenges to recently promulgated laws or regulations in favor of awaiting an actual application of the new rule." *Id.*

### A. SB976's age-assurance requirement is not yet fit for review.

The district court correctly determined that NetChoice could not satisfy the fitness-for-review prong of the inquiry, which asks whether "further factual development would 'significantly advance [the Court's] ability to deal with the legal issues presented.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003). Further factual development is essential to the resolution of NetChoice's claim. SB976's age-assurance requirement is "still in flux." 1-ER-016. Companies are not required to "reasonably determine[]" whether each user is a minor until January 2027, §§ 27001(a)(1)(B), 27002(a)(2), and the Attorney General has not yet promulgated the required regulations concerning age assurance

19

that may refine or clarify the burdens (if any) that age assurance may entail, *see* § 27006(b). Under these circumstances, the court below correctly declined for prudential reasons to await further facts rather than "decide 'constitutional questions in a vacuum.'" *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc).

NetChoice disagrees, arguing that there is no need for further factual development because *any* age-assurance requirement is per se unconstitutional because it impedes minors and adults' access to protected speech. *See* Opening Brief ("OB") 45-46. Even assuming that the features regulated by SB976 are protected speech, *but see infra* 29-35, the Supreme Court cases that NetChoice cites fall far short of establishing a per se rule about the constitutionality of age-assurance requirements. In both *Reno v. ACLU*, 521 U.S. 844 (1997), and *Ashcroft v. ACLU*, 542 U.S. 656 (2004), the Court considered whether laws that criminalized the act of providing obscene or indecent material to children online unduly restricted adults' access to protected speech. The laws in both cases allowed defendants to escape liability if they implemented specific age-verification procedures to block minors' access to the objectionable content. *See Reno*, 521 U.S. at 859-61 (statute required "designated forms of age proof, such as a verified credit card or an adult identification number or code"); *Ashcroft*, 542 U.S. at 662 (similar).

Neither case held that age-verification provisions are per se unconstitutional or necessarily subject to strict scrutiny. In both, the Court rejected age verification as an affirmative defense only after carefully reviewing district court findings of fact. *Reno*, 521 U.S. at 855-57; *Ashcroft*, 542 U.S. at 671-72. In *Reno*, the Court noted that the age-verification requirement at issue was unreliable at determining users' ages and prohibitively expensive to implement. 521 U.S. at 876-77, 881-82. And in *Ashcroft*, the Court explained that age-verification technology then in use was less effective than other means of blocking minors' access to content. 542 U.S. at 668. Indeed, the *Ashcroft* Court emphasized the need for the district court to update its factfinding on remand, because the record was five years old and did "not reflect current technological reality—a serious flaw in any case involving the Internet." *Id.* at 671. Properly understood, *Reno* and *Ashcroft* establish that "the viability of age assurance under the First Amendment is not an abstract question of law but rather requires a deep factual dive into how the implementation of age assurance using current technologies does or does not burden speech." 1-ER-015.

NetChoice nevertheless claims that the district court's prudential-ripeness determination was error because it is unconstitutional to "forc[e] website visitors to forgo anonymity otherwise available on the internet." OB 48 (internal quotation omitted). That argument also fails. The cases on which NetChoice relies are inapposite, either because (unlike SB976) they concerned imminently effective

21

age-assurance requirements, or because (unlike SB976) they involved statutes requiring parental consent before a minor could even access certain platforms. *See NetChoice, LLC v. Reyes*, No. CV 23-00911-RJS (CMR), 2024 WL 4135626, at *3 (D. Utah Sept. 10, 2024) (companies required to "implement an age assurance system" requiring submission of documentary evidence), *appeal docketed*, No. 24-4100 (10th Cir. Oct. 11, 2024); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753, 762 (S.D. Miss. 2024) (immediately requiring "all users, adults and minors alike, to verify their age before they may open an account"), *appeal docketed*, No. 24-60341 (5th Cir. July 5, 2024); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *1 (W.D. Ark. Aug. 31, 2023) ("Arkansans must submit age-verifying documentation before accessing a social media platform."). SB976's age-assurance provisions do not require users to submit documentation, for example, and they only restrict a minor's access to certain features—such as addictive feeds—not to entire platforms or their content.

In any event, NetChoice's argument depends on erroneous factual assumptions. First, NetChoice assumes that anonymity *is* otherwise available on the internet—relying on *Griffin*'s citation to a finding made by the District of Vermont in 2002 (as recounted in *American Booksellers Foundation v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)). Second, NetChoice points to no non-conclusory evidence substantiating the idea that a nebulous fear of losing anonymity will

actually chill users from accessing certain platform features. *Cf.* 3-ER-361 (Davis Decl. ¶ 59) ("I also understand that some people may be uncomfortable sharing identification."); 3-ER-336 (Veitch Decl. ¶ 50) (similar). And most importantly, third, NetChoice's argument assumes that age-assurance methods that satisfy SB976 will require users to forgo some aspect of their anonymity that they have not already forgone simply by logging onto the internet. But that is not necessarily the case—which only underscores the wisdom of awaiting further factual development on prudential-ripeness grounds. *See*, *e.g.*, 1-ER-016 (citing 2-ER-123-26 (Egelman Decl. ¶¶ 20-21)) (describing age assurance using data already collected from users for advertising purposes).

### B. NetChoice will not suffer hardship if age-assurance questions are delayed until they are ripe.

NetChoice also fails to satisfy the second prong of the prudential-ripeness inquiry, because it cannot show that it will suffer hardship if the Court withholds consideration of its challenge to the age-assurance requirement. *See Oklevueha*, 676 F.3d at 837. As the district court noted, not just any theoretical harm will suffice. The hardship must be "direct and immediate"; otherwise, "there is little harm in delaying judicial review" until more facts can be developed. 1-ER-018 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)).

NetChoice failed to establish any such "direct and immediate" harms. SB976's age-assurance requirement does not go into effect until 2027—nearly two

23

years from now. Moreover, the requirement may be further defined through yet-to-be adopted implementing regulations required by SB976. *See* §§ 27001(a)(1)(B), 27006(b). NetChoice can offer little more than speculative and conclusory allegations that any future age-assurance requirement will "prove costly and difficult for NetChoice members to implement." 3-ER-315 (Cleland Decl. ¶ 28). But that allegation should not be accepted at face value—especially when the government's declarant, an expert in his field, concluded (relying on cited reports) that age assurance is technically feasible, can be done in a manner that protects privacy, and is already required in other jurisdictions where NetChoice's members operate. 2-ER-142-43 (Egelman Decl. ¶¶ 55-56). On this record, the district court correctly found that NetChoice failed to establish sufficient hardship to justify "entangl[ing]" the court in an "abstract disagreement[]" about the legality of SB976's age-assurance requirement. *Project Veritas v. Schmidt*, 125 F.4th 929, 941 (9th Cir. 2025) (en banc).

## II.    NETCHOICE HAS FAILED TO MEET ITS BURDEN OF SHOWING THAT SB976 IS LIKELY UNCONSTITUTIONAL ON ITS FACE

The district court also acted well within its discretion when it found that NetChoice had not yet compiled an evidentiary record sufficient to show that it was likely to succeed on the merits of its facial First Amendment challenge. *See Smith v. Helzer*, 95 F.4th 1207, 1215 (9th Cir. 2024) (explaining that it is a "heavy burden" to show that the district court abused its discretion in denying preliminary

injunction). The first hurdle a plaintiff must clear in any free-speech challenge to a statute is to show that the statute actually burdens the plaintiff's speech in a way that is more than incidental, such that any constitutional scrutiny is required at all. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019). Only after the plaintiff has shown that such scrutiny is warranted will a court proceed to determine whether the statute burdens speech to an unconstitutional degree. *See United States v. Swisher*, 811 F.3d 299, 311 (9th Cir. 2016) (en banc).

NetChoice's facial challenge fails this threshold inquiry. NetChoice's core contention is that SB976's targeting of addictive feeds in its coverage definition and specific requirements renders the statute facially unconstitutional. But as the district court explained, NetChoice has not developed a record capable of showing at the threshold that SB976's addictive-feed provisions burden protected speech in a way that is more than incidental.

## A.    Facial free speech challenges are "hard to win."

When a plaintiff brings a facial constitutional challenge, its claim is not that its particular interests will be harmed, but that the challenged statute is so flawed that it can never be constitutionally applied. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). "Facial challenges are disfavored for several reasons." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). They "raise the risk of 'premature interpretation of statutes on the basis of factually

barebones records.'" *Id.* They risk asking courts to "anticipate a question of constitutional law in advance of the necessity of deciding it" or to "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Id.* And they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.

Because facial challenges are "strong medicine," they are "not to be 'casually employed.'" *United States v. Hansen*, 599 U.S. 762, 770 (2023). In a typical facial challenge, the burden is on the plaintiff to show that "no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. Facial challenges under the First Amendment's free speech clause—sometimes called "overbreadth" challenges, *id.*—are somewhat different but still "hard to win," *Moody*, 603 U.S. at 723. A plaintiff must show that the law's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. If that burden is met, the law is unenforceable in *any* scenario, not just in its unconstitutional applications, due to the "threat" that "an overbroad law may deter or 'chill' constitutionally protected speech." *Virginia v. Hicks*, 539 U.S. 113, 119.

To meet its facial burden, a plaintiff cannot just survey the "text of [the law]"; it must also make a showing of "'actual fact[]' that substantial overbreadth exists." *Id.* at 122. "Plaintiffs in a facial challenge must prove that the statute's

26

'unconstitutional applications [are] realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep.'" *Ariz. Att'ys for Crim. Justice v. Mayes*, 127 F.4th 105, 110 (9th Cir. 2025) (*AACJ*).  Without a "lopsided ratio" in favor of realistic unconstitutional applications of the statute, courts must handle claims "as they usually do—case-by-case." *Hansen*, 599 U.S. at 770.

The Supreme Court recently reaffirmed, in the context of two laws regulating internet companies, that meeting the burden of a facial First Amendment challenge is a "rigorous" undertaking. *Moody*, 603 U.S. at 723. In *Moody*, the Court considered First Amendment challenges to Texas and Florida laws that limited the ability of companies to moderate content on their platforms. *Id.* at 717. The Eleventh Circuit had affirmed a preliminary injunction against the Florida law; the Fifth Circuit had reversed a preliminary injunction against the Texas law. *Id.* The Fifth Circuit had ruled that content moderation is not protected speech, or, if it *is* protected speech, that it can be curtailed to further a government interest in the diversity of ideas. *Id.* at 722. The Supreme Court reversed both courts because neither had conducted the "rigorous" facial inquiry required by the caselaw discussed above. *Id.* at 723, 726.

Before the Court remanded the cases, however, it provided further guidance to the Fifth Circuit. The Court explained that a law that interferes with editorial discretion—that is, the curation of content into compilations or repertoires such as

27

newspaper pages, newsletters, and even parades—is subject to scrutiny under the First Amendment. *Id.* at 726-31. To the extent that the Texas law interfered with the content-moderation policies of platforms such as Facebook and YouTube by limiting their "authority to remove, label or demote messages they disfavor," the law ran afoul of the First Amendment's protection for editorial discretion. *Id.* at 736, 744. Importantly, though, the Court was careful to note that its analysis pertained to restrictions on "independent content standards" that make "user-agnostic judgments," *not* to "feeds whose algorithms respond solely to how users act online," *id.* at 736 n.5—*i.e.*, the feeds that SB976 covers.

The Court reemphasized that "[e]ven in the First Amendment context, facial challenges are disfavored, and neither parties nor courts can disregard the requisite inquiry into how a law works in all of its applications." *Id.* at 744. Indeed, the Court was unanimous in emphasizing the need for a fully developed factual record in a facial challenge. *See id.* at 726 (explaining that the "underdeveloped" record prevented analysis of facial claims); *id.* at 747 (Barrett, J., concurring) ("[T]he analysis is bound to be fact intensive, and it will surely vary from function to function and platform to platform."); *id.* at 748 (Jackson, J., concurring) ("[C]ourts must make sure they carefully parse not only what entities are regulated, but how the regulated activities *actually function*[.]"); *id.* at 769 (Alito, J., concurring) ("[I]t is impossible to determine whether [a law is] unconstitutional in all [its]

28

applications without surveying those applications."). The Court's bottom line remained that in cases like this one, where a law regulates "a broad swath of varied platforms and functions," successfully proving a facial First Amendment challenge is a "daunting, if not impossible, task." *Id.* at 745 (Barrett, J., concurring); *see also id.* at 725 (majority opinion) (explaining that courts must "determine what [the law] covers" across the "variegated and complex" online environment).

### B.   NetChoice has not yet developed a record sufficient to establish that SB976 facially burdens protected speech.

With those background principles in mind, the district court did not abuse its discretion when it denied NetChoice a preliminary injunction on its facial First Amendment claims against SB976's addictive-feed provisions. To succeed on the merits of its facial claims, NetChoice had to satisfy a two-part burden. First, NetChoice had to provide a factual record sufficient to allow the court to "determine [the] law's full set of applications," cataloging "[w]hat activities, by what actors" the law regulates. *Moody*, 603 U.S. at 718, 724. Here, that means surveying an "ever-growing number of apps, services, functionalities, and methods for communication and connection" and discerning how SB976 would apply to each. *See id.* at 725.

Second, NetChoice had to produce a record that would allow the court "to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* That includes showing not only that each

29

potential application of SB976 has a more-than-incidental impact on speech, triggering First Amendment scrutiny, but also that SB976 is likely to fail such scrutiny. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117, 1123 (9th Cir. 2024). Potential applications of SB976 that NetChoice does not challenge "must [be] treat[ed] as constitutional for purposes of this facial challenge."[6] *AACJ*, 127 F.4th at 111.

### 1. NetChoice has not demonstrated the full set of SB976's potential applications.

The district court appropriately denied NetChoice preliminary-injunctive relief at the first step based on NetChoice's failure to compile a record that shows SB976's "full set of applications." *Moody*, 603 U.S. at 718. NetChoice was required—and failed—to substantiate its facial claim by inventorying the universe of platforms that would be affected by SB976. Even NetChoice does not argue that its record, consisting of just four declarations, comprises "the kind of wide-ranging record on the entire spectrum of personalized feeds in existence that would be necessary to make that showing." 1-ER-023.

---

[6] For the purposes of this First Amendment inquiry, it does not matter whether a plaintiff invokes the speech rights of the speaker (here, the platform) or the listener (here, the user); those rights are analyzed under the same criteria. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion) ("[T]he right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them[.]") (emphasis added). If a feature does not constitute protected speech, then the government does not violate the First Amendment rights of a user by restricting the user's access to that feature.

Nor could it. Three of NetChoice's declarations address only a few platforms—YouTube (3-ER-318-37); Facebook and Instagram (3-ER-338-63); and Dreamwidth (3-ER-364-77)—and do not explain how those platforms' feeds actually function. The fourth contends only that five of NetChoice's members would be covered by SB976, 3-ER-314 (Cleland Decl. ¶ 26), while saying nothing about how SB976's operative provisions would affect three of those members (NextDoor, Pinterest, and X). That paltry record does not allow this Court to determine "what [SB976] covers," and thus it is "impossible to determine whether [the] statute reaches too far[.]" *United States v. Williams*, 553 U.S. 285, 293 (2008). "It is a mystery how NetChoice could expect to prevail on a facial challenge without candidly disclosing the platforms that it thinks the challenged laws reach[.]" *Moody*, 603 U.S. at 787 (Alito, J., concurring).

### 2. NetChoice has not assembled a record that would allow for a comparison of SB976's valid and invalid applications.

The second step of the inquiry requires NetChoice to show that SB976 is "lopsided," *Hansen*, 599 U.S. at 770, because its "unconstitutional applications substantially outweigh its constitutional ones," *Moody*, 603 U.S. at 724. NetChoice cannot meet that burden at this stage of the litigation, having failed to survey the full range of SB976's potential applications. *See Williams*, 553 U.S. at 293.

NetChoice does not argue otherwise. Instead, it asks the Court to focus on three potential applications of SB976's addictive-feed provisions: its potential

31

application to the feeds on Instagram, YouTube, and Facebook. OB 13, 30. Yet even if evidence of SB976's impact on just three platforms were sufficient to substantiate a facial First Amendment challenge, NetChoice fails to show that SB976 actually interferes with protected speech on those three platforms.

Every First Amendment free speech claim must begin with a threshold showing that the challenged government action regulates speech in a way that is more than incidental. *Project Veritas*, 125 F.4th at 942, 944. As to its three highlighted platforms, NetChoice argues that SB976 interferes with the "editorial discretion" described in *Moody*. OB 27. More specifically, NetChoice argues that the creation of feeds necessarily involves exercise of the same sort of judgment involved in, for example, selecting and arranging content on a newspaper page. *Id.* It further argues that because *Moody* analogized Facebook and YouTube's *content-moderation* practices to that more traditional form of "editorial" decision-making, *see Moody*, 603 U.S. at 727-33, this Court should simply apply the same "editorial discretion" principles to NetChoice members' feeds and underlying algorithms.

That argument falls short. To make even a colorable argument on this score, NetChoice must first demonstrate that SB976 interferes with "editorial choices," or *some* exercise of editorial judgment or curatorial decision-making, "as to every covered platform or function." *Id.* at 725, 731. Here, NetChoice points to content-moderation policies that Instagram, YouTube, and Facebook have adopted, such as

promoting or demoting certain types of content. OB 13-14, 32-33; *see also, e.g.*, 3-ER-354 (Davis Decl. ¶ 41); 3-ER-327, 3-ER-331-32 (Veitch Decl. ¶¶ 25, 37). But that evidence is irrelevant. As the district court correctly found, SB976 does not restrict content moderation. 1-ER-024. Instead, SB976's addictive-feed provisions are concerned with platforms' use of minors' data to feed minors online material. *See id.* (explaining that content moderation concerns "independent content standards," not utilization of a users' personal information) (quoting *Moody*, 603 U.S. at 736 n.5). Indeed, SB976 expressly *preserves* the ability of companies to restrict material based on the ages of their users. § 27000.5(a)(3) (exempting feeds from coverage definition where the only user information employed by the feed consists of "device communications or signals concerning whether the user is a minor").

Aside from irrelevant evidence about NetChoice members' content-moderation policies, NetChoice has presented almost nothing concerning the factual issue at the center of its First Amendment claim: How the *feeds* used by its members (which feeds *may* be regulated by SB976) make their recommendations. The one exception is a declaration from an executive at Meta, who explained that "Facebook and Instagram use artificial intelligence systems to decide what content appears and in what order." 3-ER-341 (Davis Decl. ¶ 12). The Meta declaration further explains that those "[f]eeds employ prediction models that use many input

33

signals"—including data from users—and that the "models and their input signals are dynamic and change frequently over time." *Id.*

NetChoice does not argue that this passage in the Meta executive's declaration supports its facial challenge, and for good reason: It indicates that at least *some* of NetChoice members' feeds are the product of artificial-intelligence algorithms that recommend material in reaction to user behavior (and that it makes those recommendations in unpredictable ways). *Accord* 2-ER-133 (Egelman Decl. ¶ 33).

As the Supreme Court has recognized, those kinds of AI-driven feeds raise First Amendment questions distinct from, and vastly more complicated than, questions concerning traditional exercises of "editorial discretion" by newspaper editors, parade organizers, and internet companies implementing "independent content standards." *Moody*, 603 U.S. at 736 n.5. For example, such feeds call into question whether a "dynamic" AI algorithm that writes its own rules, rather than executing a programmer's instructions, is "speaking" for First Amendment purposes when it recommends content. *Cf. Moody*, 603 U.S. at 795 (Alito, J., concurring) ("[W]hen AI algorithms make a decision, 'even the researchers and programmers creating them don't really understand why the models they have built make the decisions they make.'"); Austin & Levy, 77 STAN. L. REV. at 60 ("[M]achine learning models make predictions based on rules the programmer did

not write, which will inevitably and unpredictably produce output contrary to what the programmer intended, for reasons the programmer cannot explain.").[7] At a minimum, these complicated questions counsel in favor of judicial restraint—and therefore counsel against NetChoice's request for sweeping injunctive relief in the present interlocutory posture and on the present sparse record. *See Wash. State Grange*, 552 U.S. at 450 (cautioning against "premature interpretations of statutes in areas where their constitutional application might be cloudy").

### C.    Instead of submitting evidence to satisfy its burden, NetChoice misconstrues SB976 and the governing caselaw.

Rather than attempt to cure its deficient record in the district court, NetChoice argues that the Supreme Court has already resolved the question of whether "most or all personalized feeds covered by SB976 are expressive." OB 30. Even setting aside the fact that the Supreme Court has never addressed SB976, NetChoice's argument is built on a misreading of the governing caselaw—in particular, *Moody* and *Packingham v. North Carolina*, 582 U.S. 98 (2017).

---

[7] The question is not necessarily whether the platforms "agree" with the recommendations made by their algorithms, *see* Cato Institute Amicus Br. 6-7, but whether the actions that algorithms take can truthfully be called "expressive choice[s]." *Moody*, 603 U.S. at 740. The answer "might cast doubt on—or might vindicate—a social-media company's invocation of its First Amendment rights. Regardless, the analysis is bound to be fact intensive, and it will surely vary from function to function and platform to platform." *Id.* at 747 (Barrett, J., concurring).

*Moody* does not support NetChoice's claim. NetChoice argues that *Moody* categorically held that feeds of content curated by any means are necessarily protected by the First Amendment. *See, e.g.*, OB 30-31. But that overstates the Court's holding. For one thing, the Court expressly declined to resolve the question at issue in this case: Whether the First Amendment protects "feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Moody*, 603 U.S. at 736 n.5. The Court's discussion of "editorial discretion" was focused on a law that—unlike SB976—interfered with content moderation. *Id.* at 726-27. In disapproving of that law's approach, the Court was careful not to draw broad conclusions from the undeveloped preliminary injunction record, stating only that "the current record suggests that *some* platforms, in at least *some* functions, are indeed engaged in expression." *Id.* at 716 (emphasis added). Far from allowing plaintiffs like NetChoice to short-circuit the rigorous factual burden in facial First Amendment challenges, *Moody* reaffirmed that the constitutional analysis is fact-intensive. *See supra* 28. *Moody* does not call into question the district court's exercise of discretion.

NetChoice's reliance on *Packingham* is similarly misplaced. *See* OB 26, 30. Even a cursory review of *Packingham* shows that the Court did not resolve—or even touch—the questions at issue in this case. *Packingham* concerned a North

Carolina law that made it a felony for a registered sex offender to access any "commercial social networking Web site" where minors could create accounts. 582 U.S. at 101. The Court's disposition of the case had nothing to do with content feeds or any other platform feature. Rather, the Court explained, by imposing an across-the-board prohibition on social media, the law stifled the ability of sex offenders to, for example, "know[] current events, check[] ads for employment, speak[] and listen[] in the modern public square, and otherwise explor[e] the vast realms of human thought and knowledge." *Id.* at 107. That rationale is not relevant here, because SB976 does not prevent minors (or adults) from doing any of these things. SB976 regulates particular features of online platforms. It does not impose any across-the-board ban on minors' access to those platforms or any of the platforms' content.

NetChoice also relies on five district court cases. *See* OB 7, 50. But each of those cases is readily distinguishable. In *NetChoice, LLC v. Reyes*, for example, the District of Utah expressly did not reach whether the plaintiff met its facial burden of showing an impact on its speech; the defendant apparently conceded the point. *See* 2024 WL 4135626, at *3. And unlike SB976, the laws at issue in NetChoice's other cited cases targeted content or contained sweeping bans on entire social media platforms. *See Fitch*, 738 F. Supp. 3d at 761-63; *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 546-47 (S.D. Ohio 2024); *Computer & Commc'ns Indus.*

*Ass'n v. Paxton*, No. 1:24-CV-849-RP, 2024 WL 4051786, at *2 (W.D. Tex. Aug. 30, 2024) (law targeted categories of content that "promote[], glorif[y], or facilitate[]" harm), *appeal docketed*, No. 24-50721 (5th Cir. Sept. 13, 2024); *Griffin*, 2023 WL 5660155, at *1. Those cases therefore do not resolve the facial constitutionality of SB976, which neither targets content nor bans users from any platform. The district court therefore appropriately exercised its discretion to deny NetChoice relief on the current factual record.

## III.  SB976 Is Subject, at Most, to Intermediate Scrutiny

Even if the Court were to conclude that NetChoice had submitted sufficient factual evidence to establish that SB976 implicates speech protected by the First Amendment, its provisions are subject, at most, to the less-demanding standard of intermediate scrutiny.

The intermediate-scrutiny standard applies to laws that are "content-neutral"; courts reserve strict scrutiny for laws that are "content-based." *Project Veritas*, 125 F.4th at 947. To determine whether a law is content-neutral or content-based, the Court must first examine the provisions of the law itself and then its purpose. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022). A law is content-based if its provisions target "particular speech because of the topic discussed or the idea or message expressed." *Id.* If the law's provisions do not target topics, ideas, or messages, it still may be content-based if its enactment was

38

motivated by "disagreement with the message [the speech] conveys." *Project Veritas*, 125 F.4th at 950. "By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994).

SB976 is content-neutral because neither its provisions nor its "purpose or justification" are tied to any "topic discussed" or "idea or message expressed." *City of Austin*, 596 U.S. at 73-74. The provisions at issue here—SB976's addictive-feed and default-setting provisions—target *features* of internet platforms. They do not mention specific topics, messages, or ideas. Nor do they make any content unavailable to any user, regardless of whether the user is a minor or an adult. Indeed, SB976 gives minors *more* control over the content they see, not less, by allowing them to navigate content without ceding control to algorithms that prioritize and display content based on their data.[8]

_____

[8] Indeed, much characterization of SB976 offered in opposition seems to misunderstand what SB976 does. NetChoice's amici underscore the importance of the internet for adolescents—particularly vulnerable or marginalized youth—to connect with others, to express themselves creatively, and to develop their interests. *See, e.g.*, Chamber of Progress, et al., Amicus Br. 7. But SB976 does not interfere with those activities. Minors do not need addictive feeds in order to explore Reddit communities about whales or search for cookie recipes on YouTube. *Cf. id.* at 9. Nor does SB976 prevent platforms from presenting compilations of the best or most relevant content in response to a search, *see* § 27000.5(a)(2), or from delivering content from creators who users choose to follow, *see* § 27000.5(a)(4). Nor are platforms prevented from otherwise exercising editorial discretion—to, for example, curate the best vegan cookie recipes, *see* §

(continued…)

SB976's purpose also reflects a desire to regulate harmful features—not any particular content. Courts look to a statute's "stated purpose" in determining its motivation. *See McCullen v. Coakley*, 573 U.S. 464, 480 (2014). As SB976's Legislative declarations attest, SB976 was enacted to protect children and teens against harmful online features. SB976 § 1(g). The legislative record contains no hint of motivation connected to particular content that minors might see as part of those addictive feeds. That should be dispositive of the content-based versus content-neutral inquiry.[9] *See City of Austin*, 596 U.S. at 76 (noting that courts can look for "evidence that an impermissible purpose or justification underpins a facially content-neutral restriction").

NetChoice nevertheless argues that SB976 is content-based because it maintains exceptions for certain subjects. For example, NetChoice points to the fact that SB976's coverage definition, § 27000.5(b)(1), encompasses "social media platforms." OB 50. The plain text of section 27000.5(b)(1), however, only clarifies that it *includes* "social media platforms"; it is in no way targeted toward or limited to such platforms. Ultimately, whether a platform is covered by SB976 depends

---

27000.5(a)(1), or filter out content they deem harmful to minors, *see* § 27000.5(a)(2).

[9] This Court should reject, as the district court did, NetChoice's suggestion that discussion of the dangers of "violent, scary, or sexualized images" in one of the Attorney General's declarations in the court below is in any way dispositive of the Legislature's motive when it enacted SB976. *See* OB 51; 1-ER-030.

only on whether the platform uses addictive feeds. Moreover, even if SB976 singled out social media platforms for coverage (and it does not), distinguishing between social media and other types of platforms is not equivalent to discriminating between topics, ideas, or messages. *City of Austin*, 596 U.S. at 73-74; *see also* 1-ER-029 ("Social interactions can run the entire gamut of topics and ideas.").

For similar reasons, this Court should reject NetChoice's suggestion that SB976 must be content-based because it excludes platforms that limit user interaction to commercial transactions or consumer reviews. *See* OB 50. As this Court explained en banc, a law may distinguish between "classes or types of speech—such as speech that constitutes solicitation"—and remain content-neutral, "so long as it does not discriminate on the basis of viewpoint or restrict discussion of an entire topic." *Project Veritas*, 125 F.4th at 950. SB976's coverage choices fit comfortably within that framework for content-neutral laws. Commercial transactions and consumer reviews are classes or types of communication; they are not viewpoints or topics. Consumer reviews, for example, can cover a range of topics, from restaurants to sporting equipment to automobile repair. Individual reviews may encompass limitless viewpoints. The mere fact that a law distinguishes between such classes or types of communication—whether consumer reviews, solicitations, or, as in *Project Veritas*, conversations involving police

41

officers—does not render a law content-based. *See id.*

Finally, NetChoice claims that strict scrutiny applies because SB976 is improperly speaker-based because it applies to some platforms but not others. *See* OB 51-52. But NetChoice cites no authority for its argument that regulating certain "speakers" and not others triggers strict scrutiny. Indeed, the law is clear that "speaker-based" laws are viewed with suspicion only when the government has "left unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 778 (2018) (*NIFLA*). "[P]rovisions [that] distinguish between speakers" but "are not a subtle means of exercising a content preference" are not subject to strict scrutiny. *Turner*, 512 U.S. at 645; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). Here, because NetChoice has failed to establish that SB976's coverage definition is a proxy for promoting particular topics, ideas, or messages, SB976 is subject to—at most—intermediate scrutiny.

## IV. SB976'S ADDICTIVE-FEED AND DEFAULT-SETTING PROVISIONS SURVIVE ANY LEVEL OF FIRST AMENDMENT SCRUTINY

In any event, SB976 satisfies either intermediate or strict scrutiny. To pass intermediate scrutiny, a law (1) must further a significant governmental interest, and (2) must be narrowly tailored to serve that interest while "leav[ing] open ample

42

alternative channels for communication of the information." *Project Veritas*, 125 F.4th at 952. The law "need not be the least restrictive or least intrusive means" of furthering the government's interest. *Id.* at 956. To pass strict scrutiny, by contrast, a law "may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1070 (9th Cir. 2022). But even with strict scrutiny, the Constitution requires only that the law "be narrowly tailored, not that it be 'perfectly tailored.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015).

Under either level of heightened scrutiny, SB976 passes muster. SB976 is designed to further an interest that the Supreme Court has concluded is compelling—the protection of the mental and physical health of children. And it is precisely tailored to further that compelling interest by targeting only those features of online platforms that have been shown to harm children, while preserving children's access to content on the internet.

### A. SB976 furthers a significant and compelling government interest.

SB976's addictive-feed provisions are motivated by what the Supreme Court has called "a compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). The Court also recognized that children "generally are less mature and responsible"; "often lack the experience, perspective, and judgment to recognize

43

and avoid choices that could be detrimental to them"; and "are more vulnerable or susceptible to outside pressures[.]" *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) (ellipses and internal quotation omitted). And the Court has acknowledged "the legitimacy and importance of the congressional goal of protecting children from harmful materials." *Reno*, 521 U.S. at 849. In short, the law properly "assum[es] that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." *J.D.B.*, 564 U.S. at 273.

Despite this established caselaw reinforcing the Legislature's compelling interest in children's health, NetChoice argues that the evidence before the district court was insufficient to show that addictive feeds "specifically cause" harm to children. OB 36. But the Legislature identified an actual problem in need of solving, which SB976's title, findings, and history substantiate, and which the Attorney General's unrebutted declarations from experts in their fields support. *See supra* 6-10. In any event, the Supreme Court has not set forth any rule requiring a particular quantum of proof to establish a substantial or compelling interest. Indeed, the Court has found interests to be compelling, even under strict scrutiny, without requiring *any* evidentiary support. *See Williams-Yulee*, 575 U.S. at 447 (explaining that "public confidence in judicial integrity" does not "lend itself to

44

proof by documentary record" but that "no one denies that it is genuine and compelling").

Still NetChoice dismisses the government's evidence of a compelling interest, citing *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), for the proposition that the government must support the interest furthered by a statute with evidence of causation, not correlation. OB 36. But *Brown* does not support NetChoice's position. As an initial matter, the Attorney General provided the district court with ample evidence showing that addictive feeds cause real harm. *See, e.g.*, 2-ER-237-41 (Radesky Decl. ¶¶ 61, 64, 67). As the district court concluded, much of that evidence consists of randomized trials and experiments that show causation. 1-ER-032; *see also* 2-ER-181 (Feder Decl. ¶ 38) (explaining that the randomized trials "necessarily imply causation"). Indeed, one of the government's declarants, well-credentialed in this area, pointed to seven such experimental studies, which together "corroborate and strengthen" the conclusion that "a substantial fraction of social media use is unwanted use due to habit formation," and that "spending less time using social media improves mental health and well-being outcomes like depression, anxiety, self-image, and sleep duration." 2-ER-181-87, 2-ER-194 (Feder Decl. ¶¶ 38-48, 59).

Regardless, NetChoice's characterization of *Brown* as strictly requiring evidence of causation over correlation in every case is not accurate. *Brown*

concerned a content-based restriction on violent video games—an effort to categorize such video games as "obscene" and therefore outside the ambit of the First Amendment. 564 U.S. at 789, 793. The Court rejected that categorization, and then—turning to the strict-scrutiny analysis—rejected the government's evidence of the harms caused by violent video games as too ambiguous to support a compelling interest in targeting them. *Id.* at 799-801. But the problem with the studies relied upon by the governing was *not* strictly that they showed correlation instead of causation, but that they "suffer[ed] from significant, admitted flaws in methodology" while showing "at best *some* correlation" between violent video games and "minuscule real-world effects." *Id.* at 800-01 (emphasis added). That questionable evidence therefore was not enough to convince the Court—already skeptical that the law was motivated not by the "objective effects" of violent video games but by "the ideas expressed" in them—that violent video games posed a legitimate threat to children's health. *Id.* at 799.

Unlike the law at issue in *Brown*, SB976 does not target specific content and does not raise the kind of "doubts about whether the government is in fact pursuing the interest it invokes" that spurred the Court in *Brown* to subject the statute at issue there to such scrutiny. 564 U.S. at 802. Indeed, SB976 makes its intentions quite clear: It is meant to target platforms' addictive features, not their content. *See* SB 976 § 1(b). And its specific previsions are all squarely aimed at implementing

that stated intent, regulating only the harmful features of platforms, not the content that might become available through those features. *See*, *e.g.*, § 27000.5(a). This Court should therefore accept the Legislature's interest as "compelling."

### B. SB976 is narrowly tailored to the protection of children's mental and physical health and well-being.

Not only has the Legislature expressed a "compelling" interest in protecting children's health, but SB976's addictive-feed provisions are also narrowly tailored to serve that interest. First, NetChoice forfeited any argument that SB976 fails intermediate scrutiny, as NetChoice never addresses the narrowly-tailored intermediate-scrutiny standard in its opening brief. *Lewis v. Andes*, 95 F.4th 1166, 1181 n.7 (9th Cir. 2024). Instead, NetChoice argues that SB976 is not sufficiently tailored because it is not the *least* restrictive means of accomplishing the Legislature's interest, OB 37–a standard that applies only to laws that are subject to strict scrutiny, not to intermediate scrutiny. *Project Veritas*, 125 F.4th at 956.

But even assuming that strict scrutiny applied, SB976 satisfies that standard. The government's compelling interest in restricting addictive-feeds—which motivates both SB976's central coverage definition and several of its specific provisions—is to protect the physical and mental health of minors, which includes limiting their access to addictive feeds. SB976 is narrowly tailored to that interest: It places limits on platforms only in connection with such addictive feeds, and it

47

does not otherwise prevent minors from signing up for any site, viewing any content, searching for any specific media, or subscribing to any creators they want.

NetChoice argues that SB976 is insufficiently tailored because NetChoice's members have adopted internal tools to protect children, and because parents have other tools to help them oversee their children online. OB 36-37. To the extent those features complement SB976 and its goal of protecting children's health, the Attorney General encourages them. But that does not mean that they are "less restrictive alternative[s]" or necessarily "serve the Government's purpose." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). In fact, the parental controls NetChoice mentions—such as routers that block access to entire websites, prohibitions on users under the age of 13, or features that allow parents to closely monitor their children's online activity, 3-ER-313 (Cleland Decl. ¶ 19)—are *more* restrictive than SB976 because they prevent minors from accessing content in ways SB976 avoids. And though parental controls might be beneficial in some respects, they do not necessarily serve SB976's purpose of alleviating the mental and physical health consequences associated with excessive or compulsive internet use. *See* SB976 § 1(b)-(e). Moreover, research has shown that in comparable online areas, such as children's privacy, voluntary self-regulation within the industry is not a reliable or effective means of protecting children. *See* 2-ER-135-137 (Egelman ¶¶ 39-43).

NetChoice next argues that SB976 is insufficiently tailored because it is overinclusive. For example, NetChoice claims that SB976 is overinclusive because it is not limited to websites that are "particularly harmful to minors" or "particularly likely to be accessed by minors." OB 52. But SB976's compelling interest is not about the dangers of "harmful" websites or websites that focus on minors. The government's compelling interest is about limiting minors' access to addictive feeds, and any website that uses an addictive feed is harmful to minors irrespective of its content. Nor is SB976 overinclusive because it does not account for and the varying maturity levels that minors may have at different ages. *Id.* The government's interest in safeguarding the health of minors applies as much to 13-year-olds as it does 17-year-olds. *See* 2-ER-172, 2-ER-175 (Feder Decl. ¶¶ 20, 30).

NetChoice's arguments about underinclusiveness also fall short. NetChoice claims that SB976 is underinclusive because it allows minors to access addictive feeds with parental consent. OB 37-38. "[T]he First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee*, 575 U.S. at 449. After all, it is "counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech." *Id.* at 448. As the Supreme Court has explained, "[w]e have . . . upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Id.* at 449.

Instead, the concept of underinclusiveness addresses "whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.* at 448. *Brown* illustrates this point. NetChoice cites *Brown* to support its underinclusiveness argument, but the Supreme Court reached the question of underinclusiveness only after concluding that the government had not sufficiently demonstrated that the interest it invoked in support of banning violent video games was anything but a cover for its "esthetic and moral judgments." 564 U.S. at 790, 799. In contrast, SB976's regulation of addictive feeds and other features is based on a well-documented and content-neutral harm caused by those features. Unlike in *Brown*, there is no reason to doubt whether the government is actually pursuing the interest it invokes. And where, as here, the government is genuinely pursuing a compelling interest, the Supreme Court has pointed to parental consent requirements as evidence of narrow tailoring that favored *upholding* a statute. *See Reno*, 521 U.S. at 865.

Finally, NetChoice suggests that SB976 is not narrowly tailored because the district court's ruling would allow jurisdictions to ban "personalized feeds" across the board, "even for adults." OB 25. But that argument misreads both the district court's order and SB976. The court below concluded only that NetChoice—at this preliminary stage—had "failed to meet its burden of demonstrating, as *Moody* requires for facial challenges, that most or all personalized feeds covered by SB976

50

are expressive and therefore implicate the First Amendment." 1-ER-020. That

preliminary conclusion, based on the evidence currently in the record, plainly says

nothing about blanket bans on "personalized feeds." Moreover, SB976 does not

regulate addictive feeds because they are harmful generally, but because they are

harmful to minors specifically. *See* SB976 § 1(g). As a result, the bread and butter

of SB976—the parental consent provisions, the age-assurance requirements, and

the default-settings provisions—are all means of tailoring SB976 to that

compelling interest.

### C. SB976's default-setting provisions are narrowly tailored to their own compelling interest.

This Court should also reject NetChoice's arguments that certain of SB976's

default-setting requirements are unconstitutional. *Cf.* OB 40-44. For example,

NetChoice argues that section 27002(b)(3)—which requires a default setting

restricting the display of the number (but not the content) of forms of feedback,

such as "likes" on posts within an addictive feed—violates the First Amendment

because numeric "like" counts "communicate[] information." OB 40. But "the

First Amendment does not prevent restrictions directed at commerce or conduct

from imposing *incidental* burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S.

552, 567 (2011) (emphasis added). And here, the burden of a content-neutral

restriction on the number of "likes"—but not the "likes" and feedback

51

themselves—is at most incidental. As the district court found, there is little expressive value in a numeric "like" count. 1-ER-033-34.

Even if the burden created by section 27002(b)(3) were more than incidental, the district court correctly found that the requirement is content-neutral and satisfies intermediate scrutiny. *See* 1-ER-033-34. It does not restrict specific ideas or views, just numbers that signify an amount of feedback. *Turner*, 512 U.S. at 643. And its purpose is not to restrict ideas or views, but to protect minors from harms to self-esteem and mental health caused by fixating on the number of "likes" they receive. SB976 § 1(c); *see also, e.g.*, 2-ER-233, 2-ER-243-44, 2-ER-247 (Radesky Decl. ¶¶ 53, 72-73, 88).[10] As described above, the Supreme Court has deemed the protection of the health and well-being of minors to be an important and compelling interest. *Supra* 43-44.  And the numeric-feedback default setting is narrowly tailored because the setting allows minors to access the content of any feedback they receive.

Nor does section 27002(b)(5)'s "private mode" default setting raise constitutional concerns. *Cf.* OB 42-44. That setting "requires covered entities to

---

[10] NetChoice suggests that the numeric-feedback default setting is content-based simply because it makes a distinction between classes or types of speech— here, between "shares" or "views." But that is wrong. The relevant question is whether the law makes distinctions based on idea, topic, or message, and SB976's numeric-feedback default setting does nothing of the sort. *See Project Veritas*, 125 F.4th at 950.

create a private mode setting that prevents users from viewing or responding to a child's posts unless that user is connected with the child on social media (such as becoming friends with the child on Facebook)." 1-ER-038. As the district court concluded, that default setting is "not particularly restrictive because [a] minor can still speak to any user she wishes to if that user requests to connect and the minor accepts," 1-ER-034, or if the minor initiates contact. Any burden on a minor's right to communicate, therefore, is no more than incidental. *See Sorrell*, 564 U.S. at 567. Moreover, even if the setting meaningfully burdened some speech, it remains constitutional. As the district court explained, the setting protects minors from being exploited by strangers online—an important and compelling interest—and it is narrowly tailored because it limits unsolicited interactions on minors' posts from strangers, while leaving minors free to communicate with anyone they wish. *See* 1-ER-034.

Contrary to NetChoice's argument, the "private mode" setting does not raise speaker-based concerns. The provision does not target any particular speaker and therefore cannot reflect a preference for any speaker or viewpoint. *See NIFLA*, 585 U.S. at 778. Nor is the provision inadequately tailored. Although NetChoice may be correct that the provision would restrict college recruiters or religious adherents from contacting minors unsolicited through platforms out of the blue, *see* OB 43, that is not dispositive. After all, platforms with addictive feeds surely are not the

only means by which such people can contact minors, if they need to—and in any event, the Supreme Court has upheld restrictions on unsolicited approaches that, like here, leave open the option for individuals to accept them if they wish. *See Hill v. Colorado*, 530 U.S. 703, 726-27 (2000).[11]

## V. SB976 IS NOT UNCONSTITUTIONALLY VAGUE BECAUSE IT CREATES REQUIREMENTS A REASONABLE PERSON WOULD UNDERSTAND

NetChoice next attacks SB976 from a different angle, arguing that it is unconstitutionally vague because potentially-regulated companies do not know whether they fall under its provisions. OB 53-55. The district court correctly rejected that argument. 1-ER-037-38. A statute is impermissibly vague only if it "fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015). The vagueness inquiry "does not require 'impossible standards of clarity.'" *Id.* If the statute is clear about what it prohibits "as a whole," it should be upheld. *Hill*, 530 U.S. at 733. And while content-based laws and criminal laws are of special concern, SB976 does not make content-based distinctions and is not enforced by criminal penalties. *Reno*, 521 U.S. at 872.

This Court should reject NetChoice's "vagueness" challenge. As an initial

---

[11] Any provision of SB976 that cannot be enforced may be severed pursuant to SB976's severability provision. *See* § 27007.

54

matter, "facial vagueness challenges are appropriate if the statute clearly implicates free speech rights," *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 (9th Cir. 2001)—a showing that NetChoice has not made, *see supra* 29-35. In any event, nothing about SB976 is unconstitutionally vague. NetChoice contends that the term "addictive feed" is vague because the statute's comprehensive definition of that term contains elements and exemptions that "potentially" conflict with one another. OB 53. To support this "potential[]" vagueness argument, NetChoice points to a concern supposed from Dreamwidth, one of its members, which apparently does not know whether its particular "reverse-chronological display of posts from people a user has affirmatively chosen to subscribe to" constitutes an "addictive feed." 3-ER-368-39 (Paolucci Decl. ¶ 12). As Dreamwidth reads SB976, its feed meets one of the exemptions to the "addictive feed" definition listed in the statute, but arguably does not meet another, separate exemption. *Id.*

Even assuming this concern is legitimate, a single instance of confusion cannot satisfy NetChoice's burden of proving that SB976 "reaches a *substantial amount* of constitutionally protected conduct." *Cal. Tchrs.*, 271 F.3d at 1149, n.7 (emphasis added). Regardless, Dreamwidth's concern is unfounded, because the plain terms of SB976 resolve the confusion. As the statute makes clear, a platform does not have an "addictive feed" within the meaning of the law so long as the platform meets *one* of the listed statutory exemptions. *See* § 27000.5(a) (providing

55

that the primary addictive feed definition will apply "unless *any* of the following conditions are met") (emphasis added). Thus, it does not matter if Dreamwidth's feed may reasonably be subject to one exemption but not another; the exemption that applies is the one that matters. Because the relationship between the "addictive feed" coverage definition and its exemptions is natural and self-evident, there is "nothing confusing about how the two interact," 1-ER-038, and the district court's order should be affirmed.

NetChoice separately contends that SB976 is void for vagueness because it uses terms like "significant part" and "primary purpose" in its definition of an "addictive feed." OB 54. To be sure, SB976 uses those terms: A platform is governed by SB976 if it provides "an addictive feed as a significant part of [its] service," § 27000.5(b)(1), and a feed is exempted if the platform "operates a feed for the primary purpose of cloud storage," § 27000.5(b)(2)(B). But NetChoice cites no precedent from this Court holding that such terms are impermissibly vague. Indeed, this Court has repeatedly upheld similar terms. *See Cal. Tchrs.*, 271 F.3d at 1153-54 (citing cases rejecting vagueness challenges to terms such as "reasonably believe" and ""unreasonably interfere"). As the Supreme Court has put it, there is no reason to "doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." *Johnson v. United States*, 576 U.S. 591, 604 (2015). That SB976 does not provide a

mathematical metric for determining whether its requirements apply does not render it unconstitutional; it is enough that it "give[s] a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013)).

## VI. NETCHOICE LACKS ASSOCIATIONAL STANDING TO RAISE AS-APPLIED CLAIMS BECAUSE PARTICIPATION FROM ITS MEMBERS IS REQUIRED

This Court should also affirm the district court's evaluation and rejection of NetChoice's claim of associational standing. NetChoice must make "a clear showing" of standing at the preliminary injunction stage. *LA All. for Hum. Rts. v. Cnty. of L.A.*, 14 F.4th 947, 956 (9th Cir. 2021). An association lacks standing to represent its members if its claims "require[] the participation of [its] individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). And a claim requires individual participation of members if it is "not common to the entire membership, nor shared by all in equal degree," *Warth v. Seldin*, 422 U.S. 490, 515 (1975), thereby "requir[ing] an 'ad hoc factual inquiry' for each member," *Ass'n of Christian Schs. Int'l v. Stearns*, 678 F. Supp. 2d 980, 986 (C.D. Cal. 2008), *aff'd*, 362 F. App'x 640 (9th Cir. 2010).

Here, NetChoice does not have standing to bring as-applied First Amendment claims on behalf of its membership. To properly resolve such as-applied claims, the Court would need to evaluate how (if at all) SB976 burdens the speech of each NetChoice member. *See supra* 32-35. That inquiry would necessarily require the

57

participation of each individual member. NetChoice's membership is not identically situated: YouTube's feed does not operate exactly like Facebook's feed, and neither of those feeds operate exactly like those of NextDoor, Pinterest, X, or other NetChoice member platforms. As NetChoice's own declarant explained, "[e]ach website makes unique decisions about how to organize, display, moderate, and disseminate content." 3-ER-309 (Cleland Decl. ¶ 7). Given these acknowledged differences, the district court correctly found that each NetChoice member must "participate in this lawsuit, at the very least for the purpose of conducting discovery into how each of those members' feeds work." 1-ER-037.

That need for individualized discovery is what distinguishes this case from those upon which NetChoice relies. OB 56. In two of those cases, the need for some "limited" participation by members was excused because the claims centered on one set of allegations, the proof of which vindicated all of the plaintiff association's members at once. *Borrero v. United Healthcare of N.Y.*, 610 F.3d 1296, 1306 (11th Cir. 2010); *Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.,* 627 F.3d 547, 552-53 (5th Cir. 2010). In another, the court found associational standing because the plaintiff association sought to undo two agreements that permitted certain hunting practices across an entire state. *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 936-37 (9th Cir. 1987). There are no similar "silver bullets" in this case; the only way to resolve

NetChoice's as-applied claims is to determine the First Amendment impact of SB976 on *each* member's unique platform—a particularized, fact-intensive inquiry that defeats associational standing.

## VII. NETCHOICE FAILS TO ESTABLISH THAT THE REMAINING INJUNCTION FACTORS WARRANT EXTRAORDINARY RELIEF

Not only has NetChoice failed to show that—on the current record—it is likely to succeed on the merits of the claims it now asserts on appeal, it has also failed to show that it is entitled to relief under the remaining preliminary injunction factors. *See DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011). For example, NetChoice has not established that it will suffer irreparable harm in the absence of additional injunctive relief. NetChoice points only to costs it claims it will incur in complying with SB976. *See* OB 58. But "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *see N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 1047 (D. Mont. 2020). That principle protects "the government's interest in being free to regulate without undue concern about onerous liabilities." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 206 (3d Cir. 1990).

Moreover, NetChoice's alleged costs are too conclusory and speculative to credit. *See Goldie's Bookstore, Inc. v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984). One declarant speaks of "costly," "difficult," and "resource intensive"

compliance measures, without once substantiating those costs or describing the measures that platforms will actually have to take to comply with SB976. 3-ER-315 (Cleland Decl. ¶¶ 28, 29). In fact, the record suggests that compliance with SB976's requirements can be accomplished with technology already in use. 2-ER-140 (Egelman Decl. ¶¶ 50, 51). Indeed, some platforms already offer users choices concerning how to algorithmically curate their feeds. 2-ER-140 (*id.* ¶ 51). And SB976's default-setting requirements similarly are feasible given that many platforms already allow parents to set the design of their children's user interface or configure basic privacy controls. 2-ER-141-42 (*id.* ¶ 53).

The equities and public interest likewise balance in favor of denying NetChoice further injunctive relief. Enjoining additional provisions of SB976 would prevent the government from pursuing its compelling public interest in protecting children's health. *See Sable*, 492 U.S. at 126. And it would inflict irreparable harm on California by preventing enforcement of a statute enacted by the people's elected representatives. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

## CONCLUSION

The district court's denial in part of NetChoice's motion for a preliminary injunction should be affirmed.

Dated:  February 27, 2025       Respectfully submitted,

                 */s/ Christopher J. Kissel*

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
LARA HADDAD
  *Supervising Deputy Attorney General*
JENNIFER E. ROSENBERG
SHIWON CHOE
CHRISTOPHER J. KISSEL
  *Deputy Attorneys General*

61

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-146

I am the attorney or self-represented party.

**This brief contains** 13,951 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Christopher J. Kissel **Date** February 27, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                    *Rev. 12/01/22*

## STATEMENT OF RELATED CASES

The Attorney General is not aware of any related cases.


Dated:  February 27, 2025                    */s/ Christopher J. Kissel*

# CERTIFICATE OF SERVICE

Case Name:  **NetChoice v. Bonta**          No.   **25-146**

I hereby certify that on <u>February 27, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## ANSWERING BRIEF

I certify that **all** participants in the case are registered ACMS/ECF users and that service will be accomplished by the ACMS/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 27, 2025</u>, at Los Angeles, California.

|  |  |
|---|---|
| J. Sissov | */S/ J. Sissov* |
| Declarant | Signature |

SA2025300276
67459509.docx