# 25-146

## United States Court of Appeals for the Ninth Circuit

NETCHOICE, LLC,

*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as Attorney General of California,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California

**BRIEF FOR STATES OF NEW YORK, ARIZONA, ARKANSAS, COLORADO, CONNECTICUT, DELAWARE, IDAHO, ILLINOIS, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OKLAHOMA, OREGON, RHODE ISLAND, SOUTH DAKOTA, TEXAS, UTAH, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA, AS AMICI CURIAE IN SUPPORT OF APPELLEE AND IN AFFIRMANCE**

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
KWAME N. AKOSAH
  *Assistant Solicitor General*
    *of Counsel*
(*Additional counsel listed on signature pages.*)

LETITIA JAMES
  *Attorney General of New York*
  *State of New York*
Attorney for Amici Curiae States in
Support of Appellee
28 Liberty Street
New York, New York 10005
(212) 416-8025

Dated: March 6, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................ii

INTRODUCTION AND INTEREST OF AMICI CURIAE ....................... 1

ARGUMENT ........................................................................................... 5

POINT I

States Have Taken Urgent Action to Protect Minors
From Mental Health Harms Caused by Social Media ................... 5

POINT II

The District Court Correctly Denied NetChoice's
Motion for a Preliminary Injunction ........................................... 15

    A.   The Addictive Feed Requirement Does Not Regulate
Expressive Conduct. .............................................................. 16

    B.   The Challenge to the Age Assurance Requirement Is
Not Ripe for Judicial Review. ................................................ 21

    C.   A Trade Organization Cannot Assert As-Applied
Challenges to the Addictive Feed and Age Assurance
Requirements. ....................................................................... 27

CONCLUSION ...................................................................................... 30

i

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Alaska Fish & Wildlife Fed. & Outdoor Council, Inc. v. Dunkle,*
    829 F.2d 933 (9th Cir. 1987) .................................................................. 29

*American C.L. Union v. Reno,*
    31 F. Supp. 2d 473 (E.D. Pa. 1999) ..................................................... 24

*Ashcroft v. American C.L. Union,*
    542 U.S. 656 (2004) ....................................................................... 24, 26

*Association of Am. Med. Colls. v. United States,*
    217 F.3d 770 (9th Cir. 2000) ................................................................. 21

*Association of Irritated Residents v. EPA,*
    10 F.4th 937 (9th Cir. 2021) ................................................................. 21

*Colwell v. Department of Health & Hum. Servs.,*
    558 F.3d 1112 (9th Cir. 2009) ........................................................... 21-22

*Computer & Commc'ns Indus. Ass'n v. Paxton,*
    747 F. Supp.3d 1011 (W.D. Tex. 2024) ................................................. 12

*Hunt v. Washington State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ....................................................................... 27, 29

*International Union, United Auto., Aerospace & Agric.*
    *Implement Workers of Am. v. Brock,*
    477 U.S. 274 (1986) .............................................................................. 27

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ................................................... 4, 16, 18-19, 28

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) .............................................................................. 17

*Reno v. American C.L. Union,*
    521 U.S. 844 (1997) .............................................................................. 24

ii

**Cases**                                                            **Page(s)**

*Smith v. Helzer,*
   95 F.4th 1207 (9th Cir. 2024) ............................................... 16

*Stormans, Inc. v. Selecky,*
   586 F.3d 1109 (9th Cir. 2009) .............................................. 22

*Turner Broad. Sys., Inc. v. FCC,*
   512 U.S. 622 (1994) ............................................................ 20

*Warth v. Seldin,*
   422 U.S. 490 (1975) .........................................................27-28

**Laws**

Ch. 321, § 1, 2024 Cal. Legis. Info. ...................................... 5

Ark. Code § 4-88-1402 ............................................................ 10

Cal. Health & Safety Code
   § 27000.5....................................................................16-17
   § 27001......................................................................16, 22
   § 27006......................................................................16, 22

Colo. Rev. Stat.
   § 6-1-1308.5 .................................................................. 10
   § 6-1-1601 ..................................................................... 11

Del. Code Ann. tit. 6, § 1204C ............................................... 12

Fla. Stat.
   § 501.1736.................................................................... 13
   § 1003.02...................................................................... 13

Ga. Code Ann. § 39-6-2 .......................................................... 13

La. Stat. Ann. § 51:1752 ......................................................... 13

Minn. Stat. § 325M.33 ............................................................ 11

Miss. Code Ann. § 45-38-7 ...................................................... 13

**Laws**                                                            **Page(s)**

N.Y. Gen. Bus. Law § 1501 ...................................................... 11

Ohio Rev. Code Ann. § 1349.09 ............................................... 13

Or. Rev. Stat. § 646A.578 ........................................................ 12

Tenn. Code Ann. § 47-18-5703 ............................................... 13

Tex. Bus. & Com. Code Ann.
   § 509.002 ............................................................................ 12
   § 509.051 ............................................................................ 12
   § 509.051 et seq. ................................................................. 12
   § 509.052 ............................................................................ 12

Utah Code Ann.
   § 13-71-201 ........................................................................ 11
   § 13-71-203 ........................................................................ 11

**Bills & Resolutions**

Assemb. Res. 167, 220th Legis. (N.J. 2022) ........................... 13

S.B. 976, 2024 Senate (Cal. 2024) ............................................. 1

S. Res. 249, 103d Gen. Assemb. (Ill. 2023) ............................. 13

**Miscellaneous Authorities**

Age Verification Providers Ass'n, *NEEDEMAND*,
   https://avpassociation.com/member/needemand/ ............................... 25

Amy Orben et al., *Windows of Developmental Sensitivity to
   Social Media*, 13 Nature Commc'ns 1 (Mar. 2022),
   https://www.nature.com/articles/s41467-022-29296-3 ......................... 8

## Miscellaneous Authorities            Page(s)

Arvind Narayanan, *Understanding Social Media Recommen-*
*dation Algorithms*, Knight First Amend. Inst. at Colum. Univ.
(2023), https://s3.amazonaws.com/kfai-documents/documents/
4a9279c458/Narayanan---Understanding-Social-Media-
Recommendation-Algorithms_1-7.pdf ..................................6-7, 17, 20

Barbara Ortutay, *States Sue Meta Claiming Its Social*
*Platforms Are Addictive and Harm Children's Mental*
*Health*, Associated Press (Oct. 24, 2023),
https://apnews.com/article/instagram-facebook-
children-teens-harms-lawsuit-attorney-general-
1805492a38f7cee111cbb865cc786c28................................................. 15

Common Sense Media, *The Common Sense Census: Media Use*
*by Tweens and Teens* (2021),
https://www.commonsensemedia.org/sites/default/files/resear
ch/report/8-18-census-integrated-report-final-web_0.pdf ................... 6

Electronic Privacy Info. Ctr. (EPIC), *Age Assurance* (n.d.),
https://epic.org/issues/platform-accountability-
governance/age-assurance/ ................................................................. 16

Emily A. Vogels et al., Pew Rsch. Ctr., *Teens, Social Media and*
*Technology 2022* (Aug. 10, 2022),
https://www.pewresearch.org/internet/2022/08/10/teens-
social-media-and-technology-2022/ ...................................................... 6

Erica Finkle, *Bringing Age Verification to Facebook Dating*,
Meta (Dec. 5, 2022), https://about.fb.com/news/
2022/12/facebook-dating-age-verification/ ......................................... 26

Google, Press Release, *New Digital Protections for Kids, Teens*
*and Parents* (updated Feb. 13, 2025),
https://blog.google/technology/families/google-new-built-in-
protections-kids-teens/........................................................................ 26

**Miscellaneous Authorities**                                                    **Page(s)**

Grace Holland & Marika Tiggemann, *A Systematic Review of the Impact of the Use of Social Networking Sites on Body Image and Disordered Eating Outcomes*, 17 Body Image 100 (June 2016), https://www.sciencedirect.com/science/article/abs/pii/S1740144516300912?via%3Dihub ................................ 9

Holly Scott et al., *Social Media Use and Adolescent Sleep Patterns: Cross-Sectional Findings from the UK Millennium Cohort Study*, 9 BMJ Open 1 (2019), https://pubmed.ncbi.nlm.nih.gov/31641035/ .......................................... 9

*Introducing New Ways to Verify Age on Instagram*, Instagram (June 23, 2022), https://about.instagram.com/blog/announcements/new-ways-to-verify-age-on-instagram .............. 23, 26

Jean M. Twenge & W. Keith Campbell, *Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychiatric Q. 311 (Mar. 11, 2019), https://pubmed.ncbi.nlm.nih.gov/30859387/ ......................................... 8

Kira E. Riehm et al., *Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth*, JAMA Psychiatry (Sept. 11, 2019), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2749480 .......................................................................................... 9

Letter from Att'ys Gen. to Mark Zuckerberg, Chief Exec. Officer, Facebook, Inc. (May 10, 2021), https://www.naag.org/wp-content/uploads/2021/05/NAAG-Letter-to-Facebook-Final-1.pdf ........................................... 14

Letter from Att'ys Gen. to Matthew Penarczyk, Head of Legal, Americas, TikTok, Inc., & Michael O'Sullivan, Gen. Counsel, Snapchat (Mar. 28, 2022), https://www.naag.org/wp-content/uploads/2022/03/NAAG-Final-Letter-Parental-Control-App.pdf ...................................................................... 14

## Miscellaneous Authorities                                   Page(s)

Letter from Att'ys Gen. to U.S. Senate Comm. on Commerce,
Sci., & Transp. (Oct. 4, 2021), https://www.naag.org/wp-
content/uploads/2021/10/Final-NAAG-Letter-to-Senate-
Subcommittee-on-Consumer-Protection-Product-Safety-and-
Data-Security.pdf .............................................................. 14

Luca Braghieri et al., *Social Media and Mental Health*, 112
Am. Econ. Rev. 3,660 (2022),
https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20211218 ............... 9

Mackenzie Austin & Max Levy, *Speech Certainty: Algorithmic
Speech and the Limits of the First Amendment*,
77 Stan. L. Rev. 1 (2025)..................................................... 20

Maria T. Maza et al., *Association of Habitual Checking
Behaviors on Social Media with Longitudinal Functional
Brain Development*, JAMA Pediatrics (Jan. 3, 2023),
https://jamanetwork.com/journals/jamapediatrics/fullarticle/
2799812 ......................................................................... 8

Melissa G. Hunt, *No More FOMO: Limiting Social Media
Decreases Loneliness and Depression*, 37 J. of Soc. & Clinical
Psych. 751 (2018), https://www.researchgate.net/publication/
328838624_No_More_FOMO_Limiting_Social_Media_Decrea
ses_Loneliness_and_Depression ............................................. 9

Monica Anderson & Michelle Faverio, Pew Rsch. Ctr., *81% of
U.S. Adults – Versus 46% of Teens – Favor Parental Consent
for Minors to Use Social Media* (Oct. 31, 2023),
https://www.pewresearch.org/short-reads/2023/10/31/81-of-
us-adults-versus-46-of-teens-favor-parental-consent-for-
minors-to-use-social-media/#:~:text=Most%20U.S.%20adults
%20(81%25),on%20these%20platforms%20(69%25)......................... 25

Nat'l Acads. of Scis., Eng'g, & Med., *Social Media and
Adolescent Health* (2024),
https://nap.nationalacademies.org/catalog/27396/social-
media-and-adolescent-health ................................................ 8

**Miscellaneous Authorities**                                    **Page(s)**

Natasha Singer, *At Meta, Millions of Underage Users Were an 'Open Secret,' States Say*, N.Y. Times (Nov. 25, 2023), https://www.nytimes.com/2023/11/25/technology/instagram-meta-children-privacy.html ............................................................... 6

Noah Apthorpe et al., *Online Age Gating: An Interdisciplinary Evaluation* (Aug. 1, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4937328 ......... 22

Ofcom, *Guidance on Highly Effective Age Assurance* (Jan. 16, 2025), https://www.ofcom.org.uk/siteassets/resources/documents/consultations/category-1-10-weeks/statement-age-assurance-and-childrens-access/part-3-guidance-on-highly-effective-age-assurance.pdf?v=388809 ........................................................ 22

Ofcom, *Statement: Age Assurance and Children's Access* (Jan. 16, 2025), https://www.ofcom.org.uk/siteassets/resources/documents/consultations/category-1-10-weeks/statement-age-assurance-and-childrens-access/statement-age-assurance-and-childrens-access.pdf?v=388849 ............................................. 25

Office of the N.Y. State Att'y Gen. Letitia James, SAFE for Kids Act, Advanced Notice of Proposed Rulemaking Pursuant to New York General Business Law Section 1500 et seq. (Aug. 1, 2024), https://ag.ny.gov/sites/default/files/2024-08/safe-forkidsact.pdf ................................................................... 11

Office of the N.Y. State Att'y Gen., Press Release, *Attorney General James Sues TikTok for Harming Children's Mental Health* (Oct. 8, 2024), https://ag.ny.gov/press-release/2024/attorney-general-james-sues-tiktok-harming-childrens-mental-health ............................................... 3, 15

Qing Huang et al., *Exploring Stress and Problematic Use of Short-Form Video Applications Among Middle-Aged Chinese Adults: the Mediating Roles of Duration of Use and Flow Experience*, Int'l J. Env't Rsch. & Pub. Health (2021), https://pubmed.ncbi.nlm.nih.gov/35010389/ ......................................... 7

**Miscellaneous Authorities**                                    **Page(s)**

U.S. Surgeon Gen., Advisory, *Social Media and Youth Mental Health* (2023), https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf ........................... 5, 7-8

W. Nicholson Price II & Arti K. Rai*, Clearing Opacity Through Machine Learning*, 106 Iowa L. Rev. 775 (2021) ............................ 21

Yao Qin et al., *Flow Experience Is a Key Factor in the Likelihood of Adolescents' Problematic TikTok Use: the Moderating Role of Active Parental Mediation*, Int'l J. Env't Rsch. & Pub. Health (2023), https://pubmed.ncbi.nlm.nih.gov/36767464/ ........................................ 7

Yoti, *Everything You Need to Know About Our Facial Age Estimation Technology* (Oct. 14, 2022), https://www.yoti.com/blog/facial-age-estimation-faq-frequently-asked-questions/ .............................................................. 26

Yvonne Kelly et al., *Social Media Use and Adolescent Mental Health: Findings from the UK Millennium Cohort Study*, 6 eClinicalMedicine 59 (Jan. 4, 2019), https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370(18)30060-9/fulltext .................................................... 10

**INTRODUCTION AND INTEREST OF AMICI CURIAE**

Amici curiae are the States of New York, Arizona, Arkansas, Colorado, Connecticut, Delaware, Idaho, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Rhode Island, South Dakota, Texas, Utah, Vermont, Washington, and the District of Columbia. Amici submit this brief in support of defendant-appellee, the Attorney General of the State of California, in this action seeking declaratory and injunctive relief against the enforcement of a California statute that protects minors from social media addiction and its associated mental health harms by limiting social media platforms' use of data about minors to develop the algorithmic processes that lead to addictive use of social media. The U.S. District Court for the Northern District of California (Davila, J.) denied in part plaintiff's motion for a preliminary injunction, and this is plaintiff's appeal from that ruling.

Amici States have a strong interest in defending the ruling that permits California to continue enforcing the law at issue here, entitled the Protecting Our Kids from Social Media Addiction Act (S.B. 976, 2024 Senate (Cal. 2024)). Amici States have enacted laws to address the youth

mental health crisis caused by minors' excessive use of social media. For example, the State of Arkansas has enacted a law that requires social media companies to obtain parental consent before allowing minors to gain access to their platforms. The State of Colorado enacted a law that requires social media companies to obtain parental consent before allowing minors to access features that are designed to significantly extend use of a social media platform. The State of Minnesota has enacted a law requiring social media platforms to report on their practices for limiting excessive social media use. The State of New York has enacted a law to protect minors from social media addiction by restricting platforms' use of minors' data to create addictive social media feeds. The State of Utah enacted a law requiring social media platforms to determine which of their users are minors and to implement safeguards on minors' accounts.

Amici have also enacted laws to protect minors online. For example, the State of Delaware has enacted a law prohibiting online targeted advertising to minors. The State of Oregon has enacted a law requiring online service providers to obtain consent before processing teenaged users' data for profiling or targeted advertising. The State of Texas has enacted a

law requiring social media platforms to determine the age of their users and obtain parental consent before collecting data on minor users.

Amici are also bringing actions against social media platforms for practices that are harmful to children. For example, amici the States of Arizona, Colorado, Connecticut, Delaware, Idaho, Illinois, Maryland, Michigan, Minnesota, New Jersey, New York, North Carolina, Oregon, Rhode Island, and South Dakota, have sued Meta for collecting data on users under thirteen without obtaining parental consent.[1] Amici the District of Columbia and the States of Illinois, Massachusetts, New Jersey, New York, North Carolina, Oregon, Vermont, and Washington have sued TikTok based on the platform's use of addictive features that have led to poor mental health outcomes for minors.[2] Accordingly, amici have an especially strong interest in explaining why plaintiff-appellant NetChoice, a social media trade association, has failed to meet its burden to show

---

[1] Compl., *Arizona v. Meta Platforms, Inc.*, No. 4:23-cv-05448 (N.D. Cal. Oct. 24, 2023), ECF No. 1.

[2] Office of the N.Y. State Att'y Gen., Press Release, *Attorney General James Sues TikTok for Harming Children's Mental Health* (Oct. 8, 2024). (For sources available online, URLs appear in the Table of Authorities. All websites were last visited March 6, 2025.)

3

that S.B. 976's addictive feed and age assurance requirements should be enjoined.

*First*, the district court correctly found that NetChoice failed to meet the heightened factual standard set forth in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) which requires plaintiffs to produce a detailed factual record explaining how each social media platform's covered processes are expressive in nature. Here, NetChoice has not provided any facts establishing how the algorithmic processes regulated by S.B. 976 create constitutionally protected expression. Nor can NetChoice make that showing because S.B. 976 specifically regulates social media processes that do not "implement [a] human being['s] inherently expressive choice." *Id.* at 745-46 (Barrett, J., concurring).

*Second*, NetChoice's challenge to S.B. 976's age assurance requirement is not ripe for judicial review because those provisions do not take effect until after California implements the law through rulemaking in or before 2027. Thus, NetChoice asks this Court to make a determination, as a matter of law, that no potential methods for age assurance can satisfy the First Amendment—a determination that this Court cannot make.

4

*Finally*, NetChoice's as-applied challenge fails because as-applied claims require deep factual inquiries into how each challenger's algorithmic processes create (or do not create) an expressive product. NetChoice cannot possibly bring such challenges as a trade group; instead, any such challenge must be brought by a specific covered platform.

## ARGUMENT

### POINT I

### STATES HAVE TAKEN URGENT ACTION TO PROTECT MINORS FROM MENTAL HEALTH HARMS CAUSED BY SOCIAL MEDIA

California enacted the Protecting Our Kids from Social Media Addiction Act (S.B. 976) to protect minors from the harmful mental effects of social media by regulating the algorithmic processes that fuel addiction.[3] The use of social media presents a well-documented and profound risk to minors' mental health and overall well-being.[4] Minors spend a substantial amount of time on social media. Ninety-five percent of minors

---

[3] *See* Ch. 321, § 1, 2024 Cal. Legis. Info. (S.B. 976's legislative findings).

[4] U.S. Surgeon Gen., Advisory, *Social Media and Youth Mental Health* (2023).

5

ages thirteen to seventeen use social media, with more than a third reporting that they use it "almost constantly."[5] Fifty-four percent of users in this age group say that it would be hard to stop using social media.[6] More than a third of children ages eight to twelve have used social media, and nearly twenty percent report using it daily, which is itself a staggering statistic considering that the largest social media applications have terms and conditions that supposedly prohibit children under age thirteen from having accounts.[7]

In recent years, social media companies have adopted sophisticated machine learning algorithms that have made social media more addictive for minors. These algorithms vary by platform but are consistent in that they leverage user data to create an often endless feed of online media that is tailor-made for each user.[8] By leveraging massive amounts of data

---

[5] Emily A. Vogels et al., Pew Rsch. Ctr., *Teens, Social Media and Technology 2022* (Aug. 10, 2022).

[6] *Id.*

[7] *See* Common Sense Media, *The Common Sense Census: Media Use by Tweens and Teens* 5 (2021); Natasha Singer, *At Meta, Millions of Underage Users Were an 'Open Secret,' States Say*, N.Y. Times (Nov. 25, 2023).

[8] *See* Arvind Narayanan, *Understanding Social Media Recommendation Algorithms* 18-22, Knight First Amend. Inst. at Colum. Univ. (2023).

on how users behave on the platform, these automated algorithmic processes create a feed of media designed to trigger an intense sense of pleasure and satisfaction in any given user,[9] triggering the brain's "reward center."[10] These processes also reduce user effort to remain engaged with the feed as much as possible, creating a mental "flow state" that makes users more likely to lose track of time,[11] and induce users to stay on the platform as long as possible at the expense of all other considerations.[12] Minors are particularly susceptible to these addictive patterns because

---

[9] *See id.*

[10]  U.S. Surgeon Gen., *supra*, at 9.

[11]  *See* Yao Qin et al., *Flow Experience Is a Key Factor in the Likelihood of Adolescents' Problematic TikTok Use: the Moderating Role of Active Parental Mediation*, Int'l J. Env't Rsch. & Pub. Health at 1, 14 (2023).

[12]  *See* Qing Huang et al., *Exploring Stress and Problematic Use of Short-Form Video Applications Among Middle-Aged Chinese Adults: the Mediating Roles of Duration of Use and Flow Experience*, Int'l J. Env't Rsch. & Pub. Health, at 11-12 (2021); Yao Qin et al., *supra*, at 3 ("[S]ocial media satisfy users' psychological needs through an intrinsic reward mechanism. When users perceive benefits, they might continue to be immersed in the process of using, which creates a closed loop of pleasure and eventually leads to problematic online behaviors.").

an individual's brain is still developing an ability to regulate time management, attention, and impulse control well into their early twenties.[13]

The more time minors spend on social media the more likely they will experience a decrease in life satisfaction, with the most significant effects demonstrated in preteenagers and young teenagers.[14] According to one study, twelve- to fifteen-year-olds who spent more than three hours per day using social media significantly increased their risk of poor

---

[13] *See* U.S. Surgeon Gen., *supra*, at 5 ("Frequent social media use may be associated with distinct changes in the developing brain in the amygdala (important for emotional learning and behavior) and the prefrontal cortex (important for impulse control, emotional regulation, and moderating social behavior), and could increase sensitivity to social rewards and punishments."); *see also* Maria T. Maza et al., *Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development*, JAMA Pediatrics (Jan. 3, 2023); *see also* Nat'l Acads. of Scis., Eng'g, & Med., *Social Media and Adolescent Health* 51 (2024) ("As children approach adolescence, their brains reach adult size, but they continue neurobiological maturation during the teen years into the mid to late twenties.").

[14] Amy Orben et al., *Windows of Developmental Sensitivity to Social Media*, 13 Nature Commc'ns 1, 5 (Mar. 2022); *see also* Jean M. Twenge & W. Keith Campbell, *Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychiatric Q. 311, 327 (Mar. 11, 2019).

mental health outcomes, including symptoms of depression and anxiety.[15] The introduction of a major social media platform caused a nine percent increase in depression and a twelve percent increase in anxiety, over baseline, in a study of college-aged users.[16]

Conversely, studies have shown that a reduction in the use of social media can improve mental health. For example, reducing social media use to ten minutes per day had a significant positive impact on well-being, decreasing symptoms of loneliness and depression.[17] Extensive use of social media is also correlated with unhealthy behaviors in minors, including disordered eating and unhealthy sleep patterns,[18] and negative

---

[15] *See* Kira E. Riehm et al., *Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth*, JAMA Psychiatry (Sept. 11, 2019).

[16] *See* Luca Braghieri et al., *Social Media and Mental Health*, 112 Am. Econ. Rev. 3,660, 3,674-75 (2022).

[17] Melissa G. Hunt, *No More FOMO: Limiting Social Media Decreases Loneliness and Depression*, 37 J. of Soc. & Clinical Psych. 751, 763 (2018); *see also* Braghieri, *supra*, at 3,663.

[18] Grace Holland & Marika Tiggemann, *A Systematic Review of the Impact of the Use of Social Networking Sites on Body Image and Disordered Eating Outcomes*, 17 Body Image 100, 108 (June 2016); Holly Scott et al., *Social Media Use and Adolescent Sleep Patterns: Cross-Sectional Findings from the UK Millennium Cohort Study*, 9 BMJ Open 1, 4-7 (2019).

9

outcomes, including online harassment, low self-esteem, and poor body image.[19]

In recent years, amici States have enacted bills to address the harms caused by minors' excessive social media use. For example, amicus the State of Arkansas has enacted the Social Media Safety Act, which requires social media platforms to verify the age of users and obtain parental consent before allowing minors to gain access to the platform. *See* Ark. Code § 4-88-1402(a)-(c).[20] Amicus the State of Colorado enacted S.B. 24-041, a law that requires social media platforms to obtain parental consent before providing a minor user with a feature that is designed "to significantly increase, sustain, or extend a minor's use of the" platform. Colo. Rev. Stat. § 6-1-1308.5 (effective October 1, 2025).[21] Amicus the

---

[19] *See* Yvonne Kelly et al., *Social Media Use and Adolescent Mental Health: Findings from the UK Millennium Cohort Study*, 6 eClinicalMedicine 59 (Jan. 4, 2019).

[20] In August 2023, the U.S. District Court for the Western District of Arkansas preliminarily enjoined the Act. Mem. Op. & Order, *NetChoice, LLC v. Griffin,* No. 5:23-cv-05105 (W.D. Ark. Aug. 31, 2023), ECF No. 44. NetChoice's summary judgment motion is currently pending with the court.

[21] Colorado also enacted H.B. 24-1136, which requires social media platforms to provide minor users with notifications informing such users

(*continued on the next page*)

State of Minnesota has enacted a law requiring social media platforms to report on how they limit "excessive" social media use, including details about how the platforms' practices impact "time spent on the platform." Minn. Stat. § 325M.33(1), (3). Amicus the State of New York enacted the Stop Addictive Feeds Exploitation for Kids Act, a law that, like S.B. 976, requires social media platforms to obtain parental consent before allowing a minor user to access addictive social media features, and further requires platforms to determine whether a user is a minor or an adult.[22] Amicus the State of Utah enacted a law requiring social media platforms to implement an age assurance system and provide safeguards that limit the amount of time minors spend on the platform. Utah Code Ann. §§ 13-71-201, -203.

Amici States have also enacted laws restricting social media platforms' collection of minor users' data. Amicus the State of Delaware

---

about the mental health impacts of social media. Colo. Rev. Stat. § 6-1-1601 (effective January 1, 2026).

[22] N.Y. Gen. Bus. Law § 1501(1). New York's law will take effect after the New York State Attorney General develops and promulgates implementing regulations—a process that is currently ongoing. Office of the N.Y. State Att'y Gen. Letitia James, SAFE for Kids Act, Advanced Notice of Proposed Rulemaking Pursuant to New York General Business Law Section 1500 et seq. (Aug. 1, 2024).

11

has enacted a law prohibiting online services from using minors' personal information for targeted advertising. Del. Code Ann. tit. 6, § 1204C. Amicus the State of Oregon enacted a law prohibiting online service providers, including social media platforms, from gathering teenage users' data "for the purposes of targeted advertising" and "profiling" without obtaining prior consent. Or. Rev. Stat. § 646A.578(2)(c). Amicus the State of Texas enacted the Securing Children Online Through Parental Empowerment Act, Tex. Bus. & Com. Code Ann. § 509.051 et seq., a law that requires online service providers, including social media platforms, *id.* § 509.002(1), to "register" the age of their users and obtain parental consent before collecting data on minor users. *Id.* §§ 509.051, 509.052.[23]

In addition, Florida, Georgia, Louisiana, Mississippi, Ohio, and Tennessee have adopted measures requiring social media platforms to obtain parental consent before allowing minors to access certain social media features, or measures requiring platforms to determine or estimate

---

[23] In August 2024, the U.S. District Court for the Western District of Texas enjoined several provisions of the Act. *Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp.3d 1011 (W.D. Tex. 2024). An interlocutory appeal is pending in the Fifth Circuit. *Computer & Commc'ns Indus. Ass'n v. Paxton*, No. 24-50721 (5th Cir.).

the age of their users.[24] Some of the above-mentioned States and others have adopted measures restricting social media access in schools,[25] and calling on Congress to pass legislation addressing social media addiction and parental consent.[26]

In addition to enacting these laws, States have pursued both advocacy and enforcement actions to protect minors from harms caused by social media. For example, in 2021, forty States, three territories, and the District of Columbia urged Meta to abandon its plans to launch a

---

[24] Fla. Stat. § 501.1736(2), (3)(a) (prohibiting account creation for minors under fourteen years of age and requiring parental consent for accounts for minors of fourteen or fifteen years of age); Ga. Code Ann. § 39-6-2(a)-(c) (requiring "commercially reasonable efforts" to verify the age of accountholders and prohibiting accounts for minors without parental consent); La. Stat. Ann. § 51:1752(A)-(B) (similar); Miss. Code Ann. § 45-38-7 (prohibiting account creation for minors without parental consent); Ohio Rev. Code Ann. § 1349.09 (requiring platforms to obtain parental consent before allowing users under sixteen to create accounts); Tenn. Code Ann. § 47-18-5703 (requiring platforms to verify the age of accountholders and prohibit accounts for minors without parental consent).

[25] *E.g.*, Fla. Stat. § 1003.02(1)(g).

[26] *E.g.*, S. Res. 249, 103d Gen. Assemb. (Ill. 2023) (Amicus Illinois passed a resolution urging federal legislation on harmful social media algorithms); Assemb. Res. 167, 220th Legis. (N.J. 2022) (Amicus New Jersey passed a resolution urging federal legislation on parental consent and social media).

13

version of Instagram for children under thirteen.[27] The following year, forty-three States and territories sent a letter to TikTok and Snapchat urging them to make their platforms compatible with widely used parental control mechanisms and to implement stronger parental controls on their platforms.[28] And forty-eight States, three territories, and the District of Columbia expressed support for the U.S. Senate's 2021 investigation of the impact of Facebook's and Instagram's algorithms on minors' mental health.[29]

In 2023, a bipartisan coalition of thirty-three States filed a federal lawsuit against Meta, the owner of the Facebook and Instagram platforms. The States allege that Meta knowingly designed and deployed features harmful to young users on those platforms, and routinely collected data on users under thirteen without obtaining parental consent.[30] Nine States

---

[27] Letter from Att'ys Gen. to Mark Zuckerberg, Chief Exec. Officer, Facebook, Inc. (May 10, 2021).

[28] Letter from Att'ys Gen. to Matthew Penarczyk, Head of Legal, Americas, TikTok, Inc., & Michael O'Sullivan, Gen. Counsel, Snapchat (Mar. 28, 2022).

[29] Letter from Att'ys Gen. to U.S. Senate Comm. on Commerce, Sci., & Transp. (Oct. 4, 2021).

[30] Compl., *Arizona v. Meta Platforms, Inc.*, No. 4:23-cv-05448 (N.D. Cal. Oct. 24, 2023), *supra*.

14

filed similar individual lawsuits against Meta in their respective states' courts.[31] And in October 2024, a bipartisan coalition of fourteen States filed separate state-court lawsuits against TikTok alleging that the platform's addictive features lead to poor mental health outcomes for minors and that TikTok has misrepresented the effectiveness of its measures used to prevent these negative mental health outcomes.[32] All of these lawsuits are ongoing.

## POINT II

### THE DISTRICT COURT CORRECTLY DENIED NETCHOICE'S MOTION FOR A PRELIMINARY INJUNCTION

NetChoice asks this Court to reverse the district court's denial of a preliminary injunction with respect to two aspects of S.B. 976. First, the district court denied a preliminary injunction as to the requirement that social media platforms obtain parental consent before providing a known minor with an "addictive feed," defined as a social media feed that displays a piece of media based on "information provided by the [minor], or other-

---

[31] Barbara Ortutay, _States Sue Meta Claiming Its Social Platforms Are Addictive and Harm Children's Mental Health_, Associated Press (Oct. 24, 2023).

[32] Office of the N.Y. State Att'y Gen., Press Release, _supra_.

15

wise associated with the [minor's] device," Cal. Health & Safety Code § 27000.5(a); *id.* § 27001(a). Second, the district court denied a preliminary injunction as to the requirement that social media platforms conduct "age assurance," measures after relevant rulemaking is completed in January 2027, Cal. Health & Safety Code § 27001(a)(1)(B); *id.* § 27006(b).[33] Amici agree with California's arguments in support of the district court's ruling and write to emphasize three points.

## A.    The Addictive Feed Requirement Does Not Regulate Expressive Conduct.

A predicate to any First Amendment claim is a showing that the challenged state action regulates speech or expressive conduct. *See Smith v. Helzer*, 95 F.4th 1207, 1214 (9th Cir. 2024). Here, there is no basis to conclude, as NetChoice urges (*see* Br. for Pl.-Appellant (Br.) at 24-39), that S.B. 976's addictive feed requirement "unduly burden[s] expression," *Moody v. NetChoice, LLC*, 603 U.S. 707, 725 (2024).

---

[33] "Age assurance is an umbrella term for a wide range of methods used to determine, estimate, or communicate the age of an online user. Age verification is a type of age assurance that evaluates age with a high level of certainty, while age estimation is the process of categorizing an individual within an age range, or over or under a certain age." Electronic Privacy Info. Ctr. (EPIC), *Age Assurance* (n.d.).

16

The law, on its face, does not regulate the "message[s]" or "ideas" expressed in a social media feed. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quotation marks omitted). Rather, the addictive feed requirement applies only when a social media platform places "media"—of any kind—in a user's feed "based, in whole or in part, on information provided by [that] user, or otherwise associated with [that] user." Cal. Health & Safety Code § 27000.5(a). By focusing on how the platforms use automated processes that rely on "information" to display "media," *id.*, the requirement works to limit only how platforms can leverage users' "[b]ehavioral data" to create "engagement optimization" algorithms that lead to the addictive behavioral patterns that harm children.[34]

The law also ensures users do not lose any access to media on the social media platform. For example, platforms can serve any media that is responsive to a user's affirmative conduct, either because the user "expressly and unambiguously requested" that media, *id.* § 27000.5(a)(4), or because the media is responsive to a user's search request, *id.* § 27000.5(a)(2).

---

[34] *See* Narayanan, *supra*, at 35; see *supra* at 6-8.

17

NetChoice offers no evidentiary support for its argument that S.B. 976 prevents its members (that is, social media platforms) from conveying their "views and priorities." *See* Br. at 33-34 (quotation marks omitted). For example, YouTube's declaration asserts that its "recommendation systems" are intended to ensure that users see "the highest quality" content on the platform (*see* Pl.-Appellant's Excerpts of Record (E.R.) 325), but S.B. 976 does not prohibit the removal or prioritization of content based on the media's quality or subject matter. Nor does S.B. 976 prevent social media platforms from enforcing their preferred "content moderation" policies, including those that "prevent harmful or objectionable speech from reaching users." (*See* E.R. 284, 329, 354.)

NetChoice is similarly wrong to argue (Br. at 27, 32-33) that social media feeds are categorically entitled to First Amendment protections. To the contrary, the Supreme Court in *Moody* made clear that it was *not* opining as to whether every feature of a social media feed was expressive; rather, the Court held solely that the content moderation practices at issue were subject to First Amendment protection. *See* 603 U.S. at 737 & n.9, 740. Indeed, eight justices in *Moody* expressed skepticism about the claim that the algorithmic processes that generate a social media feed

18

necessarily involve expressive activity. Five justices in the majority drew a distinction between content moderation processes—which they viewed as inherently expressive—and algorithmic processes that "respond solely to how users act online." *Id.* at 736 & n.5, 737.[35] With respect to the latter, the majority observed that such algorithmic processes do not necessarily involve expression because they only provide "the content [users] appear to want, without any regard to independent content standards," *id.* at 736 n.5; *see also id.* at 745-46 (Barrett, J., concurring) (noting that algorithmic processes do not necessarily "implement [a] human being['s] inherently expressive choice."). And three concurring Justices expressed even more skepticism about the expressive nature of algorithmic processes, noting that purely algorithmic decision-making, including the content moderation practices at issue, may not be as "equally [as] expressive as the decisions made by humans." *Id.* at 795 (Alito, J., concurring, joined by Thomas & Gorsuch, JJ.).

---

[35] The majority opinion was written by Justice Kagan, and joined in full by Chief Justice Roberts and Justices Sotomayor, Kavanaugh, and Barrett. Justice Jackson joined certain parts of the majority opinion.

Indeed, there is little evidence to indicate that algorithmic processes necessarily implement a person's judgment about "the ideas and beliefs deserving of expression" on the social media platform. *Cf. Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). Rather, these processes look for patterns in users' behavioral data to make a prediction about which media will keep a user "engaged" on the platform.[36] In performing these functions, the processes "writ[e] their own rules using complex math that gets executed automatically," and human beings do not "participate in the algorithm's fundamental task: determining the logic that shapes the algorithm's predictions." Mackenzie Austin & Max Levy, *Speech Certainty: Algorithmic Speech and the Limits of the First Amendment*, 77 Stan. L. Rev. 1, 42-43 (2025). As a result, algorithmic processes are effectively a "black box" in that the reasons for why they produce a particular output are so "complex" to be "incapable of human understanding." *Id.* at 60-61;

---

[36] *See* Narayanan, *supra*, at 22-24. For example, NetChoice member TikTok has represented in other litigation that its algorithmic processes "recommend[] videos to users based on content-neutral user and community behavior"; and that the "algorithm doesn't care about the content—it doesn't have an agenda. It doesn't qualitatively understand" the content it shows. Compl. ¶ 160, *Commonwealth v. TikTok Inc.*, No. 2484CV2638 (Super. Ct. Mass. Oct. 8, 2024), File Reference No. 1.

*see also* W. Nicholson Price II & Arti K. Rai, *Clearing Opacity Through Machine Learning*, 106 Iowa L. Rev. 775, 778-79 (2021) (describing the "black box" nature of machine learning algorithms).

## B.    The Challenge to the Age Assurance Requirement Is Not Ripe for Judicial Review.

The district court correctly found that NetChoice's challenge to the age assurance requirement was premature under the doctrine of prudential ripeness. (E.R. 13-19.) Prudential ripeness concerns (i) "the fitness of the issues for judicial decision" and (ii) "the hardship to the parties of withholding court consideration." *Association of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)). In cases against a government agency, courts consider whether the challenged action "is a definitive statement of an agency's position" and "has a direct and immediate effect on the complaining parties." *Association of Am. Med. Colls. v. United States*, 217 F.3d 770, 780 (9th Cir. 2000). To establish hardship sufficient to overcome a lack of prudential ripeness, a plaintiff must show that postponing review imposes a hardship "that is immediate, direct, and significant." *Colwell*

*v. Department of Health & Hum. Servs.*, 558 F.3d 1112, 1128 (9th Cir. 2009) (quotation marks omitted).

In enacting S.B. 976, the California Legislature provided a delayed effective date for the law's age assurance provisions to allow the California Attorney General to implement those provisions through rulemaking. Cal. Health & Safety Code § 27001(a)(1)(B); *id.* § 27006(b)-(c). The delayed effective date reflects the Legislature's determination that agency expertise is necessary to assess the rapidly evolving technological field of online age assurance, which currently includes, among other methods, facial age estimation, mobile-network operator age checks, credit card checks, and email-based age estimation.[37] Because the Attorney General's rulemaking process is ongoing, there is no "definitive statement" about which method for determining age may be required nor is there any "direct and immediate impact" on NetChoice's members. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (quotation marks omitted).

---

[37] Ofcom, *Guidance on Highly Effective Age Assurance* 6-8 (Jan. 16, 2025); *see also* Noah Apthorpe et al., *Online Age Gating: An Interdisciplinary Evaluation* 20-26 (Aug. 1, 2024) (unpublished manuscript).

22

As NetChoice's witness concedes (E.R. 335), the cost and time it takes to implement age assurance necessarily depends on the "complex-[ity]" of the method imposed and the "level of certainty" it requires. But S.B. 976 does not require any particular method of age assurance, nor does it specify the requisite level of certainty that a method should provide. Moreover, NetChoice provides no support for its contention (Br. at 49) that any age assurance method imposed in 2027 will necessarily require years of investment to implement. That contention is under-mined by the fact that one NetChoice member, Meta, already uses a variety of age assurance methods and technologies for Instagram in Brazil, India, Mexico, Canada, South Korea, Australia, Japan, and some countries in Europe.[38]

Contrary to NetChoice's view (*see* Br. at 45, 48), the Supreme Court has never held that online age assurance categorically violates the First Amendment. Instead, the Court has employed a fact-bound analysis that turns on the current state of the technology and whether a specific age assurance method can be feasibly implemented without overly burdening

---

[38] *Introducing New Ways to Verify Age on Instagram*, Instagram (June 23, 2022).

online speech. *See, e.g., Reno v. American C.L. Union*, 521 U.S. 844, 855-57 (1997); *Ashcroft v. American C.L. Union*, 542 U.S. 656, 671-72 (2004). In *Reno*, for example, the Court struck provisions of the Communications Decency Act of 1996 that criminalized online transmissions to minors that contain obscene or indecent content, subject to an affirmative defense for individuals that verified age using "a verified credit card" or "adult access code." *Reno*, 521 U.S. at 849, 859-60 & n.26 (quotation marks omitted). The Court observed that these methods for determining age online were infeasible because, in 1997, such methods were "effectively unavailable" or "prohibitively expensive" to implement. *Id.* at 856-57, 876-77 (quotation marks omitted).[39] But in this rapidly evolving field, there is no

---

[39] Similarly, in *Ashcroft*, the Court dealt with provisions of the Child Online Protection Act that imposed criminal penalties for posting online content that is "harmful to minors" and provided an affirmative defense for entities that verify age using methods such as "a credit card" or "any other reasonable measures that are feasible under available technology." 542 U.S. at 662 (quotation marks omitted). In granting a preliminary injunction and remanding for trial proceedings, the Court observed that "the Internet evolves at a rapid pace" and that the district court's findings about the feasibility of age verification technology, made five years earlier, may not "reflect [the] current technological reality." *Id.* at 671-72; *see also American C.L. Union v. Reno*, 31 F. Supp. 2d 473, 488 (E.D. Pa. 1999) (examining costs and technological feasibility of existing age verification technology), *aff'd sub nom.*, *American C.L. Union v. Mukasey*, 534 F.3d 181 (3d Cir. 2008).

24

basis for finding that the methods available today are similarly unavailable or prohibitively expensive.

NetChoice's argument ignores the fact that in the decades since the Supreme Court last considered age assurance technology in *Reno* and *Ashcroft*, the technological landscape has progressed exponentially, as firms compete for the increasing public support for methods to protect children from the harmful effects of social media.[40] For example, the firm Needemand provides a method to estimate an online user's age that utilizes a camera to trace the movements of the user's hand and forearms without the need to gather identifying biometric or personal information.[41] Meta, for example, already "rel[ies] on a combination of age assurance methods,"[42] including a service provided by the firm Yoti that can estimate age by scanning a user's face without retaining any information that can

---

[40] *See* Monica Anderson & Michelle Faverio, Pew Rsch. Ctr., *81% of U.S. Adults – Versus 46% of Teens – Favor Parental Consent for Minors to Use Social Media* (Oct. 31, 2023).

[41] Age Verification Providers Ass'n, *NEEDEMAND* (n.d.).

[42] Ofcom, *Statement: Age Assurance and Children's Access* 22 (Jan. 16, 2025).

identify that user.[43] According to Meta, "81% of people" who have verified their age for Facebook Dating "chose to use Yoti's" service.[44] Google announced that in 2025 the company will "begin testing a machine learning-based age estimation model in the U.S." that will help "estimate whether a user is over or under 18 so that [Google] can apply protections to help provide more age-appropriate experiences."[45] Given the "rapid pace" of change in this field, *Ashcroft*, 542 U.S. at 658, there is no basis to assume that California will inevitably fail to identify any age assurance technologies that can satisfy the First Amendment.

---

[43] Yoti, *Everything You Need to Know About Our Facial Age Estimation Technology* (Oct. 14, 2022); Instagram, *supra*.

[44] Erica Finkle, *Bringing Age Verification to Facebook Dating*, Meta (Dec. 5, 2022).

[45] Google, Press Release, *New Digital Protections for Kids, Teens and Parents* (updated Feb. 13, 2025).

### C.   A Trade Organization Cannot Assert As-Applied Challenges to the Addictive Feed and Age Assurance Requirements.

NetChoice lacks associational standing to assert its as-applied challenge to the addictive feed and age assurance requirements (*see* E.R. 382, 395), because the as-applied claims asserted "require[] the participation of individual members in the lawsuit," *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Specifically, the as-applied challenges at issue in this case do not raise a "pure question of law," *cf. International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986), but rather require "individualized proof" of "the fact and extent" of the First Amendment injury allegedly suffered by a particular social media platform based on its particular use of algorithmic feeds and age assurance mechanisms, *see Warth v. Seldin*, 422 U.S. 490, 515-16 (1975).

For example, NetChoice asserts that an unspecified number of its members are affected by S.B. 976's addictive feed and age assurance requirements (*see* E.R. 382, 395), but NetChoice provides declarations

27

about alleged effects only on Meta and Google (E.R. 318-337 (Google);[46] E.R. 338-363 (Meta))—and alleges no facts with respect to the other members of the association. The Meta and Google declarations offer no detail about how their algorithmic processes function and the impact, if any, that S.B. 976 would have on a given member's expressive activity. Nor can this Court assume without evidence from all as-applied challengers that the alleged First Amendment harms are "common to the entire membership" or "shared by all in equal degree," *Warth*, 422 U.S. at 515. Indeed, five Justices in *Moody* made clear their view that nothing less than a "process to process" and "platform to platform" factual analysis would suffice to determine the expressive nature of the algorithmic processes regulated. *Moody*, 603 U.S. at 747 (Barrett, J., concurring); *id.* at 749 (Jackson, J., concurring) (noting that courts must "carefully parse not only what entities are regulated, but how the regulated activities *actually function*"); *id.* at 766-67 (Alito, J., concurring).

Contrary to NetChoice's view (Br. at 56), the fact that NetChoice seeks only equitable relief does not obviate the need for individualized

---

[46] YouTube, a video-sharing platform, is owned by Google. (*See* E.R. 330.)

28

proof because associational standing requires a showing that that "*neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit*," *Hunt*, 432 U.S. at 343 (emphasis added). In any case, the injunctive relief requested likewise raises significant factual questions about which specific algorithmic services or NetChoice members would be covered by the injunction. In that sense, this case sharply contrasts with cases cited by NetChoice (Br. at 56) finding associational standing on the basis that the plaintiff organization sought generalized equitable relief that would benefit all members. *See, e.g., Alaska Fish & Wildlife Fed. & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 934-35, 938 (9th Cir. 1987).

## CONCLUSION

Based on the foregoing, and on the arguments of defendant-appellee the California Attorney General, this Court should affirm the district court's denial of plaintiff's motion for a preliminary injunction.

Dated:   New York, New York
         March 6, 2025

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Amicus Curiae


By:   __*/s/ Kwame N. Akosah*__
      KWAME N. AKOSAH
      Assistant Solicitor General

      BARBARA D. UNDERWOOD
        *Solicitor General*
      ESTER MURDUKHAYEVA
        *Deputy Solicitor General*
        *of Counsel*

      28 Liberty Street
      New York, NY 10005
      (212) 416-8025


*(Counsel listing continues on next page.)*

KRISTIN K. MAYES
  *Attorney General*
  *State of Arizona*
2005 North Central Avenue
Phoenix, AZ 85004

TIM GRIFFIN
  *Attorney General*
  *State of Arkansas*
323 Center Street, Suite 200
Little Rock, AR 72201

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway 10th Fl.
Denver, CO 80203

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 0610

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

*(Counsel listing continues on next page.)*

RAÚL LABRADOR
  *Attorney General*
  *State of Idaho*
700 W. Jefferson Street, Suite 210
P.O. Box 83720
Boise, ID 83720

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 S. LaSalle Street
Chicago, IL 60603

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of*
  *Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
408 Galisteo St.
P.O. Drawer 1508
Santa Fe, NM 87504

JEFF JACKSON
  *Attorney General*
  *State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

GENTNER DRUMMOND
  *Attorney General*
  *State of Oklahoma*
313 NE 21st Street
Oklahoma City, OK 73105

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

Marty J. Jackley
  *Attorney General*
  *State of South Dakota*
1302 E. Highway 14, Suite 1
Pierre, SD 57501

KEN PAXTON
  *Attorney General*
  *State of Texas*
P.O. Box 12548
Austin, TX 78711

DEREK BROWN
  *Attorney General*
  *State of Utah*
Utah Capitol Building
350 North State Street Suite 230
Salt Lake City, UT 84114

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-146

I am the attorney or self-represented party.

**This brief contains** 5,803 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Kwame N. Akosah   **Date** March 6, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 25-146

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Brief of Amici States in Support of Defendant-Appellee.

**Signature** | s/Kwame N. Akosah      **Date** | Mar 6, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                    *Rev. 12/01/2018*