No. 25-146

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

NETCHOICE, LLC,
  *Plaintiff-Appellant*,

v.

ROB BONTA,
IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF CALIFORNIA
  *Defendant-Appellee.*

———————————

On Appeal from the United States District Court for the
Northern District of California
No. 5:24-cv-07885-EJD
The Honorable Edward J. Davila

———————————

**BRIEF OF THE ELECTRONIC PRIVACY INFORMATION
CENTER, TECH JUSTICE LAW PROJECT, AND EIGHTEEN
LAW AND TECHNOLOGY SCHOLARS AND PRACTITIONERS
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE
AND AFFIRMANCE**

———————————

Megan Iorio
Tom McBrien
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140
iorio@epic.org

March 6, 2025          *Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amici curiae* the Electronic
Privacy Information Center and Tech Justice Law Project state that
they have no parent corporations and that no publicly held corporation
owns 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF AUTHORITIES.................................................................... iv

INTEREST OF THE *AMICI CURIAE* ...................................................... 1

SUMMARY OF THE ARGUMENT .......................................................... 5

ARGUMENT........................................................................................ 9

I.  SB 976's addictive feeds provision does not regulate expression ... 9

    A.  The *Moody* Court signaled only that social media companies' content moderation decisions may be expressive................... 9

    B.  The use of surveillance data to generate addictive feeds is not expressive ................................................................. 14

        i.  Engagement-maximizing algorithms generate feeds based on users' behavior, not the message or viewpoint of content ............................................................. 15

        ii.  Using engagement-maximizing algorithms is not an exercise of protected editorial discretion ...................... 17

        iii.  The use of machine learning to build engagement-maximizing algorithms further undermines the expressiveness of the algorithms' decisions.................. 23

        iv.  Engagement-maximizing algorithms are functional, not expressive, aspects of feed creation ......................... 27

II.  Even if SB 976's addictive feeds provision does regulate or incidentally impact expression, it is subject to and passes intermediate scrutiny...................................................................... 31

    A.  SB 976 is facially content-neutral......................................... 32

B.    SB 976 is content-neutral because it can be justified without
reference to the content of the regulated speech .................. 33

C.    SB 976 serves a significant government interest, is narrowly
tailored to that interest, and leaves open ample alternative
channels for expression ........................................................ 36

CONCLUSION ........................................................... 41

CERTIFICATE OF COMPLIANCE ....................................... 42

CERTIFICATE OF SERVICE ............................................. 43

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023)........................................................................ 11, 22
*Bernstein v. Dep't of Justice,*
  176 F.3d 1132 (9th Cir. 1999) ............................................................ 28
*Brown v. Ent. Merchants Ass'n,*
  564 U.S. 786 (2011)............................................................................ 23
*Burns v. Town of Palm Beach,*
  999 F.3d 1317 (11th Cir. 2021) ......................................................... 29
*Committee for Reasonable Regulation of Lake Tahoe v. Tahoe Regional
  Planning Agency,*
  311 F. Supp. 2d 972 (D. Nev. 2004) ................................................... 29
*Hill v. Colorado,*
  530 U.S. 703 (2000)............................................................................ 34
*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995)............................................................ 18, 21, 22
*Masterpiece Cakeshop v. Colorado Civil Rights Commission,*
  584 U.S. 617 (2018)............................................................................ 22
*Miami Herald Pub. Co. v. Tornillo,*
  418 U.S. 241 (1974)............................................................................ 18
*Moody v. NetChoice,*
  603 U.S. 707 (2024)................................................................... passim
*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California,*
  475 U.S. 1 (1986)................................................................................ 19
*Project Veritas v. Schmidt,*
  125 F.4th 929 (9th Cir. 2025)............................................... 32, 33, 34
*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)............................................................................ 32
*Sable Commc'ns of Cal., Inc. v. FCC,*
  492 U.S. 115 (1989)............................................................................ 36

iv

*TikTok Inc. v. Garland*,
    145 S. Ct. 57 (2025)................................................................. 34
*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994)........................................................ 19, 34
*United City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001)....................................... 27, 28, 29
*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)........................................................ 33, 39

## Statutes

Cal. Health & Safety Code § 1(b)................................................. 34
Cal. Health & Safety Code § 27000.5(a)................................... 14, 32, 33
Cal. Health & Safety Code § 27000.5(a)(1) ................................... 40
Cal. Health & Safety Code § 27000.5(a)(4) ................................... 39
Cal. Health & Safety Code § 27001(a)............................................ 33

## Other Authorities

Allison Gordon & Pamela Brown, *Surgeon General Says 13 is "Too
    Early" to Join Social Media*, CNN Health (Jan. 29, 2023)................. 39
American Library Ass'n, *Become a Librarian*........................................ 26
Arvind Narayanan, *Understanding Social Media Recommendation
    Algorithms*, The Knight First Amendment Institute at
    Columbia University (2023) ..................................... 15, 16, 40
Brett Frischmann & Evan Selinger,
    *Re-Engineering Humanity* (2018) .................................... 17, 20
Brett Frischmann & Susan Benesch, *Friction-in-Design Regulation as
    21st Century Time, Place, and Manner Restriction*,
    25 Yale J.L. & Tech. 376 (2023) ........................................ 32
Christopher G. Davis & Gary S. Goldfield, *Limiting Social Media Use
    Decreases Depression, Anxiety, and Fear of Missing Out in Youth with
    Emotional Distress: A Randomized Controlled Trial*, Am. Psych.
    Assoc. (Apr. 22, 2024) .................................................... 37
*Community Guidelines*, Facebook.com.................................... 10

v

Compl., *Massachusetts v. TikTok Inc. et al.*, No. 2484-cv-2638-BLS-1 (Mass. Sup. Ct. Feb. 3, 2025) ....................................................... passim

Gaia Bernstein, *Unwired: Gaining Control over Addictive Technologies* (2023) ................................................................... 36

Georgia Wells, Deepa Seetharaman & Jeff Horwitz, *Is Facebook Bad for You? It Is for About 360 Million Users, Company Surveys Suggest*, Wall St. J. (Nov. 5, 2021) ....................................................... 38

Jason Kohler, *Instagram 'Error' Turned Reels Into Neverending Scroll of Murder, Gore, and Violence*, 404Media (Feb. 27, 2025).................. 13

Kate Klonick, *The Facebook Oversight Board: Creating an Independent Institution to Adjudicate Online Free Expression*, 129 Yale L.J. 2418 (2020) .................................................... 10

Keach Hagey & Jeff Horwitz, *Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead*, Wall St. J. (Sep. 15, 2021) ... 25

Knight Georgetown Institute, *Better Feeds: Algorithms That Put People First* (2025) ............................................................. 20

Kyle Langvardt, *Crypto's First Amendment Hustle*, 16 Yale J.L. & Tech. 130 (2023) ........................................... 28

Mackenzie Austin & Max Levy, *Speech Certainty: Algorithmic Speech and the Limits of the First Amendment*, 77 Stan. L. Rev. 1 (2025) ...................................... 12, 13, 24

Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement,* Facebook (May 5, 2021) .................................. 31

Mattha Busby, *Social Media Copies Gambling Methods 'To Create Psychological Cravings,'* The Guardian (May 8, 2018) ........................ 35

Matthew B. Lawrence et al., *What Courts Are Asking Medicine About Social Media*, J. of the Am. Med. Ass'n (2025) .................................... 38

Monica Anderson, et al., *Teens, Social Media and Technology 2023*, Pew Research Ctr. (Dec. 11, 2023) ............................................ 38

Neil Richards & Woodrow Hartzog, *Against Engagement*, 104 Boston U. L. Rev. 1151 (2024) ...................................... 14, 16, 30, 35

Ravi Iyer, *Feed Algorithms Contain both Expressive and Functional Components*, USC Neely Center for Ethics and Technology (Dec. 10, 2024) ................................................................ 15, 17

Sam Schechner et al., *How Facebook Hobbled Mark Zuckerberg's Bid to Get America Vaccinated*, Wall St. J. (Sep. 17, 2021) .......................... 25

Tim Walker, *Facebook Whistleblower Frances Haugen: Educators, Students Can Lead on Social Media Reform*, NEA Today (Mar. 17, 2022) ................................................ 35

Tim Wu, *Machine Speech*, 161 U. Pa. L. Rev. 1495 (2013) ........ 18, 27, 30

Victoria Rideout & Michael B. Robb, Common Sense Media, *Social Media, Social Life: Teens Reveal Their Experiences* (2018) ................ 38

## INTEREST OF THE *AMICI CURIAE*

The Electronic Privacy Information Center ("EPIC") is a public interest research center in Washington, D.C., established in 1994 to focus on emerging privacy and civil liberties issues.[1] EPIC regularly participates as amicus in cases involving First Amendment challenges to reasonable platform regulations. *See* EPIC, *The First Amendment* (2025).[2]

The Tech Justice Law Project ("TJLP") is a legal initiative of Campaign for Accountability, a 501(c)(3) nonpartisan, nonprofit organization. TJLP works to ensure that legal and policy frameworks are responsive to emergent technologies and their societal effects.

The law and technology scholars and practitioners who join this brief are some of the foremost experts in data privacy, constitutional law, and the human impacts of technology:[3]

---

[1] Both parties consent to the filing of this brief. In accordance with Rule 29, the undersigned states that no party or party's counsel authored this brief in whole or in part nor contributed money intended to fund the preparation of this brief. No outside person contributed money intended to fund the preparation of this brief.

[2] https://epic.org/issues/platform-accountability-governance/the-first-amendment-and-platform-regulation/.

[3] Signatories list their affiliations for identification purposes only. The brief does not reflect the views of their institutions.

1

Susan Benesch
Executive Director, Dangerous Speech Project
Faculty Associate, Berkman Klein Center for Internet & Society
Harvard University

Gaia Bernstein
Technology Privacy and Policy Professor of Law
Co-Director, Institute for Privacy Protection
Co-Director Gibbons Institute for Law Science and Technology
Seton Hall University

Ryan Calo
Lane Powell & D. Wayne Gittinger Professor of Law
University of Washington

Danielle Keats Citron
Jefferson Scholars Foundation Schenck Distinguished Professor in Law
University of Virginia

Julie E. Cohen
Mark Claster Mamolen Professor of Law and Technology
Georgetown University

Brett M. Frischmann
Charles Widger Endowed University Professor in Law,
Business, and Economics
Villanova University

Woodrow Hartzog
Professor of Law
Boston University

Ravi Iyer
Managing Director
USC Marshall School Neely Center
Former Meta Product Manager

Jerry Kang
Ralph and Shirley Shapiro Distinguished Professor of Law
University of California Los Angeles

Jennifer King
Privacy and Data Policy Fellow
Stanford Institute for Human-Centered Artificial Intelligence

Kyle Langvardt
Associate Professor of Law and Schmid Professor for Excellence in
Research, 2024-25
University of Nebraska

Gregory P. Magarian
Thomas and Karole Green Professor of Law
Washington University in St. Louis

Roger McNamee
Author, Zucked: Waking Up to the Facebook Catastrophe

Neil M. Richards
Koch Distinguished Professor in Law
Washington University in St. Louis
Director, Cordell Institute for Policy in Medicine & Law

Olivier Sylvain
Professor of Law
Fordham University
Senior Policy Research Fellow, Knight First Amendment Institute at
Columbia University

Zephyr Teachout
Professor of Law
Fordham University

Ari Ezra Waldman
Professor of Law
University of California, Irvine

Shoshana Zuboff
Charles Edward Wilson Professor Emerita
Harvard Business School
Author, The Age of Surveillance Capitalism: The Fight for a Human
Future at the New Frontier of Power

## SUMMARY OF THE ARGUMENT

NetChoice asks this Court to issue a ruling that would radically break from First Amendment jurisprudence while harming users' privacy and their ability to control their online experiences. Courts must exercise caution when deciding how long-standing constitutional principles apply to new socio-technological systems, as the Supreme Court did in *Moody v. NetChoice*, 603 U.S. 707 (2024), and as Judge Davila did in his order below. The *Moody* Court was clear: some of the decisions social media companies make in generating feeds may be expressive, but other decisions may not be. Here, as in *Moody,* the Court must look at the specific activity SB 976 regulates and determine whether that activity is expressive. *Id.* at 724; *id.* at 748 (Jackson, J., concurring in part and concurring in the judgement).

SB 976's addictive feeds provision limits the categories of personal data social media companies can use to generate feeds for minors. The provision targets a particularly harmful and invasive method of feed generation called engagement maximization, which uses data collected through surveillance of user interactions with a platform to manipulate them into staying on the platform. The *Moody* Court

questioned whether use of these kinds of "algorithms [that] respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards," is expressive. *Moody*, 603 U.S. at 736 n.5. And for good reason.

The use of engagement-maximizing algorithms is very different than the content moderation practices the *Moody* Court recognized may be expressive. Content moderation involves companies removing and downranking content that violates their policies. These curatorial decisions are closely analogous to those long recognized as protected editorial judgement. Laws that override content moderation decisions may compel companies to publish messages and viewpoints they deem unfit to publish.

SB 976 does not force companies to publish messages they do not think are fit for publication, nor does it prevent them from publishing messages they wish to publish. The use of engagement-maximizing algorithms is unlike any exercise of editorial discretion recognized in precedent. It lacks any semblance of human knowledge, control, and intent to imbue any message or idea in the compilation. Engagement-maximizing algorithms do not select and arrange content based on a

6

company's judgment that the message is fit for publication. They are blind to the meaning of the media selected and how that meaning impacts the message sent by the overall compilation. The algorithm's choices are not intended to express any coherent message or reflect any cohesive theme. In fact, these algorithms often amplify messages that the companies claim they do not wish to publish at all. That is in large part because they are driven by the decisions of machines, not humans. And the machines don't know—and don't care—what messages they are selecting and amplifying.

Engagement maximization more resembles the functional activities that courts have recognized occur alongside expression. Because engagement maximization is not inextricably intertwined with content moderation, the state can regulate it without having an incidental impact on companies' expression.

Even if the addictive feeds provision directly or indirectly regulates expression, it is subject to, at most, intermediate scrutiny. The provision is content-neutral both on its face and in effect. The provision promotes the state's substantial interest in protecting minors' privacy and autonomy. SB 976 also leaves ample room for companies to

personalize feeds on their platforms—according to users' express preferences, not surveillance of their activities online. This type of personalization will enhance minors' autonomy and control of their online experiences, making it *more* likely that they see what they want to see on social media, not less.

## ARGUMENT

## I.    THE ADDICTIVE FEEDS PROVISION DOES NOT REGULATE EXPRESSION.

### A. The *Moody* Court signaled only that social media companies' content moderation decisions may be expressive.

In *Moody,* the Supreme Court signaled that a law compelling a social media company to publish what it would rather exclude restricts the company's exercise of editorial discretion. *See Moody*, 603 U.S. at 728. The process by which companies exclude or otherwise express disapproval of unwanted content is called content moderation. *Id.* at 719. Content moderation is similar to traditional editorial discretion because both involve a speech compiler deciding whether to include or exclude pieces of media based on how each piece would affect the overall message of the compilation. *Id.* at 731–32.

Content moderation begins with the leaders and employees of the social media company establishing content guidelines for the platform. These guidelines "list the subjects or messages the platform prohibits or discourages—say, pornography, hate speech, or misinformation on select topics." *Moody*, 603 U.S. at 719. Content guidelines are heavily laden with humans' value judgments about the semantic content of the

9

media, prohibiting media judged to be distasteful, low-quality, or irrelevant. *See, e.g.*, *Community Guidelines*, Facebook.com.[4] Algorithms are often used to filter and flag content, but humans also play an important role in enforcing moderation rules by reviewing user-reported content and reviewing algorithmic filtering decisions for errors. *See* Kate Klonick, *The Facebook Oversight Board: Creating an Independent Institution to Adjudicate Online Free Expression*, 129 Yale L.J. 2418, 2423 (2020). While content moderation may not be perfect, it reflects companies' conscious efforts to avoid publishing content they do not think is fit for publication.

The *Moody* Court signaled in dicta that content moderation can be protected editorial discretion. "When the platforms *use their Standards and Guidelines to decide* which third-party content those feeds will display, or how the display will be ordered and organized, they are making expressive choices." *Moody,* 603 U.S. at 740 (emphasis added). In the Court's view, a social media company, through content moderation systems, decides "whether—and, if so, how—to convey posts having a certain content or viewpoint," and "[t]hose choices rest on a set

---

[4] https://www.facebook.com/help/477434105621119/.

10

of beliefs about which messages are appropriate and which are not." *Id.* at 738. A company that does not want to spread pro-Nazi beliefs, say, acts expressively when excluding pro-Nazi media. A law that "direct[s] a company to accommodate messages it would prefer to exclude" thus infringes on the company's protected editorial discretion. *Id.* at 731.

The *Moody* Court saw their decision as a direct application of decades of Supreme Court precedent recognizing the rights of speech compilers to exclude messages and viewpoints they do not wish to carry. *See id.* at 728–33 (discussing the Court's editorial discretion precedent). The editorial discretion cases are themselves part of the Court's compelled speech precedent that prohibits the government from "coopt[ing] an individual's voice for its own purposes." *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023). They involve the government overriding a person's or group's knowing choice not to speak on a given topic or to express a specific viewpoint or message. To the extent that companies' content moderation decisions reflect the editorial

judgements of their leaders and employees, they fit squarely within this precedent.

But four justices in *Moody* signaled that companies' delegation of content moderation to machine learning algorithms may attenuate the expressiveness of moderation decisions—and no justice wrote to the contrary. Machine learning algorithms are inscrutable black boxes that create their own rules with limited guidance from their human creators. Mackenzie Austin & Max Levy, *Speech Certainty: Algorithmic Speech and the Limits of the First Amendment*, 77 Stan. L. Rev. 1, 39–43 (2025). It is not clear that humans exert sufficient control over the decision making of machine learning algorithms to treat the outputs as the humans' speech, *id.* at 42–43, 79–81, and it would be a shocking break from precedent to recognize that anything other than a human or a group of humans has First Amendment rights. As Justice Barrett wrote in her concurrence, "technology may attenuate the connection between content-moderation actions (e.g., removing posts) and human beings' constitutionally protected right" of expression. *Moody*, 603 U.S. at 746 (Barrett, J., concurring). She further noted, "If the AI relies on large language models to determine what is 'hateful' and should be

removed, has a human being with First Amendment rights made an inherently expressive 'choice . . . not to propound a particular point of view'?" *Id.*

The human creators of machine-learning algorithms are also not able to fully explain why the algorithms make any given decision nor to predict with any level of certainty what the algorithms will output in any given case. *See* Austin & Levy, *supra*, at 63–64. As Justice Alito observed, "[W]hen AI algorithms make a decision, even the researchers and programmers creating them don't really understand why the models they have built make the decisions they make. Are such decisions equally expressive as the decisions made by humans?" *Moody*, 603 U.S. at 795 (Alito, J., concurring in the judgement) (quotation marks and citations omitted). No court has ever ruled that a speaker engages in editorial expression when they compile speech using metrics that they can neither understand nor explain, *see* Austin & Levy, *supra* at 30–33, and whose output they cannot control and must frequently disavow, *see, e.g.*, Jason Kohler, *Instagram 'Error' Turned Reels Into Neverending Scroll of Murder, Gore, and Violence*, 404Media (Feb. 27, 2025) (summarizing Meta's apology for erroneously causing many users'

13

feeds to be filled with videos of humans and animals being violently killed).[5]

### B. The use of surveillance data to generate addictive feeds is not expressive.

SB 976 regulates social media companies' use of personal data to generate users' feeds. Cal. Health & Safety Code § 27000.5(a).[6] Social media companies do not use this personal data to moderate content but to fuel "engagement-maximizing algorithms" that extend usage of their products. Unlike content moderation algorithms, which evaluate the message or viewpoint of content to determine whether it violates a company's policies, engagement-maximizing algorithms evaluate *users* by measuring how likely it is the user will interact with a given piece of media, regardless of its message or viewpoint. *See* Neil Richards & Woodrow Hartzog, *Against Engagement*, 104 Boston U. L. Rev. 1151, 1154 (2024). Engagement maximization lacks every characteristic of protected editorial judgement, and their use is functional, not expressive.

---

[5] https://www.techpolicy.press/an-advocates-guide-to-automated-content-moderation/.
[6] All statutory citations are to the California Health and Safety Code unless otherwise noted.

### i. Engagement-maximizing algorithms generate feeds based on users' behavior, not the message or viewpoint of content.

Engagement-maximizing algorithms evaluate user behavior to maximize the probability that a specific user will interact with a specific piece of content. *See* Arvind Narayanan, *Understanding Social Media Recommendation Algorithms*, The Knight First Amendment Institute at Columbia University 20 (2023).[7] The company's goal is to determine what will keep each user engaging with the platform most, which maximizes the ad revenue the user generates for the company. *See* Ravi Iyer, *Feed Algorithms Contain both Expressive and Functional Components*, USC Neely Center for Ethics and Technology (Dec. 10, 2024)[8].

The primary fuel for engagement-maximizing algorithms is user behavioral data collected through surveillance, not explicit user feedback or the topic, meaning, or viewpoint of content. *See* Narayanan, *supra*, at 18. The behavioral data used by these algorithms can include

---

[7] https://s3.amazonaws.com/kfai-documents/documents/4a9279c458/Narayanan---Understanding-Social-Media-Recommendation-Algorithms_1-7.pdf.
[8] https://neely.usc.edu/2024/12/10/algorithms-contain-both-expressive-and-functional-components/.

likes, clicks, comments, time spent watching, time spent lingering, and other indications that a piece of content held a user's attention. *Id.* at 18–19; *e.g.*, Meta Decl. ¶ 12; Compl. ¶ 159, *Massachusetts v. TikTok Inc. et al.*, No. 2484-cv-2638-BLS-1 (Mass. Sup. Ct. Feb. 3, 2025) [hereinafter "TikTok Compl."].

To create the engagement-maximizing algorithm, social media companies use machine learning techniques to direct a computer to determine what combination of the surveillance data best predicts increased usage of the platform—what practitioners call "engagement." *See* Richards & Hartzog, *supra*, at 1162–63. The algorithm then constructs profiles of users from the surveillance data, uses these profiles to compare each user to other users, and shows users media that users with similar profiles engaged with heavily. *See* Narayanan, *supra*, at 22. It is thus the computer, and not humans, that determines the specific rules for what content to show to a given user and in what order.

In contrast to content moderation, which evaluates the message expressed by media and how that message will affect the feed's overall message, engagement-maximizing algorithms do not evaluate the

16

viewpoint, topic, or quality of media. The algorithms, according to at least one major social media company, are "content-neutral." TikTok Compl. ¶ 160. Companies use them not to shape a coherent message out of the media selected but to accomplish the functional task of inducing profitable user behavior. *See* Iyer, *supra*; *see generally* Brett Frischmann & Evan Selinger, *Re-Engineering Humanity* (2018). Any message goes—including content that violates the company's own policies—so long as it maximizes user engagement.

### ii. Using engagement-maximizing algorithms is not an exercise of protected editorial discretion.

The *Moody* Court recognized that engagement maximization is distinct from content moderation and that this distinction might be constitutionally salient. While laws overriding companies' content moderation decisions fall squarely within the Court's prior precedent on editorial discretion and compelled speech, the same is not true of laws that regulate the use of algorithms that "respond solely to how users act online." *Moody*, 603 U.S. at 736 n.5. As Justice Barrett wrote in her concurrence, "The First Amendment implications . . . might be different" for "a platform's algorithm [that] just presents automatically to each user whatever the algorithm thinks the user will like—e.g.,

17

content similar to posts with which the user previously engaged." *Id.* at 746 (Barrett, J., concurring).

Ruling in NetChoice's favor would be a substantial departure from the Supreme Court's editorial discretion jurisprudence. Companies' use of these algorithms lacks every characteristic of protected editorial discretion: knowledge and concern for the message expressed by the media; intent to send a message through decisions to include or exclude; and actually sending a coherent message to users.

The tentpole editorial discretion cases all involve the knowing selection or exclusion of a message, topic, speaker, or viewpoint. *See* Tim Wu, *Machine Speech*, 161 U. Pa. L. Rev. 1495, 1521, 1528 (2013) (noting "knowing selection" as a signature of expression). The parade organizers in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995), wanted to exclude a float because they thought its pro-LGBTQ message was inappropriate for an event celebrating Irish-American heritage. *Id.* at 562. The Miami Herald in *Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241 (1974), refused to publish a response from a political candidate whose viewpoint the paper did not think merited publishing. *Id.* at 256. And the power utility in *Pac. Gas & Elec. Co. v.*

18

*Pub. Utilities Comm'n of California*, 475 U.S. 1 (1986), did not want to include in its mailings to customers messages from a citizens rights group that would likely critique or contradict the views of the company. *Id.* at 12–13. Even the cable operators in *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994), knew something about the broadcasters and cable programmers they chose between and the kinds of content, messages, and viewpoints they carried. *Id.* at 636.

While social media companies' content moderation practices may "rest on a set of beliefs about which messages are appropriate and which are not," *Moody*, 603 U.S. at 738, and lead to decisions not to "convey posts having a certain content or viewpoint," *id.*, an engagement-maximizing algorithm does not evaluate the message, topic, viewpoint, or speaker of content when deciding whether to include it in a user's feed, and consequently does not use this information to determine what content to select. The algorithm "doesn't care about the content—it doesn't have an agenda. It doesn't qualitatively understand" the content it selects and ranks for users. TikTok Compl. ¶ 160; *see also* Knight Georgetown Institute, *Better Feeds: Algorithms That Put People*

19

*First* 12–13 (2025) (describing non-content signals to which engagement-maximizing algorithms respond).[9]

Another hallmark of the exercise of protected editorial discretion is the speaker sending (or avoiding sending) a particularized message through their decision to include or exclude something from their compilation. A social media company is not *trying* to send a message through its engagement-maximizing algorithm's selection and ranking decisions. Companies deploy engagement-maximizing algorithms with the sole aim of engineering a specific behavioral response in users— with no regard for the message that including or excluding the content sends to the user. *See* Frischmann & Selinger, *supra*.

Because companies do not intend to send any message when they use engagement-maximizing algorithms, they rarely advance any coherent message, and when they do, it is accidental. When a speaker selects third-party speech for inclusion in a compilation, the "overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the

---

[9] https://kgi.georgetown.edu/wp-content/uploads/2025/02/Better-Feeds_-Algorithms-That-Put-People-First.pdf.

whole." *Hurley,* 515 U.S. at 577. A feed's overall message should thus derive from the messages of the individual posts the algorithm selects, which "in the aggregate [] give the feed a particular expressive quality." *Moody*, 603 U.S. at 738. But because engagement-maximizing algorithms choose content for inclusion based purely on the probability that it will induce a user into staying on the platform, not on the message expressed by the content, the resulting compilations are often a hodge-podge of messages that lack a "common theme." *Hurley,* 515 U.S. at 576. The output is equivalent to a group of people walking together carrying a random assortment of signs with no collective purpose and no coherent message, theme, or viewpoint. Each participant in this walk may be engaged in expression through their individual signs and chants, but the *organizers* failed to craft any message through their decision making and selection process. And just as a parade or a protest without a message is "just motion," *Id.* at 569, feed personalization through engagement maximization is just an endless scroll.

The only potential message NetChoice claims that the use of engagement-maximizing algorithms might send is "this is the best mix

of content for [you]." Opening Br. at 34. But this message is not "distilled from the individual presentations along the way." *Hurley*, 515 U.S. at 577. It is just another way of saying that the feed is customized to each user.

What NetChoice seeks to protect is more akin to a tailor's seeking First Amendment protections for selling custom suits because the customization of the suit sends a message that "this is the best fit for you." The tailor, like the social media company, is merely providing a product to the customer's specifications. And just as a tailor would not enjoy a First Amendment defense from an unsatisfied customer, social media companies should not be protected by the First Amendment for providing a customized product to users.

Even in cases where the Court found a personalized product expressive, such as personalized websites, *303 Creative*, 600 U.S. at 587, and personalized cakes, *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617, 626 (2018), the message the Court found expressive was not "this is the best website for you" or "this is the best cake for you" but "this is a marriage I want to celebrate." When it comes to interactive video games, the personalization is not, itself, what

22

makes the game expressive: it is that the game creators "communicate ideas—and even social messages" through the game's features and storytelling mechanics. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011). All of these cases involve the communication of ideas in the speaker's own voice—something the decisions of engagement-maximizing algorithms lack.

### iii. The use of machine learning to build engagement-maximizing algorithms further undermines the expressiveness of the algorithms' decisions.

When engagement-maximizing algorithms are used to generate personalized feeds, humans are not in control of the rules for what to include and how to rank it. As discussed in Section I.B.i, companies that use machine learning to train engagement-maximizing algorithms give the computer a goal—maximize time spent on the platform—and a set of potential parameters, and let the machine make its own rules for what to include in a feed. The machine then executes the rules without human supervision. As a result, the human creators of the algorithm cede their ability to control, explain, understand, or predict the algorithm's output. *See Moody*, 603 U.S. at 795 (Alito, J., concurring in the judgement) (contrasting newspaper editors' expressive curation

23

with algorithms that "prioritize content based on factors that the platforms have not revealed and may not even know."); Austin & Levy, *supra*, at 63–64.

This undermines a claim to protected editorial discretion. In editorial discretion cases, the curator expresses themselves through the decision to publish or not publish something. If the social media company is delegating the decision-making process to an algorithm, it is not at all clear that the decision can be attributed to the humans in the company. That is why at least four justices and some scholars believe that the use of machine-learning algorithms may attenuate the expressiveness even of *content moderation* decisions that otherwise have all the hallmarks of editorial discretion. See *supra* Part I.A. The case for the expressiveness of *engagement maximization* using machine learning, then, is even weaker because such decision making lacks any characteristic of editorial discretion.

Clear evidence that engagement-maximizing algorithms do not reflect companies' editorial judgment is that they sometimes amplify media that violates the company's own content policies. This shows that the people in the company lack control over what messages and

24

viewpoints are selected by the algorithm. *See, e.g.,* Sam Schechner et al., *How Facebook Hobbled Mark Zuckerberg's Bid to Get America Vaccinated*, Wall St. J. (Sep. 17, 2021).[10] When platforms lack curatorial control they can hardly claim to be exercising editorial judgement. It would be as if the parade committee in *Hurley* delegated authority to choose parade units to a random unvetted third party, told them the only constraint was to choose participants whose banners were eye-catching, and then tried to claim the third party's curatorial decisions represented their own pro-Irish expression even when the third party placed a float defaming Irish people at the vanguard of the parade.

But analogies between the decision making of engagement-maximizing algorithms and that of humans will inevitably be strained because the way that engagement-maximizing algorithms make decisions is so alien to human decision making. Humans may consider their audience when making editorial choices, but unlike an engagement-maximizing algorithm, humans cannot and do not consider information about the audience in a vacuum, ignoring all information

_____

[10] https://www.wsj.com/articles/facebook-mark-zuckerberg-vaccinated-11631880296.

25

about the message, viewpoint, topic, or speaker of the content they recommend. Librarians, for instance, do not mindlessly recommend books to children simply because other children requested them. Librarians are trained professionals with advanced degrees in vetting and recommending books and periodicals. American Library Ass'n, *Become a Librarian*.[11] Their job is to know something about the expressive content of the materials they recommend before recommending them, just as it is the job of a lawyer to know the holding of a case they are citing before citing it. It is also impossible for a librarian to shield themselves from information about the materials they recommend. Even just the title of a book can give the librarian a good idea of its expressive content.

Librarians are a bad analogy to engagement-maximizing algorithms for another reason: the way a librarian gathers and uses information about a child is fundamentally different from how an engagement-maximizing algorithm gathers and uses personal data. A librarian does not surveil children. They do not trail a child around the library measuring how long the child's eyes dwelled on different book

---

[11] https://www.ala.org/educationcareers/libcareers/become.

covers, group that child with other library-goers whose eyes dwelled on similar covers, and then recommend a book to the child based on what those other library-goers checked out, no matter who the other library-goers were and without knowing anything about the book in question. If that were how librarians worked, their actions would rightly be condemned as invasive and subject to regulation.

### iv. Engagement-maximizing algorithms are functional, not expressive, aspects of feed creation.

Courts have long recognized that some communications "combin[e] nonspeech and speech elements, *i.e.,* functional and expressive elements." *United City Studios, Inc. v. Corley*, 273 F.3d 429, 451 (2d Cir. 2001). This "de facto functionality doctrine" allows the "state to regulate the functional aspects of the communication process, while protecting its expressive aspects." Wu, *supra* at 1496–97. Engagement-maximization is a functional aspect of feed creation. The algorithms organize an ocean of media into a single stream that keeps users on the platform. This functional aspect is not inextricably intertwined with content moderation, the expressive aspect of feed creation. The State

can regulate the use of engagement-maximizing algorithms without impacting content moderation.

When considering the distribution and use of computer code, courts have long focused on whether the law at issue regulates the expressive or the functional aspect of the code. *See* Kyle Langvardt, *Crypto's First Amendment Hustle*, 16 Yale J.L. & Tech. 130, 146 (2023). The distribution of code is expressive when the code is "meant to be read and understood by humans" and when it communicates the "scientific ideas" of the programmer to others. *Bernstein v. Dep't of Justice*, 176 F.3d 1132, 1142, 1145 (9th Cir. 1999), *reh'g granted, op. withdrawn*, 192 F.3d 1308 (9th Cir. 1999). A use of code is functional when the code is instead used to accomplish the task that the software was programmed to achieve. *Corley,* 273 F.3d at 451. For example, when a researcher distributes code to communicate to other researchers how to design an encryption algorithm, such a use of code is expressive. *Bernstein*, 176 F.3d at 1141. But when a person distributes encryption software to an end user to decrypt an encrypted file, that use is functional. *Corley*, 273 F.3d at 451, 454. If a law regulates a functional aspect of code, courts determine whether the regulation would have an

incidental impact on an expressive aspect of the code, and if so, subject the regulation to intermediate scrutiny. *See id.* at 454.

Similarly, courts have recognized that architecture combines both expressive and functional activities. *See, e.g., Committee for Reasonable Regulation of Lake Tahoe v. Tahoe Regional Planning Agency*, 311 F. Supp. 2d 972, 1005 (D. Nev. 2004) (noting that while a building project "may involve an intent to convey an artistic, political, or self-expressive message, the great majority [of building choices] are functional in nature and are not commonly associated with expression"). Whether a regulation of building practices triggers First Amendment scrutiny depends not on whether any aspect of building design is expressive (some of it surely is, such as the choice of Beaux-Arts or Brutalism) but on what aspect of the building process is being regulated and whether that aspect has the characteristics of expressive conduct. *See Burns v. Town of Palm Beach*, 999 F.3d 1317, 1335–43 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1361 (2022).

When social media companies use surveillance data to make curatorial decisions, they are not trying to—nor do they actually—send their own ideas or messages to the user. *See supra* Part I.B.ii.

Engagement-maximizing algorithms, instead, serve the functional purpose of organizing the media on a platform in a way that maximizes the amount of time users spend on the platform, which maximizes corporate profits. *See* Richards & Hartzog, *supra*, at 1162–63.

Even NetChoice essentially argues that feed personalization is functional, not expressive. They repeatedly describe feed personalization as a tool for users to organize the vast quantities of media posted to social media platforms. *See, e.g.*, Opening Br. 9–10, 33–34. Their characterization of engagement maximization as a tool reflecting user choice is disingenuous, as such feeds do not reflect—and often override—the actual preferences of users. *See, e.g.*, TikTok Compl. ¶ 265–72 (explaining how TikTok introduced a "Refresh" tool for users to reset their engagement data if they were unhappy with their feed, then decided to degrade the tool's effectiveness when users' fondness for it caused their engagement numbers to drop). But it is telling that, even in NetChoice's own view, the personalization of feeds is "primarily" a means to "facilitate the communications of another person, or to perform some task for the user"—the hallmarks of a functional, not expressive, aspect of communication. Wu, *supra*, at 1498, 1532–33.

30

While companies may combine content moderation with engagement-maximizing algorithms to create a single feed, regulation of the latter does not impact the former. The two are entirely separate processes. A company could re-engineer a feed to not use the surveillance data without changing their content moderation practices. *See* Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement,* Facebook (May 5, 2021) (discussing content moderation and engagement maximization as independent processes).[12] The feed would be just as expressive after that change because engagement maximization is not responsible for the curation's expressiveness— content moderation is.

## II.    EVEN IF SB 976 DOES REGULATE OR INCIDENTALLY IMPACT EXPRESSION, IT IS SUBJECT TO AND PASSES INTERMEDIATE SCRUTINY.

Even if SB 976's addictive feeds provision did burden expression, either directly or indirectly, it would be subject to, and pass, intermediate scrutiny. The law does not target particular topics or viewpoints: it places content-agnostic limits on narrow categories of personal data that can be processed to generate a feed. In other words,

---

[12] https://www.facebook.com/notes/751449002072082.

31

it is a content-neutral regulation of the manner in which feeds operate. *See generally* Brett Frischmann & Susan Benesch, *Friction-in-Design Regulation as 21st Century Time, Place, and Manner Restriction*, 25 Yale J.L. & Tech. 376 (2023). The law also protects a substantial government interest and leaves ample room for companies to personalize and express messages through feeds.

### A. SB 976 is facially content-neutral.

To assess whether a law is content-neutral, a court must first evaluate whether the law is facially content-neutral or, instead, whether it explicitly regulates speech based on the topic or viewpoint expressed. *Project Veritas v. Schmidt*, 125 F.4th 929, 950 (9th Cir. 2025) (en banc).

SB 976 is facially content-neutral because it does not regulate any category of content or viewpoint. It defines addictive feeds specifically in reference to the type of user data they process, § 27000.5(a), not "based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). If a company compiles speech for a known minor using prohibited categories of data, it will violate the law no matter what the individual pieces of media or the overall compilation express. *See §§*

32

27000.5(a); 27001(a). If a company does not use the regulated categories of personal information, then SB 976 does not apply, no matter what message the company expresses or how appealing the content is to users. The law is thus facially content-neutral.

### B. SB 976 is content-neutral because it can be justified without reference to the content of the regulated speech.

Even a facially content-neutral law can still be content-based if it "cannot be 'justified without reference to the content of the regulated speech.'" *Project Veritas*, 125 F.4th at 950 (quoting *Reed*, 576 U.S. at 164). The guiding principle for assessing content-neutrality is determining whether the government regulated speech based on its disagreement with the message the speech conveys. The Supreme Court has routinely emphasized that "'[t]he government's purpose' in regulating speech 'is the controlling consideration' in 'determining content neutrality.'" *Project Veritas*, 125 F.4th at 947 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791–92 (1989)). In other words, "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* (quoting *Hill v.*

33

*Colorado*, 530 U.S. 703 (2000)). The reason why the First Amendment is concerned with content-based restrictions on speech is the potential to "drive certain ideas or viewpoints from the marketplace," either by directly suppressing a certain viewpoint or by restricting "discussion of an entire topic." *Id.* at 949 (internal quotation marks and citations omitted).

SB 976's provisions can be justified without reference to the content of the regulated speech. The legislature's justification for SB 976 is content-neutral: regulating "addictive features . . . that pose a significant risk of harm to the mental health and well-being of children and adolescents." § 1(b). This justification "neither references the content of speech on [regulated entities] nor reflects disagreement with the message such speech conveys." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 68 (2025). To the extent SB 976 burdens speech at all, it is like the must-carry provisions in *Turner Broadcasting System v. FCC* that applied "only [to] the manner in which speakers transmit their messages to viewers, and not upon the messages they carry." 512 U.S. at 645. It is irrelevant to the statute whether a feed is rightwing or leftwing, filled with pop culture or metaphysics. What matters is

whether the feed uses specific categories of personal data in a specific way that leads to predictable, content-agnostic harms.

The legislature's justification is preventing the use of addictive design, not regulating compelling content. Social media companies have employed psychologists and borrowed techniques from the casino industry to induce over-use. *See* Richards & Hartzog, *supra*, at 1164; Mattha Busby, *Social Media Copies Gambling Methods 'To Create Psychological Cravings,'* The Guardian (May 8, 2018).[13] A whistleblower reported that "[k]ids say, 'I can't stop using this, but it makes me feel miserable.' . . . Facebook has built an addictive product." Tim Walker, *Facebook Whistleblower Frances Haugen: Educators, Students Can Lead on Social Media Reform*, NEA Today (Mar. 17, 2022).[14] Saying SB 976 regulates content because feeds' media can be enjoyable would be like saying gambling regulations are content-based because people enjoy the images of fruit on a slot machine.

---

[13] https://www.theguardian.com/technology/2018/may/08/social-media-copies-gambling-methods-to-create-psychological-cravings.
[14] https://www.nea.org/nea-today/all-news-articles/facebook-whistleblower-frances-haugen-educators-students-can-lead-social-media-reform.

**C. SB 976 serves a significant government interest, is narrowly tailored to that interest, and leaves open ample alternative channels for expression.**

SB 976 passes intermediate scrutiny because promoting minors' physical and mental health is a significant state interest, the law narrowly regulates specific data management and design practices that lead to over-use, and the law leaves open many channels for personalized delivery of the same media over social media channels.

The protection of children's health is a well-established state interest. *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). States have long regulated products that induce over-use in children such as tobacco, gambling, and junk food. *See* Gaia Bernstein, *Unwired: Gaining Control over Addictive Technologies* 47–78 (2023). Regulating addictive features fits within this constitutionally accepted tradition.

Over-use of social media harms children by interfering with core life activities such as sleeping, exercising, and socializing. Disruption of these core life activities causes myriad harmful effects. A randomized controlled trial that limited social media usage to one hour per day showed that reducing social media use leads to "significant

improvements in well-being, and in particular in self-reported happiness, life satisfaction, depression, and anxiety." *See* Christopher G. Davis & Gary S. Goldfield, *Limiting Social Media Use Decreases Depression, Anxiety, and Fear of Missing Out in Youth with Emotional Distress: A Randomized Controlled Trial*, Am. Psych. Assoc. (Apr. 22, 2024).[15] TikTok's internal records show that compulsive usage of the platform causes disrupted sleep, depression, "increased loneliness," "loss of analytical skills, memory formation, contextual thinking, conversational depth, empathy, and increased anxiety." TikTok Compl. ¶ 7.

Evidence shows that companies' behavioral engineering tactics are ruthlessly effective, preventing minors from controlling the amount of time they spend on social media. Facebook's research showed that one out of eight users reported compulsive social media use that interfered with their sleep, work, and relationships. *See* Georgia Wells, Deepa Seetharaman & Jeff Horwitz, *Is Facebook Bad for You? It Is for About 360 Million Users, Company Surveys Suggest*, Wall St. J. (Nov. 5,

---

[15] https://psycnet.apa.org/buy/2024-76138-001 (last visited Sept. 18, 2024).

2021).[16] In the United States, 16 percent of teens say they use TikTok "almost constantly," and 17 percent of teens say the same about YouTube. Monica Anderson, et al., *Teens, Social Media and Technology 2023*, Pew Research Ctr. (Dec. 11, 2023).[17] A study found that 72 percent of teens believe that tech companies manipulate them to spend more time on their devices. Victoria Rideout & Michael B. Robb, Common Sense Media, *Social Media, Social Life: Teens Reveal Their Experiences* 15 (2018).[18] This level of evidence is sufficient to justify state action. *See* Matthew B. Lawrence et al., *What Courts Are Asking Medicine About Social Media*, J. of the Am. Med. Ass'n, at E1 (2025).

SB 976 is properly tailored because it targets a non-expressive component of feed construction that amplifies over-use. Social media over-use is significantly driven by engagement-maximizing algorithms. As TikTok's Head of Child Safety Policy admits: "The reason kids watch TikTok is because *the algo[rithm] is really good.*" TikTok Compl. ¶ 8.

---

[16] https://www.wsj.com/articles/facebook-bad-for-you-360-million-users-say-yes-company-documents-facebook-files-11636124681.

[17] https://www.pewresearch.Org/internet/2023/12/ll/teens-social-media-and-technology-2023/ (last visited Feb. 14, 2025).

[18] https://www.commonsensemedia.org/sites/default/files/research/report/2018-social-media-social-life-executive-summary-web.pdf.

(emphasis added). A 2023 U.S. Surgeon General report remarked that "pitting adolescents[']" "willpower to control how much time [they]'re spending . . . against" some of "the world's greatest product designers" is "just not a fair fight." Allison Gordon & Pamela Brown, *Surgeon General Says 13 is "Too Early" to Join Social Media*, CNN Health (Jan. 29, 2023).[19] The Act narrowly regulates the fuel for engagement-maximizing algorithms: personal data that does not reflect users' express preferences. Regulating engagement-maximizing algorithms that cause over-use serves the government's interest in protecting children's health "in a direct and effective way." *Ward*, 491 U.S. at 800.

The Act also leaves open ample alternative channels of communication for NetChoice's members to deliver information to minors through personal feeds and other information-delivery mechanisms. The Act allows companies to provide minors with personalized feeds that reflect the minors' own decisions about what authors, creators, and posters to follow. § 27000.5(a)(4). This type of personalization was the prevailing model of feed design until just a few

---

[19] https://www.cnn.com/2023/01/29/health/surgeon-general-social-media/index.html.

years ago. *See* Narayanan, *supra*, at 9, 40 (showing that major companies moved toward algorithmic content selection and sorting between 2016 and 2022). The Act also does not prohibit companies from organizing feeds based on their value judgements about content. Companies could provide curations of the best cat videos, or trending content, or breaking news. Companies could organize this content based on timeliness, i.e., in reverse chronological order, or they could order content based on media-specific metrics like popularity, virality, and controversiality because these metrics are based on aggregate data and not necessarily information "persistently associated with the user" and "concern[ing] the user's previous interactions with media." § 27000.5(a)(1). They could provide minors with multiple feed options that they can toggle between, which many covered entities already do, like X's "Following" and "For you." Companies can also allow users to combine the companies' and other posters' curations into personalized feeds. *See* § 27000.5(a)(4) (wherein the company would be considered a "poster"). Meanwhile, minors may still search for specific media and creators, share information through personal messages, and more.

40

In short, the "addictive" aspect of addictive feeds is just not necessary for companies to organize content in an expressive way or to personalize feeds for users.

## CONCLUSION

For the foregoing reasons, EPIC respectfully urges the Court to affirm the district court's order.

**Date:**        March 6, 2025              /s/ Megan Iorio
                                            Megan Iorio
                                            Tom McBrien
                                            ELECTRONIC PRIVACY
                                            INFORMATION CENTER
                                            1519 New Hampshire Ave. NW
                                            Washington, DC 20036
                                            (202) 483-1140

                                            *Attorneys for Amici Curiae*
                                            *Electronic Privacy Information Center,*
                                            *Tech Justice Law Project, and*
                                            *Eighteen Law and Technology*
                                            *Scholars and Practitioners*

41

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

**This brief contains 6,978 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Megan Iorio*        **Date:** March 6, 2025

## CERTIFICATE OF SERVICE

I certify that on March 6, 2025, this brief was e-filed through the CM/ECF System of the U.S. Court of Appeals for the Ninth Circuit. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

**Date:**     March 6, 2025          /s/ Megan Iorio
                                     Megan Iorio
                                     Tom McBrien
                                     ELECTRONIC PRIVACY
                                     INFORMATION CENTER
                                     1519 New Hampshire Ave. NW
                                     Washington, DC 20036
                                     (202) 483-1140

                                     *Attorneys for Amici Curiae*
                                     *Electronic Privacy Information Center,*
                                     *Tech Justice Law Project, and*
                                     *Eighteen Law and Technology*
                                     *Scholars and Practitioners*

43